UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SELWYN KARP and ETHAN TREISTMAN, | 16CV8216 |
| Plaintiffs, | Ci  JUDGE SHADUR |
| | MAG. JUDGE WEISMAN |
| -v.- | |
| HARRIS ASSOCIATES, L.P., | **COMPLAINT** |
| Defendant. | Jury Trial Demanded |

**FILED**

AUG 19 2016

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ............................................................................... 1

II.    JURISDICTION AND VENUE ......................................................................... 3

III.   PARTIES ............................................................................................................ 3

   A.   Plaintiffs ..................................................................................................... 3

   B.   Defendant .................................................................................................... 4

IV.    BACKGROUND:  THE PROBLEM OF "CAPTIVE" MUTUAL FUNDS, AND
       CONGRESS'S EVOLVING RESPONSE TO SUCH PROBLEMS VIA THE ICA ........ 5

   A.   Mutual Fund Organization and Operation .................................................. 5

   B.   The Unique Structure of the Mutual Fund Industry
        Makes Mutual Funds  "Captive" to their Investment Advisers .................. 6

   C.   The ICA, as Enacted in 1940, Sought to Limit Investment Advisers' Influence
        and Control over Captive Funds by Requiring Independent  Boards to Approve
        Fund Fees .................................................................................................... 8

   D.   The ICA's 1970 Amendments, Including Section 36(b), Were Intended
        to  *Decrease* the Deference Accorded to Board Evaluation and Approval
        of  Fund Fees, and *Increase* the Ability of Fund Shareholders to Challenge
        Excessive Fees .......................................................................................... 10

V.     THE FUNDS' ORGANIZATION AND OPERATIONS ................................. 13

   A.   Organization and Operation of the Funds ................................................ 13

   B.   Organization of the Oakmark Fund Complex ........................................... 17

VI.    HARRIS'S ORGANIZATION AND OPERATIONS ..................................... 20

   A.   Harris's Investment Advisory Products and Clients ................................ 20

      1.   The Oakmark Funds ............................................................................ 20

      2.   Arm's-Length Clients for Harris Investment Strategies ................... 20

      3.   Subadvised Funds ............................................................................... 21

      4.   Other Products and Clients ................................................................ 22

   B.   Harris's Investment Advisory Process ..................................................... 22

VII.   THE SERVICES HARRIS PROVIDED, AND THE FEES HARRIS CHARGED,
       TO THE FUNDS ............................................................................................. 27

   A.   The Services Provided by Harris to the Funds under the IAAs ............... 28

      1.   Portfolio Selection Services ............................................................... 28

      2.   Other Services .................................................................................... 38

   B.   The Advisory Fee Rates Charged by Harris to the Funds under the IAAs ....... 41

VIII.  HARRIS EXTRACTED EXCESSIVE FEES FROM THE FUNDS ............... 44

   A.   Comparative Fee Structures ..................................................................... 44

ii

1. Harris Provided Arm's-Length Clients with Substantially Similar Investment Advisory Services at Substantially Lower Advisory Fee Rates.................... 45

    a)     Advisory Services .................................................................................. 45

    b)     Advisory Fees ....................................................................................... 57

2. Harris Provided Subadvised Funds with Substantially Similar Investment Advisory Services at Substantially Lower Advisory Fee Rates.................... 63

    a)     Advisory Services .................................................................................. 65

    b)     Advisory Fees ....................................................................................... 78

3. Mutual Funds Whose Size, Character and Investment Strategy are Comparable to the Funds Paid Lower Advisory Fees for Similar Investment Advisory Services ...... 81

    a)     The Oakmark Fund .............................................................................. 82

    b)     The Income Fund ................................................................................. 83

    c)     The International Fund........................................................................... 85

    d)     Results and Conclusions ....................................................................... 86

4. The Board Performed Similar Comparisons Yielding Similar Factual Results (but Different Conclusions) ............................................................................ 87

B.    Economies of Scale.................................................................................... 89

1. General Allegations: Economies of Scale, Their Role in Excessive Fees, and the Use of Breakpoints to Address these Matters .......................................... 89

2. The Funds' Growth Generated Significant Economies of Scale that Harris Largely Monopolized.................................................................. 92

    a)     The Economies of Scale Generated by the Funds' Growth ..................... 94

    b)     Harris Monopolized the Benefits of the Funds' Economies of Scale .................... 98

    c)     Breakpoints in the Funds' Advisory Fee Rate Schedules did Not Operate to Share any Meaningful Portion of Such Benefits with the Funds and/or the Funds' Shareholders..................................... 100

    d)     Comparison of the Funds' Fee Breakpoints with those Obtained by Harris's Arm's-Length Clients Provides Further Indication of the Breakpoints' Inefficacy ...................................................... 105

C.    The Nature and Quality of Services Provided to the Funds' Shareholders .................... 107

1.    The *Nature* of the Services Harris Provided to the Funds .......................... 107

2.    The *Quality* of the Services Harris Provided to the Funds .......................... 107

D.    The Profitability of the Funds to the Advisor ...................................................... 112

E.    Fall-Out Financial Benefits Attributable to the Funds...................................... 117

F. The Care and Conscientiousness of the Funds' Board in Approving the IAAs and the Harris Investment Advisory Fees Set Forth Therein............................................. 119

1.    The Board.......................................................................................... 120

|       | 2. | The Board Approved Substantively Excessive Advisory Fees | 121 |
|       | 3. | The Board's Deficient Approval Process | 121 |
|       | 4. | The Board Rubber-Stamped the Advisory Fees that Harris Proposed | 142 |
| IX. | | THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND | 146 |
| X. | | CAUSES OF ACTION | 148 |
| XI. | | PRAYER FOR RELIEF | 149 |
| XII. | | JURY TRIAL DEMANDED | 150 |

**List of Tables and Exhibits**

                                                                            **Pages**

Table 1        The Oakmark Fund Complex:  Organization and Variation            18

Table 2        The Funds' Operative Investment Advisory Fee Rates               42

Table 3        The Funds' Most-Recently Disclosed Advisory Fee Payments         43

Table 4        The Oakmark Funds and the Corresponding "Strategies" Harris      48
               Offered to Arm's-Length Clients

Table 5        The Oakmark Funds' Excessive Fees I:                             59
               (per fee comparison to Harris's advisory fee rates for corresponding
               "Strategies" provided to Arm's-Length Clients)

Table 6        Subadvised Funds:                                                70
               The Portfolio Selection Services Harris Provides to the Subadvised
               Funds Are Substantially Identical to Those Harris Provides to the
               Oakmark Funds (and to Arm's-Length Clients for Corresponding
               Harris Strategies)

Table 7        The Oakmark Funds' Excessive Fees II:                            79
               (per fee comparison to Harris's advisory fee rates for Corresponding
               Subadvised Funds)

Table 8        The Quality of Harris's Services                                111

Table 9        The Sources of Harris's Advisory Assets and Advisory Fee        114
               Revenues (Estimated)

Table 10       Annual Excessive Fee Damages                                 147-48

Exhibit A1     The Oakmark Fund, the Corresponding Harris U.S. Equity Strategy,
               and Similar/Identical Subadvised Funds

Exhibit A2     The Oakmark Select Fund, the Corresponding Harris Concentrated
               Value Strategy, and Similar/Identical Subadvised Funds

Exhibit A3     The Oakmark Equity and Income Fund, the Corresponding Harris
               Balanced Strategy, and Similar/Identical Subadvised Funds

Exhibit A4     The Oakmark International Fund, the Corresponding Harris
               International Strategy, and Similar/Identical Subadvised Funds

Exhibit A5    The Oakmark International Small Cap Fund, the Corresponding Harris International Small Cap Strategy, and Similar/Identical Subadvised Funds

Exhibit A6    The Oakmark Global Fund, the Corresponding Harris Global All Cap Strategy, and Similar/Identical Subadvised Funds

Exhibit A7    The Oakmark Global Select Fund, the Corresponding Harris Global Concentrated Strategy, and Similar/Identical Subadvised Funds

Exhibit B     Other Services Provided by Harris as Subadviser to the Subadvised Funds, as Set Forth in Operative Subadvisory Contracts

Exhibit C1    Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (alphabetically, by fund name)

Exhibit C2    Advisory Fees Paid by Large U.S. Large-Cap Value Mutual Funds (only funds with net assets > $1 billion; listed in descending order of fees)

Exhibit D1    Advisory Fees Paid by Moderate Allocation Mutual Funds (alphabetically, by fund name)

Exhibit D2    Advisory Fees Paid by Large Moderate Allocation Mutual Funds (only funds with net assets > $1 billion; listed in descending order of fees)

Exhibit E1    Advisory Fees Paid by International All-Cap Value Mutual Funds (alphabetically, by fund name)

Exhibit E2    Advisory Fees Paid by Large International All-Cap Value Mutual Funds (only funds with net assets > $1 billion; listed in descending order of fees)

Exhibit F1    Oakmark Fund – Historical Data Relevant to Analysis of Economies of Scale

Exhibit F2    Oakmark Equity & Income Fund – Historical Data Relevant to Analysis of Economies of Scale

Exhibit F3    Oakmark International Fund – Historical Data Relevant to Analysis of Economies of Scale

Plaintiffs Selwyn Karp and Ethan Treistman ("Plaintiffs"), by Plaintiffs' undersigned counsel, bring this action against Harris Associates L.P. ("Harris" or "Defendant") and allege as follows. The following allegations are based on knowledge as to Plaintiffs and Plaintiffs' own actions, and on information and belief, based on the investigation of Plaintiffs' counsel, as to all other matters. Such investigation included, but was not limited to, a review and analysis of documents, including filings with the Securities Exchange Commission ("SEC"), concerning *inter alia*: (a) Harris and the investment advisory services it offers to its various advisory clients; (b) Harris's "captive" mutual funds in the Oakmark Fund Complex, for which Harris serves as investment adviser; and (c) other mutual funds, sponsored and advised by other investment advisers who retained Harris as a subadviser for such funds; and (d) other matters of public record. Many of the facts supporting the allegations contained herein are known only to Defendant or are exclusively within Defendant's custody and/or control. Plaintiffs believe that a reasonable opportunity for discovery will yield additional, substantial evidentiary support for the allegations herein.

## I.     NATURE OF THE ACTION

1.     Plaintiffs bring this action against Defendant on behalf of and for the benefit of the Oakmark Fund (the "Oakmark Fund"), the Oakmark Equity & Income Fund (the "Income Fund"), and the Oakmark International Fund (the "International Fund" – and together with the Oakmark Fund and Income Fund, the "Funds") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b) (hereinafter, "Section 36(b)").

2.     Harris, as the Funds' investment adviser, manages the Funds' investment portfolios, and receives investment advisory fees from the Funds for providing them with investment advisory services, as further specified herein.

3.     Under Section 36(b), Defendant owes a fiduciary duty to the Funds with respect to the investment advisory fees paid by the Funds.

4.     Defendant breached that fiduciary duty by receiving investment advisory fees from the Funds that are so disproportionately large that they bear no reasonable relationship to

the value of the services provided by Defendant, and could not have been the product of arm's-length bargaining (hereinafter, "excessive" fees).

5.     Particularized factual allegations set forth herein demonstrate, *inter alia*, that the investment advisory fee rates that Defendant extracts from the Funds:

      a.  constitute mark-ups of 65.2% (the Oakmark Fund), 51.3% (the Income Fund) and 66.9% (the International Fund over the advisory fee rates that Defendant charges to provide certain of its other institutional clients with substantially similar, and in large part effectively *identical*, investment advisory services as those Defendant provides to the Funds;

      b.  constitute a mark-up, on average, of approximately 69.7% over the advisory fee rates that Defendant charges to provide other mutual funds with substantially similar, and in large part effectively *identical*, investment advisory services as those Defendant provides to the Funds;   and, more specifically, mark-ups of approximately:

          i.  45.8% for the Oakmark Fund;

         ii.  23.8% for the Income Fund; and

       iii.  60.8% for the International Fund;

      c.  substantially exceed – by 46.2% (the Oakmark Fund), 54.7% (the Income Fund), and 12.0% (the International Fund) – the average advisory fee rates paid by other mutual funds comparable in size, character and investment strategy to the Funds;

      d.  are *outliers*, standing at the highest end of the range of advisory fee rates paid by such comparable mutual funds; and

      e.  are higher than the rates charged to *any and all* other comparable mutual funds of similar very large size (*i.e.*, exceeding $15 billion of net assets).

6.      Plaintiffs bring this action to recover for the Funds the excessive and unlawful investment advisory fees extracted by Defendant in violation of Section 36(b), as well as lost profits and other actual damages caused by the Funds' payment of such excessive fees.

7.      Because the conduct complained of herein is continuing in nature, Plaintiffs seek recovery for a period commencing at the earliest date in light of any applicable statute of limitations through the date of final judgment after trial.

8.      No pre-suit demand on the Funds' Board of Trustees is required, as the demand requirement of Rule 23.1 of the Federal Rules of Civil Procedure does not apply to actions brought under Section 36(b).

## II.     JURISDICTION AND VENUE

9.      The claim asserted herein arises under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

10.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5) and 80a-43, and 28 U.S.C. § 1331.

11.     Venue is proper in this judicial district pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391, because Defendant maintains offices in this district, and/or transacts business in this district.

## III.    PARTIES

### A.     Plaintiffs

12.     Plaintiff Selwyn Karp is a shareholder in the Oakmark Fund, and has continuously owned shares in the Oakmark Fund since at least August 2015.

13.     Plaintiff Ethan Treistman is a shareholder in the Income Fund and the International Fund, and has continuously owned shares in the Income Fund and International Fund since at least August 2015.

3

**B.      Defendant**

14.      Defendant Harris Associate L.P ("Harris"), an SEC-registered investment advisor, is a limited partnership organized under Delaware law, with principal offices located at 111 South Wacker Drive, Suite 4600, Chicago, IL 60606.

15.      As of December 31, 2015, Harris:

      a.  employed 194 persons, 29 of whom performed investment advisory functions; and

      b.  managed approximately $108.5 billion of assets for approximately 2,360 investment advisory clients, including, as further detailed below:

            i.  $75.2 billion held in the seven captive funds in Oakmark Fund Complex, including $17.1 billion in the Oakmark Fund, $17.6 billion in the Income Fund and $26.5 billion in the International Fund;

            ii.  $33.4 billion for other, independent, non-captive investment advisory clients who negotiate with Harris over services and fees on an arm's-length basis, including primarily and as detailed further below:

                  1.  various arm's-length institutional clients (hereinafter, "Arm's-Length Clients"), who obtain from Harris one or more of the discrete "investment strategies" Harris offers to such clients on a "separate account" basis (hereinafter, "Strategies"); and

                  2.  as one particular set of such Arm's-Length Clients, *other* investment advisers who sponsor and serve as investment adviser to other mutual funds, and who retain Harris as a subadviser for such funds.

16.     Harris' general partner is Harris Associates, Inc.  Harris and Harris Associates, Inc. are indirect subsidiaries of Natixis Global Asset Management S.A. ("NGAM"), an international asset management group based in Paris, France), which in turn is owned by Natixis, a French investment banking and financial services firm, which in turn is principally owned by Groupe BPCE, France's second-largest banking group.

## IV.     BACKGROUND:   THE PROBLEM OF "CAPTIVE" MUTUAL FUNDS, AND CONGRESS'S EVOLVING RESPONSE TO SUCH PROBLEMS VIA THE ICA

### A.     Mutual Fund Organization and Operation

17.     Open-end management investment companies, also known as a "mutual funds," are collective investment vehicles that pool money from investors (raised through sale of shares in the fund) and invest the money in a portfolio of securities.  Each share issued by the Fund represents, and may be redeemed for, a *pro rata* interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

18.     Unlike other companies, a mutual fund has no employees or facilities of its own.  Instead, mutual funds contract with and rely on a variety of external service providers to perform the fund's business activities and operations.

19.     Chief among these mutual fund service providers is the investment advisor, who is charged with managing the mutual fund's portfolio of securities, including researching potential investments and deciding which securities – in which amounts, and at what times – to purchase for or sell from the portfolio.

20.     Other service providers provide mutual funds with the remaining services required for their operation, including: (1) a panoply of service providers that provide various administrative, mechanical or "back office" functions, and (2) a board of directors that provides oversight over the fund's various service providers.

> a.  For example, a "transfer agent" provides much of the day-to-day operational services requisite for mutual fund functioning, such as:  (1) receiving and processing mutual fund share purchase and sale/redemption requests; (2)

transferring shares; (3) preparing shareholder account statements and confirmations; (4) responding to shareholder inquiries concerning account status, portfolio performance, distributions and share price; and (5) providing shareholders with copies of account histories.

b. Further mutual fund operations – including provision of custodial, audit, accounting, legal, compliance and marketing services – are separately provided by further third parties (*e.g.*, custodians, auditors, accountants, counsel, distributors), and separately compensated by mutual funds.

c. Lastly, operational oversight is provided by a board of directors, who, among other things, evaluate and approve the contracts between mutual funds and their service providers, and the services provided under such contracts.

**B.    The Unique Structure of the Mutual Fund Industry Makes Mutual Funds "Captive" to their Investment Advisers**

21.    As a practical and historical matter, mutual funds have typically been created by investment advisers, who then provide investment advisory services to such mutual funds in exchange for investment advisory fees. Frequently, persons affiliated with such investment advisers are appointed to serve on such mutual funds' boards of directors, and affiliates of the investment adviser are retained to provide further services to such mutual funds (for example, distribution).

22.    Consequently, the relationship between investment advisers and mutual funds has been fraught with potential conflicts of interests, and the potential for abuse is inherent in the structure of such investment companies.

23.    For example, prior to regulation (discussed below) that required mutual funds to have independent board members review and approve investment advisory fees, investment advisers could both propose their own fees (wearing their "investment adviser" hat) and ratify such fees (wearing their "board" hat).

24.    Yet even after multiple rounds of legislation and regulation seeking to institute mutual funds boards independent of mutual fund investment advisers, Congress has recognized that such legislation and regulation do not alter the fundamental structural fact that mutual funds do not have an arm's-length relationship with their investment advisers.  As the Senate stated in 1969, in its report accompanying proposed amendments to the ICA, including Section 36(b), enacted in 1970:

> Mutual funds, with rare exception, are not operated by their own employees. Most funds are formed, sold, and managed by external organizations, that are separately owned and operated.  These separate organizations are usually called investment advisers.  The advisers select the funds' investments and operate their businesses.
> . . .
>
> Because of the unique structure of this industry, the relationship between mutual funds and their investment adviser is not the same as that usually existing between buyers and sellers or in conventional corporate relationships.  Since a typical fund is organized by its investment adviser which provides it with almost all management services . . ., a mutual fund cannot, as a practical matter sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy.

*See* S. Rep. No. 91–184, 1970 U.S.C.C.A.N. 4897 (hereinafter, "Senate Report"), at 4901.

25.    The peculiar dependence of mutual funds upon their founding/sponsoring investment advisers makes such funds, in effect, "captive" to their investment advisers.  Mutual funds established by investment advisor sponsors are hereinafter referred to as "captive funds."

26.    Historically, captive funds' dependence on and/or loyalty to their investment advisors has allowed investment advisors and their affiliates a decided advantage in negotiating the terms of the contractual relationships between them and the captive funds.  In essence, because mutual funds cannot (and do not) "walk away" from their investment advisers, mutual funds have less ability to reject or negotiate the terms and conditions proposed and preferred by their investment advisers.  Investment advisory fees are one of the principal matters affected by

7

this state of affairs. While it is in the interest of the mutual fund, and mutual fund shareholders, to secure investment advisory fees that are as low as possible, the investment adviser's interests are the very opposite: to secure investment advisory fees as high as possible. Historically, such conflicts of interests have generally been resolved in investment advisers' favor and to captive funds' detriment.

27.     As a result, captive funds have historically paid – and often continue today to pay – relatively high and/or excessive investment advisory fees.

**C.      The ICA, as Enacted in 1940, Sought to Limit Investment Advisers' Influence and Control over Captive Funds by Requiring Independent Boards to Approve Fund Fees**

28.     In 1940, responding to numerous problems and abuses in the then-lightly regulated mutual fund industry, Congress enacted the ICA in order to create standards of operation and care applicable to investment advisers and their affiliates. In its "Findings and Declaration of Policy" preamble to the ICA, Congress recognized that "investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interests of [mutual fund shareholders]." 15 U.S.C. § 80a-1(b)(2).

29.     In order "to mitigate and, so far as it is possible, to eliminate the conditions [] that adversely affect [] the interests of investors" (15 U.S.C§ 80a-1(b)), the ICA, as originally enacted in 1940, sought to bolster the ability of mutual fund boards to act *independently* of the investment advisers by:  (1) requiring that at least 40% of a mutual fund's board consist of persons neither employed by nor affiliated with the investment adviser (15 U.S.C.§ 80a-10); and (2) requiring that such boards review and approve written contracts between the mutual fund and the investment adviser (and other key service providers) (15 U.S.C.§ 80a-16).  In sum, and as originally enacted, the ICA placed mutual fund boards in the role of "independent watchdog," and relied wholly on fund boards to "furnish a check upon the management" of mutual funds by the funds' investment advisers.

8

30.     Notwithstanding these and other of the ICA's initial provisions, decades of excessive investment advisory fees extracted from captive funds thereafter followed. The ICA's original regulatory schema, which relied solely on mutual fund boards to police fund fees, proved insufficient.

31.     First, evidence indicated that, notwithstanding the ICA's original regulations concerning mutual fund board duties and independence, the investment advisory fees paid by mutual funds were comparatively high and disproportionate to the services provided.

a.    For example, an SEC-commissioned study found that investment advisers often charged mutual funds higher fees than those charged to the advisers' other clients, and that the structure of the industry, even as regulated by the ICA, had proved resistant to efforts to moderate adviser compensation. *See* Wharton School Study of Mutual Funds, H. R. Rep. No. 2274, 87th Cong., 2d Sess., 28-30, 34, 66-67 (1962). The study explicitly concluded that the unaffiliated directors mandated by the ICA were "of restricted value as an instrument for providing effective representation of mutual fund shareholders in dealings between the fund and its investment adviser." *Id.*, at 34.

b.    Likewise, a subsequent report authored by the SEC itself found that as mutual funds grew in size, the investment advisory fees they paid became increasingly unmoored from the advisory services provided. *See* Securities and Exchange Commission, Public Policy Implications of Investment Company Growth, H. R. Rep. No. 2337, 89th Cong., 2d Sess., 89 (1966) (hereinafter "SEC Report"). Specifically, noting that investment advisers were generally compensated on the basis of a fixed percentage of a fund's assets (rather than on services rendered or actual expenses), the SEC determined that, as a fund's assets grew, this form of payment could produce "unreasonable" fees in light of the economies of scale realized in managing a larger portfolio. SEC Report at 94, 102.

32.     Second, evidence further indicated that where fund shareholders had sought to challenge the propriety of director-approved mutual fund advisory fees, such efforts had failed because of the imposing legal standards employed by courts to evaluate such fees and challenges to them.  *See* SEC Report at 132-43 (noting use of "corporate waste" standard to review fees approved by fund directors, so that only "unconscionable" or "shocking" fees conferred liability).  Such standards, in effect, allowed directors' approval of fees – notwithstanding substantial evidence that such fees were frequently excessive – to place such fees beyond, and immune to, legal challenge from fund shareholders.  *Id.*

**D.     The ICA's 1970 Amendments, Including Section 36(b), Were Intended to *Decrease* the Deference Accorded to Board Evaluation and Approval of Fund Fees, and *Increase* the Ability of Fund Shareholders to Challenge Excessive Fees**

33.     The above-mentioned evidence led directly to amendment of the ICA in 1970, as the Senate explicitly acknowledged in its report accompanying such amendments:

> In total this bill represents a 3-year effort on the part of your committee to deal with the problems described in the 1962 Wharton School of Finance and Commerce study of mutual funds, the 1963 special study of the securities markets made by the Securities and Exchange Commission and the Commission's 1966 report on public policy implications of investment company growth.

*See* Senate Report, at 4897-98.

34.     In relevant part, the 1970 amendments to the ICA were threefold:

a.  first, strengthening board *independence*, by rewriting 15 U.S.C. §80a-(10) (now requiring at least 40% of board members to be "uninterested" persons, rather than merely persons unaffiliated with the investment adviser); *see also* 15 U.S.C. §80a-(2)(a)(19) (defining "interested" persons);

b.  second, strengthening board *diligence* with respect to evaluation and approval of advisory fees, by rewriting 15 U.S.C. §80a-(15)(c) to add that "It shall be the duty of the directors of a registered investment company to request and

10

evaluate, and the duty of an investment adviser to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve as investment adviser of such company.";
and

c. third, *easing extant legal standards facing fund shareholders seeking to challenge fund advisory fees*, by adding and enacting the new Section 36(b), which (1) conferred a fiduciary duty on investment advisers and their affiliates with respect to the payments they received from mutual funds; and (2) provided fund shareholders (as well as the SEC) with a private right of action, against the investment adviser, for breach of such fiduciary duty.

35.     Section 36(b)'s inclusion in the mutual fund regulatory schema indicates Congressional recognition that placing sole reliance on mutual fund boards to guard against excessive mutual fund advisory fees (1) had failed (as had been evidenced during the three decades following passage of the ICA in 1940), and (2) would *continue* to fail, notwithstanding the 1970 amendments strengthening boards' independence and diligence.

36.     And while the ICA as amended in 1970 still relied on fund boards to evaluate and determine fund fees in the first instance, the 1970 amendments, including Section 36(b), demonstrated clear Congressional intent that the extant deference accorded boards' fee determinations be *lessened*.

a. First and generally, merely by adding Section 36(b) and its right of action for fund shareholders to challenge fund fees notwithstanding fund directors' approval of such fees, Congress recognized that board review and approval of fees did not *per se* guarantee that the fees approved would not be excessive.

b. Second and more specifically, Congress explicitly instructed courts, when evaluating investment advisory fees challenged as excessive: (1) "to consider the approval given by the directors;" (2) to give to such approval "such consideration as the court deems appropriate under the circumstances;" and

11

(3) to employ a sliding scale of deference to such directorial approval based on such circumstances, including the degree to which the fee-setting "deliberations of the directors were a matter of substance or a mere formality:"

> The directors of a fund have the initial responsibility for approving management contracts. *Section 36(b)(2) therefore instructs the courts to consider the approval given by the directors of the fund to such compensation and provides that their approval shall be given such consideration as the court deems appropriate under all the circumstances. Among other things, the court might wish to evaluate whether the deliberations of the directors were a matter of substance or a mere formality.*

*See* Senate Report, at 4910 (emphasis added).

c. Third, Congress also explicitly indicated that its intent in enacting Section 36(b) was to *decrease* the legal obstacles facing mutual fund shareholders seeking to challenge excessive fees, and to *lower* the applicable legal standards used by courts to adjudicate such challenges:

> [The ICA's original] provisions did not provide any mechanism by which the fairness of management contracts could be tested in court. Under general rules of law, advisory contracts which are ratified by the shareholders, or in some states approved by a vote of the disinterested directors, may not be upset in the courts except upon a showing of "corporate waste." As one court put it, the fee must "shock the conscience of the court." *Such a rule may not be an improper one when the protections of arm's-length bargaining are present. But in the mutual fund industry where, these marketplace forces are not likely to operate as effectively, your committee has decided that the standard of "corporate waste" is unduly restrictive and recommends that it be changed.*
>
> * * *
>
> Thus, upon a challenge in court to compensation or payments, the ultimate test, even if the compensation or payments are approved by the directors and stockholders, will not be whether it involves a "waste" of corporate assets but will be whether the investment adviser has fulfilled his fiduciary duty to the mutual fund shareholders in determining the fee

*See* Senate Report, at 4901 and 4910 (emphasis added).

37.     Lastly, Congress also and explicitly noted that its addition of Section 36(b) was intended to address the problem of excessive fees generated by "economies of scale" – *i.e.*, that director-approved fund fees continued to be set at high rates notwithstanding (1) that funds had grown substantially in size, and (2) that the costs to provide such funds with advisory services had not grown at the same rate, because of economies of scale in the provision of advisory services (as further explained in Section VI.C, *infra*).   Congress made clear its intent that "investors should share equitably, as they do in other areas, in the economies," and that such sharing could be accomplished through fund advisors' "reduc[ing] their effective charges as the funds grows in size" (*i.e.*, "breakpoints," as further explained in Section VI.C, *infra*):

> This bill recognizes that investors should share equitably, as they do in other areas, in the economies available as a result of the growth and general acceptance of mutual funds.
>
> ***
>
> It is noted, however, that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry. In some instances these economies of scale have not been shared with investors. Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size. Accordingly, the best industry practice will provide a guide.

*See* Senate Report, at 4901 and 4902.

## V.     THE FUNDS' ORGANIZATION AND OPERATIONS

### A.     Organization and Operation of the Funds

38.     The Funds are organized and exist as three distinct series of the Harris Associates Investment Trust, an open-end management investment company organized under Massachusetts law as a Massachusetts business trust pursuant to a February 1, 1991 agreement and declaration of trust.

39.     The Harris Associates Investment Trust was sponsored and established by Harris as the means to create and house captive mutual funds as clients for Harris's investment advisory

13

services. In addition to the three series represented by the Funds, the Harris Associates Investment Trust has four further series, each relating to a distinct Oakmark-branded fund: specifically (1) the Oakmark Select Fund; (2) the Oakmark Global Fund; (3) the Oakmark Global Select Fund; and (4) the Oakmark International Small Cap Fund. These seven mutual funds, each a series of the Harris Associates Investment Trust, are commonly referred to as the Oakmark Funds, and comprise the Oakmark Fund Complex.

40. Neither the Harris Associates Investment Trust nor any of the funds in the Oakmark Fund Complex has employees of its own. Instead, all of the Oakmark Funds' operations are carried out by an array of external service providers who provide the same services to each of the Oakmark Funds, pursuant to contracts between such service providers and the Harris Associates Investment Trust.

41. Harris serves as investment adviser for each of the mutual funds in the Oakmark Fund Complex, pursuant to distinct investment advisory agreements between Harris and the Harris Associates Investment Trust for each of the Oakmark Funds. As the Oakmark Funds' investment adviser, Harris, as further detailed below, researches potential investments, selects particular investments for each funds' portfolio, and manages such portfolios on an ongoing basis.

42. Other service providers provide the Oakmark Funds with the rest of the services they require to function, including substantially all "back office," administrative, regulatory and shareholder-facing services.

43. Boston Financial Data Services, Inc. ("BFDS") serves as Transfer Agent for each of the Oakmark Funds, pursuant to a Transfer Agency and Service Agreement between BFDS and the Harris Associates Investment Trust dated October 1, 2005, and subsequently amended October 1, 2008, October 1, 2011, February 15, 2012 and July 17, 2014 (the "Transfer Agency Agreement"). The list of services provided by BFDS is extremely long (see e.g., Transfer Agency Agreement at Clauses 1.1(a)-(q), 1.2(a)-(h), 1.3, 11.5 and Schedules 1.2(f) and 1.3): in essence, the transfer agent maintains the accounts of fund shareholders, and handles all fund

shareholder transactions and queries. As summarized in the Oakmark Funds' most recent
Statement of Additional Information, filed with the SEC on or about May 6, 2016 ("Oakmark
Funds SAI"):

> BFDS maintains shareholder accounts and prepares shareholder
> account statements, processes shareholder transactions, prepares
> distribution payments, and maintains records of Fund transactions.
> The Trust pays BFDS for its services based on the number of open
> and closed shareholder accounts.

*See* Oakmark Funds SAI, at 40

44.     State Street Bank & Trust Company ("State Street") serves as Custodian for each
of the Oakmark Funds, pursuant to a Custodian Agreement dated April 1, 2002, and
subsequently amended March 20, 2008, February 2, 2011, January 31, 2012 and July 1, 2014
(the "Custodian Agreement"). As Custodian, State Street provides the Oakmark Funds not only
with custodial services (such as holding and maintaining each fund's securities and cash,
transferring cash and securities in connection with fund investment transactions, making all
payments to cover the funds' expenses), but also performs an array of further portfolio
accounting and administrative services (including, among other things, preparing a substantial
amount of the information reported to the Oakmark Funds' shareholders and board, and to the
SEC):

> [A]s custodian, State Street is responsible for holding all securities
> and cash of each Fund, receiving and paying for securities
> purchased, delivering against payment securities sold, receiving
> and collecting income from investments and making all payments
> covering expenses of the Funds. State Street also performs certain
> portfolio accounting and administrative services for the Funds,
> such as monitoring each Fund's compliance with its investment
> guidelines, testing each Fund's compliance with Subchapter M of
> the Code, calculating each Fund's periodic dividend rates and total
> returns, preparing certain tax forms, preparing financial
> information for presentation to the Adviser, the Trust's board of
> trustees and each Fund's shareholders and for filing with the SEC,
> and calculating each Fund's excise tax distributions. Each Fund
> pays the custodian a monthly fee for the provision of such services.

*See* Oakmark Funds SAI, at 40.

45.    State Street also serves as Administrator for each of the Oakmark Funds, pursuant to an Administration Agreement dated April 1, 2002 and subsequently amended on March 20, 2008, February 2, 2011, January 1, 2012 and July 1, 2014 (the "Administration Agreement"). As Administrator, State Street is required to assist "in conducting various aspects of the Fund's administrative operations" (*see* Administration Agreement at Clause 3), including with respect to a series of administrative and compliance functions – relating to various aspects of management reporting, compliance reporting, financial reporting, treasury administration and tax matters – specified in Appendix B to the Administration Agreement.

46.    Review of Appendix B to the Administration Agreement, which sets forth (1) the particular functions in which State Street is supposed to "assist," and (2) State Street's and Harris' *respective responsibilities* for each of these functions, makes clear that State Street is tasked with the laboring oar in effectively all administrative and compliance functions, while Harris's role is largely limited to reviewing and approving State Street's work.    *See* Administration Agreement at Appendix B.

47.    Deloitte & Touche LLP serves as the independent registered public accounting firm for the Harris Associates Investment Trust, providing it with audit and accounting services for each of the Oakmark Funds. *See e.g.* Oakmark Funds SAI at 40.

48.    K&L Gates serves as counsel to the Harris Associates Investment Trust, and as such provides it and each of the Oakmark Funds with legal services.

49.    Additionally, many of the further expenses incurred in the operation of the Funds are separately and directly paid for by the Funds – as set forth, for example, at Clause 5 of the investment advisory agreements relating to the Funds:

> 5.    EXPENSES TO BE PAID BY THE TRUST. The Trust shall pay all expenses not expressly assumed by the Adviser, including but not limited to: all charges of depositories, custodians and other agencies for the safekeeping and servicing of its cash, securities and other property and of its transfer agents, fund accounting

16

agents, registrars and its dividend disbursing and redemption agents, if any; all charges of legal counsel and of independent auditors; all compensation of trustees other than those affiliated with the Adviser and all expenses incurred in connection with their services to the Trust; all costs of borrowing money; all expenses of publication of notices and reports to its shareholders and to governmental bodies or regulatory agencies; all expenses of proxy solicitations of the Trust or its board of trustees with respect to the Fund; all expenses of shareholder meetings; all expenses of typesetting of the Fund's prospectus and of printing and mailing copies of the prospectus furnished to each then-existing shareholder or beneficial owner; all taxes and fees payable to federal, state or other governmental agencies, domestic or foreign; all stamp or other transfer taxes; all expenses of printing and mailing certificates for shares of the Trust; all expenses of bond and insurance coverage required by law or deemed advisable by the Trust's board of trustees; all expenses of maintaining the registration of shares of the Trust under the 1933 Act and of qualifying and maintaining qualification of shares of the Trust under the securities laws of such United States jurisdictions as the Trust may from time to time reasonably designate and all expenses of maintaining the registration of the Trust under the 1940 Act; and all fees, dues and other expenses related to membership of the Trust in any trade association or other investment company organization. In addition to the payment of expenses, the Trust shall also pay all brokers' commissions and other charges relating to the purchase and sale of portfolio securities.

50.     Finally, a single board of trustees for the Harris Associates Investment Trust (hereinafter, the "Board") oversees each of the funds in the Oakmark Fund Complex. Among the Board's primary duties is to monitor and oversee the Oakmark Funds' service providers, including Harris particularly, and to annually evaluate, review and approve (or not) the Oakmark Funds' investment advisory agreements with Harris (and the investment advisory fee rates provided for therein).

**B.     Organization of the Oakmark Fund Complex**

51.     The seven funds in the Oakmark Fund Complex, as set forth in Table 1 below, feature a discernible logic in investment strategy and management as they vary by geographic foci, market-capitalization foci, and level of diversification:

**Table 1**
**The Oakmark Fund Complex:  Organization and Variation**

| Harris Fund | Portfolio Managers | Principal Investment Strategy Specifications re. . . | | | | |
|---|---|---|---|---|---|---|
| | | Asset Class | Region | Market Cap | Investment Style | Positions |
| **Oakmark Fund** | William Nygren Kevin Grant | Equity | U.S. | "Larger" Cap | Value | 30 - 60 |
| **Oakmark Select Fund** | William Nygren Anthony Coniaris Win Murray | Equity | U.S. | Large Cap Mid Cap | Value | 12 - 20 |
| **Oakmark Equity & Income Fund** | Clyde McGregor Colin Hudson Edward Wojciechowski | Equity + Fixed Income | U.S. | All Cap | Value | 30 - 60 (equity) |
| **Oakmark International Fund** | David Herro Robert Taylor | Equity | Inter-national | All Cap | Value | 30 - 60 |
| **Oakmark International Small Cap Fund** | David Herro Michael Manelli | Equity | Inter-national | Small Cap | Value | 30 - 70 |
| **Oakmark Global Fund** | Clyde McGregor Robert Taylor | Equity | Global | All Cap | Value | 30 - 60 |
| **Oakmark Global Select Fund** | William Nygren David Herro | Equity | Global | "Larger" Cap | Value | 12 - 20 |

52.    Six of the Oakmark Funds focus entirely on stock investments, including two funds focused on investing in U.S. companies, two on investing in non-U.S. companies (*i.e.*, "International"), and two on investing globally (*i.e.*, "Global," combining U.S. and International).  The seventh, the U.S.-focused Income Fund, invests in stocks *and* bonds, (with a U.S. focus).

53.    Of the six stock-only funds: (a) the two U.S.-focused funds feature the same lead portfolio manager (Nygren, working with different portfolio managers on each U.S. fund); (b) the two International funds feature the same lead portfolio manager (Herro, likewise

accompanied by different additional portfolio managers on each non-U.S. fund); and (c) the two Global funds, which combine U.S. and International investments, are led by paired portfolio managers plucked, one each, from the aforementioned Oakmark U.S.-focused and International-focused funds (*i.e.*, each "Global" Oakmark fund features one portfolio manager of a U.S.-focused Oakmark fund [Nygren, McGregor], and one portfolio manager of an International Oakmark fund [Herro, Taylor]).

54.     The two U.S. stock funds, as well as the two global stock funds, differ from each other primarily in the number of investments they hold in their portfolios. In each case, there is: (a) a 'standard' fund (for U.S. investments, the Oakmark Fund; for global investments, the Oakmark Global Fund) designed to hold 30-60 different investment positions; and (b) a "Select" fund (for the U.S., the Oakmark Select Fund; for global investments, the Oakmark Global Select Fund) designed to hold only 12-20 different positions. All four funds invest primarily in large or "larger"-capitalization companies.

55.     The two international funds differ from each other differently: not in terms of the number of investments held (each designed to hold from 30 to 70 positions), but in the market-capitalization of the companies in which they invest – the International Fund invests in companies of all sizes (an "all cap" fund), while the Oakmark International Small Cap Fund focuses solely on smaller companies.

56.     As set forth in Sections VIII.A.1-2, *infra*, Harris has replicated for its Arm's-Length Clients the above-summarized array / organization of the Oakmark Fund Complex, repackaged as:

        a.  discrete Strategies, which Harris offers to Arm's-Length Clients at advisory fee rates far below those Harris extracts from the Oakmark Funds; and

        b.  Subadvised Funds, which are fashioned by Harris as clones of various Oakmark Funds and/or Harris Strategies, and which Harris likewise offers to investment advisor Arm's-Length Clients at fee rates far below those Harris extracts from the Oakmark Funds.

## VI.    HARRIS'S ORGANIZATION AND OPERATIONS

57.    As of December 31, 2015, Harris employed 194 persons, 29 of whom performed investment advisory functions, to manage approximately $108.52 billion of assets for approximately 2,360 investment advisory clients.

### A.    Harris's Investment Advisory Products and Clients

58.    Harris describes its investment advisory operations, including its investment advisory services and clients, in the Form ADV it files annually with the SEC (most recently, on or about March 21, 2016), including a Harris-authored "Firm Brochure" filed as Part 2A to the Form ADV (hereinafter, "Form ADV"), as well as on its website (hereinafter, "Harris Website").[1]

59.    As set forth in such Harris-authored documents, Harris offers investment advisory services to four sets of clients. *See* Form ADV at 4-9; *see also* Harris Website at "Strategies & Products" (describing four basic sets of products delivered to four sets of clients).[2]

### 1.    The Oakmark Funds

60.    First and most importantly, one single client, the Harris Associates Investment Trust, alone accounted for $ 75.2 billion, or 69.3%, of Harris's total assets under management ("AUM"). Established by Harris as the vehicle to create and house *captive* mutual clients for its investment advisory services, the Harris Associates Investment Trust currently contains seven such captive funds: *i.e.*, the seven Oakmark Funds, comprising the Oakmark Fund Complex, each existing as a separate series of the Harris Associates Investment Trust (which currently has seven separate series). *See e.g.* Form ADV at 4, 8-9; Harris Website at "Strategies & Products" (listing the Oakmark Fund Complex as one of Harris's four basic products).

### 2.    Arm's-Length Clients for Harris Investment Strategies

61.    Second, Harris also provides investment advisory services to a variety of non-captive, independent institutional clients (and/or high net worth individuals), who negotiate for

---

[1]    The Harris Website is available at:  http://www.harrisassoc.com/Harris.htm.
[2]    Available at:  http://www.harrisassoc.com/Strategies--Products.htm.

such services, and for the fees payable to Harris in exchange for such services, on an arm's-length basis (hereinafter, "Arm's-Length Clients"). Such Arm's-Length Clients include, for example, government retirement plans, corporate pension and profit-sharing plans, charitable organizations, foundations, endowments, banks, trust companies, insurance companies, corporations, sovereign funds, and, as discussed separately in "Third" below, *other* advisory firms. *See e.g.* Form ADV at 8-9. Generally, the assets of such Arm's-Length Clients are managed by a Harris on a separate account basis (with the possible exception noted in "Third" below). *See e.g.* Form ADV at 6-7; Harris Website at "Strategies & Products" (listing "Separate Accounts" as one of Harris's four basic products).

62.     Harris currently offers such Arm's-Length Clients a discrete menu of approximately ten distinct "investment strategies" (hereinafter, "Strategies"). *See* Form ADV at 4, 6-7 (listing such strategies and the advisory fee rates Harris charges in connection with each); *see also* Harris website at "Strategies & Products" (listing such strategies). As detailed in Section VIII.A.1, *infra*, the investment advisory products that Harris offers to its Arm's-Length Clients (*i.e.*, Harris's menu of Strategies) largely replicate the investment strategies Harris provides to the seven captive funds in the Oakmark Fund Complex, including the Funds. For each of the seven Oakmark Funds, there exists a *corresponding* Strategy that Harris offers to its Arm's-Length Clients. Although the investment advisory services offered by Harris to its Oakmark Funds and to Arm's-Length Clients for Harris's corresponding Strategies are substantially similar and, often, to large extent *identical*, Harris charges, for such services, substantially higher investment advisory fee rates to its captive Oakmark Funds than to its Arm's-Length Clients.

### 3.     Subadvised Funds

63.     Third, among Harris's Arm's-Length Clients are *other* investment advisory firms, which on occasion employ Harris as a *subadviser* to provide investment advisory services to mutual funds, portfolios and/or other pooled investment vehicles (hereinafter, "Subadvised

Funds"). *See e.g.* Form ADV at 4, 8-9, 16-17; *see also* Harris Website at "Strategies & Products" (listing "Sub-Advisory Services" as one of Harris's four basic products).

64.     Again and as detailed in Section VIII.A.2 *infra*, the investment advisory services that Harris offers to the Subadvised Funds largely replicate the investment strategies underlying the Oakmark Funds and the corresponding Harris Strategies offered to Harris's Arm's-Length Clients. In other words, for many of the seven Oakmark Funds, there exists not only a corresponding Strategy offered to Arm's-Length Clients, but also corresponding Subadvised Funds. Although the investment advisory services offered by Harris to its Oakmark Funds and to corresponding Subadvised Funds are substantially similar and to large extent *identical*, Harris charges substantially higher investment advisory fee rates to its captive Oakmark Funds than to the Subadvised Funds.

### 4.     Other Products and Clients

65.     Fourth, and presented here only for the sake completeness, Harris also provides certain broker-dealers and/or individual investors with so-called "wrap fee programs," model portfolios and certain further non-discretionary advisory services. *See* Form ADV at 5-6. However, such investment advisory products and services account for only a *de minimis* fraction of Harris's total AUM; specifically, as of December 31, 2015, $267.7 million (accounting for less than 0.25% of Harris's total AUM of $108.52 billion).

### B.     Harris's Investment Advisory Process

66.     As set forth in Harris's Form ADV – and confirmed by the Funds' SEC filings, the Subadvised Funds' SEC filings, and in publicly-available Harris-authored presentations on Harris and its investment advisory services, products and process – the investment advisory services that Harris offers to any (and all) clients rest on a core set of collectively-developed investment analyses that ultimately yield a small number of "approved" investments (the "Approved List") from which all Harris portfolio managers must select investments for any of Harris's particular advisory clients. *See e.g.*:

a. Form ADV at 9-11 (Harris's process for all clients); Harris Website at "Investment Approach" and "Focused Research" (same);[3]

b. Prospectus at 49-51 and SAI at 5; Prospectus at 2-3, 8-9, 14-15, 22-23, 29-30, 36-37, 43-44 (Harris's process for the Oakmark Funds, including the Funds); Harris presentation on the Oakmark Fund, titled "2nd Quarter 2015" (hereinafter, the Fund Presentation), at 2-9 (Harris's process for the Oakmark Fund, and generally);[4] Oakmark Website at "About Oakmark – Philosophy & Process" (Harris's process for the Oakmark Funds, including the Funds);[5]

c. September 18-19, 2014 NGAM "Product Overview" presentation on two of the Subadvised Funds – Harris Associates U.S. Equity Fund and the Harris Associates Concentrated U.S. Equity Fund (and on Harris's U.S. Equity Strategy) (hereinafter, the "Subadvised Funds Presentation"), at 3-13 (Harris's process for two Subadvised Funds and for the U.S. Equity Strategy, and Harris's process generally).[6]

67. Specifically, this common and core effort yields an Approved List of 120-180 U.S. stocks, and a similar Approved List of 120-180 International stocks:

### Our Process

We use an intensive, fundamental research process to identify companies that meet our value criteria.

While some value investors may search only for stocks with low price-to-earnings or price-to-book value ratios, we focus on:

- Companies whose stock price represents a significant discount to our estimate of underlying business value
- Companies with growing free cash flow and intelligent investment of that excess cash



The Bottom Up Investment Process

---

[3] Available, respectively, at: http://www.harrisassoc.com/Why-Harris/Investment-Approach.htm and http://www.harrisassoc.com/Why-Harris/Focused-Research.htm.

[4] Available at: http://docplayer.net/5193525-Harris-associates-the-oakmark-fund.html.

[5] Available at: http://www.oakmark.com/About-Oakmark/Philosophy--Process.htm.

[6] Available at: http://citywire.co.uk/publications/WEB_Resources/Presentations/Switzerland-2014/NGAM.pdf.

- Companies with management teams that think and act like owners

Our research team uses a variety of methods to generate investment ideas from a universe of thousands of equity securities. Attractive securities are subjected to a rigorous quantitative and qualitative review to identify the best values in the market. **Those that pass the quality test earn a place on our U.S. or international "approved list," each typically made up of 120 to 180 securities. Fund managers construct their portfolios using only securities from an approved list**.

*See* Oakmark Website at "About Oakmark – Philosophy & Process" (bold added for emphasis);[7]

*see also* Prospectus at 50-51.

\* \* \*

## HOW THE FUNDS INVEST

### Bottom-Up Investment Process

All portfolio managers at Harris Associates L.P., investment adviser to the Oakmark Funds (the "Adviser"), strive to abide by a consistent investment philosophy and process. This process involves a collective, unified effort to identify what the managers believe are the best values in the marketplace for their respective Funds.

Each manager typically constructs a focused portfolio from a list of approved stocks, built on a stock by stock basis from the bottom up. The following chart illustrates this bottom-up investment process:

### Bottom-Up Investment Process

### Universe of Thousands of Equity Securities
(All stocks available for investment.)

### Criteria Screens
(Managers and research team screen for stocks that they believe are worth further consideration.)

### Quantitative and Qualitative Research
(Rigorous analysis is performed to seek to ensure that the stock meets certain "value" standards.)

---

[7] Available at: http://www.oakmark.com/About-Oakmark/Philosophy--Process.htm.

**Approved List**
(Approximately 120-180 securities.)

**Invest**
(Managers select stocks from the approved list for their specific
funds.)

*See* SAI, at 5; Form ADV at 10-11 (same).

68.     Harris develops its parallel U.S. and International Approved Lists through a two-
part process, in which:

        a.  first, separate teams (one for U.S., another for international) of research and
            investment analysts (including, as detailed below, high-level Harris portfolio
            managers, and including certain of the Funds' portfolio managers) perform
            "fundamental research," including both quantitative and qualitative analyses,
            in order to identify, from the universe of thousands of stocks, those most
            promising in the light of Harris's "value" investment philosophy;[8] and

        b.  second, certain of the promising investment candidates are elevated to the
            Approved Lists after formal approval by Harris's Stock Selection Groups (one
            for the U.S., another for International), which are comprised only of the
            senior-most Harris personnel, including certain of the Funds' portfolio
            managers, and which meet weekly to evaluate existing investments on and
            new candidates for the Approved Lists.[9]

69.     With respect to U.S. investments, Harris's Stock Selection Group is comprised of
the following three persons:

        a.  Robert M. Levy, CFA, Partner, Chief Investment Officer - U.S. Equities and
            Portfolio Manager;

        b.  Clyde S. McGregor, CFA, Partner and Portfolio Manager (of the Oakmark
            Income Fund and the Oakmark Global Fund); and

---

[8] *See* Fund Presentation at 5-7 and Subadvised Fund Presentation at 7-11 (more particularized descriptions of fundamental research process; *see also* Prospectus at 49-51 (more generalized description).
[9] *See* Fund Presentation at 8 and Subadvised Fund Presentation at 12; *see also* Fund Presentation at 3 (identifying the members of the U.S. stock investment team, including the investment analysts and the Stock Selection Group).

      c.  William C. Nygren, CFA, Partner, Portfolio Manager (of the Oakmark Fund, Oakmark Select Fund, and Oakmark Global Select Fund) and U.S. Investment Analyst.

*See* Fund Presentation at 3.

     70.   With respect to U.S. investments, the investment analysts and product specialists include:

      a.  Kevin G. Grant, CFA, Partner, Portfolio Manager (of the Oakmark Fund, together with Mr. Nygren) and U.S. Investment Analyst;

      b.  Edward J. Wojciechowski, CFA, Portfolio Manager (of the Income Fund, together with Mr. McGregor and Mr. Hudson) and U.S. Investment Analyst;

      c.  Win Murray, CFA, Portfolio Manager and Director of U.S. Research;

      d.  Judson H. Brooks, CFA, Partner and U.S. Investment Analyst;

      e.  M. Colin Hudson, CFA, CFA, Partner, Portfolio Manager (of the Income Fund, together with Mr. McGregor and Mr. Wojciechowski) and U.S. Investment Analyst;

      f.  Anthony P. Coniaris, CFA, Partner, Portfolio Manager and U.S. Investment Analyst;

      g.  Robert F. Bierig, Portfolio Manager and U.S. Investment Analyst;

      h.  Michael A. Nicolas, CFA, U.S. Investment Analyst;

      i.  Matthew A. Logan, CFA, Partner, Portfolio Manager and U.S. Investment Analyst;

      j.  Alex E. Fitch, U.S. Investment Analyst;

      k.  Michael J. Mangan, Partner and Portfolio Manager; and

      l.  Jay R. Bornstein, Portfolio Manager.

*See* Fund Presentation at 3 and 16-20 (respectively, listing and providing brief "bios" for such individuals); *see also* Harris Website at "Portfolio Managers" and "Investment Analysts."[10]

## VII.    THE SERVICES HARRIS PROVIDED, AND THE FEES HARRIS CHARGED, TO THE FUNDS

71.    Harris serves as investment adviser to the Funds pursuant to:

a.    an Investment Advisory Agreement for the Oakmark Fund, between Harris and the Harris Associates Investment Trust, dated October 30, 2000, as subsequently amended on or about April 18, 2001, November 1, 2004, November 1, 2012, November 1, 2013, and November 1, 2015 (the "Oakmark Fund IAA");

b.    an Investment Advisory Agreement for the Income Fund, between Harris and the Harris Associates Investment Trust, dated October 30, 2000, as subsequently amended on or about April 18, 2001, November 1, 2003, November 1, 2004, November 1, 2007 and November 1, 2008 (the "Income Fund IAA"); and

c.    an Investment Advisory Agreement for the International Fund, between Harris and the Harris Associates Investment Trust, dated October 30, 2000, as subsequently amended on or about April 18, 2001, November 1, 2004, November 1, 2006, November 1, 2007, November 1, 2013 and November 1, 2014 (the "International Fund IAA")

72.    The Oakmark Fund IAA, the Income Fund IAA and the International Fund IAA (collectively, the "IAAs") set forth the services to be provided by Harris to the Funds and the fee rates that the Funds must pay Harris as compensation for the services provided. The IAAs are substantively identical to each other in all respects (*e.g.*, the services required of Harris), except for the differing advisory fee rates set forth therein.

---

[10] Available at:  http://www.harrisassoc.com/About-Us/Portfolio-Managers.htm and
http://www.harrisassoc.com/About-Us/Investment-Analysts.htm

**A.      The Services Provided by Harris to the Funds under the IAAs**

73.      As detailed below, the services Harris provides to the Funds, under the IAAs and as the Funds' investment adviser, are two-fold.

      a.   In primary and largest part, the IAAs require Harris to research potential investments for the Funds, and decide which securities to purchase for or sell from the Funds' investment portfolios, at which times and in which amounts. Such services are referred to herein as "Portfolio Selection Services."

      b.   In much smaller part, Harris also appears to provide certain further services to the Funds – although, as noted below, the IAAs neither specific nor require Harris to provide any further services over and above Portfolio Selection Services – which boil down to: (1) minor administrative- and compliance-related services (including maintaining books and records for the Funds, relating primarily to Harris's provision of Portfolio Selection Services), and (2) periodic reporting to the Funds' shareholders and the Funds' Board concerning the Funds' performance (*i.e.*, the Portfolio Selection Services provided). Such further services are referred to herein as "Other Services."

**1.      Portfolio Selection Services**

74.      The IAAs require Harris to provide certain investment advisory services to the Fund. In their largest and core part, such services include researching potential investments, deciding which securities to purchase for or sell from the Funds' investment portfolios, and arranging for the execution of purchase and sale orders on behalf of the Funds (hereinafter, "Portfolio Selection Services").

      2.   SERVICES OF ADVISER.

        (a)      The Adviser shall manage the investment and reinvestment of the assets of the Fund, subject to the supervision of the board of trustees . . .

> (b)   The Adviser shall place all orders for the purchase and
> sale of portfolio securities for the account of the Fund with brokers
> or dealers selected by the Adviser . .

*See* IAAs at Clauses 2(a)-(b).

75.   Indeed, under the IAAs, such Portfolio Selection Services are the *only* services explicitly required of Harris.[11] Notwithstanding that the IAAs do not appear to require Harris to provide any further services, it does appear – as discussed in Section VII.A.2 immediately below, that Harris does provide certain Other Services to the Funds.

76.   The Funds' SEC filings provide some further detail concerning the Portfolio Selection Services Harris provides to the Funds, specifying:

a.   each Fund's stated "investment objective," *i.e.*, the *end* which Harris's Portfolio Selection Services endeavor to achieve;

b.   each Fund's stated "principal investment strategies," *i.e.* the particular *means* employed to reach the stated investment objective; and

c.   further detail concerning how, and by whom, each Fund's Portfolio Selection Strategies are developed and implemented.

77.   The stated investment objectives for the Funds are set forth below:

### Oakmark Fund

**INVESTMENT OBJECTIVE**
Oakmark Fund seeks long-term capital appreciation.

\* \* \*

### Income Fund

**INVESTMENT OBJECTIVE**
Oakmark Equity and Income Fund seeks income and preservation and growth of capital.

---

[11] Clause 3 of the IAAs, titled "SERVICES OTHER THAN AS ADVISER," allows Harris:  (1) to act as securities broker in connection with the purchase or sale of investments for/from the Funds' portfolios, and receive separate fees or commissions for such extra-advisory services; and (2) allows Harris to "receive compensation from the Trust for other services performed by or for the Trust which are not within the scope of the duties of the Adviser under this agreement."

29

* * *

## International Fund

**INVESTMENT OBJECTIVE**
Oakmark International Fund seeks long-term capital appreciation.

*See* Prospectus at, respectively, 1, 13 and 35.

78.     Harris seeks to fulfill the Funds' stated investment objectives through differing "principal investment strategies" pursued by Harris on behalf of each Fund, and in providing each Fund with different set of investments, as set forth below.

> a.   **Oakmark Fund**.  As the Oakmark Fund's below-stated principal investment strategies indicate, the Oakmark Fund, as advised by Harris, invests in a relatively small portfolio (30 to 60 different positions) of stocks issued by "larger"-capitalization U.S. companies, and employs a "value" orientation in stock selection.

PRINCIPAL INVESTMENT STRATEGY

**The Fund invests primarily in a diversified portfolio of common stocks of U.S. companies. The Fund generally invests in the securities of larger capitalization companies. The Fund uses a value investment philosophy in selecting equity securities**. This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below what we believe is their true business value presents the best opportunity to achieve the Fund's investment objective.

The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, the Adviser looks for the following characteristics, although the companies selected may not have all of these attributes: (1) free cash flows and intelligent investment of excess cash; (2) earnings that are

30

growing and are reasonably predictable; and (3) high level of company management ownership.

Key Tenets of the Oakmark Investment Philosophy:

1. Buy businesses that are trading at a significant discount to the Adviser's estimate of the company's intrinsic value. At the time the Adviser buys a company, the Adviser wants the company's stock to be inexpensive relative to what it believes the entire business is worth.

2. Invest with companies expected to grow shareholder value over time. Value investors can sometimes fall into the trap of buying a stock that is inexpensive for a reason—because the company just does not grow. The Adviser looks for good quality, growing businesses with positive free cash flow and intelligent investment of cash.

3. Invest with management teams that think and act as owners. The Adviser seeks out companies with management teams that understand the dynamics of per share value growth and are focused on achieving such growth. Stock ownership and incentives that align managements' interests with those of shareholders are key components of this analysis.

In making its investment decisions, the Adviser uses a "bottom-up" approach focused on individual companies, rather than focusing on specific economic factors or specific industries. To facilitate its selection of investments that meet the criteria described above, the Adviser uses independent, in-house research to analyze each company. As part of this selection process, the Adviser's analysts typically visit companies and conduct other research on the companies and their industries.

Once the Adviser identifies a stock that it believes is selling at a significant discount to the Adviser's estimated intrinsic value and that the company has one or more of the additional qualities mentioned above, the Adviser may consider buying that stock for the Fund. The Adviser usually sells a stock when the price approaches its estimated worth. This means the Adviser sets specific "buy" and "sell" targets for each stock the Fund holds. The Adviser monitors each portfolio holding and adjusts these price targets as warranted to reflect changes in a company's fundamentals.

The Adviser believes that holding a relatively small number of stocks allows its "best ideas" to have a meaningful impact on the Fund's performance. **Therefore, the Fund's portfolio typically holds thirty to sixty stocks** rather than hundreds, and a higher percentage of the Fund's total assets may also be invested in a particular sector or industry.

*See* Prospectus at 1-2 (bold added for emphasis).

b. **Income Fund**. As indicated by its below-stated principal investment strategies, the Income Fund, as advised by Harris, invests primarily in both equity *and debt* securities issued by U.S. companies (although up to 35% of the portfolio can consist of securities issued by non-U.S. companies). Like the Oakmark Fund, the Income Fund limits stock positions to a relatively small number (30 to 60 different positions); unlike the Oakmark Fund, the Income Fund can invest in stocks issued by small-, medium- and large-capitalization companies. The percentage of the Income Fund's portfolio consisting of stocks (as opposed to debt securities) can fluctuate between 40% and 75% of the portfolio's total assets, depending on Harris's view of the relative value of these two asset classes. To buffer the greater volatility of stocks, and to provide income, the Income Fund also invests in bonds, primarily with the highest credit ratings (although as much as 20% of the portfolio can consist of bonds with below-investment grade credit ratings (also termed "junk bonds").

PRINCIPAL INVESTMENT STRATEGY

**The Fund invests primarily in a diversified portfolio of U.S. equity and debt securities (although the Fund may invest up to 35% of its total assets in equity and debt securities of non-U.S. issuers). The Fund is intended to present a balanced investment program between growth and income by investing approximately 40-75% of its total assets in common stock, including securities convertible into common stock, and up to 60% of its total assets in debt securities issued by U.S. or non-U.S. governments and corporate entities rated at the time of purchase within the two highest grades assigned by Moody's Investors Service, Inc. or by Standard & Poor's Corporation**

32

**Ratings Group, a division of The McGraw-Hill Companies. The Fund may invest up to 20% of its total assets in unrated or below investment grade rated debt securities, sometimes called junk bonds. The Fund may invest in the securities of large-, mid-, and small-capitalization companies.**

The Fund uses a value investment philosophy in selecting equity securities. This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below what we believe is their true business value presents the best opportunity to achieve the Fund's investment objective.

The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, the Adviser looks for the following characteristics, although the companies selected may not have all of these attributes: (1) free cash flows and intelligent investment of excess cash; (2) earnings that are growing and are reasonably predictable; and (3) high level of company management ownership.

Key Tenets of the Oakmark Investment Philosophy:

1. Buy businesses that are trading at a significant discount to the Adviser's estimate of the company's intrinsic value. At the time the Adviser buys a company, the Adviser wants the company's stock to be inexpensive relative to what it believes the entire business is worth.

2. Invest with companies expected to grow shareholder value over time. Value investors can sometimes fall into the trap of buying a stock that is inexpensive for a reason—because the company just does not grow. The Adviser looks for good quality, growing businesses with positive free cash flow and intelligent investment of cash.

3. Invest with management teams that think and act as owners. The Adviser seeks out companies with management teams that understand the dynamics of per share value growth and are focused on achieving such growth. Stock ownership and incentives that

align managements' interests with those of shareholders are key components of this analysis.

In making its equity investment decisions, the Adviser uses a "bottom-up" approach focused on individual companies, rather than focusing on specific economic factors or specific industries. To facilitate its selection of investments that meet the criteria described above, the Adviser uses independent, in-house research to analyze each company. As part of this selection process, the Adviser's analysts typically visit companies and conduct other research on the companies and their industries.

Once the Adviser identifies a stock that it believes is selling at a significant discount to the Adviser's estimated intrinsic value and that the company has one or more of the additional qualities mentioned above, the Adviser may consider buying that stock for the Fund. The Adviser usually sells a stock when the price approaches its estimated worth. This means the Adviser sets specific "buy" and "sell" targets for each stock the Fund holds. The Adviser monitors each portfolio holding and adjusts these price targets as warranted to reflect changes in a company's fundamentals.

The Adviser believes that holding a relatively small number of stocks allows its "best ideas" to have a meaningful impact on the Fund's performance. Therefore, **the Fund's portfolio typically holds thirty to sixty stocks** rather than hundreds, and a higher percentage of the Fund's total assets may also be invested in a particular sector or industry.

**The proportion of the Fund held in debt securities will vary in light of the Adviser's view of the attractiveness of debt securities**. In times when the Adviser believes equities provide above average absolute value, the proportion of the Fund allocated to debt securities will decline. **In selecting debt securities, the Adviser considers many factors, including among other things, quality, yield-to-maturity, liquidity, current yield and call risk. The Adviser believes the role of fixed income investments in the Fund is to help buffer the volatility of the Fund's equity portfolio and generate income.**

*See* Prospectus at 14-15 (bold added for emphasis).

    c.  **International Fund**.  As the International Fund's below-stated principal investment strategies indicate, the International Fund, as advised by Harris, invests in a relatively small portfolio (30 to 60 different positions) of stocks

34

issued by non-U.S. companies of all sizes, and employs a "value" orientation in stock selection.

## PRINCIPAL INVESTMENT STRATEGY

**The Fund invests primarily in a diversified portfolio of common stocks of non-U.S. companies.** The Fund may invest in non-U.S. markets throughout the world, including emerging markets. Ordinarily, the Fund will invest in the securities of at least five countries outside of the U.S. There are no geographic limits on the Fund's non-U.S. investments. **The Fund may invest in securities of large-, mid-, and small-capitalization companies.**

**The Fund uses a value investment philosophy in selecting equity securities.** This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below what we believe is their true business value presents the best opportunity to achieve the Fund's investment objective.

The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, the Adviser looks for the following characteristics, although the companies selected may not have all of these attributes: (1) free cash flows and intelligent investment of excess cash; (2) earnings that are growing and are reasonably predictable; and (3) high level of company management ownership.

*Key Tenets of the Oakmark Investment Philosophy:*
*1.      Buy businesses that are trading at a significant discount to the Adviser's estimate of the company's intrinsic value.* At the time the Adviser buys a company, the Adviser wants the company's stock to be inexpensive relative to what it believes the entire business is worth.
*2.      Invest with companies expected to grow shareholder value over time.* Value investors can sometimes fall into the trap of buying a stock that is inexpensive for a reason—because the company just does not grow. The Adviser looks for good quality, growing businesses with positive free cash flow and intelligent investment of cash.

35

3. *Invest with management teams that think and act as owners.* The Adviser seeks out companies with management teams that understand the dynamics of per share value growth and are focused on achieving such growth. Stock ownership and incentives that align managements' interests with those of shareholders are key components of this analysis.

In making its investment decisions, the Adviser uses a "bottom-up" approach focused on individual companies, rather than focusing on specific economic factors or specific industries. To facilitate its selection of investments that meet the criteria described above, the Adviser uses independent, in-house research to analyze each company. As part of this selection process, the Adviser's analysts typically visit companies and conduct other research on the companies and their industries. Once the Adviser identifies a stock that it believes is selling at a significant discount to the Adviser's estimated intrinsic value and that the company has one or more of the additional qualities mentioned above, the Adviser may consider buying that stock for the Fund. The Adviser usually sells a stock when the price approaches its estimated worth. This means the Adviser sets specific "buy" and "sell" targets for each stock the Fund holds. The Adviser monitors each portfolio holding and adjusts these price targets as warranted to reflect changes in a company's fundamentals.

**The Adviser believes that holding a relatively small number of stocks allows its "best ideas" to have a meaningful impact on the Fund's performance. Therefore, the Fund's portfolio typically holds thirty to sixty stocks rather than hundreds**, and a higher percentage of the Fund's total assets may also be invested in a particular region, sector or industry.

*See* Prospectus at 36-37 (bold added for emphasis).

79.    Although the Funds' principal investment strategies diverge in part (*e.g.*, the Income Fund invests in bonds as well as stocks; the International Fund invests in non-U.S. companies; the Oakmark Fund invests only in "larger" capitalization stocks), as well as overlapping significantly (the Oakmark Fund and the Income Funds focus on U.S., rather than international, stock investments; the Oakmark Fund and the International Fund focus on stock investments only; the Income Fund and the International Fund invest in companies of any and all capitalizations), Harris employs:

      a.    a shared "value philosophy" in managing all three Funds (as indicated by verbatim recitation of such philosophy in the principal investment strategies of all three Funds – and, indeed, in the principal investment strategies for *all* of the Oakmark Funds); and

      b.    for the two U.S.-focused Funds, a shared set of Harris personnel and resources (*i.e.*, those comprising Harris' above-described Domestic Investment Team). *See* Section VI.B, *supra*; *see also* Prospectus at 1-46; *see also* SAI at 5.

80.    As set forth above in Section VI.B, although common or collective effort is involved across all the Oakmark Funds to narrow down the universe of domestic/ U.S. securities to a small "Approved List" of 120-180 securities (and the universe of international securities to a parallel Approved List of similar size) in which the Oakmark Funds may invest, different portfolio managers for each of the Oakmark Funds then ultimately select different securities from such Approved List for the Oakmark Funds they manage.

81.    The Funds' portfolio managers are:

    a.  **Oakmark Fund**:

William Nygren

Kevin Grant.

    b.  **Income Fund**:

Clyde McGregor

M. Colin Hudson

Edward J. Wojciechowski

    c.  **International Fund**:

David G. Herro

Robert A. Taylor

*See* SAI at 18; Prospectus at 5, 20 and 40.

82.    Portfolio Selection Services constitute by far the largest part of the services provided by Harris to the Funds, and, as set forth above, are provided with substantial and

37

lengthy particularized description in the Oakmark Funds' SEC filings. As set forth next and below, although Harris also provided the Funds with certain Other Services, such Other Services were minor in comparison and receive barely any mention at all in the same SEC filings.

### 2. Other Services

83. As set forth in Section V.A, *supra*, most of the further services required for operation of the Oakmark Funds, over and above the Portfolio Selection Services provided by Harris as the Oakmark Funds' investment adviser, were provided by a variety of *other* service providers (*e.g.*, BFDS, State Street) pursuant to separate contracts (*e.g.*, the Administration Agreement, the Custodian Agreement, the Transfer Agency Agreement) and separate payments, or were otherwise procured by the Oakmark Fund for separate compensation.

84. Although not explicitly specified or required of Harris under the IAAs, Harris may also provide the Funds with various further services in addition to the specified and requisite Portfolio Selection Services. As set forth below, these Other Services boil down to (1) a modicum of administrative and/or compliance-related services (*e.g.*, maintaining certain books and records for the Funds. primarily with respect to the Portfolio Selection Services provided by Harris); and (2) periodic reporting – to the Funds' Board, in the Funds' SEC filings, and in other Funds-related communications – concerning the Funds' performance in light of the Portfolio Selection Services Harris provided (hereinafter, "Other Services").

85. First, and as mentioned above, the IAAs do not appear to specify, or require Harris to perform, *any* such Other Services.

86. Second, the Funds' SEC filings likewise specify no Other Services, but do vaguely indicate their existence:

      a. For example, the Funds' Prospectus indicates that Harris provides (unspecified) "administrative services" to the Funds:

> MANAGEMENT OF THE FUNDS
> The Oakmark Funds' investments and business affairs are managed by Harris Associates L.P. . . .

> Subject to the overall authority of the board of trustees, the Adviser furnishes continuous investment supervision and management to the Funds . . .
>
> Each Fund pays a management fee to the Adviser for serving as investment adviser **and for providing administrative services**.

*See* Prospectus at 58 (bold added for emphasis).

b. Likewise, the Funds' SAI hints at such administrative services in its generalized explanation that Harris, in addition to providing "continuing investment supervision to the Funds," also "is responsible for overall management of the Funds' business affairs:"

> INVESTMENT ADVISER
>
> The Adviser furnishes continuing investment supervision to the Funds **and is responsible for overall management of the Funds' business affairs** pursuant to investment advisory agreements relating to the respective Funds (the "Agreements").
>
> ***
>
> For its services as investment adviser, the Adviser received from each Fund a monthly fee based on that Fund's net assets . . .

*See* SAI, at 16-17 (bold added for emphasis).

c. Finally, the Funds' Semi-Annual Report contains a description of the Board's annual review and approval of the IAAs (the "Fee Approval Summaries," as further detailed in Section VIII.F *infra*,). Such description, among other things, describes the Board's review of the "nature, quality and extent of the Adviser's services." Fairly read, such Board analysis of the "nature [] and extent" of the services provided by Harris indicates that such services are primarily Portfolio Selection Services, but that Harris also provides further services as "administrator of the Funds" and further compliance-related services:

39

1. Nature, Extent and Quality of Services

The Board's consideration of the nature, extent and quality of the Adviser's services to the Funds took into account the knowledge the Board gained during meetings with the Adviser throughout the year. In addition, the Board considered: the Adviser's long-term history of care and conscientiousness in the management of the Funds; the consistency of its investment approach; the qualifications, experience, and capabilities of, and the resources available to, the Adviser's investment and other personnel responsible for managing the Funds; **the Adviser's performance as administrator of the Funds; and the Adviser's compliance program**. The Board also reviewed the Adviser's resources and key personnel involved in providing investment management services to the Funds, including the time that investment personnel devoted to each Fund and the investment results produced as a result of the Adviser's in-house research.

*See* SAR, at 73 (bold added for emphasis).

87.     However, to the extent that Harris provides the Funds with administrative and/or compliance-related services, the particular services provided are (1) nowhere specified, and (2) nowhere distinguished from the administrative and compliance-related services provided to the Funds by State Street (as Custodian and Administrator) and BFDS (as Transfer Agent) -- services specified at length in the Custodian Agreement, Administration Agreement and the Transfer Agency Agreement (*see* Section V.A, *supra*).

88.     Moreover, to the extent that Fund SEC filings state that Harris serves "as administrator of the Funds," such representation is belied by the fact that *State Street* serves as Administrator of the Oakmark Funds pursuant to the Administration Agreement, and that pursuant to such agreement State Street is tasked with the lion's share of administrative and compliance functions (*see* Section V.A, *supra*, at ¶¶44-46).

89.     Finally, to the extent that Harris provides the Oakmark Funds with compliance-related services, it further appears that such compliance services are ones for which Harris receives, at least in part, separate and direct compensation from the Oakmark Funds.  For example, the Oarkmark Funds are responsible for paying the compensation of the Oakmark Funds' Chief Compliance Officer, Richard J. Gorman (a Harris employee).

40

90.     Ultimately, based on information and belief resulting from counsel's review of the Funds' SEC filings and other reports to shareholders and investors, Harris-authored materials concerning and describing its investment advisory services, and counsel's understanding of the Other Services customarily and typically provided by mutual fund investment advisers, the Other Services provided to the Funds by Harris comprise: (1) a modicum of administrative and/or compliance-related services (*e.g.*, maintaining certain books and records for the Funds. primarily with respect to the Portfolio Selection Services provided by Harris); and (2) periodic reporting – to the Funds' Board, in the Funds' SEC filings (specifically, the "Portfolio Manager Commentary" sections of the Funds Annual and Semi-Annual Reports), and in other Funds-related communications (specifically, the "Portfolio Manager Commentary" sections of the additional two quarterly reports issued each year for the Funds; quarterly fund "Factsheets" containing summary portfolio/performance data) – concerning the Funds' performance in light of the Portfolio Selection Services Harris provided.

**B.      The Advisory Fee Rates Charged by Harris to the Funds under the IAAs**

91.     The IAAs require the Funds to pay to Harris, as compensation for Harris's provision of investment advisory services, an investment advisory fee, calculated and payable monthly based on the Funds' net assets at the end of each month.

92.     The Funds' operative advisory fee rates, applied to the Funds' net assets on an annualized basis, are set forth at Clause 6 of the IAAs and are as follows:

**Table 2**

**The Funds' Operative Investment Advisory Fee Rates**

| Oakmark Fund | | | Income Fund | |
|---|---|---|---|---|
| **Fund Net Assets** | **Fee Rate** | | **Fund Net Assets** | **Fee Rate** |
| First $2 billion | 1.000% | | First $5 billion | 0.750% |
| $2.0 - $3.0 billion | 0.900% | | $5.0 - $7.5 billion | 0.700% |
| $3.0 - $5.0 billion | 0.800% | | $7.5 - $10 billion | 0.675% |
| $5.0 - $7.5 billion | 0.750% | | $10.0 - $12.5 billion | 0.650% |
| $7.5 - $10.0 billion | 0.675% | | $12.5 - $16.0 billion | 0.600% |
| $10 - $12.5 billion | 0.625% | | $16.0 - $21.0 billion | 0.585% |
| $12.5 - $25.0 billion | 0.620% | | $21.0 - $28.0 billion | 0.5775% |
| $25.0 - $35.0 billion | 0.615% | | $28 billion and up | 0.5725% |
| $35 billion and up | 0.610% | | | |

| International Fund | |
|---|---|
| **Fund Net Assets** | **Fee Rate** |
| First $2 billion | 1.000% |
| $2.0 - $3.0 billion | 0.950% |
| $3.0 - $5.0 billion | 0.850% |
| $5.0 - $7.5 billion | 0.825% |
| $7.5 - $11.0 billion | 0.815% |
| $11.0 - $16.5 billion | 0.805% |
| $16.5 - $23.0 billion | 0.800% |
| $23.0 - $30.0 billion | 0.795% |
| $30.0 - $35.0 billion | 0.790% |
| $35 billion and up | 0.785% |

*See* IAAs at Clause 6; *see also* Semi-Annual Report at 62.

93.     Application of such fee rates against fund assets can be summarized and encapsulated in a single figure: a fund's "blended" investment advisory fee rate (*i.e.*, the annualized overall fee rate paid by a fund). The most-recently *reported* blended rates for the Funds are set forth below:

| Oakmark Fund | Income Fund | International Fund |
|---|---|---|
| **Blended Fee Rate** | **Fee Rate** | **Fee Rate** |
| 0.72% | 0.66% | 0.83% |

42

*See* Prospectus at 1, 13 and 35.

94.    However, and as noted in Section VIII.A *infra*, such reported rates are slightly stale (and appear to be based on 2015 data).  Based on the Funds' most-recently reported net assets (as of June 30, 2016), the Funds currently incur advisory fees at slightly higher rates:

        a.  0.74% for the Oakmark Fund;

        b.  0.68% for the Income Fund; and

        c.  0.84% for the International Fund.

95.    The Funds operate on a fiscal year that ends on September 30, and, typically, take approximately two months after the close of each semi-annual and annual period (*i.e.*, the six months ended March 30 of every year, and the 12 months ended September 30 of very year) to issue and file with the SEC their semi-annual and annual reports (which contain, *inter alia*, audited financial statements for the Funds).  Consequently, the investment advisory fees paid by the Funds during the fiscal year ending September 30, 2016 will not be disclosed until late November 2016.

96.    The Funds' most-recently disclosed investment advisory fee payments, for the six month period ended March, 30, 2016 (*i.e.*, the first half of the Fund's fiscal 2016 year, from October 1, 2015 to March 30, 2016) and, for comparison, for the 12 month period ended September 30, 2015 (*i.e.*, the Funds' fiscal 2015 year), are set forth below:

**Table 3**

**The Funds' Most-Recently Disclosed Advisory Fee Payments**

|  | **Oakmark Fund** | **Income Fund** | **International Fund** |
|---|---|---|---|
| **First Half of Fiscal 2016** | $60,989,000 | $59,439,000 | $110,078,000 |
| **Fiscal 2015 (full year)** | $129,133,000 | $135,288,000 | $243,867,000 |

*See* Annual Report at 42-43; Semi-Annual Report at 46-47.

97.    To the extent that Section 36(b) provides a damages limitation 'start date' (but no corresponding end date) that limits damages only to those excessive fees charged during the

period *beginning* one year prior to the complaint filing (but extending through the pendency of the action), the excessive fees claimable as damages here include:

    a.  a small portion of the Funds' fiscal 2015 excessive fees (*i.e.*, only those fees relating to last month of fiscal 2015, which falls within the year prior to this complaint's filing);

    b.  the Funds' excessive fees for the first half of Fiscal 2016; and

    c.  the Funds' excessive fees for all subsequent periods, which the Funds have yet to report.

## VIII.  HARRIS EXTRACTED EXCESSIVE FEES FROM THE FUNDS

98.    Since the ICA was amended through Section 36(b), judicial standards have evolved to determine whether or not investment advisory fees were excessive and/or breached fiduciary duties. These standards, known as the "*Gartenberg* factors," are addressed *seriatim* in Sections VIII.A-F below.

### A.    Comparative Fee Structures

99.    The investment advisory fees paid by the Funds are **aptly** compared to:

    a.  the investment advisory fees paid by *other Harris advisory clients* – specifically, Arm's-Length Clients, including the Subadvised Funds – for investment advisory services *substantially similar and in large part identical to those Harris provided to the Fund*s (*see* Section VIII.A.1-2, *infra*); and

    b.  the investment advisory fees paid to other investment advisers by other mutual funds whose size, character and investment strategy were comparable to the Funds' (*see* Section VIII.A.3, *infra*).

100.    Such apt comparisons uniformly indicate that the Funds paid substantially *higher* fees (as the Board itself acknowledged in conducting similar comparisons – *see* Section VIII.A.4, *infra*) for substantially *similar* investment advisory services.

101.    In light of the similarity of services provided (which makes such fee comparisons *apt*), the Funds' higher advisory fees do not appear to arise from, and cannot be explained by, any purportedly greater or additional services that Harris provided to the Funds (*i.e.*, services purportedly *not* provided to Harris' other clients and/or to other similar mutual funds).

**1.    Harris Provided Arm's-Length Clients with Substantially Similar Investment Advisory Services at Substantially Lower Advisory Fee Rates**

**a)    Advisory Services**

102.    As set forth above in Section VI.A, *supra*, Harris has in relevant part three different sets of clients:

a.  the seven Oakmark Funds in the Oakmark Fund Complex;

b.  Arm's-Length Clients, to whom Harris offers a menu of approximately ten discrete Strategies; and

c.  Subadvised Funds.

103.    Exhibits A1 through A7 and B hereto gather comparative data concerning the services provided and the fees charged by Harris to each of these three sets of clients, extracted from, *inter alia*, SEC filings (and exhibits thereto) concerning the Oakmark Funds and the Subadvised Funds (and, to the extent such Subadvised Funds are domiciled outside the U.S., filings with foreign securities regulators and/or further informational documents provided to foreign investors in such Subadvised Funds, authored by Harris and/or its affiliates), and from the Harris Website (the only public source of information concerning the services provided to Arm's-Length Clients).  Such data includes:

a.  the principal investment objectives (for the Funds and Subadvised Funds);

b.  the principal investment strategies;

c.  the identity of the investment advisor and/or subadviser (or, stated differently, Harris's role as either investment adviser or investment subadviser);

d.  the particular Harris personnel identified as "portfolio managers;"

45

e.  the advisory and/or subadvisory services required by operative advisory and subadvisory contracts;

f.  the advisory and/or subadvisory services performed;

g.  the advisory and/or subadvisory fees Harris charged;

h.  specific information concerning the investment portfolios Harris provided and managed for such clients, including data concerning:

    i.  the ten largest stock holdings, as of particular dates;

    ii.  the total number of different stock holdings, as of particular dates;

    iii.  the sector allocations of the portfolios (*e.g.*, X% in the financial sector, y% in the industrial sector, etc.);

i.  portfolio performance;

j.  portfolio "turnover" rates; and

k.  portfolio size.

104.  Each of Exhibits A1 through A7 presents data for (1) one of the seven distinct Oakmark Funds, and (2) to the extent available, Strategies and/or Subadvised Funds that *correspond* to that particular Oakmark Fund. Correspondence is indicated, *inter alia*, where the investment advisory services provided by Harris to a particular Oakmark Fund appear, through examination of such data, substantially similar and/or identical to those Harris provided to Arm's-Length Clients for a particular Harris Strategy, or to Subadvised Funds. For example, correspondence arises where similar and/or the same Harris personnel served as portfolio managers for an Oakmark Fund *and* for a Strategy and/or Subadvised Fund, and provided such different clients not only with similar and/or the same investment strategies, but similar and/or the same investment portfolios (*e.g.*, featuring similar and/or the same particular investments, sector allocations, etc.), featuring similar and/or the same performance and/or turnover rates.

105.  The data collected in Exhibits A1 through A7 provides extensive and particularized indication that substantial correspondences exist between the services Harris

provides to the Oakmark Funds and: (a) those Harris provides to its Arm's-Length Clients (as set forth below), and (b) those Harris provides to the Subadvised Funds (as set forth in Section VIII.A.2, *infra*).

106.    **First**, as Table 4 on the following page makes clear, Harris has repackaged, as Strategies for its Arm's-Length Clients, the array and variation of the principal investment strategies that it provides to the seven funds in the Oakmark Fund Complex (as set forth in Section V.B, *supra*). Put simply, there is an identifiable, one-to-one correspondence between the different Strategies Harris offers to its Arm's-Length Clients and the seven funds in the Oakmark Fund Complex.

**Table 4**

**The Oakmark Funds and the Corresponding "Strategies" Harris Offered to Arm's-Length Clients**

| Harris Fund | Portfolio Managers | Advisory Fee Rates for Fund | Principal Investment Strategy Specifications re. . . | | | | | Harris Strategy | Portfolio Managers | Advisory Fee Rates for Strategy |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Asset Class | Region | Market Cap | Investment Style | Number of Investments | | | |
| Oakmark Fund | William C. Nygren, Kevin Grant | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.625% on the next $2.5 billion; 0.620% on the next $12.5 billion; 0.615% on the first $10.0 billion; and 0.610% over $35.0 billion | Equity | U.S. | "Larger" Cap | Value | Fund: 30 - 60 Strategy: ~40 | U.S. Equity | Robert M. Levy | 0.75% on the first $15 million 0.45% on asset value over $15 million |
| Oakmark Select Fund | William C. Nygren, Anthony P. Coniaris, Win Murray | 1.00% up to $1 billion; 0.95% on the next $500 million; 0.90% on the next $500 million; 0.85% on the next $500 million; 0.80% on the next $2.5 billion; 0.75% on the next $5 billion; and 0.725% over $10 billion | Equity | U.S. | Large Cap Mid Cap | Value | Fund: 12 - 20 Strategy: ~20 | Concentrated Value | Robert M. Levy | 1.00% on the first $10 million 0.50% on asset value over $10 million |
| Oakmark Equity & Income Fund | Clyde S. McGregor, Colin Hudson, Edward J Wojciechowski | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.587% on the next $8.5 billion; 0.5775% on the next $7 billion; and 0.5725% over $24 billion | Equity + Fixed Income | U.S. | All Cap | Value | Fund: 30 - 60 (equity) Strategy: unspecified | Balanced | Clyde S. McGregor, Michael J. Mangan, Jay B. Bornstein, Andrew M. Gloek, Diane L. Mustain, Thomas W. Delaney | 0.75% on the first $15 million 0.45% on asset value over $15 million |
| Oakmark International Fund | David G. Herro, Robert A. Taylor | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.800% on the next $6.5 billion; 0.80% on the next $6.5 billion; 0.795% on the next $7 billion; 0.790% on the next $5 billion; and 0.785% over $35 billion | Equity | non-U.S. | All Cap | Value | Fund: 30 - 60 Strategy: 35 - 65 | International | David G. Herro, Robert A. Taylor | 0.70% on the first $100 million 0.50% on asset value over $100 million |
| Oakmark International Small Cap Fund | David Herro, Michael Manelli | 1.25% up to $500 million; 1.10% on the next $1 billion; 1.05% on the next $2 billion; 1.025% on the next $1.5 billion; and 1.00% over $5 billion | Equity | non-U.S. | Small Cap | Value | Fund: 30 - 70 Strategy: 35 - 70 | International Small Cap | David G. Herro, Michael L. Manelli | 1.00% on all asset values |
| Oakmark Global Fund | Clyde S. McGregor, Robert A. Taylor | 1.00% up to $2 billion; 0.95% on the next $2.5 billion; 0.90% on the next $4 billion; and 0.875% over $8 billion | Equity | U.S. + non-U.S. | All Cap | Value | 30 - 60 | Global All Cap | Clyde S. McGregor, Robert A. Taylor | 0.80% on the first $100 million 0.65% on asset value over $100 million |
| Oakmark Global Select Fund | William C Nygren, David G. Herro | 1.00% up to $2 billion; 0.95% on the next $4 billion; 0.875% on the next $4 billion; and 0.85% over $7 billion | Equity | U.S. + non-U.S. | "Larger" Cap | Value | Fund: 12 - 20 Strategy: 15 - 25 | Global Concentrated | Robert M. Levy, David G. Herro, Michael L. Manelli | 0.78% on the first $10 million 0.55% on asset value over $10 million |
| n/a | n/a | n/a | Equity | U.S. | Mid Cap | Value | Fund: n/a Strategy: ~45 | Mid Cap Value | Michael J. Mangan | 0.90% on the first $10 million 0.50% on asset value over $10 million |
| n/a | n/a | n/a | Equity | Japan | Large Cap Mid Cap | Value | Fund: n/a Strategy: 20 - 30 | Japan Equity | David G. Herro, Robert A. Taylor, Eric Liu | 0.75% on the first $100 million 0.60% on asset value over $100 million |
| n/a | n/a | n/a | Equity | U.S. + non-U.S. | Large Cap | Value | Fund: n/a Strategy: 30 - 60 | Global | Robert M. Levy, David G. Herro, Michael L. Manelli | 0.70% on the first $100 million 0.50% on asset value over $100 million |

48

107.    For example, the Strategy analogues to the Oakmark Fund and its less-diversified companion, the Oakmark Select Fund (both U.S.-focused, both "larger" capitalization focused, the former's portfolio with 30-60 positions and the latter's with only 12-20) are, respectively, Harris's "U.S. Equity" Strategy (U.S.-focused, "larger" capitalization, "approximately" 40 positions in the portfolio) and Harris's "Concentrated Value" Strategy (the same foci, but with "approximately" 20 positions).   Likewise, where both Oakmark funds share a lead portfolio manager (Nygren), both the corresponding Harris Strategies share a portfolio manager (Levy).

108.    Similarly and with even greater correspondence, corresponding to the International Fund (30-60 non-U.S., all-cap positions) and the Oakmark International Small Cap Fund (30-70 non-U.S., small-cap positions) are identically-named Harris Strategies of effectively *identical* design:  respectively, Harris's International Strategy (a portfolio of 35-65 non-U.S., all-cap positions), and Harris's International Small Cap Strategy (a portfolio of 35-70 non-U.S., small-cap positions).   Indeed and as set forth below, these two International Oakmark Funds and their corresponding two Harris Strategies are not merely identical in name and design, but *identical in execution down to the smallest details*:  the Harris Strategies are managed by the same portfolio managers as the International Oakmark Funds, who provide both Strategies and funds with exactly the same investment portfolios (identical positions, identical sector allocations, identical turnover rates) and, consequently, exactly the same performance (apart from performance differences resulting from differing advisory fee rates).

109.    The two Oakmark "Global" funds (Oakmark Global and Oakmark Global Select) have corresponding Strategy analogues in Harris's Global and Global Concentrated Strategies. The correspondence between the former (*i.e.*, the Oakmark Global Fund and Harris's Global Strategy) is, like the correspondences between the International Oakmark Funds and international Harris Strategies, *exact*, down to the smallest details: identical portfolio managers (McGregor and Taylor) provide both fund and Strategy with exactly the same positions, portfolios and performance (apart from performance differences resulting from differing advisory fee rates).   The correspondence between the latter (the Oakmark Global Select Fund

and Harris's Global Select Strategy) parallels that between the U.S.-focused Oakmark funds and their corresponding Harris Strategies: with Nygren co-helming the fund and Levy co-leading the corresponding Strategy, the intent and design of the two investment products are fundamentally the same, but particularized execution differs.

110.    Finally, the Income Fund, led by McGregor and others as a U.S.-focused fund that invests in bonds as well as stocks of all capitalizations, has its analogue in Harris's Balanced Strategy, led by McGregor and others in the same manner (*i.e.*, U.S.-focused, bonds and stocks of all capitalizations).

111.    **Second**, the array and variations of Harris's Strategies not only parallel and correspond to those of the Funds (as set forth in "First" above and in Table 4), but, for the most part, Harris's Strategies are led by the same Harris portfolio managers that helm the corresponding Oakmark Funds. Specifically:

a.    the International Fund and the Harris International Strategy are both managed by Herro and Taylor;

b.    the Oakmark International Small Cap Fund and the Harris International Small Cap Strategy are both managed by Herro and Manelli;

c.    the Oakmark Global Fund and the Harris Global Strategy are both managed by McGregor and Taylor (the former providing U.S. focus/expertise; the latter international);

d.    the Income Fund, and Harris's corresponding Balanced Strategy, both feature McGregor as the lead portfolio manager (accompanied by differing sets of additional portfolio managers); and

e.    the Oakmark Global Select Fund and the Harris Global Select Strategy share a common manager for their international component (Herro), although different co-managers for their U.S. component (Nygren for the Oakmark fund; Levy for the Harris strategy).

50

... 

112.    The sole exception, and the principal difference between the Oakmark Funds and the Harris Strategies, arises from:

        a.    Harris's deployment of Nygren as chief portfolio manager for Oakmark equity funds with a U.S. focus (the Oakmark Fund and the Oakmark Select Fund) or with a U.S. component (the Oakmark Global Select Fund); and

        b.    Harris's parallel deployment of Levy as portfolio manager for the three Harris Strategies that correspond to these three Oakmark funds (*i.e.*, Harris's U.S. Equity, Concentrated Value, and Global Concentrated Strategies).

113.    Although the parallel placement of Nygren on the Oakmark Funds side and Levy on the Harris Strategies side introduces certain particularized differences between such Oakmark Funds and Strategies (*e.g.*, Nygren and Levy select different particular investments for their respective portfolios, and thus cause portfolio allocations, turnover and performance to differ), this neither makes these Oakmark Funds and Harris Strategies fundamentally dissimilar, nor renders their comparison inapt.  To the contrary and as set forth above in Table 4, these three Oakmark Funds and their corresponding Harris Strategies are fundamentally similar investment products in design and intent, and differ only in particularized execution.[12]

114.    **Third**, as mentioned above and set forth in detail in Exhibits A1 to A7, the similarities between the seven Oakmark Funds and their corresponding Harris Strategies are not limited to fundamental investment portfolio design (per "First" above) or identity, overlap or equivalency in portfolio management (per "Second" above), but, in many instances, extend to provision of not merely similar, but *identical*, investment positions, portfolios and products.

---

[12] Moreover, Levy and Nygren are of equivalent stature, and occupy equivalent roles, within Harris: each serves on Harris's three-person U.S. Stock Selection Group (where they are joined by its third member, McGregor), which functions as the gatekeeper of Harris's Approved List of investments for *all* clients, accounts and/or portfolios. Therefore, clients receiving portfolios of similar fundamental design, but selected by Nygren on the one hand (the Oakmark funds) or Levy on the other (the corresponding Harris Strategies), are receiving *equivalent* investment products and services. Such equivalence is all the greater in light of the fact that *all* Oakmark funds and Harris Strategies invest only in the common and relatively small set of securities admitted onto Harris's Approved List by vote of the Stock Selection Group.

115.    For example, as data collected in Exhibit A4 indicates, the International Fund and the Harris International Strategy are not merely similarly-designed investment products (portfolios of 30-60 investments in non-U.S. companies of all capitalizations), but exactly *identical* investment products, featuring:

      a.  exactly the same total number of positions in their portfolios (60 as of December 31, 2015; 57 as of March 31, 2016);

      b.  the exact same set of ten largest holdings, in exactly the same order and in almost exactly the same proportions, on both December 31, 2015 (*e.g.*, Credit Suisse as the largest position, constituting ~5% of the portfolio, followed by Honda as the second largest position, constituting ~4% of the portfolio, followed by BNP Paribas at approximately 3.8%, etc.), and March 31, 2016 (*e.g.*, with Glencore now the largest holding, at 4.8% of the portfolio, displacing Credit Suisse to second place at 4.3%, etc.); and

      c.  the exact same sector allocations within the portfolio as a whole (*e.g.*, 30.5% financials, 26.5% consumer discretionary, 19.3% industrials, etc.), further indicating that the portfolios were not only identical at the top (*e.g.*, the "top ten" positions), but identical *throughout*.

116.    Likewise, similar data in Exhibits A5 and A7 establish, similarly, that further Oakmark Funds and Harris Strategies – specifically (1) the Oakmark International Small Cap Fund and the Harris International Small Cap Strategy, and (2) the Oakmark Global Fund and the Harris Global Strategy – were not merely similar in design and leadership, but *identical* investment products featuring identical positions and portfolios.

117.    While similar data for the remaining four Oakmark Funds and their corresponding Strategies (including the above-discussed parallel deployments, in three cases, of Nygren on the Oakmark Fund side and Levy on the Strategy side) introduce divergences in the *particulars* (*e.g.*, "top ten" holdings lists that feature varying degrees of overlap, rather than complete identity; sector allocations that indicate broad, if not total, portfolio commonalities), such divergences do

not outweigh the fundamental similarity or equivalency of these funds and their corresponding Strategies as investment products. In addition to the basic similarities of portfolio design, limiting their portfolios to similar numbers of investments in similarly-sized companies from similar geographical regions, such Oakmark funds and Strategies also shared the yet-deeper similarities occasioned by common reliance on Harris's collective work to generate a small set of approved investments (the Approved List) from which all Harris portfolio managers were constrained to select their investments.

118.     **Fourth** and lastly, such similarities in positions and portfolios provided yielded concomitant similarities in the investment performance Harris delivered.

119.     For those Oakmark funds and corresponding Harris Strategies where not only the portfolio managers, but the actual portfolios, were identical, investment performance was identical as well (apart from differences introduced by different fee levels). For example, the International Fund had returns of -3.83% for the year ended December 31, 2015 (duplicated by the Harris International Strategy's returns of -3.79% for the same period); and -12.37% for the year ended March 31, 2016 (duplicated again by the Harris International Strategy's returns of -12.22% for the same period). *See* Exhibit A4. Harris delivered similarly identical performance to:

  a.   the Oakmark International Small Cap Fund and clients of Harris's Oakmark International Small Cap Strategy, and

  b.   the Oakmark Global Fund and clients of Harris's Global Strategy.

*See* Exhibits A5 and A7.

120.     Indeed, even where differences in leadership of otherwise-corresponding Oakmark Funds and Harris Strategies yielded different investment portfolios delivered to the Oakmark Funds versus to Arm's-Length Clients for Harris's corresponding strategies, *the resulting difference in investment performance were minor – which further indicates the essential similarity of such corresponding investment products and services.*

a. For example, notwithstanding that Nygren headed the Oakmark Fund, and Levy the corresponding Harris U.S. Equity Strategy, and that consequently each was provided with differing particular investments, the Oakmark Fund had returns of -4.0% for the year ended March 31, 2016, while the corresponding Harris U.S. Equity Strategy had similar returns of -4.69% for the same period. *See* Exhibit A1.

b. Likewise, where the Income Fund returned -4.73% for the year ended March 31, 2016, the Harris Balanced Strategy, notwithstanding its receipt of different particular investment positions, returned a similar -3.93%. *See* Exhibit A3.

121.    In sum, the foregoing allegations indicate most specifically that the *Portfolio Selection Services* that Harris provided to the Oakmark Funds, including the Funds, were substantially similar to – and, often, exactly identical to – the Portfolio Selection Services that Harris provided to Arm's-Length Clients for those Harris Strategies corresponding to the Oakmark Funds.

122.    Furthermore, Harris did not provide the Oakmark Funds with *Other Services* meaningfully different, greater, or more costly or valuable than the Other Services provided to Arm's-Length Clients for those Harris Strategies corresponding to the Oakmark Funds.

123.    As set forth in Section VII.A.2, *supra*, the Other Services provided to the Funds by Harris comprise:

a. in largest part, periodic reporting to the Oakmark Funds' Board and shareholders, including in SEC filings (such as annual and semi-annual reports) and other Fund-related communications (*e.g.*, quarterly reports and quarterly Fact Sheets for the Oakmark Funds), and including the "Portfolio Manager Commentary" section of such documents and communications (quarterly narratives reporting on market and economic conditions, the Oakmark Funds' portfolios and performance, and on how Harris's Portfolio Selection Services saliently impacted portfolios and performance); and

54

     b. in addition, a modicum of administrative and/or compliance-related services *not already performed by the Oakmark Funds' other service provider*s or separately compensated by the Oakmark Funds (which largely boil down to maintaining certain books and records for the Oakmark Funds, primarily with respect to the Portfolio Selection Services provided by Harris).

124.    Harris provided substantially similar Other Services to its Arm's-Length Clients.

125.    As Harris itself explains, Harris provides *all* of its investment advisory clients with similar investment portfolio reporting services on at least a quarterly basis, reporting *inter alia* information with respect to portfolio holdings, market values and rates of return over various time periods. *See* Form ADV at 27-28.

126.    Indeed, examination of the documents and data that Harris reports to its Arm's-Length Clients indicates that such reporting is fundamentally equivalent – in content and in frequency – to the reporting provided to Oakmark Fund investors. *See inter alia* Harris Website at:

     a. "Institutions," describing certain of the monthly and quarterly reporting services provided to Harris's institutional clients:

> In addition to monthly and quarterly performance and portfolio updates, we provide quarterly strategy letters that typically focus on broad business trends and general market outlook. These letters allow us to offer our observations regarding market opportunities, regulatory issues, investor behavior or other relevant themes.[13]

     b. "Strategy Commentary," providing links to quarterly narrative reports for many of the Strategies Harris offers to Arm's-Length Clients, whose contents – reporting on market and economic conditions, Harris Strategy portfolios and performance, and on how Harris's Portfolio Selection Services saliently impacted such portfolios and performance – are functionally equivalent to the

---

[13]  Available at: http://www.harrisassoc.com/Investors/Institutions.htm.

"Portfolio Manager Commentaries" provided to Oakmark Fund investors;[14] and

c. particular Strategy pages (*e.g.*, "U.S. Equity"), providing extensive data and reporting concerning each Harris Strategy, including portfolio characteristics (such as the total number of holdings, portfolio turnover, and average market capitalization, current and projected price-to-earnings and price-to-book ratios of portfolio holdings), portfolio sector allocations, top-ten and complete portfolio holdings, portfolio performance data over multiple time periods, etc..[15]

127. And while mutual funds with many investors may present more administrative and operational complications than accounts managed for single investors, *most such additional work does not fall on Harris as the Oakmark Funds' investment adviser*, but on *other* entities, such as State Street and BFDS, specifically tasked with and paid for such work. The modicum of administrative work left for *Harris* to perform for the Oakmark Funds consisted primarily of oversight, as well as maintenance of books and records (concerning, in largest part, Harris's provision of Portfolio Selection Services).

128. Such administrative tasks were not meaningfully different or greater than those Harris provided to its Arm's-Length Clients. For example, Harris maintained books and records concerning its provision of Portfolio Selection Services to its Arm's-Length Clients, just as it did for the Oakmark Funds. Moreover, where the Oakmark Funds separately paid other service providers to other services they required, Harris's Arm's-Length Clients had no such separate arrangements with other service providers – meaning that Harris had to perform, and/or absorb the costs of, providing any such additional services its Arm's-Length Clients required *itself*. For example, pursuant to the Administration Agreement, some of the financial reporting that Harris provided to the Oakmark Fund shareholders and to the Board was *prepared for Harris* by the

---

[14] Available at: http://www.harrisassoc.com/Commentaries--News/Strategy-Commentary.htm.
[15] Available at: http://www.harrisassoc.com/Strategies--Products/Harris-Strategies/U.S.-Equity/U.S.-Equity.htm.

Oakmark Funds' Administrator (State Street); but, for its Arm's-Length Clients, Harris, operating without the services of an external administrator, had to prepare such reporting information itself.

129.    Indeed, and as set forth in the following Section VIII.A.2 *infra*, more detailed information concerning the Other Services provided to one particular set of Harris's Arm's-Length Clients – the Subadvised Funds – indicates that the Other Services that Harris provided to its Arm's-Length Clients, and particularly Harris's reporting-related obligations to such clients, were equivalent to and on occasion *exceeded* those that Harris provided to the Oakmark Funds. *See* Section VIII.A.2, *infra* and Exhibit B.

**b)**    **Advisory Fees**

130.    Notwithstanding the above-detailed similarity, and in many cases the exact identity, between the investment advisory services that Harris provided to the Oakmark funds and to Arm's-Length Clients for corresponding Harris Strategies, Harris levied investment advisory fee rates on the Oakmark Funds, including the Funds, that were sharply higher than the rates charged to Arm's-Length Clients who received similar and/or substantially identical services from Harris.

131.    Table 5 on the following page:

    a.    compares the advisory fee rates that Harris charged to the Oakmark Funds, including the Funds, and those that Harris charged to Arm's-Length Clients for corresponding Harris Strategies, and

    b.    measures, on the basis of such comparison, the excessive fees that Harris charges to the Oakmark Funds, including the Funds, calculated as the difference between:

        i.    the blended rate and fees the Oakmark Funds paid, at the advisory fee rate schedules applicable to each of the Oakmark Funds, and

57

ii. the blended rate and fees that the Oakmark Funds would have paid pursuant to the advisory fee rate schedules Harris offered to Arm's-Length Clients for corresponding Harris Strategies.

**Table 5**

**The Oakmark Funds' Excessive Fees I:**
(per fee comparison to Harris's advisory fee rates for corresponding "Strategies" provided to Arm's-Length Clients)

| Fund / Net Assets (as of June 30, 2016) | Advisory Fee Rates for Fund | Fund Blended Rate (@ 6/30/2016 net assets) | Annual Advisory Fee Payment (@ 6/30/2016 net assets) | Advisory Fee Rates for Corresponding Strategy | Fund Blended Rate @ Strategy Rates | Annual Advisory Fee Payable (@ Strategy Rates) | Excessive Fees (Excess Over Strategy) $ | % |
|---|---|---|---|---|---|---|---|---|
| Oakmark Fund $15.2 billion | 1.00% up to $2 billion; 0.90% on the next $7 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.625% on the next $2.5 billion; 0.620% on the next $12.5 billion; 0.615% on the next $10.0 billion; and 0.610% over $35.0 billion | 0.74% | $112,990,000 | U.S. Equity 0.75% on the first $15 million 0.45% on assets over $15 million | 0.45% | $68,400,000 | $44,590,000 | 65.19% |
| Oakmark Select Fund $4.8 billion | 1.00% up to $1 billion; 0.95% on the next $500 million; 0.90% on the next $500 million; 0.85% on the next $500 million; 0.80% on the next $2.5 billion; 0.75% on the next $5 billion; and 0.725% over $10 billion | 0.87% | $41,900,000 | Concentrated Value 1.00% on the first $10 million 0.50% on asset value over $10 million | 0.50% | $24,050,000 | $17,850,000 | 74.22% |
| Oakmark Equity & Income Fund $16.2 billion | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5675% on the next $7 billion; and 0.5725% over $28 billion | 0.68% | $110,295,000 | Balanced 0.75% on the first $15 million 0.45% on asset value over $15 million | 0.45% | $72,900,000 | $37,395,000 | 51.30% |
| Oakmark International Fund $23.0 billion | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; 0.80% on the next $6.5 billion; 0.795% on the next $7 billion; 0.790% on the next $5 billion; and 0.78% over $35 billion | 0.84% | $192,275,000 | International 0.70% on the first $100 million 0.50% on asset value over $100 million | 0.50% | $115,200,000 | $77,075,000 | 66.91% |
| Oakmark International Small Cap Fund $2.4 billion | 1.25% up to $500 million; 1.10% on the next $1 billion; 1.05% on the next $2 billion; 1.025% on the next $5 billion; and 1.00% over $8 billion | 1.11% | $26,610,000 | International Small Cap 1.00% on all asset values | 1.00% | $24,000,000 | $2,610,000 | 10.88% |
| Oakmark Global Fund $2.4 billion | 1.00% up to $2 billion; 0.95% on the next $2 billion; 0.90% on the next $4 billion; and 0.875% over $8 billion | 0.99% | $23,800,000 | Global All Cap 0.80% on the first $100 million 0.65% on asset value over $100 million | 0.66% | $15,750,000 | $8,050,000 | 51.11% |
| Oakmark Global Select Fund $2.0 billion | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.875% on the next $4 billion; and 0.85% over $7 billion | 1.00% | $20,000,000 | Global Concentrated 0.78% on the first $100 million 0.55% on asset value over $100 million | 0.56% | $11,230,000 | $8,770,000 | 78.09% |
| | | | | | | AVERAGE DEGREE OF EXCESS | | 56.81% |

132. For example, as Table 5 above indicates for the Oakmark Fund:

    a. the Oakmark Fund, at its most-recently reported level of net assets, incurs a blended advisory fee rate of 0.74% per year, resulting in annualized advisory fees of $112.99 million; but

    b. were the Oakmark Fund assessed advisory fees pursuant to the rate schedule in effect for Arm's-Length Clients for Harris's corresponding U.S. Equity Strategy (who obtained substantially similar services from Harris as those provided to the Oakmark Fund), the Oakmark Fund would be charged a blended advisory fee rate of only 0.45%, resulting in annualized advisory fees of $68.4 million; and consequently

    c. the difference between these two sums -- $44.59 million per year – constitutes a concrete measure of the excessive fees paid annually by the Oakmark Fund, and equates to a 65.2% overcharge above the rates paid by Arm's-Length Clients to receive similar investment advisory services.

133. Likewise, as Table 5 above indicates with respect to the Income Fund:

    a. the Income Fund, at its most-recently reported level of net assets, incurs a blended advisory fee rate of 0.68% per year, resulting in annualized advisory fees of $110.30 million; but

    b. were the Income Fund assessed advisory fees pursuant to the rate schedule in effect for Arm's-Length Clients for Harris's corresponding Balanced Strategy (who obtained substantially similar services from Harris), the Income Fund would be charged a blended advisory fee rate of only 0.45%, resulting in annualized advisory fees of $72.90 million; and consequently

    c. the difference between these two sums -- $37.40 million per year – constitutes a concrete measure of the excessive fees paid annually by the Income Fund, and equates to a 51.3% overcharge above the sum paid by Arm's-Length Clients to receive similar investment advisory services.

134. Finally, as Table 5 above indicates with respect to the International Fund:

    a. the International Fund, at its most-recently reported level of net assets, incurs a blended advisory fee rate of 0.84% per year, resulting in annualized advisory fees of $192.3 million; but

    b. were the International Fund assessed advisory fees pursuant to the rate schedule in effect for Arm's-Length Clients for Harris's corresponding International Strategy (who obtained substantially similar services from Harris), the International Fund would be charged a blended advisory fee rate of only 0.50%, resulting in annualized advisory fees of $115.2 million; and consequently

    c. the difference between these two sums -- $77.1 million per year – constitutes a concrete measure of the excessive fees paid annually by the International Fund, and equates to a 66.9% overcharge above the sum paid by Arm's-Length Clients to receive similar investment advisory services

135. In short, the above comparisons indicate that the Oakmark Fund pays investment advisory fees that are 65.52% higher, the Income Fund fees that are 51.3% higher, and the International Fund advisory fees that are 66.9% higher, than the fee rates Harris charged to its Arm's-Length Clients for the receipt of substantially similar, and often and in large part identical, investment advisory services.

136. Indeed and more broadly, Table 5 further indicates that:

    a. each of the four other funds in the Oakmark Fund Complex paid similarly excessive fees; and

    b. that, across the *entire* Oakmark Fund Complex, Harris extracted from the Oakmark Funds advisory fee rates on average 56.81% higher than operative advisory fee rates charged to Arm's-Length Clients for Harris's corresponding Strategies).

137.    Table 5 also provides insight into the particular manner in which Harris is able to extract excessive fees from the Funds (and from the other funds in the Oakmark Fund Complex). In principal part, and as further discussed in Section VIII.B.2.c-d *infra*, such excessive fees arise from:

    a.  levying rates to many of the Oakmark Funds that, even at the *highest* breakpoint levels (*i.e.*, where the fees are *lowest*), still exceeded the advisory fee rates charged to Arm's-Length Clients for corresponding Harris Strategies at the lowest breakpoints (*i.e.*, where the fees are highest). For example, while advisory fee rates assessed to the International Fund slowly reduce from 1.00% on the first $2 billion of assets to 0.785% on assets above $35 billion, Arm's-Length Clients for Harris's corresponding International Strategy pay 0.70% rates *from the outset* (*i.e.*, lower rates at outset than any and all rates at any and all breakpoints for the corresponding International fund), which quickly and substantially reduce thereafter (specifically, to 0.50% on all assets exceeding $100 million);

    b.  employing advisory fee rate schedules for the Oakmark Funds with breakpoints that *space fee reductions widely apart and that provide for only minor fee reductions*, especially in comparison to the faster and sharper reductions made available through breakpoint scheduled offered to Harris's Arm's-Length Clients.

        i.  For example, where Arm's-Length Clients for the Harris U.S. Equity and Balanced Strategies (corresponding to the Oakmark Fund and Income Fund) enjoy advisory fee rates that reduce *quickly* (once assets reach only $15 million) and *sharply* (by 40%, from 0.75% to 0.45%), the Funds are burdened by advisory fee rates that reduce far more slowly and gradually: (a) the Oakmark Fund only nears a 40%

62

reduction to initial fee rate levels (the reduction achieved on the Strategy side once Strategy assets exceed $15 million) once its net assets exceed *$35 billion*; and (b) the Income Fund's rates never come close to a 40% reduction, but instead reduce by only 24%, and even then only so reduce once net assets exceed *$28 billion*.

ii. Similarly, where Arm's-Length clients for the Harris International Strategy enjoy advisory fee rates that reduce quickly and relatively sharply (falling from 0.70% to 0.50% -- a 28.6% reduction – once assets exceed $100 million, the International Fund is burdened by advisory fee rates that (a) reduce *less* (22%), and (b) far more *slowly* (reaching a 22% reduction to initial rates only when Fund assets exceed *$35 billion*).

### 2. Harris Provided Subadvised Funds with Substantially Similar Investment Advisory Services at Substantially Lower Advisory Fee Rates

138. One particular subset of Harris's Arm's-Length Clients consists of *other investment advisers* who, as set forth below, retain Harris as a *subadviser* in connection with various funds or portfolios managed and/or sponsored by such other investment advisers. *See e.g.* Harris Website at "Sub-advisory Services" page;[16] *see also* Form ADV at 4, 8 and 9:

> Harris also has arrangements with other advisory firms wherein, while Harris has discretionary authority over client assets, Harris is not the client's primary adviser and instead acts in a sub-advisory capacity.
>
> * * *
>
> Harris is the adviser to the Oakmark Fund, Oakmark Select Fund, Oakmark Equity and Income Fund, Oakmark Global Fund, Oakmark Global Select Fund, Oakmark International Fund and Oakmark International Small Cap Fund (collectively, the

---

[16] Available at: http://www.harrisassoc.com/Strategies--Products/Harris-Products/Sub-advisory-Services.htm.

"Oakmark Funds"). The fees paid to Harris by the Oakmark Funds are described in the Oakmark Funds' prospectus. Harris also provides sub-advisory services to one or more registered investment companies at rates negotiated with those clients; fees paid by these funds for investment advisory services are described in each fund's prospectus.

\* \* \*

Harris provides investment advisory services to many types of U.S. and non-U.S. clients including individuals, government retirement plans, corporate pension and profit sharing plans, trusts, estates, charitable organizations, foundations, endowments, banks, trust companies, insurance companies, corporations, sovereign funds and other types of entities. . . Harris also has arrangements with other advisory firms wherein, while Harris has discretionary authority over client assets, Harris is not the client's primary adviser and instead acts in a sub-advisory capacity.

139. Harris's investment adviser clients are qualitatively distinguished from all other Arm's-Length Clients in (at least) one very salient way: namely, the *public disclosure duties they face* as a result of the fact that, like Harris, they are managing and/or sponsoring their own mutual fund complexes, housed in their own registered, open-end investment management companies. Such disclosure duties require, *inter alia*, provision of information concerning:

    a. the advisory and subadvisory services provided to such funds by their investment advisers and subadvisers;

    b. the fee rates charged by, and the advisory and subadvisory fees paid to, such funds' investment advisers and subadvisers;

    c. the contracts between such funds and their investment advisers, setting forth the services such advisers must perform;

    d. the contracts between such investment advisers have with subadvisers, setting forth the services such subadvisers must perform;

    e. the investment objectives and principal investment strategies for such funds; and

    f. substantial detail concerning such funds' investment portfolios and performance, including

i.   full portfolio holdings;

ii.  portfolio sector allocation;

iii. portfolio turnover;

iv.  the largest individual positions in the portfolio; and

v.   portfolio / fund performance over multiple time periods.[17]

140.  Consequently and in short, such extensive disclosures allow for detailed understanding of the respective services provided by such funds' advisers and subadvisers, and of the fees paid for such services.

141.  Concretely, and as demonstrated below, such disclosures – collected in Exhibits A1 to A7 and B hereto, in connection with approximately twenty different funds for which Harris serves as a subadvisor (the "Subadvised Funds") – generate an unusually detailed and precise picture of the exact services that Harris provided as a subadvisor, and of Harris's compensation for such services.

142.  Specifically, such detailed disclosures reveal:

a.  that the subadvisory services provided by Harris to the Subadvised Funds are not merely substantially similar to, *but largely identical to*, the services Harris provides to the Oakmark Funds as their investment adviser; and

b.  that Harris provides such services to the Subadvised Funds at fee rates far lower than those Harris extracts from its captive Oakmark Funds.

### a)   Advisory Services

143.  Portfolio Selection Services (*i.e.*, researching and selecting investments for the fund's portfolio, deciding which investments to purchase or sell when, arranging for execution of

---

[17] However, certain investment advisers making extensive use of subadvisers have sought and obtained exemptive orders from the SEC that reduce their regulatory burden, including certain of the above-mentioned disclosure duties – and, in particular, disclosure duties concerning the fee rates and fees paid to subadvisers. For example, while such investment advisers are still required to provide public disclosure of their subadvisory contracts with subadvisers, they are allowed to redact the specific fee rates set forth in such contracts for the provision of subadvisory services. In such cases, even though subadvisory fee rates are redacted from the subadvisory contracts, they may still be ascertained from other, requisite disclosures – as detailed herein.

such purchases and sales, and managing the portfolio on an ongoing basis) are the primary and largest part the investment advisory services provided by investment advisers.

144.    However, where investment advisers retain subadvisers, it is universally the case – generally, and, here, for each of the 20 Subadvised Funds – that these very Portfolio Selection Services are delegated by the investment adviser to the subadviser. *See e.g.* Exhibits A1 through A7 at "Advisory Services" and "Subadvisory Services" rows for each of the twenty Subadvised Funds; *see also* Exhibit B (extracting, from Harris's operative subadvisory contracts concerning the Subadvised Funds, the subadvisory duties contractually required of Harris). Having handed off Portfolio Selection Services to their subadvisors, such investment advisers' remaining roles are primarily administrative: providing oversight over subadvisors, maintaining books and records, performing other compliance-related obligations, and reporting to fund shareholders and boards. *Id.*

145.    Although extensively documented in Exhibits A1 through A7 hereto for each of the twenty Subadvised Funds, examples are provided below for purposes of illustration:

> a.  **The Natixis Oakmark Fund, advised by NGAM Advisors, L.P. and subadvised by Harris**.  As explained in the Natixis Oakmark Fund's most recent Prospectus, dated May 1, 2016:
>
> Advisers
>
> NGAM Advisors, L.P. ("NGAM Advisors"), located at 399 Boylston Street, Boston, Massachusetts 02116, serves as the adviser to each of the Funds . . .  NGAM Advisors oversees, evaluates, and monitors the subadvisory services provided to each Fund . . .  It also provides general business management and administration to each Fund . . .  NGAM Advisors does not determine what investments will be purchased or sold by the Funds. The advisers and subadvisers listed below make the investment decisions for their respective Funds. . .
>
> * * *
>
> Subadvisers

66

Each Subadviser has full investment discretion and makes all determinations with respect to the investment of the assets of a Fund or a segment of the Fund, subject to the general supervision of the Fund's adviser and the Board of Trustees

Harris Associates, located at 111 S. Wacker Drive, Suite 4600, Chicago, Illinois 60606, serves as subadviser to the Natixis Oakmark Fund, Natixis Oakmark International Fund and a segment of the Natixis U.S. Equity Opportunities Fund. . .

*See* Natixis Funds May 1, 2016 Prospectus, at 52.

b. **The MML Focused Equity Fund, advised by MML Investment Advisers, LLC and subadvised by Harris**. As explained in the MML Focused Equity Fund's most recent Prospectus and Statement of Additional Information, dated May 1, 2016:

MML Advisers contracts with the following subadvisers to help manage the Funds. Subject to the oversight of the Trustees, MML Advisers has the ultimate responsibility to oversee the subadvisers and recommend their hiring, termination, and replacement. This responsibility includes, but is not limited to, analysis and review of subadviser performance, as well as assistance in the identification and vetting of new or replacement subadvisers. In addition, MML Advisers maintains responsibility for a number of other important obligations, including, among other things, board reporting, assistance in the annual advisory contract renewal process, and, in general, the performance of all obligations not delegated to a subadviser. MML Advisers also provides advice and recommendations to the Trustees, and performs such review and oversight functions as the Trustees may reasonably request, as to the continuing appropriateness of the investment objective, strategies, and policies of each Fund, valuations of portfolio securities, and other matters relating generally to the investment program of each Fund.

\* \* \*

MML Advisers has also entered into a Subadvisory Agreement with Harris pursuant to which Harris serves as MML Focused Equity's and MML International Equity's subadviser, providing day-to-day management of each Fund's investments.

*See*, respectively, MML Focused Equity Fund May 1, 2016 Prospectus at 94-95, and Statement of Additional Information at B-62.

146. In short and in the first instance, as subadviser to the twenty Subadvised Funds, Harris provides such funds with Portfolio Selection Services.

147. To examine the nature and particulars of the Portfolio Selection Services that Harris provided, Plaintiffs reviewed and analyzed, *inter alia*:

    a.  the Subadvised Funds' stated investment objectives;

    b.  the Subadvised Funds' stated principal investment strategies, including specifications and restrictions concerning:

        i.  asset class (*i.e.*, stocks, bonds);

        ii.  geographical region (*i.e.* U.S., International [non-U.S.], and Global [U.S. and International]);

        iii.  market capitalization (*i.e.*, small-, mid- and large-capitalization issuers);

        iv.  investment style (*e.g.*, value, growth); and

        v.  number of portfolio holdings (*i.e.*, a very small number of 20 or fewer total holdings, a slightly larger set of 30-60 holdings, etc.);

    c.  the Harris personnel serving as the Subadvised Funds' portfolio managers;

    d.  the particular portfolios of investments selected and managed by Harris for the Subadvised Funds, as of recent and particular dates (namely, December 31, 2015 and March 31, 2016), including:

        i.  the total number of positions held in the portfolios;

        ii.  the portfolios' allocations to various economic sectors;

        iii.  the portfolios' turnover ratios; and

        iv.  the portfolios' ten largest holdings;

    e.  the Subadvised Funds' performance (specifically, for the annual periods ended December 31, 2015 and March 31, 2016).

148.    The results of such examination, set forth in Exhibits A1 through A7 and summarized in Table 6 below, show:

a.  that the Portfolio Selection Services that Harris provided as subadviser to the Subadvised Funds were not merely substantially similar to the Portfolio Selection Services that Harris provided as investment adviser to the Oakmark Funds (and to Arm's-Length Clients for Harris's corresponding Strategies); but

b.  that, most frequently, they were effectively *identical* to those services, as, most frequently, the Subadvised Funds were fashioned as clones of various of the Oakmark Funds and/or corresponding Harris Strategies.

**Table 6**

**Subadvised Funds:**
**The Portfolio Selection Services Harris Provides to the Subadvised Funds Are Substantially Identical to Those Harris Provides to the Oakmark Funds (and to Arm's-Length Clients for Corresponding Harris Strategies)**

| Oakmark Fund / Harris Strategy | Subadvised Fund | Subadvised Funds' Harris Portfolio Managers | Subadvised Fund Principal Investment Strategy Specifications | | | | | Particularized Portfolio Analysis (top 10 holdings, total number of positions, portfolio sector diversification, annual performance) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Asset Class | Region | Market Cap | Investment Style | Number of Investments | Harris's Portfolio Allocation | Particularized Portfolio Data Establishes Match to . . | Match Degree |
| **Oakmark Fund** William C. Nygren Kevin Grant **U.S. Equity Strategy** Robert M. Levy | Natixis Oakmark Fund | William C Nygren Kevin Grant M. Colin Hudson Michael Mangan | Equity | U.S. | "Larger" Cap | Value | 30 - 60 | 100% | Oakmark Fund | perfect |
| | Natixis U.S. Equity Opportunities Fund | William C Nygren Kevin Grant M. Colin Hudson Michael Mangan | Equity | U.S. | "Larger" Cap | Value | not specified | 50% | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |
| | Harris Associates U.S. Equity Fund | Robert M. Levy M. Colin Hudson Anthony Coniaris Robert Bierig | Equity | U.S. | "Larger" Cap | Value | "approximately 40 - 50" | 100% | U.S. Equity Strategy | perfect |
| | Oakmark Natixis Funds | William Nygren Kevin Grant Michael Mangan | Equity | U.S. | "Larger" Cap | Value | 30 - 60 | 100% | Oakmark Fund | perfect |
| **Oakmark Select Fund** William C. Nygren Anthony P Coniaris Win Murray **Concentrated Value Strategy** Robert M. Levy | Harris Associates Concentrated U.S. Equity Fund | Robert M. Levy M. Colin Hudson Anthony Coniaris Robert Bierig | Equity | U.S. | All Cap | Value | "approximately 20" | 100% | Concentrated Value Strategy | perfect |
| | MassMutual Select Focused Value Fund | Robert M. Levy M. Colin Hudson Anthony Coniaris Robert Bierig | Equity | U.S. | All Cap | Value | "The Fund is non diversified [and] hold[s] larger positions in a smaller number of stocks than a diversified fund ' | 100% | Concentrated Value Strategy | perfect |
| | MML Focused Equity Fund | Robert M. Levy M. Colin Hudson Anthony Coniaris Robert Bierig | Equity | U.S. | All Cap | Value | "The Fund is non diversified [and] hold[s] larger positions in a smaller number of stocks than a diversified fund ' | 100% | Concentrated Value Strategy | perfect |
| | Litman Gregory Masters Equity Fund | William C. Nygren | Equity | U.S. | All Cap ("but mostly large- and mid-") | Value | 5 - 15 (each subadvisor provides small number of "highest-conviction stocks") | 15% | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |
| **Oakmark E&I Fund** Clyde S. McGregor et al. **Balanced Strategy** Clyde S. McGregor et al | Litman Gregory Masters Equity Fund | Clyde McGregor | Equity | U.S. | All Cap ("[m]ostly large- and mid-") | Value | 5 - 15 (each subadvisor provides small number of "highest-conviction stocks") | 15% | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |
| **Oakmark International Fund** David G. Herro Robert A. Taylor **International Strategy** David G. Herro Robert A. Taylor | MIST Harris Oakmark International Portfolio | David Herro Robert Taylor | Equity | International (non-U.S.) | All Cap ("primarily in mid- to large-cap companies"( | Value | not specified | 100% | Oakmark International Fund and Harris International Strategy | perfect |
| | MML International Equity Fund | David Herro Robert Taylor | Equity | International (non-U.S.) | All Cap | Value | 30 - 60 | 100% | Oakmark International Fund and Harris International Strategy | perfect |
| | Oakmark International Natixis Funds | David Herro Robert Taylor | Equity | International (non-U.S.) | All Cap | Value | not specified | 100% | Oakmark International Fund and Harris International Strategy | perfect |
| | Natixis Oakmark International Fund | David Herro Robert Taylor | Equity | International (non-U.S.) | All Cap | Value | 30 - 65 | 100% | Oakmark International Fund and Harris International Strategy | perfect |
| | Litman International MarketMasters Fund | David Herro Robert Taylor | Equity | International (non-U.S.) | Large Cap | Value | not specified | 24% | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |
| **Oakmark Global** Clyde McGregor Robert Taylor **Global All Cap Strategy** Clyde McGregor Robert Taylor | Harris Associates Global Equity Fund | Clyde McGregor Robert Taylor | Equity | Global (U.S. and Int'l) | All Cap | Value | not specified | 100% | Oakmark Global Fund and Harris Global Strategy | perfect |
| | JNL/Harris Oakmark Global Equity Fund | David Herro Robert Levy Michael Manelli | Equity | Global (U.S. and Int'l) | All Cap | Value | 30 - 60 | 100% | Oakmark Global Fund and Harris Global Strategy | partial |
| | Russell Global Equity Fund | David Herro Robert Levy | Equity | Global (U.S. and Int'l) | Mid-to-Large Cap | Value | 40 - 60 | 18% | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |
| **Oakmark Global Select** William C Nygren David G. Herro **Global Concentrated Strategy** Robert N. Levy David G. Herro Michael L. Manelli | Harris Associates Global Concentrated Equity Fund | David Herro Robert Levy Rob Taylor Michael Manelli Anthony Coniaris M. Colin Hudson Robert Bierig | Equity | Global (U.S. and Int'l) | Larger Cap | Value | "approximately 20" | 100% | Harris Global Strategy | partial |
| | Litman Gregory Masters International Fund | David Herro | Equity | Global (U.S. and Int'l) | All Cap ("but mostly large- and mid-") | Value | 8 - 15 (each subadvisor provides small number of "highest-conviction stocks") | 20% | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |
| | Cornerstone Advisors Global Public Equity Fund | David Herro William Nygren | Equity | Global (U.S. and Int'l) | not specified | Value | not specified | undisclosed allocation | n/a (presence of multiple subadvisors makes it impossible to identify Harris's particular portfolio selections) | |

149. First and specifically, insofar as the Portfolio Selection Services provided by Harris as subadvisor to the Subadvised Funds were "substantially similar" to those Harris provided as investment adviser to the Oakmark Funds (and to Arm's-Length Clients for Harris's corresponding Strategies), the Portfolio Selection Services shared common oversight, intent and design, by:

     a. being carried out by the *same Harris personnel – i.e.*, the portfolio managers of the Subadvised Funds were the same as the portfolio managers of the Oakmark Funds (and of Harris's corresponding Strategies);

     b. pursuing the *same investment objectives*; and

     c. employing the *same principal investment strategies – i.e.*, the Subadvised Funds featured the same specifications and limitations as the Oakmark Funds (and Harris's corresponding Strategies), including the same specifications concerning:

          i. asset class;

          ii. geographical region;

          iii. market capitalization;

          iv. investment style; and

          v. number of portfolio holdings.

150. Table 6 above provides a comprehensive and comprehensible summary of such substantial similarities between the twenty Subadvised Funds and six of the seven Oakmark Funds (and corresponding Harris Strategies).

151. As an illustrative example, the first of the twenty Subadvised Funds listed in Table 6, the Natixis Oakmark Fund, subadvised by Harris, was "substantially similar" to the Oakmark Fund insofar as the Natixis Oakmark Fund and the Oakmark Fund shared the same:

     a. lead portfolio managers (Nygren and Grant);

     b. asset class focus (equities);

    c.  geographical focus (U.S.);

    d.  market-capitalization focus ("larger"-capitalization companies, comprising large-cap and to lesser extent mid-cap companies);

    e.  investment style (Harris's "value" philosophy); and

    f.  specifications concerning the total number of portfolio holdings (30-60 different positions).

152.    Indeed, as Table 6 indicates, the degree of "substantial similarities" demonstrated by the Oakmark Natixis Fund – *i.e.*, effectively *exact* similarity in oversight, intent and design – was the rule. Such exact similarity was exhibited by approximately fifteen of the twenty Subadvised Funds.[18]

153.    Second and relatedly, insofar as the Portfolio Selection Services provided by Harris as subadviser to the Subadvised Funds were "effectively identical" to those Harris provided as investment adviser to the Oakmark Funds (and to Arm's-Length Clients for Harris's corresponding Strategies), the Portfolio Selection Services exhibited *identical, particularized investment execution*:

    a.  sharing *identical portfolios*, featuring:

        i.  identical total numbers of positions held;

        ii.  identical sector allocations; and

        iii.  identical largest holdings;

    b.  and, consequently, sharing exactly the same investment performance and results.

---

[18] Four of the exceptions are quite straightforward. Three of the Subadvised Funds (the three Litman Gregory funds) each featured *multiple* subadvisors, each of which was limited to a small number (5-15) of his or her "highest conviction" investments: consequently, the portions of these portfolios managed by Harris departed from their Oakmark Fund siblings in terms of the number of investments managed in their portfolios. A fourth Subadvised Fund, the Laudus International MarketMasters Fund, utilized a similar multi-subadvisor structure, but constrained each subadvisor to operate within a narrower market-capitalization range than he or she otherwise did: consequently, causing Harris's management of this Subadvised Fund, constrained to *large-cap* investments only, to depart from the relevant Oakmark Fund sibling, which made investments across all market capitalizations.

154.    Exhibits A1 through A7 provide detailed facts concerning the Subadvised Funds' (and the Oakmark Funds' and corresponding Harris Strategies') portfolios and performance; Table 6 summarizes, in each case, the direction and extent of the identity: *i.e.*, whether the Subadvised Fund points to an Oakmark Fund (or a corresponding Harris Strategy), and whether the identity is perfect or partial.

155.    As an illustrative example, the first of the twenty Subadvised Funds listed in Table 6, the Natixis Oakmark Fund, subadvised by Harris, was "effectively identical" to the Oakmark Fund insofar as the Natixis Oakmark Fund and the Oakmark Fund shared effectively identical portfolios (as of March 31, 2016), including effectively identical:

a.   numbers of holdings (50 and 51, respectively);

b.   sector allocations:

| Oakmark Fund | Natixis Oakmark Fund |
|---|---|
| Financials 29.7%<br>Information Technology 27.0%<br>Industrials 11.0%<br>Consumer Discretionary 10.6%<br>Energy 6.1%<br>Health Care 4.7%<br>Consumer Staples 4.6%<br>Materials 1.6%<br>Short-Term and Other 4.7% | Financials 30.70%<br>Information Technology 27.65%<br>Industrials 11.25%<br>Consumer Discretionary 11.04%<br>Energy 6.43%<br>Health Care 4.79%<br>Consumer Staples 4.71%<br>Materials 1.68% |

c.   largest holdings:

| Oakmark Fund | Natixis Oakmark Fund |
|---|---|
| General Electric   3.0% | Alphabet 3.60% |
| Bank of America   3.0% | Bank of America 3.15% |
| Citigroup, Inc. 2.6% | General Electric 3.12% |
| MasterCard 2.6% | Citigroup 2.72% |
| Alphabet  2.5% | MasterCard 2.65% |
| Apache Corp. 2.5% | JPMorgan Chase 2.62% |
| American Int'l Group 2.5% | Apache 2.60% |
| Visa 2.5% | American Int'l Group 2.58% |

| JPMorgan Chase 2.4% | Whirlpool 2.56% |
| Intel Corp. 2.4% | Visa 2.54% |

and:

    d.  performance (respectively, for the year ended March 31, 2016, declines of 4.00% and 4.52%).

*See* Exhibit A1.

156.    Again, as Table 6 indicates, the degree of "effective identity" demonstrated by the Oakmark Natixis Fund – *i.e.*, effectively *exact* similarity in investment execution – was the rule. Such effectively exact identity was exhibited by at least twelve of the twenty Subadvised Funds.[19]

157.    In sum, most of the Subadvised Funds were fashioned by Harris to be mere clones of various of the Oakmark Funds (and/or corresponding Harris Strategies).[20]

158.    Moreover, in addition to providing the Subadvised Funds with substantially similar, and most often effectively identical, Portfolio Selection Services as those Harris provided to the Oakmark Funds (and to Arm's-Length Clients for corresponding Harris Strategies), Harris also provided the Subadvised Funds with Other Services comparable to those it provided to the Oakmark Funds.

159.    Harris's subadvisory contracts with the Subadvised Funds' investment advisers set forth the services that Harris was explicitly obligated to provide as the Subadvised Funds' subadviser.

---

[19] As Table 6 further indicates, a further six of the Subadvised Funds featured multiple subadvisers, making it impossible to determine, from such Subadvised Funds' disclosures concerning their *aggregate* portfolios and performance, the *particular* portfolio selections made by *Harris* (and the resulting investment performance attributable specifically and only to Harris). That said, and as noted in n. 18 *supra*, four of these six multi-manager Subadvised Funds depart slightly in design from their Oakmark Fund / Harris Strategy siblings: three by constricting portfolio selections to a smaller number (5-15 positions) of highest-conviction selection; and fourth by imposing a more restrictive market-capitalization focus (large-cap only, rather than all-cap). Consequently, as many as fourteen of the twenty Subadvised Funds may feature such "perfect" effective identity.

[20] And of the remainder, featuring additional restrictions concerning number of portfolio positions or market capitalization foci, allowed Harris to repackage a portion of the work Harris had already performed for the Oakmark Funds into the guise of a Subadvised Fund.

160.    Exhibit B hereto extracts, from Harris's operative subadvisory contracts with the Subadvised Funds, the services contractually required of Harris.  As Exhibit B demonstrates in detail, Harris, in addition to providing the Subadvised Funds with Portfolio Selection Services, was also required to provide the Subadvised Funds with *Other Services*, consisting primarily of:

      a.  regular reporting services;

      b.  and further administrative and compliance-related services, including maintaining books and records with respect to the provision of Portfolio Selection Services.

161.    Insofar as the Portfolio Selection Services provided to the Subadvised Funds were substantially similar to, and/or effectively identical to, those Harris provided to the Oakmark Funds (and to Arm's-Length Clients for Harris's corresponding Strategies) – as demonstrated above – the books and records obligations relating to such services were, likewise, substantially similar and/or effectively identical.

162.    Likewise, the reporting services required of Harris pursuant to its subadvisory contracts paralleled – in content, extent and periodicity – the above-detailed reporting services that Harris provided as investment adviser to the Oakmark Funds (*see* ¶90, *supra*).  As Exhibit B details, by way of reporting services, Harris was generally required to:

      a.  provide periodic reports to the Subadvised Funds' boards on its Portfolio Selection Services and on the Subadvised Funds' performance, as well as further special reports on matters or topics as the boards may request;

      b.  provide information and commentary on a quarterly, semi-annual and annual basis with respect to the same, for use in Subadvised Fund SEC filings and/or other documents; and

      c.  provide further, compliance-related reports.

163.    Indeed, the reporting services required of Harris by the Subadvised Funds, while most often set forth in generalized and abbreviated fashion in Harris's subadvisory contracts, on

occasion were delineated in great detail, and in such instances appear to even rival the reporting that Harris provided to the Oakmark Funds.

164.    For example, three of the Subadvised Funds required Harris to provide, in addition to regular reporting to the Subadvised Funds' boards,  the following reports and information to the Subadvised Funds' adviser:

> The Subadviser shall provide to MassMutual the following:
>
> 1. Quarterly Portfolio Data Sheets (due on the 10th business day after the end of every quarter):
>
> The data sheets should include the following information:
>
> a. Portfolio Characteristics for the Portfolio, standard and best fit market index
>
> b. Portfolio Sector Weights for the Portfolio, standard and best fit market index.
>
> c. Top 10 Equity Holdings (% of equities) for the Portfolio
>
> d. Top 5 contributors and detractors by performance based on contribution to the Portfolio
>
> e. Purchases (New) and Sales (Eliminated) during the quarter.
>
> f. Performance of the Portfolio vs. standard and best fit market index and peer group
>
> 2. Portfolio Manager Commentary (due on the 10th business day after the end of every quarter): The commentary should include information on the following topics (there is no limit to the number of words used):
>
> a. Qualitative assessment by manager: list three factors that were the major influences on performance – both positive and negative
>
> b. Performance attribution:
>  - The industry weightings that had the largest contribution to performance during the most recent quarter.
>  - The industry weightings that had the largest detraction from performance during the most recent quarter.

- The five holdings that contributed the most to performance during the most recent quarter.
- The five holdings that detracted the most from performance during the most recent quarter.

c. The manager's market outlook.

d. How he/she has positioned the Portfolio for the near term.

3. Portfolio attribution analysis of the Portfolio: Performance attribution should demonstrate the impact of portfolio management decisions including Asset Allocation Effects and Security Selection Effects.

4. Quarterly Conference Calls: The purpose of this contact will be to obtain a greater understanding of the performance of the Portfolio, the reasons for that performance, and to gain valuable insights into the Portfolio provided by the manager

5. Annual On-Site Meeting - As part of MassMutual's due diligence process, members of MassMutual's Investment Group arrange an "on site" meeting with each of the managers in MassMutual's Investment Program. Typically, these meetings include a general overview of the firm as well as separate meetings with each of the portfolio managers to discuss their long-term and short-term strategies, modifications to their investment strategy or style and any other relevant information.

See Exhibit B at entries for MassMutual Select Focused Value Fund, MML Focused Equity Fund and MML International Equity Fund.

165. Furthermore, given the above-detailed effective identity in the Portfolio Selection Services that Harris delivered to the Subadvised Funds and to the Oakmark Funds, Harris did not need to perform much or any additional work to provide reporting services to the Subadvised Funds, as the reporting developed for the Oakmark Funds was directly applicable, and transferable, to the Subadvised Funds.

166. In sum, the Other Services Harris provided to the Subadvised Funds were substantially similar to those Harris provided to the Oakmark Funds.

**b)** **Advisory Fees**

167. Notwithstanding the above-detailed substantial similarity, and in many cases the exact identity, between the services that Harris provided to the Oakmark Funds as their investment adviser and to the Subadvised Funds as their investment subadviser, Harris charged advisory fee rates to the Oakmark Funds, including the Funds, that were sharply higher than the rates it charged for provision of substantially similar and/or effectively identical services to the Subadvised Funds (or, technically, to the Subadvised Funds' investment advisers).

168. Table 7 on the following page:

    a. compares the advisory fee rates that Harris charged to the Oakmark Funds, including the Funds, and the subadvisory fee rates that Harris charged to corresponding Subadvised Funds, and

    b. measures, on the basis of such comparison, the excessive fees that Harris charges to the Oakmark Funds, including the Funds, calculated as the difference between:

        i. the blended rate and fees the Oakmark Funds paid, at the advisory fee rate schedules applicable to each of the Oakmark Funds, and

        ii. the blended rate and fees that the Oakmark Funds would have paid pursuant to the subadvisory fee rates offered by Harris to the corresponding Subadvised Funds.

Table 7

The Oakmark Funds' Excessive Fees II:
(per fee comparison to Harris's advisory fee rates for Corresponding Subadvised Funds)

| Oakmark Fund / net assets @ 6/30/2016 | Oakmark Funds' Advisory Fee Rates / Current Blended Rate (based on 6/30/2016 net assets) | Annual Advisory Fee Payment (@ 6/30/2016 net assets) | Corresponding Subadvised Funds | Advisory Fee Rates for Subadvised Funds | Oakmark Fund Blended Rate @ Subadvised Fund Fee Rates | Oakmark Fund Annual Advisory Fee Payable (@ Subadvised Fund Rates) | Oakmark Fund Excessive Fees (Excess Over Subadvised Fund) $ | Oakmark Fund Excessive Fees (Excess Over Subadvised Fund) % |
|---|---|---|---|---|---|---|---|---|
| Oakmark Fund $16.3 billion | 0.74% | $112,990,000 | Natixis Oakmark Fund | .72% first $300 million .50% AUM > $300 million | 0.50% | $76,000,000 | $36,990,000 | 48.67% |
| | | | Natixis U.S. Equity Opportunities Fund | 0.52% | 0.52% | $79,040,000 | $33,950,000 | 42.96% |
| | | | Harris Associates U.S. Equity Fund | As Subadvised Fund is foreign-domiciled, neither subadvisory fee rates nor subadvisory contract is publicly disclosed. | | | | |
| | | | Oakmark Natixis Funds | As Subadvised Fund is foreign-domiciled, neither subadvisory fee rates nor subadvisory contract is publicly disclosed. | | | | |
| Oakmark Select Fund $4.8 billion | 0.87% | $41,900,000 | Harris Associates Concentrated U.S. Equity Fund | As Subadvised Fund is foreign-domiciled, neither subadvisory fee rates nor subadvisory contract is publicly disclosed. | | | | |
| | | | MassMutual Select Focused Value Fund * | operative subadvisory fee equates to 0.38% | 0.38% | $18,240,000 | $23,660,000 | 129.71% |
| | | | MML Focused Equity Fund * | operative subadvisory fee equates to 0.40% | 0.40% | $19,200,000 | $22,700,000 | 118.23% |
| | | | Litman Gregory Masters Equity Fund (Nygren allocation) | 0.65% on first $50 million 0.60% on next $100 million 0.55% on AUM > $150 million | 0.55% | $26,500,000 | $15,400,000 | 58.11% |
| Oakmark Equity & Income Fund $16.2 billion | 0.68% | $110,295,000 | Litman Gregory Masters Equity Fund (McGregor allocation) | 0.65% on first $50 million 0.60% on next $100 million 0.55% on AUM > $150 million | 0.55% | $89,100,000 | $21,195,000 | 23.73% |
| Oakmark International Fund $23.0 billion | 0.84% | $192,275,000 | MIST Harris Oakmark International Portfolio | .65% first $50 million .60% next $50 million .50% next $900 million 0.45% AUM > $1 billion | 0.45% | $104,125,000 | $88,150,000 | 84.66% |
| | | | MML International Equity Fund * | operative subadvisory fee equates to 0.50% | 0.50% | $115,000,000 | $77,275,000 | 67.20% |
| | | | Oakmark International Natixis Fund | As Subadvised Fund is foreign-domiciled, neither subadvisory fee rates nor subadvisory contract is publicly disclosed. | | | | |
| | | | Natixis Oakmark International Fund | 0.60% on all AUM | 0.60% | $138,000,000 | $54,275,000 | 39.33% |
| | | | Lazard International MarketMasters Fund | 0.60% on first $125 million 0.575% on next $125 million 0.55% on AUM > $250 million | 0.55% | $126,593,750 | $65,681,250 | 51.83% |
| Oakmark Global Fund $2.4 billion | 0.99% | $23,800,000 | Harris Associates Global Equity Fund | As Subadvised Fund is foreign-domiciled, neither subadvisory fee rates nor subadvisory contract is publicly disclosed. | | | | |
| | | | JNL/Harris Oakmark Global Equity Fund | 0.60% for first $100 million 0.50% for AUM > $100 million | 0.50% | $12,100,000 | $11,700,000 | 96.69% |
| | | | Russell Global Equity Fund | average fee rate paid to all subadvisers equates to 0.30% ** | 0.30% ** | $7,200,000 ** | $16,600,000 ** | 230.56% ** |
| Oakmark Global Select Fund $2.0 billion | 1.00% | $20,000,000 | Harris Associates Global Concentrated Equity Fund | As Subadvised Fund is foreign-domiciled, neither subadvisory fee rates nor subadvisory contract is publicly disclosed. | | | | |
| | | | Litman Gregory Masters International Equity Fund ** | not disclosed; average fee to all subadvisers equates to 0.473% | 0.473% ** | $9,460,000 ** | $10,540,000 ** | 111.42% ** |
| | | | Cornerstone Advisors Global Public Equity Fund | 1.00% on first $50 million 0.90% on assets over $50 million | 0.57% | $11,420,000 | $8,580,000 | 75.13% |

| Average Degree of Excess Fees Charged to Oakmark Funds, per comparison to ... | | |
|---|---|---|
| All Subadvised Funds | | 84.17% |
| Subadvised Funds with Advisory Fee Disclosures Specific to Harris | | 69.70% |
| Subadvised Funds Disclosing Actual Harris Fee Rate Schedules | | 57.91% |

169. For example, as Table 7 above indicates for the Oakmark Fund:

    a. the Oakmark Fund, at its most-recently reported level of net assets, incurs a blended advisory fee rate of 0.74% per year, resulting in annualized advisory fees of $112.99 million; but

    b. were the Oakmark Fund assessed advisory fees pursuant to the rate schedule in effect for corresponding Subadvised Funds (who obtained substantially similar services from Harris as those provided to the Oakmark Fund), the Oakmark Fund would be charged a blended advisory fee rate of only 0.50% or 0.52%, resulting in annualized advisory fees of $76-$79 million; and consequently

    c. the difference between these two sums -- $34-$37 million per year – constitutes a concrete measure of the excessive fees paid annually by the Oakmark Fund, and equate to a 43.0% - 48.7% overcharge above the rates paid by corresponding Subadvised Funds to receive similar investment advisory services.

170. Likewise, as Table 7 above indicates for the International Fund:

    a. the International Fund, at its most-recently reported level of net assets, incurs a blended advisory fee rate of 0.84% per year, resulting in annualized advisory fees of $192.3 million; but

    b. were the International Fund assessed advisory fees pursuant to the rate schedule in effect for corresponding Subadvised Funds (who obtained *effectively identical* services from Harris as those provided to the International Fund), the International Fund would be charged a blended advisory fee rate of between 0.45% and 0.60%, resulting in annualized advisory fees of $104.1-$138.0 million; and consequently

    c. the difference between these two sums -- $54.3-$88.2 million per year – constitutes a concrete measure of the excessive fees paid annually by the

International Fund, and equate to a 39.3% - 84.7% overcharge above the rates paid by corresponding Subadvised Funds to receive similar investment advisory services.

171.    Indeed, as Table 7 demonstrates more generally by comparing the fee differentials between *all* of the Oakmark Funds and their corresponding Subadvised Funds, Harris's average overcharge to the Oakmark Funds was approximately 69.7%.[21]

172.    In sum, extensive and detailed facts indicate that Harris provided the Subadvised Funds with substantially similar and often effectively identical services as those it provided to the Oakmark Funds, but charged the Subadvised Funds far lower fees for the provision of such services.

### 3.    Mutual Funds Whose Size, Character and Investment Strategy are Comparable to the Funds Paid Lower Advisory Fees for Similar Investment Advisory Services

173.    Comparison of the Funds' advisory fees with the advisory fees paid by comparable mutual funds pursuing comparable investment strategies further indicates that the advisory fees that Harris extracts from the Funds are excessive.  As set forth below, the advisory fee rates paid by the Funds are:

a.  sharply higher than those paid, on average, by mutual funds of comparable size, character and investment strategy;

b.  *outliers*, by virtue of advisory fee rates that are not merely above average, but that stand at the very highest end of the range of advisory fee rates paid by such comparable funds; and

---

[21] The alternate averages also calculated in Table 7 -- average overcharges of 57.9% and 84.2% -- are, respectively, excessively conservative and excessively liberal with the available data.  The latter figure is contaminated by inclusion of effective subadvisory fee rates paid to subadvisers *other than Harris* for certain of the Subadvised Funds operating with *multiple* subadvisers.  The former figure excludes from consideration valid and reliable data concerning the effective subadvisory fee rates paid to Harris by certain further Subadvised Funds that do not *directly* disclose the subadvisory fee *rates* paid to Harris (but, in providing disclosure of the dollar amount of fees paid to Harris, allow for effective derivation of Harris's advisory fee rates).

c. higher than the advisory fee rates paid by *any and all other mutual funds* pursuing similar investment strategies at similar, very large size (*i.e.*, with net assets exceeding $15 billion).

174.    To conduct such a comparison, Plaintiff's counsel analyzed data obtained from the Bloomberg Professional service, distributed by Bloomberg Finance L.P. ("Bloomberg"), which, among other things, maintains data on more than 7,000 U.S.-domiciled mutual funds, in order to find those funds most comparable to the Fund. Bloomberg categorizes mutual funds, *inter alia*, by asset class, fund objective, fund strategy, fund geographic focus, and fund market-capitalization focus.

### a)    The Oakmark Fund

175.    Bloomberg categorizes the Oakmark Fund as U.S. equity large-cap value fund.

176.    There are 267 mutual funds so-categorized by Bloomberg (including the Oakmark Fund). *See* Exhibit C1 hereto (listing such funds). The average investment advisory fee paid by those funds is 0.6360%. *Id.* The 0.74% blended/operative advisory fee rate currently extracted from the Oakmark Fund by Harris is 16.4% above such average.

177.    A yet more apt comparison, however, is to compare the Oakmark Fund to its *closest* peers: namely, the subset of U.S. large-cap value mutual funds *who also share with the Oakmark Fund a large net asset size* (more than $1 billion). Such large funds are more closely comparable because they, like the Oakmark Fund, present economies of scale in provision of investment advisory services that often allow for reduced advisory fee rates (as further detailed in Section VIII.B, *infra*). Of the aforementioned 267 U.S. large cap value funds, ninety (90) have net assets exceeding $1 billion. *See* Exhibit C2 hereto (listing such funds). The average investment advisory fee among these larger funds (excluding the Oakmark Fund) is 0.5038% -- *i.e.*, substantially lower than the 0.6360% average discussed in the prior paragraph, which included advisory fees charged to smaller funds operating in the absence of economies of scale (and thus confirming the distinctive nature of larger funds). *Id.*

178.   The 0.74% blended/operative advisory fee rate currently extracted from the Oakmark Fund by Harris significantly exceeds this more apt 0.5062% average (*i.e.*, the average fees paid by funds of similar character and size): the Oakmark Fund's advisory fee rate is 46.2% higher than the average investment advisory fee paid on average by such larger U.S. large-cap value funds.

179.   The Oakmark Fund's fees are not merely significantly above average, but stand as marked outliers at the extreme end of the entire fee range.

      a.   Among the ninety $1 billion+ U.S. large-cap value funds, *only twelve pay investment advisory fee rates higher than those paid by the Oakmark Fund. See* Exhibit C2. This places the Oakmark Fund not in the middle of similar funds' advisory fee distribution, but rather at the extreme high end of the fee distribution – approximately at the 86th percentile.

      b.   Indeed, among the yet smaller subset of U.S. large cap value mutual funds whose net assets exceed $15 billion, *the Oakmark Fund pays the highest advisory fees of all – by far. See* Exhibit C2 (in distant second place is the Blackrock Equity Dividend Fund, with fees of 0.54%).

### b)   The Income Fund

180.   Bloomberg categorizes the Income Fund as a mixed allocation fund (*i.e.*, a fund that invests in both stocks and bonds) pursuing a U.S. moderate allocation objective/strategy.

181.   There are 117 mutual funds so-categorized by Bloomberg (including the Income Fund). *See* Exhibit D1 (listing such funds). The average investment advisory fee paid by those funds is 0.5469%. *Id.* The 0.68% blended/operative advisory fee rate currently extracted from the Income Fund by Harris is thus 24.3% greater than this category average.

182.   A yet more apt comparison, however, is to compare the Income Fund to its *closest* peers: namely, the subset of U.S. moderate allocation mutual funds whose large size ($1 billion of net assets or more) more closely approximates that of the Income Fund, and thus takes into account economies of scale in provision of investment advisory services (as further detailed in

Section VIII.B, *infra*). Of the aforementioned 117 large U.S. moderate allocation mutual funds, 43 have assets of $1 billion or more. *See* Exhibit D2 hereto (listing such funds). The average investment advisory fee among these 43 larger funds (excluding the Income Fund) is 0.4396% -- *i.e.*, substantially lower than the 0.5469% average discussed in the prior paragraph, which included advisory fees charged to smaller funds operating in the absence of economies of scale (and thus confirming the distinctive nature of larger funds). *Id.*

183.    The 0.68% blended/operative advisory fee rate currently extracted from the Income Fund by Harris *significantly* exceeds this more apt 0.4396% average: *the Income Fund's advisory fee rate is 54.7% higher the average investment advisory fee paid on average by such larger U.S. moderate allocation funds.*

184.    The Income Fund's fees are not merely significantly above average, but stand as marked outliers at the extreme end of the entire fee range.

   a.   Among the forty-three $1 billion+ U.S. moderate allocation funds, only nine pay investment advisory fee rates higher than those paid by the Income Fund. *See* Exhibit D2. This places the Income Fund not in the middle of similar funds' advisory fee distribution, but rather at the extreme high end of the fee distribution – in the top quartile. However, none of the nine above-mentioned mutual funds closely compares in size to the Income Fund: each of the nine has net assets of only $1-$2.6 billion, meaning that all nine such funds are between one-sixth and one-sixteenth (*i.e.* 6% to 16%) the size of the Income Fund.

   b.   Indeed, among the yet smaller subset of U.S. moderate allocation mutual funds whose net assets exceed $15 billion, *the Income Fund pays the highest advisory fees of all – by far. See* Exhibit D2 (in distant second place is the Vanguard Wellington Fund, with fees of 0.25%).

c)        **The International Fund**

185.     Bloomberg categorizes the International Fund as an international equity all-cap value fund.

186.     There are 67 mutual funds so-categorized by Bloomberg (including the International Fund).  *See* Exhibit E1 hereto (listing such funds).  The average investment advisory fee paid by those funds is 0.78%.  *Id.*  The 0.84% blended/operative advisory fee rate currently extracted from the International Fund by Harris is 7.7% above such average.

187.     A yet more apt comparison, however, is to compare the International Fund to its *closest* peers:  namely, the subset of international all-cap value mutual funds *who also share with the International Fund a large net asset size* (more than $1 billion).  Such large funds are more closely comparable because they, like the International Fund, present economies of scale in provision of investment advisory services that often allow for reduced advisory fee rates (as further detailed in Section VIII.B, *infra*).  Of the aforementioned 67 international all-cap value funds, nineteen (19) have net assets exceeding $1 billion.  *See* Exhibit E2 hereto (listing such funds).  The average investment advisory fee among these larger funds (excluding the Oakmark Fund) is 0.7588% -- *i.e.*, slightly lower than the 0.780% average discussed in the prior paragraph, which included advisory fees charged to smaller funds operating in the absence of economies of scale (and thus confirming the distinctive nature of larger funds).  *Id.*

188.     The 0.84% blended/operative advisory fee rate currently extracted from the International Fund by Harris significantly exceeds this more apt 0.7588% average (*i.e.*, the average fees paid by funds of similar character and size):  the International Fund's advisory fee rate is 12.0% higher than the average investment advisory fee paid on average by such larger international all-cap value funds.

189.     The International Fund's fees are not merely significantly above average, but stand as marked outliers at the extreme end of the entire fee range.

a.    Among the nineteen $1 billion+ international all-cap value funds, *only five pay investment advisory fee rates higher than those paid by the International*

*Fund. See* Exhibit E2. This places the International Fund not in the middle of similar funds' advisory fee distribution, but rather at the higher end of the fee distribution – approximately at the 69th percentile. However, only one of the five above-mentioned mutual funds closely compares in size to the Income International: each of the out four funds has net assets of only $1-$3 billion, making them between one-eighth and one-twenty-thirdth (*i.e.* 4% to 13%) the size of the International Fund.

b. Indeed, among the yet smaller subset of international all-cap value mutual funds whose net assets exceed $15 billion, *the International Fund pays the highest advisory fees of all. See* Exhibit E2.

### d) Results and Conclusions

190. The above comparisons to the investment advisory fees paid by other, comparable mutual funds provide further and corroborating indication that the Funds' advisory fees are excessive.

191. Not only are they substantially higher than the advisory fees paid by Harris' other clients for similar services, but they are also far above the average investment advisory fee rates paid by similar funds, and in fact are so far above the average to make the Funds an outlier on the advisory fee scale. Indeed, as demonstrated above, when each of the Funds is compared only to other mutual funds of comparable investment strategy and comparable very large size (*i.e.*, net assets exceeding $15 billion), each of the Funds pays higher investment advisory fees than any and all of its peers.

192. Moreover, the above comparisons are biased towards *understating* the degree to which the Funds' fees are excessive. This is because many of the comparator mutual funds are likewise captive funds with respect to their investment advisers, and thus subject to like imposition and extraction of inflated advisory fees. Hence, the degree to which the Funds' advisory fees are excessive may be even greater than indicated by the above comparison (as

86

many comparator funds' advisory fees may themselves be inflated and/or excessive as a result of such captivity).

> **4. The Board Performed Similar Comparisons Yielding Similar Factual Results (but Different Conclusions)**

193.    As also and further detailed in Section VIII.F *infra*, the Board, in the course of reviewing and approving continuation of the IAAs through October 31, 2016, performed fee comparisons similar to those set forth above, which yielded similar results.

194.    First, the Board compared the Funds' advisory fee rates with those charged to "other mutual funds comparable in size, character and investment strategy (the 'Expense Group')." *See* Semi-Annual Report, at 74. With respect specifically to the Oakmark Fund and the Income Fund, the Board's comparison found, just as the analysis here (*see* Section VIII.A.3, *infra*), that "each Fund's management fee rate is higher than the median of the Fund's Expense Group." *Id.* (With respect to the International Fund, the Board's comparison fund the International Fund's advisory fees to be lower than the median advisory fees paid by other funds in the Expense Group – a finding *opposite* to the one indicated by the data here. *See* Section VIII.A.3.c, *supra*).

195.    Second, the Board also compared the Funds' advisory fee rates "for comparable institutional separate account clients and subadvised funds," and again, just as here (*see* Sections VIII.A.1-2, *infra*), found that "in most instances, the fees paid by those other clients were lower than the fees paid by the Funds . . ." *Id.*

196.    However, the Board appears to have drawn different conclusions from these fundamentally similar factual inquiries and findings. As set forth in the Funds' Semi-Annual Report, in relevant part:

> Using information provided by Broadridge, the Board evaluated each Fund's advisory fee compared to the advisory fee for other mutual funds comparable in size, character and investment strategy (the "Expense Group"), and each Fund's expense ratio compared to that of the Expense Group.

The Board also reviewed the Adviser's advisory fees for comparable institutional separate account clients and subadvised funds (for which the Adviser provides portfolio management services only). The Board considered the appropriateness and reasonableness of any differences between the fees charged to a Fund and any such comparable funds and/or separate accounts, including any breakpoints, and **noted the Adviser's explanation that, although in most instances, the fees paid by those other clients were lower than the fees paid by the Funds, the differences reflected the Adviser's significantly greater level of responsibilities and broader scope of services regarding the Funds, and the more extensive regulatory obligations and risks associated with managing the Funds**.

* * *

*Oakmark Fund and Oakmark Equity and Income Fund.* The Board considered that each Fund's management fee rate is higher than the median of the Fund's Expense Group. **The Board noted, however, that each Fund's total expense ratio, which reflects the total fees paid by an investor, is lower than the median of each Fund'ss Expense Group. The Board also considered its negotiation with the Adviser, the result of which was the Adviser's agreement to add additional breakpoints to its investment advisory agreement with the Oakmark Fund to reduce the Adviser's fees at levels that would come into effect as fund assets continue to grow.**

*Oakmark International Fund.* The Board considered that the Fund's management fee rate and total expense ratio are lower than the respective medians of the Fund's Expense Group.

*See* Semi-Annual Report, at 74 (bold added for emphasis).

197. The Board's above-detailed reasoning and conclusions – and, especially, the mitigating factors purportedly "noted" by the Board to explain (away) the Funds' higher fee rates, such as the purportedly greater services provided to the Funds, or analysis of the Funds' total expense ratios generally (rather than investment advisory fees specifically), or consideration of the new breakpoints incorporated into the Oakmark Fund's advisory fee rate schedule (as of November 1, 2015) – are further discussed in Section VIII.F, *infra*.

**B.    Economies of Scale**

198.    In amending the ICA in 1970 to add Section 36(b), Congress, explicitly:  (a) recognized that significant economies of scale exist in the provision of investment advisory services to mutual funds; and (b) intended that the benefits of such economies of scale be shared with mutual fund shareholders, through use of breakpoints and/or other advisory fee/rate reductions, rather than be monopolized by investment advisors.    *See* Section VI.C.1, *infra*.

199.    As the detailed factual allegations below indicate:

    a.    the Funds' sizeable growth has generated substantial economies of scale for Harris in providing the Funds with investment advisory services;

    b.    Harris has retained for itself the lion's share of such benefits, while releasing only a small trickle back to the Funds and/or the Funds' shareholders; and

    c.    as a result, the current advisory fees that Harris charges to the Funds are grossly disproportionate to the investment advisory services provided, are excessive, and constitute a breach of Harris' fiduciary duties to the Funds.

**1.    General Allegations:  Economies of Scale, Their Role in Excessive Fees, and the Use of Breakpoints to Address these Matters**

200.    Economies of scale in the provision of advisory services arise from the fact that as AUM increase, the marginal cost of providing advisory services for such AUM decreases. Although the particular differential costs may vary, the principle holds generally and arises from multiple factors.

    a.    For example, a simple example of economies of scale arises where AUM increases are due purely to market forces:  *i.e.*, an increase in the *value* of a fund's assets, even as such assets remain constant in amount and kind (1,000 shares of stock rising in value from $10,000 to $20,000).  In this event, the investment advisor services the additional AUM at *zero* additional variable cost – there is no change in the number or kind of securities held in the portfolio, or in the number of shareholders in the fund.    Although no

additional investment advisory services need be or are rendered in this event, the investment advisor takes in twice its original advisory fees.

b. Similarly, AUM can increase by virtue of existing fund holders purchasing more fund shares, which likewise produces no changes to the composition of the fund's portfolio or to the number of fund shareholders, and thus requires no additional provision of investment advisory services.

c. Additionally, AUM can increase when *new* investors purchase fund shares, but even in this event the additional *investment advisory* costs are *de minimis* as: (1) the additional dollars contributed by new shareholders are simply invested in the same core portfolio of securities already produced by prior investment advisory services; and (2) the additional *administrative* costs of adding new shareholders are borne by *other* parties (*e.g.*, transfer agents) pursuant to other contracts.

d. Lastly and most basically, the work required to operate a mutual fund does not increase proportionately with the assets under management. While initial and fixed operating costs for provision of investment advisory services are substantial (*e.g.*, salaries for research, trading and portfolio management personnel sufficient to manage an entire portfolio; offices to house them; procurement of systems and information necessary to conduct research and manage the portfolio), the variable costs for provision of further investment advisory services for further AUM are much smaller, and often negligible or nonexistent.

201. For these reasons, and put simply, it does not cost an investment advisor ten times as much to render services to a $2 billion fund as a $200 million fund. At some point – a point reached by the Funds, which since 2000 rose from less than $100 million AUM (the Income Fund), less than $1 billion (the International Fund), and approximately $3 billion (the Oakmark Fund) to now each exceed $16 billion AUM – the additional cost to provide advisory services to

each additional dollar in the Funds (whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches or equals zero.

202.   The existence of economies of scale in the mutual fund industry has been confirmed by the SEC and the Governmental Accounting Office (the "GAO"), both of whom conducted in-depth studies of mutual fund fees and concluded that economies of scale exist in the provision of investment advisory services. *See SEC Division of Investment Management Report:  Report on Mutual Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials, and the Ranking Member, Committee on Commerce, House of Representatives* (2000) ("GAO Report"), at 9.  These findings have been further confirmed by academic research, which also describes the existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders. *See e.g.* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610 (2001).

203.   Indeed, the legislative history of Section 36(b) recognizes that an investment advisor's failure to pass on economies of scale to the fund is a principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

*See* Senate Report, at 4901-02.

204.   However, while mutual fund economies of scale are generated by (and therefore belong to) the mutual fund itself, mutual fund investment advisors can and often do monopolize the benefits of such economies of scale by continuing to charge high investment advisory fee rates on mutual fund assets even as a fund's asset base rises substantially.  As such fees become increasingly untethered to the costs of providing such services, they become excessive.

205.    To address the matter, share economy of scale benefits, and avoid taking excessive fees, investment advisors now frequently employ a declining rate structure in which the percentage of AUM taken as an investment advisory fee declines at higher AUM levels. This is done by providing a schedule of AUM "breakpoints" (*e.g.*, $500 million, $1 billion, $5 billion, etc.) at which investment advisory fee rates on AUM above such breakpoints decrease. For example, per the above breakpoint schedule, one rate (the highest) could be applied as the fee for all assets up to $500 million (*e.g.*, 0.75%); another, lower rate could be applied as the fee for assets between $500 million and $1 billion (*e.g.*, 0.60%); and a third rate, lower still, as the fee for assets between $1 billion and $5 billion (*e.g.*, 0.50%). Such breakpoint-adjusted fee schedules reflect (but do not mirror) the cost efficiencies and economies of scale in the management of mutual fund portfolios as mutual funds' AUM grow.

206.    Adoption of breakpoints can allow investment advisors to comply with the above-stated Congressional intent that investment advisors "reduce their effective charges as the fund grows in size."

### 2.    The Funds' Growth Generated Significant Economies of Scale that Harris Largely Monopolized

207.    Exhibits F1-F3 hereto set forth data relevant to economies of scale, extracted from prospectuses and annual reports filed with the SEC by the Funds, concerning, respectively, the operations of the Oakmark Fund, the Income Fund and the International Fund during each of the last fifteen completed fiscal years (*i.e.*, fiscal 2001 through fiscal 2015). Such data includes:

a.  the Funds' net assets (as of the close of each fiscal year ended September 30);

b.  disaggregation of net asset value into

    i.    paid-in capital (*i.e.*, the amounts invested into the Funds by shareholders), and

    ii.   investment appreciation (or depreciation);

c.  the Funds' number of shares outstanding;

d.  the Funds' advisory fees paid;

e.  the Funds' blended advisory fee rates;

f.  the Funds' advisory fee rate schedules;

g.  the Funds' reported portfolio turnover;

h.  the Funds' number of equity holdings; and

i.  the Funds' portfolio managers.

208.  Such data indicates, as set forth in detail below, that:

a.  the Funds' sharp growth generated economies of scale for Harris in its provision of advisory services to the Funds, insofar as:

   i.  the Funds skyrocketed in size between 2001 and 2015, with the Oakmark Fund more-than quintupling from $3.1 billion to $16.6 billion, the Income Fund increasing approximately *30-fold*, from $620 million to $18.2 billion, and the International Fund nearly *36-fold*, from $740 million to $26.5 billion;

   ii.  while the *work required of Harris* to provide the Funds with advisory services did *not* grow at the same rate, but, instead, far more slowly (and in certain material respects did not grow at all);

b.  the Funds' advisory fee rates allowed Harris to retain the lion's share of the benefits generated by such economies of scale, insofar as:

   i.  the advisory fees that the Funds paid to Harris effectively tracked the skyrocketing growth of the Funds' assets, rather than the *far-slower growth of the work required of Harris to advise the Funds*; and

   ii.  breakpoints in the Funds' advisory fee rate schedules did not function to provide Fund shareholders with a meaningful share of such benefits, relative either to (1) the

93

windfall sums retained by Harris, or (2) breakpoints in Harris's advisory fee agreements with Arm's-Length Clients, which operated to reduce Harris's fees far more sharply.

### a) The Economies of Scale Generated by the Funds' Growth

209. **First**, the Funds skyrocketed in size between fiscal 2001 and 2015:

  a. the Oakmark Fund's net assets more-than quintupled from $3.1 billion to $16.6 billion;

  b. the Income Fund's net assets increased approximately *30-fold*, from $620 million to $18.2 billion; and

  c. the International Fund's net assets increased nearly *36-fold*, from $740 million to $26.5 billion \

*See* Exhibits F1-F3 (at "Fund Net Assets" column and at "Growth 2001 to 2015" row).

210. **Second**, however, the sharp growth in the Funds' size was not accompanied by parallel growth in the advisory services required of, or provided by Harris (or of Harris's costs to provide the Funds with advisory services), as indicated *inter alia* by the particularized facts set forth below.

211. First, notwithstanding the Funds' sharp net asset growth, none of the Funds experienced substantial (or much of any) growth in the number of different equity investments held. Specifically:

  a. the Oakmark Fund, with only $3.1 billion of net assets in 2001, held 59 different stocks in its portfolio – but fifteen years later, with $16.9 billion of net assets in 2015, held *fewer* investments: 57. *See* Exhibit F1 at "Number of Equity Holdings" column.

  b. the Income Fund, with only $2.4 billion of net assets, in 2002, held 46 different equity positions in its portfolio – and, 14 years later, with $18.2

94

billion of net assets in 2015, held only one more position: 47. *See* Exhibit F2 at "Number of Equity Holdings" column.

c. the International Fund, with only $740 million of net assets in 2001, held 52 different stocks in its portfolio – but fifteen years later, with $26.5 billion of net assets in 2015, held only 8 more investments: 60. *See* Exhibit F3 at "Number of Equity Holdings" column

212. Indeed, the relatively small number of investments managed in the Funds' investment portfolios *throughout this period* – with the Oakmark Fund and the International Fund containing 55 different stocks on average in their portfolios, and the Income Fund 46 (*ibid.*) – is in no way a fluke, but rather an explicit and constant design feature of the Funds, enshrined in the "Principal Investment Strategies" of each. *See e.g.*, Prospectus at 3 (Oakmark Fund), 15 (Income Fund) and 35 (International Fund) (explaining that each Fund will hold "a relatively small number of stocks" – "typically [] thirty to sixty stocks rather than hundreds" – in order to allow Harris's "best ideas to have a meaningful impact" on Fund performance). The Funds have operated with this particular Principal Investment Strategy throughout the period in question (2001-2015). *See e.g.* January 30, 2002 Prospectus, at 2 ("The Adviser believes that holding a small number of stocks allows its 'best ideas' to have a meaningful impact on fund performance; therefore, the portfolio of each Fund, except Select Fund, typically holds 30 to 60 stocks rather than hundreds.").

213. Second, and relatedly, each of the Funds has also been managed in a manner that, throughout the period in question, yields relatively minimal changes to the Funds' portfolios (as measured by the portfolio turnover rate – the percentage of the total portfolio undergoing investment changes during each year). For example, the Oakmark Fund's most recent annual turnover was 33% (slightly above its 28% average), the Income Fund's most recent annual turnover was an even lower 25% (below its 64% average), and the International Fund's most recent annual turnover was 48% (slightly above its 39% average). *See* Exhibits F1-F3 at

"Portfolio Turnover" column.[22]  Again, as with the relatively small number of different positions, the relatively infrequent investment changes are an intentional, integral and constant part of the "long-term" manner in which Harris manages the Funds:

> The Adviser's value strategy also emphasizes investing for the long-term. The Adviser believes that the market will ultimately discover these undervalued companies, so it gives them the time such recognition requires. The Adviser has found that generally it takes three to five years for the gap between stock price and true business value to narrow. Therefore, successful implementation of this value investment philosophy requires that the Funds and their shareholders have a long-term investment horizon.

*See* Prospectus at 52.

214.    Consequently, to the extent that the extent of advisory work performed can be measured by such concrete facts indicative of actual advisory activity – the number of different stocks held in the Funds' portfolios; the extent to which the Funds' portfolios are changed each year – the advisory services that the Funds require of Harris have effectively stayed constant throughout this period.  Harris has managed each of the Funds throughout to hold only 30 to 60 stocks, and, throughout, has changed portfolio investments infrequently – so not only have Harris' advisory duties remained constant even as the Funds have grown sharply, they have remained constant at a relatively low level.

215.    Third, to the extent that advisory work is also measured by the time and effort expended to research and identify potential new investments, exactly the same holds true.

216.    Throughout the 2001-2015 period, Harris has employed the same investment "process" described in Section VI.B, *supra*, in which Harris personnel engage in a "collective, unified effort" to identify particular stocks for an Approved List shared by and for all of the

---

[22]    Indeed, to the extent that the Funds' portfolio data indicate any trend over time, they indicate that portfolio turnover has been decreasing over time, even as the Funds have grown much bigger.  For both the Oakmark Fund and the Income Fund, most of highest annual turnover figures occurred when the Funds were smaller, rather than larger (*e.g*, 2001 turnover for the Oakmark Fund was 57% , the second highest amount during the 2001-2015 period, and for the Income Fund, 124%, the highest such amount during such period).  *Ibid*.  Likewise, for the International Fund, turnover was highest (58%) when the Fund was smallest (2001).

96

Oakmark Funds. *See e.g.* January 30, 2002 Statement of Additional Information at 4 (describing "HOW THE FUNDS INVEST").

217.    Relevant here are two aspects of this process:

    a.  first, the research demands placed on the Funds' portfolio managers (specifically: to pick 30-60 stocks from the approved list of 120-180 stocks) are not great; and,

    b.  second, that *both the collective effort (to develop and maintain a winnowed-down Approved List of stocks for investment by all Oakmark Funds) and the particular effort of the Funds' portfolio managers (to pick 30-60 stocks from the list) have stayed the same over time, even as the Funds grew dramatically.*

218.    Fourth, and relatedly, the number of portfolio managers Harris requires to operate the Funds has not grown -- at all, in the case of the Oakmark Fund and the International Fund, or meaningfully, in the case of the Income Fund.

    a.  The Oakmark Fund has featured exactly the same two portfolio managers throughout the 2001-2015 period (Nygren and Grant), even as Oakmark Fund assets quintupled from $3.1 billion to $16.6 billion;

    b.  The International Fund was led by two portfolio managers both when it was smallest (2001 through 2005, as assets rose from less than $1 billion to nearly $6 billion) and when it was largest (2009-2015, as assets rose well above $20 billion) – but, in the intervening years between these two periods, by one portfolio manager;

    c.  The Income Fund, which featured two portfolio managers in 2001 (when Income Fund assets stood below $1 billion), only one portfolio manager in 2011-2012 (as Income Fund assets grew to exceed $19 billion), and currently utilizes three.

*See* Exhibits F1-F3 at "Portfolio Managers" column.

219.    Fifth, although the number of shares issued by the Funds has also increased sharply (albeit at approximately half the rate of the increase in the Funds' net assets – see Exhibits F1-F3 at "Shares Outstanding" column), such increases in the number of shares (and or shareholders) *do not impose any additional advisory work (or costs) on Harris*. Instead, the extra work and costs associated with the increases in Fund shares and Fund shareholders are matters born by the Fund's Transfer Agent, BFDS, which handles shareholder accounts and shareholders in the first instance, and which is compensated directly by the Funds for such additional (non-advisory work) by flat fees charged for each new account.

220.    Sixth, as Exhibits F1-F3 further demonstrate, at any given time a substantial amount of the Funds' net asset value consists of *mere market appreciation*: on average, 19.1% of the Oakmark Fund's net asset value, 15.7% of the Income Fund's net asset value, and 4.7% of the International Fund's net asset value. *See* Exhibits F1-F3 at "Share of Fund Assets Consisting of Appreciation" column; *see also* prior three columns ("Fund Net Assets," "Paid-in Capital," and "Unrealized and Undistributed Income and Gains"). Such contributions to net asset value require little if any additional investment advisory services.

221.    The foregoing particularized facts set forth at "First" through "Sixth" above all indicate in different ways the same thing: that the advisory services required of and/or provided by Harris have not grown appreciably (if at all), even as the Funds' size has increased five-fold (the Oakmark Fund), 30-fold (the Income Fund) and 35-fold (the International Fund).

            **b)      Harris Monopolized the Benefits of the Funds' Economies of
                      Scale**

222.    **Third**, notwithstanding and in contrast to the above facts, the advisory fees that the Funds paid to Harris *tracked the skyrocketing growth of the Funds' assets*, rather than the far-slower growth of the work required of Harris to advise the Funds. Specifically:

            a.  while the Oakmark Fund's net assets grew 435.2% between 2001 and 2015
                (from $3.1 billion to $16.6 billion), the Oakmark Fund's annual advisory fee
                payments grew 403.2% (from $25.6 million to $129.1 million);

b. while the Income Fund's net assets grew 2,817.5% between 2001 and 2015 (from $620 million to $18.2 billion), the Income Fund's annual advisory fee payments grew 8,398.0% (from $1.6 million to $135.3 million); and

c. while the International Fund's net assets grew 3,475% between 2001 and 2015 (from $740 million to $26.5 billion), the International Fund's annual advisory fee payments grew 2,849% (from $8.3 million to $245.3 million).

*See* Exhibits F1-F3 (at "Advisory Fees" column and at "Growth 2001 to 2015" row).

223. In other words, as the Funds grew (and generated economies of scale, as set forth in "Second" above), Harris's advisory fees became unmoored from – and ceased to bear any reasonable relationship to – the advisory services that Harris provided. Such fees were therefore excessive.

224. Harris's eye-popping fee increases between 2001 and 2015 (exceeding 5-fold for the Oakmark Fund, 29-fold for the International Fund, and 80-fold for the Income Fund) were not the result of Harris providing the Funds, with, respectively, five, twenty-nine or eighty times as much advisory services in 2015 as in 2001, or that Harris's costs to provide such services were five, twenty-nine or eighty times greater in 2015 as in 2001. To the contrary, and as detailed immediately above, neither the amount nor the cost of Harris's advisory services to the Funds grew substantially between 2001 and 2015, let alone at the rate of the Funds' net assets (and fees). The increase in Harris's advisory fees during this period was not a function of any similar increase in services (or costs), but merely an artifact of Harris's operative fee rates under the IAAs.

225. That the growth in fees extracted far outstripped any growth in services provided (or the cost to provide such services) indicates both that the growth in the Funds' size generated significant economies of scale for Harris, and that Harris monopolized, rather than shared, the benefits flowing from such economies.

c) **Breakpoints in the Funds' Advisory Fee Rate Schedules did Not Operate to Share any Meaningful Portion of Such Benefits with the Funds and/or the Funds' Shareholders**

226.    **Fourth**, Harris was able to extract such excessive fees because, as detailed below: (i) the Funds' advisory fee rate schedules linked Harris's advisory fees to the amount of the Funds' *net assets*, while (ii) providing breakpoints that, notwithstanding multiple amendments to the IAAs adding and/or altering such breakpoints, did very little to reduce Harris's fee rates and fees as Fund assets grew. Consequently, Harris' advisory fees were able to break free of any and all links to the actual advisory services Harris provided, and instead follow the Funds' assets skywards. This allowed Harris to keep for itself the vast majority of the economy of scale benefits generated by the Fund's growth, while returning only a small portion to the Funds and the Funds' shareholders – indeed, a far smaller portion than that obtained through the breakpoints obtained by Arm's-Length Clients in arm's-length fee negotiations with Harris (as specified in Sections VIII.A.1.b and VIII.A.2.b, *supra*).

227.    Exhibits F1-F3 set forth:

   a.    the advisory fee rate schedules, as occasionally amended from year to year between 2001 and 2015, for the Oakmark Fund, Income Fund and International Fund (*see id.* at "Advisory Fee Rate Schedule" column);

   b.    the Funds' operative, blended advisory fee rates for each year, as set forth in the Funds' prospectuses (*see id.* at "Advisory Fee Blended Rate (per Prospectus)" column); and

   c.    calculation of the what the operative blended rate for each Fund would be, applying (1) each Fund's most-recently reported net asset value (as of June 30, 2016), to (2) the Funds' varying advisory fee rates schedules over the 2001-2015 period (*see id.* at "Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules)" column).

228.    The interplay of such data reveals that, notwithstanding the Funds' increasingly elaborated fee breakpoint schedules, such breakpoints functioned to share only a tiny portion of

economy of scale benefits with the Funds and their shareholders, while allowing Harris to retain the vast majority.

229.  **Oakmark Fund**.  While on first blush it can appear that the breakpoints caused Oakmark's blended advisory fee rates to drop substantially, from 0.96% in 2001 to 0.72% in 2015 (a 25% reduction), *see* Exhibit F1 at "Advisory Fee Blended Rate (per Prospectus)" column, such data is misleading.  In large part, this decline is an artifact of the fact that in 2001 and other early years, the Oakmark Fund's smaller size did not allow it to reach and benefit from breakpoints *then already in its fee schedule* (*e.g.*, advisory fee rates of 0.80% on assets from $3-$5 billion, and 0.75% on assets above $5 billion).

230.  The more meaningful analysis is to employ current Oakmark Fund assets ($15.2 billion, as of June 30, 2016) against the various historical advisory fee schedules/breakpoints operative during 2001 through 2015, in order to see what effect such breakpoints really had (*i.e.*, eliminating confounding effects from variations in the Oakmark Fund's size).

231.  As such analysis shows, the net effect of the Oakmark Fund's breakpoints, as progressively amended from 2001 through 2015, was to reduce the Oakmark Fund's blended advisory fees from 0.80% (pursuant to 2001 breakpoint/fee rates) to 0.74% (pursuant to current breakpoint/fee rates).  *See* Exhibit F1 at "Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules)" column. *This amounts to a fee reduction of merely 6 basis points (i.e., 0.06%) over the course of a $12.1 billion increase in the Oakmark Fund's size* (from $3.1 billion in 2001 to $15.2 billion as of mid-2016).

232.  Concrete translation such miniscule fee reduction into actual dollars and cents reveals the extent to which Harris, respectively, shared with the Funds, and kept for itself, the benefits generated by the Oakmark Fund's economies of scale:

> a.  the 0.06% advisory fee reduction effected by the breakpoints amounts, as against current Oakmark Fund assets of $15.2 billion, to an annual fee reduction of $9.1 million – *i.e*, the sum that Harris returned to, and/or shared with, the Oakmark Fund and its shareholders;

      b.  meanwhile, during the same 2001-2015 period, *the annual advisory fees Harris extracted from the Oakmark Fund for itself, increased by $103.5 million* (from $25.7 million in 2001 to $129.1 million in 2015);

      c.  consequently, Harris shared only 8% of the benefits generated by the Oakmark Fund's economies of scale ($9.1 million in fee reductions as against total advisory fee increases of $112.6 million absent such reductions), while keeping 92% for itself (*i.e.*, $103.5 million of the $112.6 million).

233.    Close examination of the Oakmark Fund's breakpoint schedules reveals why they have been and are so ineffective in sharing economy of scale benefits with the Oakmark Fund and Oakmark Fund shareholders (or, stated conversely, so effective in allowing Harris to retain the lion's share of such benefits). The primary culprit is that the schedules have been constructed in counter-intuitive, contra-logical and self-defeating fashion, *so that the breakpoint fee reductions decrease even as the economies of scale increase*. *See* Exhibit F1 at "Advisory Fee Rate Schedule" column. Specifically, the reductions in the advisory fee rates get ever smaller (*e.g.*, from 0.65% on assets over $10 billion (from 2005 to 2012), to 0.625% on assets over $10 billion (2013), to 0.625% on assets between $10 and $12.5 billion and 0.620% on assets above $12.5 billion (2014-2015)) even as the economies of scale get ever larger. Such tiny incremental breakpoint reductions (matters of 3, 2.5 or even 0.5 basis points) not only have little effect due to their tiny size, but, moreover, are exactly the *opposite* of what economy of scale logic calls for. If economies of scale increase as assets do, then the rate reductions at higher asset levels should grow *larger*, not smaller (as the marginal costs of providing advisory services to each new dollar at such higher AUM are lower and lower).

234.    As a result, although the Oakmark Fund's operative advisory fee rate schedule bristles with breakpoints, these breakpoints privilege form over function, and create an *appearance* of fee reductions with actually effecting substantive fee reductions.

235.    **Income Fund**. The situation is fundamentally similar for the Income Fund, which, although it started the period with a single flat 0.75% rate applicable to all Income Fund

assets, gradually accrued through amendments a large collection of breakpoints. *See* Exhibit F2 at "Advisory Fee Rate Schedule" column. However, notwithstanding such array, the net effect has been to reduce the Income Fund's operative blended advisory fee rate from 0.75% in 2001 to 0.66% in 2015 (and, holding fund size constant at the most-recently reported level -- $16.2 billion as of June 30, 2015 – to eliminate confounding effects from variations in fund size) to 0.68% currently. *See id.* at, respectively, "Advisory Fee Blended Rate (per Prospectus)" column and at "Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules)" column.

236. Put simply, and just like the case with the Oakmark Fund, as the Income Fund grew by more than $15 billion from 2001 to mid-2016 (from $620 million to $16.2 billion), the Income Fund's operative blended advisory fee rate was reduced by only 7 basis points (0.07%).

237. Concrete translation of such miniscule fee reduction into actual dollars and cents reveals the extent to which Harris, respectively, shared with the Funds, and kept for itself, the benefits generated by the Income Fund's economies of scale:

   a. the 0.07% advisory fee reduction effected by the breakpoints amounts, as against current Income Fund assets of $16.2 billion, to an annual fee reduction of $11.3 million – *i.e*, the sum that Harris returned to, and/or shared with, the Income Fund and its shareholders;

   b. meanwhile, during the same 2001-2015 period, *the annual advisory fees Harris extracted from the Income Fund for itself, increased by $133.7 million* (from $1.6 million in 2001 to $135.3 million in 2015);

   c. consequently, Harris shared only 7.8% of the benefits generated by the Income Fund's economies of scale ($11.3 million in fee reductions as against total advisory fee increases of $145 million absent such reductions), while keeping 92.2% for itself (*i.e.*, $133.7 million of the $145.0 million).

238. Just as was the case with the Oakmark Fund, the culprit again is the counter-intuitive, contra-logical and self-defeating construction of the breakpoint schedule – where, even more so than in the case of the Oakmark Fund, the breakpoint fee rate reductions continually

*decrease* in size even as the economies of scale continually *increase*. *See* Exhibit F2 at "Advisory Fee Rate Schedule" column. For example, the Income Fund's current breakpoint schedule (operating unchanged since approximately 2009), institutes at its highest end a series of *four breakpoints, covering an asset range of $15.5 billion, that function to reduce marginal fee rates by less than 3 basis points altogether* (from 0.60% to 0.585% to 0.5775% to 0.5725%). *Id.*

239. As a result, although the Income Fund's operative advisory fee rate schedule bristles with breakpoints, these breakpoints privilege form over function, and create an *appearance* of fee reductions with actually effecting substantive fee reductions.

240. **International Fund**. The same applies, in yet more extreme fashion, for the International Fund, which likewise gradually accrued through amendments a large collection of breakpoints. *See* Exhibit F3 at "Advisory Fee Rate Schedule" column.

241. As Exhibit F3 shows, notwithstanding the sheer number of breakpoints, *their net effect has been almost nonexistent*: reducing the International Fund's operative blended advisory fee rate from 0.87% in 2001 to 0.83% currently (when holding fund size constant at the most-recently reported level -- $23.0 billion as of June 30, 2016 – to eliminate confounding effects from variations in fund size). *See id.* at, respectively, "Advisory Fee Blended Rate (per Prospectus)" column and at "Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules)" column.

242. Put simply, as the International Fund grew by more than $25 billion from 2001 to mid-2015 (from $740 million to $26.5 billion), the International Fund's operative blended advisory fee rate was reduced by only 4 basis points (0.04%).

243. Concrete translation of such miniscule fee reduction into actual dollars and cents reveals the extent to which Harris, respectively, shared with the Funds, and kept for itself, the benefits generated by the International Fund's economies of scale:

> a. the 0.04% advisory fee reduction effected by the breakpoints amounts, as
> against current International Fund assets of $23.0 billion, to an annual fee

reduction of $9.2 million – *i.e*, the sum that Harris returned to, and/or shared with, the Income Fund and its shareholders;

b.  meanwhile, during the same 2001-2015 period, *the annual advisory fees Harris extracted from the International Fund for itself, increased by $235.6 million* (from $8.3 million in 2001 to $243.9 million in 2015);

c.  consequently, Harris shared only 3.76% of the benefits generated by the International Fund's economies of scale ($9.2 million in fee reductions as against total advisory fee increases of $244.8 million absent such reductions), while keeping 96.24% for itself (*i.e*., $235.6 million of the $244.8 million).

244.  Again, as with both the Oakmark Fund and the Income Fund, the culprit is the counter-intuitive, contra-logical and self-defeating construction of the breakpoint schedule – where, even more so than in the case of the other two Funds, the breakpoint fee rate reductions continually *decrease* in size even as the economies of scale continually *increase*. *See* Exhibit F3 at "Advisory Fee Rate Schedule" column. For example, the International Fund's current breakpoint schedule institutes at its highest end a series of *seven breakpoints, covering an asset range of $30 billion, that function to reduce marginal fee rates by only 4 basis points altogether* (from 0.825% at the beginning to 0.785% at the end, via interim breakpoint rates of 0.815%, 0.805%, 0.800%, 0.795% and 0.790%). *Id*.

245.  As a result, although the International Fund's operative advisory fee rate schedule bristles with breakpoints, these breakpoints privilege form over function, and create an *appearance* of fee reductions with actually effecting substantive fee reductions.

### d)  Comparison of the Funds' Fee Breakpoints with those Obtained by Harris's Arm's-Length Clients Provides Further Indication of the Breakpoints' Inefficacy

246.  The inefficacy of the Funds' advisory fee breakpoints, to the extent not immediately evident from their face, is thrown into sharp relief via comparison to the breakpoints obtained by Harris's Arm's-Length Clients.

247.    Such comparisons reveal that:

    a.  whereas the Funds employed breakpoints that *spaced fee reductions widely apart and that provided for only minor fee reductions* at each break;

    b.  faster and sharper reductions advisory fee reductions were made available through breakpoint schedules offered to Harris's Arm's-Length Clients.

248.    For example, Arm's-Length Clients for the Harris U.S. Equity and Balanced Strategies corresponding, respectively, to the Oakmark Fund and Income Fund, enjoy advisory fee rates that reduce *quickly* (once assets reach only $15 million) and *sharply* (by 40%, from 0.75% to 0.45%).    Similarly, Arm's-Length Clients for the Harris International Strategy, corresponding to the International Fund, enjoy advisory fee rates that reduce only slightly less *quickly* (once assets reach only $100 million) and slightly less *sharply* (by 28.6%, from 0.70% to 0.50%).

249.    In contrast, the Funds are burdened by advisory fee rates that the Funds' breakpoints reduce far more slowly and gradually.

250.    The Oakmark Fund only nears a 40% reduction to initial fee rate levels (the reduction achieved on the Strategy side once Strategy assets exceed $15 million) once Oakmark Fund net assets exceed *$35 billion*.  In other words, the Oakmark Fund's pace of fee reductions through breakpoints is *more than 2,300 times slower* than the fee reductions obtained by Arm's-Length Clients provided with substantially similar investment advisory services.

251.    The Income Fund's rates *never* achieve a similar 40% reduction:    instead, available rate reductions do not exceed 25%, and only so reduce once net assets exceed *$28 billion*.

252.    Likewise, where Arm's-Length Clients for Harris's International Strategy see a 28.6% reduction to marginal advisory fee rates once assets exceed $100 million, the International Fund's marginal rates – notwithstanding the International Fund's numerous breakpoints – *never* reach a similar 28.6% reduction.  Instead, available reductions to marginal advisory fee rates top out at 21.5%, and only so reduce once International Fund net assets exceed *$35 billion*.

Consequently, the International Fund's breakpoints cause marginal rates to reduce at a rate more than 450 times slower than the International Strategy's breakpoints.[23]

### C. The Nature and Quality of Services Provided to the Funds' Shareholders

#### 1. The *Nature* of the Services Harris Provided to the Funds

253. As detailed in Section VII.A, *supra*, the services provided by Harris to the Funds are:

> a. primarily, Portfolio Selection Services – namely, researching potential investments, deciding which securities to purchase for or sell when from the Funds' investment portfolios, and arranging for the execution of purchase and sale orders on behalf of the Funds; and
>
> b. in comparatively *de minimis* part, Other Services, including a modicum of administrative, compliance and reporting services not already provided by the Funds' other service providers (such as State Street as Custodian and Administrator, and BFDS as Transfer Agent).

254. All further services and expenses necessary to operate and maintain the Funds are provided by third parties pursuant to separate contracts with the Fund, or are separately paid for by the Fund. *See* Section V.A, *supra.*

#### 2. The *Quality* of the Services Harris Provided to the Funds

255. Harris's Portfolio Selection Services – *specifically* – are the primary metric on which Harris, the Funds' investors, and the Funds' Board judge the quality of Harris's services, as the Funds' SEC filings make clear.

256. For example, the "Portfolio Manager Commentary" letters authored by Harris that lead off the Funds' Annual and Semi-Annual Reports filed with the SEC, as well as the Funds' further quarterly reports, focus invariably and exclusively on Harris's Portfolio Selection Services. *See e.g.* Semi-Annual Report at 5, 13-14.

---

[23] The International Fund achieves only 75% of the reduction to marginal rates that the International Strategy does over the course of an asset range 350 times larger ($35 billion versus $100 million).

257. Likewise, the same Fund SEC filings and quarterly reports feature a standard "Summary Information" page for each of the Oakmark Funds, packed with statistics and disclosures relating solely to Harris' Portfolio Selection Services (*e.g.*, portfolio size, portfolio turnover rate, portfolio sector allocations, top ten portfolio holdings, and portfolio performance). *See e.g.* Semi-Annual Report at 4, 12.

258. Most tellingly, the Board, tasked with evaluating the "nature, extent and quality" of Harris' services as part of the Board's annual review and approval of the Funds' IAAs, itself focuses its evaluation almost exclusively on Harris's Portfolio Selection Services, and specifically on the concrete facts of the Funds' investment performance (in which Harris' Portfolio Selection Services are encapsulated). For example and as set forth in the Funds' Semi-Annual Report:

### 1. Nature, Extent and Quality of Services

The Board's consideration of the nature, extent and quality of the Adviser's services to the Funds took into account the knowledge the Board gained during meetings with the Adviser throughout the year. In addition, the Board considered: the Adviser's long-term history of care and conscientiousness in the management of the Funds; the consistency of its investment approach; the qualifications, experience, and capabilities of, and the resources available to, the Adviser's investment and other personnel responsible for managing the Funds; the Adviser's performance as administrator of the Funds; and the Adviser's compliance program. The Board also reviewed the Adviser's resources and key personnel involved in providing investment management services to the Funds, including the time that investment personnel devoted to each Fund and the investment results produced as a result of the Adviser's in-house research. The Board also noted the significant personal investments that the Adviser's personnel have made in the Funds, which serve to further align the interests of the Adviser and its personnel with those of the Funds' shareholders.

### 2. Investment Performance of the Funds

The Board considered each Fund's investment performance over various time periods, and the performance of a group of comparable funds pursuing broadly similar strategies (the Fund's

"Performance Universe") selected by Broadridge Financial
Solutions, Inc. ("Broadridge"). Because the Committee
commenced its review in June, the performance periods considered
by the Board were those ended on April 30, 2015. Where available,
the Board considered one-, three-, five-, and ten-year performance.
The Board also considered updated performance information at its
October meeting at which the Agreements were approved.

Further detail considered by the Board regarding the investment
performance of each Fund is set forth below:

*Oakmark Fund.* The Board considered that the Oakmark Fund
outperformed the median annualized returns of its respective
Performance Universe during the three-, five- and ten-year periods
ending April 30, 2015, but underperformed the median annualized
return of its respective Performance Universe during the one-year
period ending April 30, 2015.

\* \* \*

*Oakmark Equity and Income Fund.* The Board considered that the
Oakmark Equity and Income Fund outperformed the median
annualized returns of its respective Performance Universe during
the one-, three-, five-, and ten-year periods ending April 30, 2015.

\* \* \*

*Oakmark International Fund.* The Board considered that the
Oakmark International Fund outperformed the median annualized
returns of its respective Performance Universe during the three-,
five-, and ten-year periods ending April 30, 2015, but
underperformed the median annualized return of its respective
Performance Universe during the one-year period ending April 30,
2015.

*See* Semi-Annual Report, at 73-74.

259.    However, the quality of the Portfolio Selection Services provided by Harris to the

Funds does not rise to the high level of the advisory fees charged by Harris, as indicated by the

Funds' most-recently updated performance information – for the 3-month, 6-month, and 1-, 3-,

5- and 10-year periods ended June 30, 2016.

260. Like other mutual funds, the Funds report investment performance not only absolutely, but relative to relevant benchmarks of their own selection, such as broad market indices and/or indices composed of comparable mutual funds.

a. The Oakmark Fund's stated benchmark is the S&P 500 Index, but the Oakmark Fund's SEC filings also provide performance comparisons to the Lipper Large Cap Value Funds Index.

b. The Income Fund's stated benchmark is the Lipper Balanced Funds Index, but the Income Fund's SEC filings also provide performance comparisons to the S&P 500 Index and the Barclays U.S. Government / Credit Index.

c. The International Fund's stated benchmark is the MSCI World ex U.S. Index, but the International Fund's SEC filings also provide performance comparisons to the MSCI EAFE Index and the Lipper International Funds Index.[24]

261. As shown in Table 8 below, the Funds' investment performance has fallen short of the Funds' self-selected benchmarks, often sharply, for all of the above-mentioned time periods save the longest (i.e., for the for the 3-month, 6-month, and 1-, 3-, and 5- year periods

---

[24] *See* the Funds Semi-Annual Report, at 4, 12 and 32; *see also* Oakmark Website at "Overview" pages for the Oakmark Fund, Income Fund and International Fund, available respectively at: http://www.oakmark.com/Our-Funds/Overview/Oakmark.htm, http://www.oakmark.com/Our-Funds/Overview/Equity-Income.htm and http://www.oakmark.com/Our-Funds/Overview/International.htm. The S&P 500 Total Return Index is a market capitalization-weighted index of 500 large-capitalization stocks commonly used to represent the U.S. equity market, with returns reflecting reinvested dividends and capital gains distributions. The Barclays U.S. Government/Credit Bond Index is a benchmark index made up of the Barclays U.S. Government and U.S. Corporate Bond indices, including U.S. government Treasury and agency securities as well as corporate and Yankee bonds. The Lipper Large Cap Value Funds Index is an equally-weighted index of the largest 30 funds within the large cap value funds investment objective as defined by Lipper Inc., and adjusted for the reinvestment of capital gains and income dividends. The Lipper Balanced Funds Index measures the performance of the 30 largest U.S. balanced funds tracked by Lipper. The MSCI World ex U.S. Index (Net) is a free float-adjusted market capitalization index that is designed to measure international developed market equity performance, excluding the U.S. The MSCI EAFE (Europe, Australasia, Far East) Index (Net) is a free float-adjusted market capitalization index that is designed to measure the international equity market performance of developed markets, excluding the U.S. & Canada. The Lipper International Funds Index reflects the net asset value weighted total return of the 30 largest international equity funds.

ended June 30, 2016), and has also fallen short, during most of the same periods, of the performance of most other of the Funds' self-selected comparators:

**Table 8**
**The Quality of Harris's Services**
**Oakmark Fund**

| | Total Return (as of 06/30/2016) | | Average Annual Total Returns (as of 06/30/2016) | | | |
|---|---|---|---|---|---|---|
| | 3 Month | YTD | 1 Year | 3 Year | 5 Year | 10 Year |
| Oakmark Fund | 1.33% | 0.70% | -2.99% | 8.65% | 11.32% | 8.20% |
| S&P 500 Total Return | 2.46% | 3.84% | 3.99% | 11.66% | 12.10% | 7.42% |
| Lipper Large Cap Value Fund Index | 3.40% | 4.30% | 0.30% | 8.70% | 9.80% | 5.70% |

**Income Fund**

| | Total Return (as of 06/30/2016) | | Average Annual Total Returns (as of 06/30/2016) | | | |
|---|---|---|---|---|---|---|
| | 3 Month | YTD | 1 Year | 3 Year | 5 Year | 10 Year |
| Oakmark Equity & Income Fund | -0.42% | 0.35% | -5.18% | 5.86% | 5.68% | 6.28% |
| S&P 500 Total Return | 2.46% | 3.84% | 3.99% | 11.66% | 12.10% | 7.42% |
| Barclays Govt/Corp Bond | 2.67% | 6.23% | 6.70% | 4.20% | 4.11% | 5.22% |
| Lipper Balanced Fund | 1.99% | 3.31% | 1.49% | 6.75% | 6.70% | 5.54% |

**International Fund**

| | Total Return (as of 06/30/2016) | | Average Annual Total Returns (as of 06/30/2016) | | | |
|---|---|---|---|---|---|---|
| | 3 Month | YTD | 1 Year | 3 Year | 5 Year | 10 Year |
| Oakmark International Fund | -7.77% | -10.49% | -18.25% | -1.23% | 2.29% | 3.68% |
| MSCI World ex-U.S. Total Return | -1.05% | -2.98% | -9.84% | 1.88% | 1.23% | 1.63% |
| MSCI EAFE Index | -1.46% | | -10.16% | 2.06% | 1.68% | 1.58% |
| Lipper International Fund Index | -0.99% | -2.60% | -9.51% | 2.62% | 1.95% | 2.45% |

262. As the above Fund-reported performance data show:

    a. the Oakmark Fund lagged its benchmark by 1%, 3%, 7% and 3% for the 6-month, 1-year, 3-year and 5-year periods ended June 30, 2016, and also fell short of similar funds' performance during the most recent 3-month, 6-month, 1-year and 3-year periods;

    b. the Income Fund lagged its benchmark and similar funds by 3%, 7%, 1% and 1% for the 6-month, 1-year, 3-year and 5-year periods ended June 30, 2016;

    c. the International Fund lagged its benchmark by 6%, 7%, 8% and 3% during the most recent 3-month, 6-month, 1-year and 3-year periods, and fell short of similar funds' performance by similar amounts during the same time periods.

263. In sum, such Fund-reported performance data indicates that each of the Funds underperformed benchmarks and the average performance of comparable large mutual funds through all periods during the most recent three to five years. During the same time, as set forth in Section VIII.A.3, *supra*, the Funds each paid investment advisory fee rates significantly above those paid on average by comparable large mutual funds.

264. That the Funds paid fees higher than average for performance lower than average is further indication that the Funds' investment advisory fees are excessive.

**D. The Profitability of the Funds to the Advisor**

265. Harris is a privately-held company, and as such neither discloses its financial results of operations nor releases financial statements to the public. Consequently, information concerning (a) Harris's overall profitability (*i.e.*, overall revenues minus overall costs), and more particularly (b) *Harris's profitability with respect to the Funds* (*i.e.*, revenues gained from the Funds minus the costs incurred by Harris in providing advisory services to the Funds), are within Harris's particular knowledge and exclusive control, and are not publicly available.

266. However, as detailed below, and on the basis of all information that *is* publicly available, the Funds:

112

a. are the three largest accounts managed by Harris, constituting, by themselves, more than half (56.4%) of Harris's *total* AUM (*i.e.*, as of December 31, 2015, $61.25 billion out of a total of $108.5 billion);

b. are the three largest contributors to Harris's overall advisory revenues, accounting for an even greater share of Harris's (estimated) overall advisory revenues (estimated, as detailed below, to generate 61.0% of Harris's total advisory fee revenue, although the exact share cannot be determined from publicly available information); and

c. are the three largest drivers of Harris's profits, accounting for a yet greater share of Harris's overall profits than of Harris's revenues and AUM. (although the exact share cannot be determined from publicly available information).

267. Table 9 on the following page, aggregating data from multiple Oakmark Fund and Harris documents relating to Harris's advisory business and the Oakmark Funds, provides a substantially-detailed (estimated) accounting of Harris's advisory assets and advisory fee revenues, and of the relative sources of each:

113

**Table 9**

**The Sources of Harris's Advisory Assets and Advisory Fee Revenues (Estimated)**

| | Assets (as of December 31, 2015) | | Blended Advisory Fee Rate | Annualized Advisory Fee Payments (at stated asset/rate levels) | |
|---|---|---|---|---|---|
| | $ | % of total | | $ | % of total |
| **Oakmark Fund** | $17,073,430,000 | 15.73% | 0.72% | $122,928,696 | 16.31% |
| **Income Fund** | $17,636,074,000 | 16.25% | 0.66% | $116,398,088 | 15.45% |
| **Oakmark International Fund** | $26,539,957,000 | 24.46% | 0.83% | $220,281,643 | 29.23% |
| **Remaining Oakmark Funds** | | | | | |
| Oakmark Select Fund | $5,829,358,000 | 5.37% | 0.85% | $49,549,543 | 6.58% |
| Oakmark Global Fund | $3,051,844,000 | 2.81% | 0.98% | $29,908,071 | 3.97% |
| Oakmark Global Select Fund | $2,268,262,000 | 2.09% | 1.00% | $22,682,620 | 3.01% |
| Oakmark International Small Cap Fund | $2,767,877,000 | 2.55% | 1.10% | $30,446,647 | 4.04% |
| **Subtotal - All Oakmark Funds** | $75,166,802,000 | 69.26% | 0.79% | $592,195,309 | 78.59% |
| **Arm's-Length Clients *** | $33,354,179,229 | 30.74% | 0.48% | $161,345,746 | 21.41% |
| **Total Harris** | $108,520,981,229 | 100.00% | 0.69% | $753,541,054 | 100.00% |

\* AUM for Arm's-Length Clients is the difference between total Oakmark Funds' AUM and total Harris AUM. The Blended Advisory Fee Rate for Arm's-Length Clients is estimated / calculated as (1) the midpoint, of (2) the above-detailed discounts (*see* Section VIII.A.1-2, *supra*) on advisory fee rates enjoyed by the above-detailed Arm's-Length Clients and Subadvised Funds versus the advisory fees charged to the corresponding Oakmark Funds. The average discount enjoyed by Arm's-Length Clients, relative to the Oakmark Funds' fees, was 34.8% (per comparative fee data in Table 5, *supra*) , and, by Subadvised Funds, 42.3% (per comparative fee data in Table 6, *supra*). Consequently, applying the average of these two discounts, or 38.6%, to the weighted average advisory fees paid by the Oakmark Funds results in an average advisory fee rate of 0.48% paid by Arm's-Length Clients.

Sources   Form ADV - Total Harris AUM
          Quarterly Report for December 31, 2015 -- Oakmark Funds' AUM
          Prospecus - Blended Rates for Oakmark Funds

114

269.     As Table 9 indicates, the Funds account for 56.4% of Harris's total AUM -- and an even greater 61.0% share of Harris's total (estimated) advisory fee revenues.  The Funds generate an outsized portion of Harris's total revenues, as compared against the already outsize portion of Harris's total AUM that they constitute, because Harris extracts much higher fees from the Funds than from the accounts making up the remainder of its AUM (such as the 30.7% of Harris's AUM consisting of assets managed for Arm's-Length Clients, to whom Harris charged average advisory fees of merely 0.48%).

270.     Although Harris does not publicly disclose its finances, all available facts indicate that the Funds provide Harris with an even *greater* share of its profits than of its revenues.  Were Harris to disclose its investment advisory expenses, and do so in a manner that directly reflected the actual costs to provide each of its clients with investment advisory services, the Funds would be revealed to be the most profitable of all of Harris's clients.  Among the available facts so indicating are:

271.     **The Funds' Large Absolute and Relative Size**. As indicated in Table 9 above, the Funds are Oakmark's three largest advisory accounts – by far.  Each of the Funds is: (a) approximately three to seven times larger than any of the other Oakmark Funds; and (b) *more than 1,000 times larger* than the average account size of Harris's Arm's-Length Client ($14.2 million).[25]  The Funds' large size produces substantial economy of scale benefits for Harris, as detailed in Section VIII.B, *supra*, that far outweigh any (and all) economy of scale benefits generated by Harris's other, and far smaller, clients.  Consequently, the profit opportunity presented to Harris by the Funds is qualitatively as well as quantitatively unique.

---

[25] Harris has 2,352 advisory accounts (*see* Form ADV), seven of which are the seven Oakmark Funds.  The remaining 2,345 accounts thus relate to Arm's-Length Clients.  Dividing Harris's total AUM for Arm's-Length Clients by this number yields an average Arm's-Length Client account size of $14.2 million.  This average likely masks a significant divergence between accounts managed for individuals (which, per Harris's limited disclosures, may make up approximately 75% of the number of accounts, but only approximately 25% of the total size of such accounts) and for various institutions (which, per the same disclosures, may account for only 25% of the number of such accounts, but 75% of their size).  However, absent discovery (or more particularized public disclosure from Harris), the average size of Harris's institutional accounts cannot be determined.  Notwithstanding that, the basic point appears beyond dispute:  for example, even the *largest* of the Arm's-Length Clients for which some public disclosure is available (*i.e.*, the Subadvised Funds), has net assets of $3 billion (*see* Exhibit A4), which still renders it less than one-fifth of the size of the Funds.

115

272. **The Funds' Simultaneous Large Size and High Fees**. Second, at the same time that Harris enjoys uniquely high economies of scale from the Funds that function to reduce Harris's relative advisory costs, Harris extracts advisory fees from the Funds that: (1) not only do not reflect any such economies; but (2) are comparatively *higher* than the fee rates charged to almost all of Harris's other, and much smaller, clients. For example, as indicated in Table 9 and detailed in Section VIII.A.1-2, *supra*, the Funds' advisory fees are significantly higher than: (a) the average advisory fees Harris charges to its Arm's-Length Clients overall (estimated, in Table 9, to average 0.48%).

273. **The Funds' Comparatively Restricted Investment Focus**. Third, although the four other funds in the Oakmark Fund Complex pay higher advisory fee rates than the Funds, this does not make them more profitable than the Funds, for several reasons.

    a. First, the effect of the other Oakmark Funds' higher fee rates (approximately 2% to 60% higher than the advisory fee rates charged to the Funds) is vastly outweighed by the far larger size of the Funds (three-to-ten times larger), so that the Funds pay total annual fees two to ten times greater than those paid by the other Oakmark Funds.

    b. Second, the wider geographical focus of two of the four other Oakmark Funds – the Oakmark Global Fund and the Oakmark Global Select Fund, which invest on a *global* basis, rather than on the Funds' more constricted U.S. or international bases – makes these other Oakmark Funds more expensive to operate than the Fund. For example, such other Oakmark Funds require of Harris: (1) greater research efforts and expenditures to screen, evaluate and select investments from their wider universes of possible investments; and (2) additional investment advisory services, such as hedging or otherwise mitigating the currency risks associated with non-U.S. investments. Consequently, advising the Funds is less costly and more profitable for Harris than advising the other Oakmark Funds.

    c.   Third, similarly, the more esoteric focus of a third of the four other Oakmark Funds – the Oakmark International Small Cap Fund, which invests only in small, non-U.S. companies – likewise requires greater expense and effort to operate. As less research and analysis is readily available for small-cap stocks (versus large and larger cap stocks), and for international stocks (versus U.S. stocks), Harris, to advise this fund, must – to a greater extent than any of the other Oakmark Funds – 'earn its keep' by doing its own research to identify, screen and evaluate such more obscure companies.

274.   **The Funds' Fall-Out Benefits Further Boost the Profit Attributable to the Funds**. Fourth, Harris's profits from providing the Funds with advisory services are augmented by further "fall-out benefits" that accrue to Harris from the Funds. Such benefits, next detailed in Section VIII.E, *infra*), consist of Harris's ability to spin off copies of the Funds' portfolios to Arm's-Length Clients, including investment advisers to the Subadvised Funds (as demonstrated in Section VIII.A.1-2, *supra*), generating additional advisory fee streams which, as they come at negligible additional cost, Harris enjoys as nearly pure profit. Such additional revenues and profits are directly attributable to the Funds, and would not accrue to Harris but for its relationship with the Funds.

      **E.**    **Fall-Out Financial Benefits Attributable to the Funds**

275.   "Fall-out benefits" refer to income, profits or other benefits accruing to an investment advisor that would not have occurred but for the existence of its captive mutual fund(s). Where an investment manager gains substantial fall-out benefits (over and above direct investment advisory fees) by virtue of a fund or funds it manages, consideration of such benefits is also relevant for any determination as to whether investment advisory fees are excessive.

276.   Here, Harris's relationship with the Funds afforded Harris substantial fall-out benefits.

277.   As detailed in Section VIII.A.1-2 *supra*, Harris, in effect, employs the Funds (as well as other Oakmark Funds) as original models from which Harris can spin off *copies* for other

clients, including Arm's-Length Clients (including but not limited to the Subadvised Funds) who procure Harris's corresponding investment strategies (such as the "U.S. Equity," "Balanced" and "International" Harris investment Strategies corresponding to and copying, respectively, the Oakmark Fund, the Income Fund and the International Fund.

278.     Harris is thus able to capture for itself a sizeable additional fee stream – namely, the investment advisory fees paid by such Arm's-Length Clients, for whom Harris copied advisory services developed and largely paid for by the Funds.

279.     Harris experiences these additional revenues as almost pure profit, because Harris incurs little or no additional investment advisory costs for such copies.  Almost all of the infrastructure, research and personnel required to furnish investment advisory services to such clients were already provided and paid for by investment advisory fees extracted from the Funds themselves.  The Portfolio Selection Services that Harris provides to such clients are effectively without any additional cost, and much of the Other Services (*e.g.*, quarterly reporting) are likewise largely copied from reports that Harris develops for the Funds.

280.     Indeed, the fact that *the Funds* had already paid for the development of these investment advisory services allowed Harris to offer copies to Arm's-Length Clients *at rates far lower than those it charged to the Funds* (as the marginal costs to Harris of providing such copied services are close to zero).  The Funds thus not only made Harris's extra-curricular provision of such services possible, but also made them *marketable*: more attractive to Harris's non-captive, Arm's-Length Clients by virtue of the lower fees Harris was able to offer them.

281.     Such revenues, and even more so such profits, would not have accrued to Harris but for Harris's relationship with the Funds.  Absent such relationship, Harris would not have had the originals from which to spin off copies.  And although Harris could develop original investment strategies *apart from* the Oakmark Funds, Harris would have to invest in personnel and resources to do so, thereby decreasing the profitability of such strategies (versus near-cost-free spin-offs), and/or increase the rates charged for such strategies (versus the lower rates effectively subsidized by the Oakmark Funds) and thereby decrease their marketability.

**F.**     **The Care and Conscientiousness of the Funds' Board in Approving the IAAs and the Harris Investment Advisory Fees Set Forth Therein**

282.    Mutual fund investment advisory fees are "set" (reviewed, evaluated and approved) by mutual funds' boards of trustees on an annual basis.

283.    The ICA requires, in connection with such annual fee evaluation and approval process, that

      a.   the board request, obtain and evaluation "such information as may reasonably be necessary" for evaluation of the advisory fees; and

      b.   that the investment adviser provide the board with such information:

> It shall be the duty of the directors of a registered investment company to request and evaluate, and the duty of an investment adviser to such company to furnish, such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.

*See* 15 U.S.C. 80a-15(c)

284.    Where a board's fee evaluation and approval *procedure* is deficient, a board's fee approval may lack adequate basis, and hence merits little judicial deference.

285.    Such procedural deficiencies arise primarily in two ways:

      a.   **Deficiencies in the Information Considered**. For example, an investment adviser may fail to provide the board with relevant, accurate and/or complete information, or, similarly, the board may fail to request, obtain and/or evaluate relevant, accurate and complete information necessary for reasonable evaluation of advisory fees. In such instances, a board's fee approval is based on partial or inaccurate information, and hence: (a) merits little deference, and (b) itself constitutes *further* indication of excessive fees.

      b.   **Deficiencies in the Manner of Consideration**. A board may fail to exhibit adequate conscientiousness in considering and evaluating the information it receives (including the degree to which such information is accurate,

sufficient and/or complete). In such instances, a board's fee approval likewise may lack adequate basis, and may hence merit little deference and itself constitute further indication of excessive fees.

286.    Additionally, a fee can be excessive *in substance* – wholly apart from whether the procedure used in setting it was sufficient or defective, and even where such procedure was in all appearances adequate.

287.    Here, the procedure through which the Funds' Board "set" such fees was deficient, and additionally, irrespective of procedure, the Funds' investment advisory fees were excessive in substance.

### 1.    The Board

288.    Each of Oakmark Funds, as a series of the Harris Associates Investment Trust, shares in common the Harris Associates Investment Trust's Board of Trustees (the "Board"), which consists of the following persons: Allen J. Reich; Thomas H. Hayden; Christine M. Maki; Laurence C. Morse; Steven S. Rogers; Kristi L. Rowsell; Burton W. Ruder (who recently retired from Board, effective December 31, 2015); and Peter S. Voss (collectively, the "Trustees").

289.    Once nominated and elected to the Board, Trustees never stand for re-election, but instead enjoy "indefinite" terms until reaching retirement age (72), resigning, dying, or being removed or disqualified. *See* SAI at 22. Five of the Trustees have served in such capacity for more than 20 years: Reich since 1993, and Hayden, Maki, Ruder (until his December 2015 retirement) and Voss since 1995. Rogers has been a Trustee for 10 years, and Morse for 3-4 years.

290.    Each of the Trustees except for Rowsell (the "Independent Trustees") qualifies under the ICA as a "non-interested" or independent trustee. Rowsell, an employee of Harris, is an "interested" trustee.

291.    The Board includes multiple committees thereof, all made up solely of Independent Trustees, including a "Committee on Contracts" (hereinafter, the "Committee") made up of Hayden (Chair of the Committee), Morse, Reich and Ruder. As the Funds' SEC

filings explain, the Committee on Contracts met four times during Fiscal 2015, and is responsible for:

> reviewing, in the first instance, and making recommendations to the board regarding, investment advisory agreements and any other agreements relating to the management or administration of any Fund.

*See* SAI, at 27.

292.    Each of the Trustees received at least $200,000 in compensation for serving as a Trustee during Fiscal 2015 (and Reich received more than $330,000). *See* SAI at 28.

### 2.    The Board Approved Substantively Excessive Advisory Fees

293.    Matters of process or procedure aside, the investment advisory fees approved by the Board were excessive, in substance and result, for the reasons set forth in Sections VIII.A-E, *supra*.

294.    Furthermore, the Board's approval of substantively excessive fees stemmed in part from a deficient process for the consideration, evaluation and approval of the Funds' advisory fees, as detailed immediately below in Section VIII.F.3-4.

### 3.    The Board's Deficient Approval Process

295.    The precise manner in which the Board evaluated and approved the Funds' IAAs and the investment advisory fee rates set forth therein – including the information Harris furnished to the Board; the information that the Board considered and evaluated; and the Board's conscientiousness in reviewing proffered, relevant and/or requisite information – is a matter within the particular knowledge and exclusive control of Defendant and the Board.

296.    The only *publicly-available* information concerning the Board's evaluation and approval is the purported summary of such evaluation and approval, authored by Defendant, provided each year in the Oakmark Funds' semi-annual report on Form N-CSRS filed with the SEC (hereinafter, "Fee Approval Summaries").

297.    The most recent Fee Approval Summary, concerning the Board's October 21,

2015 meeting and decision to approve continuation of the IAAs through October 2016, and set

forth in the Semi Annual Report, is reproduced below:

> **The Oakmark Funds Disclosure Regarding the Board of Trustees' October 2015 Approval of Investment Advisory Contracts as Approved April 27, 2016**
>
> Each year, the Board of Trustees (the "Board") of the Oakmark Funds (the "Funds"), including a majority of the Trustees who are not "interested persons" of Harris Associates L.P., the Funds' investment adviser (the "Adviser") or the Funds ("Independent Trustees"), is required by the Investment Company Act of 1940 (the "1940 Act") to determine whether to continue each Fund's investment advisory agreement (each, an "Agreement," and collectively, the "Agreements") with the Adviser. At a meeting held on October 21, 2015, the Board, including all of the Independent Trustees, upon recommendation of the Board's Committee on Contracts (the "Committee"), determined that the continuation of the Agreement for each Fund was in the best interest of the Fund and its shareholders, and approved the continuation of the Agreements through October 31, 2016.
>
> In evaluating the Agreements with respect to each Fund, the Board, including the Independent Trustees, reviewed materials provided by the Adviser in response to questions submitted by the Independent Trustees and counsel that is experienced in Investment Company Act of 1940 matters and that is independent of the Adviser ("Independent Counsel"), and met with senior representatives of the Adviser regarding its personnel, operations and financial condition as they relate to the Funds. In addition, the Board retained an independent data provider to provide performance and expense information for each Fund and for comparable funds.
>
> The Committee leads the Board in its evaluation of the Agreements. The Committee is comprised entirely of Independent Trustees, and more than 75% of the Board is comprised of Independent Trustees. During the last year, the Committee and the Board met multiple times to consider the Agreements. In connection with its deliberations, the Board also considered a broad range of information relevant to the annual contract review that is provided to the Board (including its various standing committees) at meetings throughout the year, including investment

performance reports and related portfolio information for each Fund, as well as periodic reports on, among other matters, pricing and valuation; brokerage and execution; compliance; and shareholder and other services provided by the Adviser and its affiliates.

Throughout the process, the Independent Trustees were advised by Independent Counsel and received from Independent Counsel a memorandum discussing the legal standards for their consideration of the proposed continuation of the Agreements. During the course of the year and during their deliberations regarding the annual contract review, the Committee and the Independent Trustees met with Independent Counsel separately from representatives of the Adviser.

In connection with their consideration of each Agreement, the Committee and the Board considered, among other things: (i) the nature, quality and extent of the Adviser's services, (ii) the investment performance of each Fund, as well as performance information for an appropriate market index and a peer group of other mutual funds, (iii) the fees and other expenses paid by each Fund, as well as fee and expense information for comparable funds and separate accounts managed by the Adviser, (iv) the profitability of the Adviser and its affiliates from their relationship with each Fund, (v) whether economies of scale may be realized as the Funds grow and whether fee levels reflect such potential economies of scale for the benefit of each Fund's shareholders, and (vi) other benefits to the Adviser that result from its relationship with each Fund.

Below is a summary of the principal information considered by the Board regarding various factors. In their deliberations, the Independent Trustees did not identify any single factor that was paramount or determinative, and each Independent Trustee may have weighed the information differently. The Board focused on the overall costs and benefits of the Agreements to each Fund and, through the Funds, their shareholders.

## 1. Nature, Extent and Quality of Services

The Board's consideration of the nature, extent and quality of the Adviser's services to the Funds took into account the knowledge the Board gained during meetings with the Adviser throughout the year. In addition, the Board considered: the Adviser's long-term history of care and conscientiousness in the management of the Funds; the consistency of its investment approach; the

qualifications, experience, and capabilities of, and the resources available to, the Adviser's investment and other personnel responsible for managing the Funds; the Adviser's performance as administrator of the Funds; and the Adviser's compliance program. The Board also reviewed the Adviser's resources and key personnel involved in providing investment management services to the Funds, including the time that investment personnel devoted to each Fund and the investment results produced as a result of the Adviser's in-house research. The Board also noted the significant personal investments that the Adviser's personnel have made in the Funds, which serve to further align the interests of the Adviser and its personnel with those of the Funds' shareholders.

## 2. Investment Performance of the Funds

The Board considered each Fund's investment performance over various time periods, and the performance of a group of comparable funds pursuing broadly similar strategies (the Fund's "Performance Universe") selected by Broadridge Financial Solutions, Inc. ("Broadridge"). Because the Committee commenced its review in June, the performance periods considered by the Board were those ended on April 30, 2015. Where available, the Board considered one-, three-, five-, and ten-year performance. The Board also considered updated performance information at its October meeting at which the Agreements were approved.

Further detail considered by the Board regarding the investment performance of each Fund is set forth below:

*Oakmark Fund.* The Board considered that the Oakmark Fund outperformed the median annualized returns of its respective Performance Universe during the three-, five- and ten-year periods ending April 30, 2015, but underperformed the median annualized return of its respective Performance Universe during the one-year period ending April 30, 2015.

*Oakmark Select Fund.* The Board considered that the Oakmark Select Fund outperformed the median annualized returns of its respective Performance Universe during the one-, three-, five-, and ten-year periods ending April 30, 2015.

*Oakmark Equity and Income Fund.* The Board considered that the Oakmark Equity and Income Fund outperformed the median annualized returns of its respective Performance Universe during the one-, three-, five-, and ten-year periods ending April 30, 2015.

124

*Oakmark Global Fund.* The Board considered that the Oakmark Global Fund outperformed the median annualized returns of its respective Performance Universe during the three-, five-, and ten-year periods ending April 30, 2015, but underperformed the median annualized returns of its respective Performance Universe during the one-year period ending April 30, 2015.

*Oakmark Global Select Fund.* Noting that the Oakmark Global Select Fund commenced operations in October 2006, the Board considered that the Fund outperformed the median annualized returns of its Performance Universe during all periods presented.

*Oakmark International Fund.* The Board considered that the Oakmark International Fund outperformed the median annualized returns of its respective Performance Universe during the three-, five- and ten-year periods ending April 30, 2015, but underperformed the median annualized return of its respective Performance Universe during the one-year period ending April 30, 2015.

*Oakmark International Small Cap Fund.* The Board considered that the Oakmark International Small Cap Fund outperformed the median annualized return of its respective Performance Universe during the one-, five-, and ten-year period ending April 30, 2015, and underperformed the median annualized returns of its respective Performance Universe during the three-year period ending April 30, 2015.

In addition to comparing each Fund's performance to that of its Performance Universe, the Board also considered each Fund's performance compared to that of its benchmark and other comparative data provided by Broadridge, including each Fund's total return and performance relative to risk. In the case of those Funds that had underperformed their Performance Universe, the Board noted that performance, especially short-term performance, is only one of the factors that it deems relevant to its consideration of a Fund's Agreements.

3. **Costs of Services Provided and Profits Realized by the Adviser**

Using information provided by Broadridge, the Board evaluated each Fund's advisory fee compared to the advisory fee for other mutual funds comparable in size, character and investment strategy (the "Expense Group"), and each Fund's expense ratio compared to that of the Expense Group.

125

The Board also reviewed the Adviser's advisory fees for comparable institutional separate account clients and subadvised funds (for which the Adviser provides portfolio management services only). The Board considered the appropriateness and reasonableness of any differences between the fees charged to a Fund and any such comparable funds and/or separate accounts, including any breakpoints, and noted the Adviser's explanation that, although in most instances, the fees paid by those other clients were lower than the fees paid by the Funds, the differences reflected the Adviser's significantly greater level of responsibilities and broader scope of services regarding the Funds, and the more extensive regulatory obligations and risks associated with managing the Funds.

The Board also considered the Adviser's costs in serving as the Fund's investment adviser and manager, including costs associated with technology, infrastructure and compliance necessary to manage the Funds. The Board reviewed the Adviser's methodology for allocating costs among the Adviser's lines of business and among the Funds. The Board also considered information regarding the structure of the Adviser's compensation program for portfolio managers, analysts and certain other employees and the relationship of such compensation to the Adviser's ability to attract and retain quality personnel. The Board also considered fall-out benefits received by the Adviser or its affiliates from their relationship with each Fund. Finally, the Board considered the Adviser's profitability analysis, as well as an Investment Management Industry Profitability Analysis prepared by Broadridge. The Board examined the pre-tax profits realized by the Adviser and its affiliates from their relationship with each Fund, as presented in the profitability analyses, as well as the financial condition of the Adviser.

Further detail considered by the Board regarding the management fee rate and expense ratio of each Fund is set forth below:

*Oakmark Select Fund, Oakmark Global Fund, Oakmark Global Select Fund and Oakmark International Small Cap Fund.* The Board considered that each Fund's management fee rate and total expense ratio are higher than the respective medians of each Fund's Expense Group.

*Oakmark Fund and Oakmark Equity and Income Fund.* The Board considered that each Fund's management fee rate is higher than the median of the Fund's Expense Group. The Board noted, however,

that each Fund's total expense ratio, which reflects the total fees paid by an investor, is lower than the median of each Fund's Expense Group. The Board also considered its negotiation with the Adviser, the result of which was the Adviser's agreement to add additional breakpoints to its investment advisory agreement with the Oakmark Fund to reduce the Adviser's fees at levels that would come into effect as fund assets continue to grow.

*Oakmark International Fund.* The Board considered that the Fund's management fee and total expense ratio are lower than the respective medians of the Fund's Expense Group.

### 4. Economies of Scale and Fee Levels Reflecting Those Economies

The Board considered whether each Fund's management fee structure reflects any potential economies of scale that may be realized by the Adviser for the benefit of each Fund's shareholders. The Board reviewed each Agreement, which includes breakpoints that decrease the management fee rate as Fund assets increase. The Board also considered that after negotiations with the Adviser, the Adviser agreed to additional breakpoints for the Oakmark Fund to reduce the Adviser's fees at levels that would come into effect as fund assets continue to grow.

### 5. Other Benefits Derived from the Relationship with the Funds

The Board also considered other benefits that accrue to the Adviser and its affiliates from their relationship with the Funds. The Board noted that an affiliate of the Adviser serves as the Funds' distributor, without compensation, pursuant to a written agreement the Board evaluates annually.

The Board also considered the Adviser's use of a portion of the commissions paid by the Funds on their portfolio brokerage transactions to obtain research products and services benefiting the Funds and/or other clients of the Adviser, and considered the Adviser's assertion that its use of "soft" commission dollars to obtain research products and services was consistent with regulatory requirements.

### 6. Conclusion

After full consideration of the above factors, as well as other factors that were instructive in evaluating the Agreements, the

127

Board, including all of the Independent Trustees, concluded that approval of the continuation of each Agreement was in the best interests of the respective Fund and its shareholders. In reaching this determination, the Board considered that the nature, extent and quality of the services provided by the Adviser to each Fund were appropriate and consistent with the Fund's Agreement and that each Fund was likely to continue to benefit from services provided under its Agreement with the Adviser; that the Adviser was delivering performance for each Fund that was consistent with the long-term investment strategies being pursued by the Fund, and that the Fund and its shareholders were benefiting from the Adviser's investment management of the Fund; that the management fees paid by each Fund to the Adviser were reasonable in light of the services provided; that the breakpoints in the fee schedule for each Fund allow shareholders to benefit from potential economies of scale that may be achieved by the Adviser; that the profitability of the Adviser's relationship with the Funds appeared to be reasonable in relation to the services performed; and that the benefits accruing to the Adviser and its affiliates by virtue of their relationship with the Funds were reasonable in light of the costs of providing the investment advisory and other services and the benefits accruing to each Fund. The Board's conclusions are based in part on its consideration of materials prepared in connection with the approval or continuance of the Agreements in prior years and on the Board's ongoing regular review of Fund performance and operations throughout the year, in addition to material prepared specifically for the most recent annual review of the Agreements..

*See* Semi-Annual Report, at pp. 73-75.

298.    As detailed below, the Fee Approval Summary was not intended to be, and is not, an accurate depiction of the Board's fee evaluation and approval process, and does not reflect Defendant's or the Board's efforts to engage in a good-faith process designed to guard against taking excessive investment advisory fees. Rather, and primarily, it reflects Defendant's efforts to shield, from legal challenge under §36(b), a deficient fee approval process that was designed and operated to ensure taking excessive investment advisory fees from the Funds.

299.    Closely examined, the Fee Approval Summary is:

a.    self-serving hearsay;

b.    boilerplate;

      c.   indicative of a *deficient* fee approval procedure, insofar as it indicates that the Board's approval of the Funds' advisory fees was based on inaccurate and/or incomplete information, and that the Board lacked adequate conscientiousness in its evaluation of such information and in reaching the conclusions stated therein, which conclusions were without adequate basis and, frequently, counterfactual.

300.    First, the Fee Approval Summary communicates, in the first instance, the *authorial intent* to describe an adequate fee approval process in which relevant information with respect to each applicable *Gartenberg* factor was considered, but does not establish that such description is in fact accurate. To the contrary, numerous aspects of the Fee Approval Summary, set forth below, indicate that, authorial intent notwithstanding, the Board's actual fee evaluation and approval was deficient.

      a.   In its introductory section, the Fee Approval Summary asserts in declaratory fashion that the Board, in meeting to consider, evaluate and ultimately approve the Funds' IAAs and fees, considered information concerning each of the remaining *Gartenberg* factors, which the Fee Approval Summary lists in bullet point form (*e.g.*, the nature and quality of the services provided; the profitability to the advisor; economies of scale; comparative fees; and fall-out benefits).

      b.   However, and as detailed below, the entire remainder of the Fee Approval Summary, although purporting to provide further detail to support these initial and declaratory assertions, does not actually provide any concrete or particularized support:

            i.   For example, as pointed out in "Second" below (¶¶ 301-02), although the remainder of the Fee Approval Summary purports to provide specifics concerning the Board's fee approval process, the remainder of the Fee Approval

129

Summary is in fact mere *boilerplate*, repeated annually and near-*verbatim* in the Oakmark Funds' semi-annual reports since at least 2010.

ii. Likewise, as pointed out in "Third" below (¶ 303), although the remainder of the Fee Approval Summary purports to further detail the Board's fee approval process, such further detail remains conclusory and devoid of almost any particularized facts. It thus does not provide or reveal any adequate basis for the Board's fee approval.

iii. Lastly, as pointed out in "Fourth" below (¶¶ 304-34), the remainder of the Fee Approval Summary indicates in substantial part the very *opposite* of what it purports to say: namely, that the Board's conclusions *lacked* adequate basis or were *counterfactual* – and thus, relatedly, that the Board failed to consider, and/or Defendant failed to furnish, adequate, accurate and complete information relevant to fee evaluation and approval.

c. Consequently, the Fee Approval Summary communicates little except its author's attempt to fashion a description of the Board's fee approval process that depicts such process to have fully complied with *Gartenberg*.

301.    Second, although the Fee Approval Summary, after asserting in declaratory bullet points the Board's purported consideration of information relating to each *Gartenberg* factor, thereafter purports to proffer more specific factual information concerning the information the Board reviewed relating to each such factor, the remainder of the Fee Approval Summary is in fact mere boilerplate. The same purportedly-specific description is repeated annually, and

substantially- verbatim,[26] in each of the semi-annual reports filed by the Oakmark Funds during the current decade. *See e.g.* the Oakmark Funds' semi-annual reports on Form N-CSRS, filed with the SEC on:

      a.  May 27, 2015, at pp. 72-74;

      b.  May 28, 2014, at pp. 72-74;

      c.  May 22, 2013, at pp. 65-66;

      d.  May 24, 2012, at pp. 90-92; and

      e.  May 26, 2011, at pp. 93-95.

302. That such substantially-identical Fee Approval Summaries were provided in each semi-annual report during the current decade is, at a minimum, a substantial indication that the Fee Approval Summary is *not* a particularized description of the Board's actual fee evaluation and approval process (unless such process is little more than a rubber-stamping), but rather a standard and wholly general form of disclosure used by Defendant year after year after year.

303. Third, while the Fee Approval Summary purports to further detail the fee approval process and the information the Board considered with respect to each *Gartenberg* factor, such further detail itself remains largely conclusory and devoid of any particularized facts, and thus fails to establish or communicate any adequate basis for the Board's fee approval.

---

[26] The Fee Approval Summaries specified in ¶ 301(a)-(e), *i.e.*, for each of five years prior to fiscal 2016, were near-verbatim identical to each other, differing only in: (i) boilerplate text employed to describe the comparative performance of each of the Oakmark Funds, as such performance occasionally fluctuated from year to year for various of the Oakmark Funds (*e.g.*, outperforming comparable mutual funds some years, underperforming other years); and (ii) boilerplate text employed to describe the comparative fees and expense ratios of each of the Oakmark Funds versus comparable mutual funds, as the results of such comparisons occasionally fluctuated (*e.g.*, in some years, certain and varying Oakmark Funds featured fees and/or expense ratios that were higher than comparable mutual funds' median fees or expenses, or in line with them, or lower), and as the advisory fee rate schedules for various of the Oakmark Funds were amended in various years via the addition of additional fee breakpoints (invariably noted in the Fee Approval Summaries).
    The current Fee Approval Summary differs slightly more, but still remains substantially identical. In addition to differences stemming from the above-mentioned fluctuations in comparative performance and fees, the Current Fee Approval Summary also differs from prior years by: (i) *re-organization* of boilerplate text (*e.g.*, merely shifting the same text from old locations to new ones, such as shifting description of the Board's *conclusions* from (a) its former locations, provided at the end of each separate discussion of each *Gartenberg* factor, to (b) its new location, as a separate and standalone "Conclusions" section following separate discussions of each *Gartenberg* factor); and (ii) *addition* of new boilerplate, primarily in the introductory section of the Fee Approval Summary, providing slightly-more detailed and expansive description of the types of materials and information reviewed by the Board.

a. For example, in its purportedly more-particularized description of the Board's review of the profitability *Gartenberg* factor, the Fee Approval Summary (1) asserts that the Board reviewed information concerning Defendant's profitability (as presented to it by Defendant) and the profitability of other investment advisers, but (2) says nothing specific as to the absolute or relative profitability levels of Defendant and other investment advisers, and (3) merely proffers an empty conclusion that the "profitability of the Adviser's relationship with the Funds appeared to be reasonable in relation to the services performed."

b. Likewise, with respect to the economies of scale *Gartenberg* factor, the Fee Approval Summary (1) proffers the empty conclusion that "the breakpoints in the fee schedule for each Fund allow shareholders to benefit from potential economies of scale that may be achieved by the Adviser," while (2) providing *no indication that the Board reviewed any information as the existence or extent of such economies of scale*, and (3) appearing to base its analysis entirely on the mere *existence* of breakpoints in the Funds' fee schedules, without any analysis of such breakpoints' absolute or relative *effects* in sharing the benefits of economies of scale with the Funds and/or Fund shareholders.

c. Similarly, in its purportedly more-particularized description of the Board's review of the "Nature, Extent and Quality of Services" *Gartenberg* factor, the Fee Approval Summary: (1) noted that the Oakmark Funds' performance "is only one of the factors" deemed relevant by the Board in evaluating quality of services, but (2) provided no particularized information concerning any factor other than the Oakmark Funds' performance, and (3) with respect to performance, which was assessed comparatively for each of the Oakmark

132

Funds using "a group of comparable funds pursing broadly similar strategies," failed to disclose the number and identity of such comparable funds.[27]

304. Fourth and lastly, the Fee Approval Summary affirmatively indicates the very *opposite* of what it purports to say: that the Board *failed* to consider, and/or Defendant *failed* to furnish, adequate, accurate and complete information relevant to fee evaluation and approval; and/or that the Board *lacked* adequate conscientiousness in evaluating the information it did and in approving the Funds' advisory fees. Such indications arise, specifically, where the Board's evaluation and/or conclusions, as described in the Fee Approval Summary, appear to be without factual basis, flawed, or even counterfactual. For example:

305. **Fee Comparisons**. Although the Fee Approval Summary asserts that Board approved the Funds' advisory fees as reasonable after comparing them with advisory fees paid by others for comparable services, the Fee Approval Summary, in so doing, indicates that the fee comparison information reviewed by the Board was materially inaccurate and incomplete, and that the Board's evaluation and conclusions with respect to comparative fees were without adequate basis, flawed and in fact counterfactual.

306. The Fee Approval Summary first explains that the Board reviewed comparative fee information based on the *same three fee comparisons presented here* – namely, comparisons to the fees paid by (1) Defendant's separate account Arm's-Length Clients, (2) Defendant's Subadvised Fund clients, and (3) comparable mutual funds:

> . . . the Board evaluated each Fund's advisory fee compared to the advisory fee for other mutual funds comparable in size, character and investment strategy (the "Expense Group"), and each Fund's expense ratio compared to that of the Expense Group.

---

[27] A failure all the more important in light of the fact, further detailed below, that the performance conclusions that the Board drew from this *unspecified* number of *unspecified* other comparable mutual funds (*e.g.*, that the Oakmark Funds *outperformed* comparable funds) appear to differ substantially from the more comprehensive factual analysis of comparable performance set forth in the Oakmark Funds' own SEC filings (*see* Section VIII.C.2, *supra*, analyzing the Funds' performance on the basis of the Funds' own benchmarks).

> The Board also reviewed the Adviser's advisory fees for
> comparable institutional separate account clients and subadvised
> funds . . .

Fee Approval Summary at 74.

307.    In fact, as the Fee Approval Summary concedes, the results of each of these three

fee comparisons, as reviewed by the Board, were the *same* (albeit wholly undetailed) as the

results of the fee comparisons presented in full detail here – namely and invariably, that the

Funds paid *higher* advisory fees than did Defendants' separate account Arm's-Length Clients,

Defendants' Subadvised Fund clients, and other similar mutual funds (*see* Section VIII.A.1-3,

*supra*):

> . . . the fees paid by those other clients [*i.e.*, institutional separate
> accounts and subadvised funds] were lower than the fees paid by
> the Funds . . .
>
> &ast; &ast; &ast;
>
> *Oakmark Fund and Oakmark Equity and Income Fund.* The Board
> considered that each Fund's management fee rate is higher than the
> median of the Fund's Expense Group.

Fee Approval Summary, at 74.[28]

308.    However, notwithstanding such similar factual comparisons and similar factual

results, the Board arrived at conclusion *exactly opposite* to the one here – namely, that the Funds'

fees were reasonable, rather than excessive.

309.    As the Fee Approval Summary further indicates, the Board was led to this

counterfactual conclusion:

> a. by Defendant, who provided the Board with crucial misinformation
>
>    concerning the services received in exchange for such differing fees; and

---

[28] The *sole* difference, to the extent ascertainable from the Fee Approval Summary,  which provided only *unparticularized* accounts of the results reviewed by the Board – *e.g.*, Fund fees were "higher" than the fees paid by similar funds, Arm's-Length Client and Subadvised Funds, without disclosing any detail as to *how much higher* – was that: (a) where the Board reviewed fee comparison results for the International Fund indicating that its advisory fee rates were *lower* the median rates paid by comparable mutual funds, (b) the same comparison here (*see* Section VIII.A.3.c, *supra*) yielded the opposite result (*i.e.*, that the International Fund's fees were higher than those paid on average by comparable mutual funds).

b. by additional acts of commission (consideration of irrelevant facts) and omission (failure to consider relevant facts).

310.    First, as the Fee Approval Summary sets forth, the Board, after being presented with facts demonstrating that Defendant charged higher advisory fees to the Funds than to Arm's-Length Clients or Subadvised Funds, then considered "the appropriateness and reasonableness of any differences between the fees charged" – at which point the Board accepted and credited the following "explanation" from Defendant:

> The Board considered the appropriateness and reasonableness of any differences between the fees charged to a Fund and any such comparable funds and/or separate accounts, including any breakpoints, and **noted the Adviser's explanation that, although in most instances, the fees paid by those other clients were lower than the fees paid by the Funds, the differences reflected the Adviser's significantly greater level of responsibilities and broader scope of services regarding the Funds, and the more extensive regulatory obligations and risks associated with managing the Funds**.

Fee Approval Summary, at 74 (bold added for emphasis).

311.    Defendant's timely proffer of this "explanation" – in effect, that the higher fees Defendant charged to the Funds were justified by the greater services Defendants provided to the Fund – led the Board to conclude that the Funds' fees, though higher, were still reasonable.

312.    However, Defendant's purportedly factual "explanation" was, in fact, *self-serving misinformation*. As set forth above in Section VIII.A, *supra*, the services that Defendant provided to the Funds (at far higher fees) were substantially similar to – and in large part effectively identical to – the services that Defendant provided to Arm's-Length Clients and Subadvised Funds. Consequently, the Funds' higher fees were *not* justified by provision of greater services. The Board was thereby led astray.

313.    Second, as the Fee Approval Summary also sets forth, the Board, after being presented with facts demonstrating that Defendant charged higher advisory fees to the Oakmark Fund and the Income Fund than other investment advisers charged to comparable mutual funds

135

they advised, then, *sua sponte*, "noted, however, that each Fund's total expense ratio, which reflects the total fees paid by an investor, is lower than the median" total expense ratio for comparable mutual funds. *See* Fee Approval Summary, at 74. Noting that these two Funds featured lower-than-average total expense ratios led the Board to conclude that the Funds' higher-than-average advisory fees were reasonable. *Id.* at 74-75.

314. However, the "total expense ratio" is *irrelevant* for evaluation of advisory fees because the total expense ratio includes, in addition to advisory fees paid for advisory services (the particular focus of Section 36(b)):

       a. a host of *other* fees paid to *other* service providers (*e.g.*, transfer agents, custodians, distributors, etc.) for *other* services; and

       b. a host of further, separate operating expenses borne directly by the Funds and the Funds' shareholders (such as Board compensation, costs for printing and mailing Fund documents, and the costs of legal and auditing services provided to the Funds).

315. Such extraneous fees and expenses included in the "total expense ratio" therefore *cloud*, rather than sharpen, evaluation of the *advisory* fees paid to the investment adviser.

316. Furthermore, to the extent that "total expense ratio" information is relevant, consideration of such information only further supports Plaintiffs' excessive *advisory* fee claims. That the Funds' total expense ratios were lower than average, even as the Funds' advisory fees were higher than average, indicates in the first instance that although the Funds proved able to restrain the fees they paid to *other service providers* (below average), such demonstrated ability to restrain fees *failed to extend to the fees the Funds paid to Defendant* (above average).

317. Additionally, the Fee Approval Summary indicates that the Board found further purported basis for judging the Funds' advisory fees reasonable, notwithstanding that they were higher than the advisory fees paid by comparable funds, by noting new additions to the Oakmark Fund's advisory fee rate schedule:

> The Board also considered its negotiation with the Adviser, the
> result of which was the Adviser's agreement to add additional
> breakpoints to its investment advisory agreement with the
> Oakmark Fund to reduce the Adviser's fees at levels that would
> come into effect as fund assets continue to grow.

Fee Approval Summary, at 74.

318.    However, the manner in which the Board considered such "breakpoints" was
deficient.  To begin with, the new breakpoints considered by the Board were for the Oakmark
Fund only (*i.e.*, *not* for any further Funds).  Substantively, and as detailed in Sections VIII.B.2.c-
d, *supra*, the Funds' breakpoints were largely *ineffective* in reducing the Funds' fees and/or in
sharing the economy-of-scale benefits monopolized by Defendant because, *inter alia*, such
breakpoints – and the newly-added ones most of all – introduced only *microscopic* rate
reductions (*e.g., less than 1 basis point*) staggered over extremely wide asset ranges (*e.g.*, at
intervals of $10 billion or more of additional Fund assets).

319.    Indeed, consideration of breakpoints, especially on a comparative basis, only
further supports Plaintiffs' excessive fee claims.  As set forth in Section VIII.B.2.d, *supra*, the
breakpoints in the advisory fee rate schedules for Defendant's Arm's-Length Clients and
Subadvised Fund clients effected *quick and sharp advisory fee rate reductions* – exactly the
*opposite* to the Funds' breakpoints.

320.    Lastly, and in addition to the Board's above-detailed consideration of misleading,
incomplete and/or irrelevant information in conducting its fee comparison evaluation, the Board
also failed to consider further, relevant and accurate information concerning, *inter alia*:

        a.  the services provided by Defendant to the Funds, as opposed to Defendant's
           Arm's-Length Clients and Subadvised Fund clients – and the substantial
           degree to which such services were similar and/or largely identical;

        b.  the actual effects of the breakpoints in the Funds' IAAs; and

        c.  comparative analysis of the breakpoints afforded to the Funds and to
           Defendant's Arm's-Length Clients and Subadvised Fund clients.

321.   **Economies of Scale**.  Although the Fee Approval Summary asserts that Board approved the Funds' advisory fees as reasonable after taking into account "any potential economies of scale," whether the Funds' IAAs "reflect[]" such economies,  and after concluding that "the breakpoints in the fee schedule for each Fund allow shareholders to benefit from potential economies of scale" (Fee Approval Summary, at 74-75), the Fee Approval Summary, in so doing, indicates that the economies of scale information reviewed by the Board was materially incomplete, and that the Board's evaluation and conclusions with respect to economies of scale were without adequate basis, flawed and in fact counterfactual.

322.   Fairly read, the Fee Approval Summary indicates that the Board's approach to the economies of scale factor was merely to *observe* that the Funds' IAAs had breakpoints, and thereafter simply to assume that (1) *if* any economies of scale existed (notably, the Fee Approval Summary refers only to "potential economies of scale"), then (2) the Funds' breakpoints would function to share them.  *Id.*  In other words, the Fee Approval Summary indicates that the Board neither performed, nor was provided with, any analysis of the Funds' *actual* economies of scale, nor of the breakpoints' *actual* effects (or lack thereof) to share the benefits of such economies. *Id.*   Therefore, the Board's *sole* basis, with respect to its consideration of and conclusion concerning economies of scale, was the limited and entirely superficial observation that the IAAs featured breakpoints.

323.   Such basis was inadequate to support the Board's conclusions.

324.   The concrete analysis performed here – on the basis of the limited data publicly available concerning Defendant's work and expenses – indicates that such economies were quite large, and that, because the Funds' breakpoints were largely ineffective in sharing their benefits with the Funds and the Funds' shareholders, such benefits were monopolized in near entirety by Defendants.  *See* Section VIII.B.2, *supra*.  Indeed, as Defendant has access to its own and more extensive relevant data concerning its actual work and costs, such analysis was *uniquely available* to the Board as a result of Defendant's and the Board's obligations under Section 15 of the ICA.  As such more extensive data would further particularize and confirm Plaintiffs'

138

analysis here, Defendant's failure to provide such information to the Board, and the Board's failure to request such information from Defendant, led the Board to a conclusion that was not merely without adequate support, but counterfactual.

325.     **Nature, Quality and Quality of Services**.  Although the Fee Approval Summary asserts that Board approved the Funds' advisory fees after purportedly extensive consideration of the "nature, extent and quality of [Defendant's] services to the Funds," (Fee Approval Summary, at 73), the Fee Approval Summary, in so doing, indicates that the Board' evaluation of information concerning this factor was materially incomplete, and that the Board's evaluation and conclusions with respect to this factor were without adequate basis, flawed and in fact counterfactual.

326.     Fairly read, the Fee Approval Summary indicates that the Board's evaluation of this factor consisted of (1) measuring service quality through the Funds' investment performance, and (2) comparing the Funds' investment performance over various time periods with the performance  "of a group of comparable funds pursing broadly similar strategies (the Fund's 'Performance Universe')."  *See* Fee Approval Summary, at 73.  The Board found that the Funds' performed *better* their respective 'Performance Universes' for most time periods.  *Id.*

327.     However, this finding is *exactly the opposite* of the comparative performance analysis *contained in the Funds' own SEC filings and utilizing the Funds' own benchmarks* – namely, that the Funds performed *worse*.  *See* Section VIII.C.2, *supra*.  In other words, the Board's evaluation of the Funds' performance (and of the quality of Defendant's services) is at contradicted by the Funds' *actual* performance, as reported to the SEC by the Funds themselves.[29]

328.     **Profitability**.   The Fee Approval Summary asserts that Board approved the Funds' advisory fees after purported consideration of Defendant's profits – from the Funds

---

[29] One possible reason for this contradiction may lie in the undisclosed details of the "Performance Universe" (*i.e.*, selected subset of "comparable funds pursing broadly similar strategies") utilized by the Board in conducting its comparative performance evaluation – and, specifically, in the manner in which selection of such Performance Universe resulted in a *biased* comparison.  However, because the identity of the other mutual funds selected to comprise the Performance Universe remain undisclosed, it is impossible to assess its adequacy and objectivity.

specifically, overall, and in comparison to the profitability of other investment advisers – led the the Board to conclude that Defendant's profitability "appeared to be reasonable . . .." (Fee Approval Summary, at 74-75).

329.    The Fee Approval Summary, however, does not provide sufficient disclosure concerning these analyses to establish – or, indeed, provide any basis to assess – their validity. Indeed, the Fee Approval merely discloses that the Board reviewed Defendant's overall profitability (itself not disclosed), as well as Defendant's profits from each of the Funds (likewise not disclosed) and Defendant's method for allocating costs to certain lines of business and among the Funds (also not disclosed) – all apparently pursuant to an otherwise-undescribed "profitability analysis" supplied by Defendant – as well as certain information referred to as "an Investment Management Industry Profitability Analysis," presumably concerning profits reported by investment advisers more generally (not disclosed either).

330.    Indeed, the data presented here provide good reason to believe that Defendant is *more* profitable than investment advisers generally, given *inter alia*:

      a.  the very high advisory fees charged to each of the three very large Funds;

      b.  the consequent large economies of scale generated by each of these Funds and Defendant's monopolization of the benefits flowing from them – the combination of which operated to boost Defendant's Fund-related profits to unusually high levels;

      c.  the fact that these three very large, high-profit Funds constituted Defendants' three largest clients and accounted by themselves for 56.4% of Defendant's total AUM) – with the result that Defendant generated unusually high profits from an unusually high amount of its AUM; and

      d.  the lower fees Defendant charged in connection with much of its remaining AUM, including especially assets managed by Defendant outside the Oakmark Fund Complex.

*See* Sections VIII.A-B, D, *supra*.

331.    Even so, the Board still found Defendant's profits to "appear[] [] reasonable" –
just as the Board found the Funds' fees to be reasonable notwithstanding that they were higher
than those charged to Defendant's other advisory clients and to comparable mutual funds.  All
the more so in light of the above-detailed deficiencies in the Board's evaluations of other
*Gartenberg* factors – including evaluation based on only superficial information, evaluation
based on misleading information supplied by Defendant, and evaluation and conclusions based
on incomplete and inadequate information – it is reasonable to suspect that such deficiencies
likewise may have extended to and marred the Board's profitability evaluation.

332.    **Fall-out Benefits**.    The Fee Approval Summary contains representations
purporting to indicate that Board considered information concerning fall-out benefits enjoyed by
Defendant as a result of its relationship with the Funds, but these very representations indicate
that information reviewed by the Board was materially incomplete, and that the Board's
evaluation and conclusions with respect to this matter were flawed and lacked adequate basis.

333.    As set forth in the Fee Approval Summary, the Board reviewed only two types of
purported fall-out benefits:  (1) that an affiliate of Defendant served as the Funds' distributor
(albeit without compensation), and (2) so-called "soft dollar" commissions paid by the Funds.[30]
As the first of the two items involved no compensation, the Board's evaluation and conclusion
with respect to fall-out benefits relates solely to the matter of such soft dollar arrangements.

334.    Here, however, detailed allegations indicate the existence of *further and much
more substantial fall-out benefits*:  namely, Defendant's sizeable stream of additional advisory
fees and revenues derived from providing copies of the Funds' portfolios to Subadvised Funds
and to Arm's-Length Clients.  *See* Sections VIII.E and VIII.A.1-2, *supra*.  The Fee Approval
Summary contains no indication that the Board considered such fall-out benefits.  To the

---

[30] Soft dollar arrangements have frequently been identified as fall-out benefits that accrue to investment advisors by
virtue of their relationship to the mutual funds they advise.  The term "soft dollars" refers to a practice in the mutual
fund industry where a fund's investment advisor, in order to obtain research from broker-dealers that the investment
advisor would otherwise have to pay for out of its own pocket (with "hard" dollars), instead obtains such research by
agreeing to direct certain amounts of mutual fund portfolio transactions for completion through the broker-dealer,
thus providing the broker-dealer with a stream of commissions expensed to the mutual fund.  The adviser thus
obtains the research it wishes, while the mutual fund pays for such research (expensed to fund shareholders).

contrary, their absence from the Fee Approval Summary, coupled with the presence of the far more inconsequential soft-dollar arrangements, is strong indication that the Board failed to consider the fall-out benefits identified here, and consequently that the Board's evaluation and conclusions with respect to fall-out benefits lacked adequate basis.

**4.      The Board Rubber-Stamped the Advisory Fees that Harris Proposed**

335.     None of the above-detailed information relevant to evaluation of advisory fees is particularly new, or confronted the Board with new facts.

    a.  The Funds' operative blended advisory fee rates have stayed nearly the same, since 2001, as have the nature and extent of the advisory services that Harris has provided.

    b.  As the Funds' combined net assets rose nearly 15-fold between 2001 and 2015, from approximately $4.5 billion to approximately $61.3 billion, economies of scale have long been present – and, given Harris's ineffective fee breakpoints, long monopolized by Harris. These, in turn, caused Harris's profitability, both from operations relating specifically to the Funds, as well as overall, to boom.

    c.  Similarly, the fall-out benefits alleged here – arising from Harris's provision to Arm's-Length Clients, at discounted fee rates, of copies of the Oakmark Funds (such as the Oakmark Fund) and of the advisory services developed and paid for by the Oakmark Funds – have likewise long accrued to Harris. For example, Harris has served as subadvisor to the Natixis Oakmark Fund (a perfect copy of the Oakmark Fund – *see* Table 6, *supra*) since at least 2002.

336.     Notwithstanding the long and continuing existence of the above facts and factors, the Board has continued to approve the advisory fees proposed by Harris, not just in October 2015, but in prior years as well, when the same facts and factors were present. Indeed, as detailed above (*see* ¶¶ 301-02, *supra*), the Fee Approval Summaries for prior years, describing

the Board's consideration and conclusions with respect to these factors, have been substantially identical to each other and to the most recent Fee Approval Summary..

337.    Consequently, there is no indication that the Board has taken any action, either in the most recent fiscal year or in any of the preceding ones, to reject the advisory fees proposed by Harris, or to act in any way to reduce or alter such investment advisory fees.

338.    In effect, therefore, Harris has itself determined the investment advisory fees to which the Funds are subject, by proposing fees each year which the Board, in effect, has rubber-stamped with its own approval.

339.    There is little indication that the Board did anything other than rubber-stamp the investment advisory fees that Harris proposed.[31]  There is no indication that the Board ever rejected advisory fee rates proposed by Harris, or negotiated for or demanded lower advisory fee rates, or negotiated a "most favored nation" provision into the IAAs (which would require that the fee rate paid by the Funds be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services).

340.    In all the above respects, the Board's "captive" behavior with respect to Harris differs diametrically from the behavior exhibited by Harris's non-captive, Arm's-Length Clients.

    a.  First, as both a standard matter and with respect to each of the particular Arm's-Length Clients identified herein, Harris's Arm's-Length Clients received substantially identical services from Harris as those Harris provided to the Funds, but paid substantially lower investment advisory fees for such services. *See* Section VIII.A.1-2, *supra*.

    b.  Second and relatedly, all such Arm's-Length Clients, as both a standard matter and in the case of most of the particular Arm's-Length Clients identified herein, achieved the lower fees they did by ensuring that Harris's

---

[31]  The Fee Approval Summaries, in certain years, note those occasions when additional breakpoints were added to the Funds' advisory fee rate schedules, or where the breakpoint schedules are otherwise altered, purportedly as a result of negotiations between the Board and Harris. However, as set forth herein (*see* Section VIII.B.2.c-d, *infra*), the changes concerning breakpoints have done almost nothing to reduce Harris's fees or share Harris's economy of scale benefits – certainly in effect, and apparently by design.

advisory fee rates featured breakpoints *that functioned to reduce rates both quickly and sharply as managed assets rose* (unlike the Funds' advisory fee rate schedules, which did not). *See* Section VIII.B.2.d, *supra* (demonstrating, inter alia, that the Oakmark Fund's pace of fee reductions through breakpoints is *more than 2,300 times slower* than the fee reductions obtained by Arm's-Length Clients).

341.    Harris's Arm's-Length Clients were able to secure superior rates from Harris precisely because they were obtained through true arm's-length negotiations between independent and non-captive counterparties.  For example, the Subadvised Funds' investment advisers – for example, Litman Gregory Fund Advisors LLC – select subadvisers such as Harris through a competitive selection process, with multiple candidates submitting proposals with respect to the services to be provided and the fees to be charged, and through negotiations that include exchanges of proposals and counterproposals:

> Before hiring a sub-advisor, Litman Gregory performs extensive due diligence. This includes quantitative and qualitative analysis, including (but not limited to) an evaluation of: the investment process, the consistency of its execution and discipline; individual holdings; strategies employed, past mistakes, risk controls, team depth and quality; operations and compliance; and business focus and vision. Litman Gregory's evaluation process includes review of literature and documents, quantitative historical performance evaluation, extensive discussions with members of the investment team and firm management and background checks through industry contacts. *Each of the sub-advisor's management fee is also an important consideration.*

*See* Litman Gregory Funds Trust Prospectus dated as of April 30, 2016, at 25 (italics added for emphasis).

342.    Harris's arm's-length counterparties have direct and substantial interests in making such efforts and securing lower advisory fees from Harris.  For example, the Subadvised Funds' advisers, who pay subadvisory fees to Harris from the investment advisory fees they

receive from the Subadvised Funds, were able to increase the amount of their retained profits (by reducing the amounts they had to pay out to Harris).

343. The Funds, as captive funds and with a Board exhibiting captive behavior, do not engage in any similar such process. No other proposals from other investment advisors were solicited, submitted or evaluated, and Harris's sole fee proposals are approved in rubber-stamp fashion without reductions achieved through negotiations or counterproposals.

344. The Board's rubber-stamping has allowed Harris to continue to maintain and enjoy excessive investment advisory fees from the Funds for many years. Indeed, and as detailed above, the investment advisory fee rates that Harris extracts from the Funds have remained nearly the same throughout the prior fifteen years, notwithstanding that, in light of the Funds' growth (and the consequent growth in Harris's economy of scale benefits, profits and fall-out benefits), the resulting advisory fees are every year, increasingly, excessive and disproportionate to the services rendered.

345. The Board's captive behavior and/or lack of adequate conscientiousness in evaluating and approving the Funds' advisory stems, at least in part, from the fact that the information received by the Board is, in largest part, information packaged and presented by Defendant.

346. Harris did not provide the Board with sufficient, complete, and/or accurate information needed to fulfill its obligations, with the result that the fee-setting process lacked good faith and integrity.

347. In approving the IAAs, the Board relied on information and analyses prepared by Harris and designed to support Harris's rationalizations for the fees charged to the Funds. For example and as detailed above, the Fee Approval Summaries indicate that Harris has not provided, and the Board has not considered, adequate information regarding, among other things: the advisory fees charged and services provided by Harris to its Arm's-Length Clients; the economies of scale enjoyed and fall-out benefits received by Harris; and the profitability of the Funds to Harris (and how to evaluate the profitability data in light of economies of scale).

348.    The Board has not considered information or analyses reflecting the interests of the Funds or the Funds' shareholders with respect to Harris's investment advisory fees, and has not critically assessed Harris's rationalization for those fees.  For example, and as the Fee Approval Summaries indicate, it appears that (1) Harris has made misleading representations to the Board, including representations regarding the services Harris provides to the Funds as compared to Harris's Arm's-Length Clients, Harris's economies of scale in providing services to the Fund, and Harris's profitability, and (2) the Board rarely, if ever, questions any information provided by Harris.

349.    In particular, the Board has uncritically accepted Harris's representations that the lower fees paid by Arm's-Length Clients reflect differences in the services provided to those clients. The Board has not appropriately examined whether the investment advisory services provided to those clients are materially different from the services provided to the Funds under the IAAs, or the extent of any such differences. Nor has the Board considered appropriate information about the cost of providing any additional services required by the IAAs (notwithstanding that the IAAs, on their face, appears to require fewer rather than more extensive services) to assess whether the difference in fees is warranted by any such differences in the services provided.

## IX.    THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND

350.    Investment advisory fees are paid to Defendant out of the Funds' assets. Each dollar in fees paid by the Funds directly reduces the value of the Funds' investment portfolios by like amount.

351.    Additionally, the payment of excessive investment advisory fees to Defendant harms the Funds on a going forward basis because the Funds lose investment returns and profits that they could have earned on the amounts paid out as fees to Defendant.

352.    The Funds have sustained millions of dollars in damages due to the excessive investment advisory fees paid to Defendant.

353.   As set forth in Section VII.B, *supra*, Section 36(b) damages accrue for the period:

    a.   starting one year prior to complaint filing, and

    b.   continuing until resolution of the action.

354.   As also set forth in Section VII.B, *supra*, precise, fully-updated information on the investment advisory fees paid by the Funds for such period has not been disclosed by Defendants. Currently, the most relevant fee disclosure available is Defendant's semi-annual disclosures for the six month period ending March 31, 2016 – the first half of the Funds' fiscal 2016 year (ending September 30, 2016), and, in entirety, part of the relevant Section 36(b) damages period. During such six month period, the Oakmark Fund paid investment advisory fees of $60.989 million, Income Fund, $59.439 million, and the International Fund, $110.078 million.

355.   On the basis of such sums, annualized, and on the basis of the fee comparison allegations set forth herein at Section VIII.A, *supra*, estimates of annual damages are as follows:

**Table 10**

**Annual Excessive Fee Damages**

| | Oakmark Fund | Income Fund | International Fund |
|---|---|---|---|
| Actual fees paid, 6 months ended March 30, 2016 | $60,989,000 | $59,439,000 | $110,078,000 |
| Annualized Fees | $121,978,000 | $118,878,000 | $220,156,000 |
| **Annual Excessive Fees, as Indicated by . . .** | | | |
| Fee Comparison to Arm's-Length Clients* | $48,141,438 | $40,306,949 | $88,247,072 |
| Fee Comparison to Subadvised Funds** | $38,316,820 | $22,853,767 | $83,243,065 |
| Fee Comparison to Comparable Mutual Funds *** | $38,545,715 | $42,033,785 | $23,588,143 |
| **Average of Above Three Excessive Fee Analyses** | **$41,667,991** | **$35,064,834** | **$65,026,093** |

\* Per Table 5, indicating respective markups for the Funds of 65.2%, 51.3% and 66.9% (versus Arm's-Length Clients for corresponding Strategies).

.

\*\* Per Table 7, indicating respective markups of 45.8%, 23.8% and 60.8% (versus corresponding Subadvised Funds).

\*\*\* Per Section VIII.A.3, *supra,* indicating respective markups of 46.2%, 54.7% and 12.0% (versus comparable mutual funds).

## X.     CAUSES OF ACTION

### COUNT I

### ICA SECTION 36(b) BREACH OF FIDUCIARY DUTY
### (EXCESSIVE INVESTMENT ADVISORY FEES)

356.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

357.    Plaintiffs assert this count, on behalf of and for the benefit of the Funds, against Defendant Harris.

358.    Defendant is the investment adviser to the Funds.

359.    Under Section 36(b), Defendant owes a fiduciary duty to the Funds with respect to its receipt of investment advisory fees and other compensation from the Funds.

360.    Defendant breached its fiduciary duty under Section 36(b) by charging investment advisory fees to the Funds that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendant and could not have been the product of arm's-length bargaining.

361.    Defendant has received and continues to receive excessive investment advisory fees attributable to Defendant's retention and monopolization of substantial economies of scale benefits – and further "fall-out" benefits – in connection with Defendant's provision of investment advisory services to the Funds, and has shared only a very small portion of such benefits with the Funds and/or the Funds' shareholders.

362.    The investment advisory fees charged by Defendant to the Funds are and have been grossly excessive in light of the true cost of providing those services to the Funds.

363.    In charging and receiving such excessive fees and failing to put the interests of the Funds and/or the Funds' shareholders, such as Plaintiffs, ahead of its own interests, Defendant has breached its statutory fiduciary duties to the Funds and/or the Funds' shareholders.

364.    As a direct, proximate, and foreseeable result of Defendant's breach of its fiduciary duty under Section 36(b), the Funds have sustained millions of dollars in damages.

365.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Funds, the actual damages resulting from Defendant's breaches of its fiduciary duties, including the excessive investment advisory fees paid by the Funds to Defendant and investment returns that would have accrued to the Funds had those fees remained in the Funds' portfolios and available for investment.

366.    Alternatively, under Section 47(b) of the ICA, 15 U.S.C. § 80a-46(b), Plaintiffs seek rescission of the IAAs and restitution of all excessive investment advisory fees paid by the Funds pursuant to the IAAs.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of the Funds, as follows:

   a.    Declaring that Defendant violated Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), through receipt of excessive investment advisory fees from the Funds;

   b.    Permanently enjoining Defendant from further violations of Section 36(b);

   c.    Awarding compensatory damages against Defendant, including repayment to the Funds of all unlawful and excessive investment advisory fees paid to Defendant by the Funds from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

d. Rescinding the IAAs pursuant to Section 47 of the ICA, 15 U.S.C. § 80a-46, including restitution to the Funds of the excessive investment advisory fees paid to Defendant by the Funds from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

e. Awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

f. Such other and further relief as the Court may deem just and proper.

## XII.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  August 19, 2016

By:

**BEHN & WYETZNER, CHARTERED**

Michael Behn
828 Davis Street, Suite 303
Evanston, IL  60201
Telephone: (312) 629-0000
Facsimile:  (224) 420-3172

*Plaintiffs' Liaison Counsel*

**KIRBY McINERNEY LLP**
Ira Press
David Bishop
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Plaintiffs' Counsel*

150

# EXHIBIT A-1

Exhibit A1

**The Oakmark Fund, the Corresponding Harris U.S. Equity Strategy, and Similar/Identical Subadvised Funds**

| | Oakmark Fund | Harris Strategy | Subadvised Fund |
|---|---|---|---|
| Investment Company | Harris Associates Investment Trust | 6 observ accounts | Natixis Funds Trust II |
| **Fund** | **Oakmark Fund** | **U.S. Equity** | **Natixis Oakmark Fund** |
| Size (12.31.2015) | $17,573,450,000 | | $286,260,283 |
| Size (3/31/2016) | $15,787,015,000 | $23,188,496,000 | $245,900,000 |
| Adviser | Harris Associates | Harris | NGAM Advisors, L.P. Advisory Fee: 0.77% on first $200 million, 65% on next $300 million, .60% on AUM > $500 million > $1B or $3 |
| Subadviser | n/a | n/a | Harris |
| Portfolio Managers | William C Nygren Kevin Grant | Robert M. Levy | William C Nygren Kevin Grant M. Colin Hudson Michael Morgan |
| Subadvisory Fee | n/a | n/a | 0.57% on first $200 million 0.50% on AUM > $200 million <$41 or 12, $4B or $6+ |
| Advisory Services | n/a | n/a | Management Services as defined in Section 2 hereof and Administrative Services (as defined in Section 3 hereof), subject to the authority of the Manager to delegate any or all of its responsibilities hereunder to other parties as provided in Sections 10c and (c) hereof. [text illegible] |
| Subadvisory Services | n/a | n/a | WHEREAS, the Advisory Agreement provides that the Manager may delegate any or all of its portfolio management responsibilities under the Advisory Agreement to one or more sub-advisers; WHEREAS, the Manager and the trustees of the Trust desire to retain the Sub-Adviser to render portfolio management services in the manner and on the terms set forth in this Agreement. [text illegible] |
| Investment Objective | long-term capital appreciation | | The Fund seeks long-term capital appreciation. (Prospectus at 12) |
| Principal Investment Strategies | stocks of U.S. companies. The Fund generally invests in the securities of larger capitalization companies. The Fund uses a value investment philosophy in selecting equity securities. This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below what we believe is their true business value presents the best opportunity to achieve the Fund's investment objective: The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, the Adviser looks for the following characteristics, although the companies selected may not have all of these attributes: (1) free cash flows and intelligent investment of excess cash; (2) earnings that are growing and are reasonably predictable; and (3) high level of company management ownership. In making its investment decisions, the Adviser uses a "bottom-up" approach focused on individual companies, rather than focusing on specific economic factors or specific industries. To facilitate its selection of investments that meet the criteria described above, the Adviser uses independent, in-house research to analyze each company. As part of this selection process, the Adviser is able to typically invest companies and conduct other research on the companies and their valuations. Once the Adviser identifies a stock that it believes is | U.S. Equity portfolios hold approximately 40 securities with a market cap focus of $5 billion and above, and typically have a 27% turnover in any industry and 7% maximum position size at the time of initial purchase. U.S. Equity portfolios are composed of securities that we believe trade at a significant discount to our estimate of intrinsic value. Self intrinsic values that grow with time and have grown, diversifiable position oriented management teams. Our bottom-up portfolio construction leads to the selection of approximately 40 companies from our approved list of U.S. stocks. The market capitalization focus is greater than $5 billion at the time of initial purchase. We do not strive for specific sector or industry exposure – these allocations instead are determined strictly through our stock selection process. | Principal Investment Strategies Under normal market conditions, the Fund primarily invests in common stocks of U.S. companies. The Fund generally invests in securities of larger capitalization companies in any industry. Harris Associates L.P. ("Harris Associates") uses a value investment philosophy in selecting equity securities, including common stocks. This philosophy is based upon the belief that, over time, a company's stock price converges with Harris Associates' estimate of the company's "true business value." Harris Associates believes that investing of securities priced significantly below what Harris Associates value presents the best opportunity to achieve the Fund's investment objective. Harris Associates uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, Harris Associates looks for the following characteristics, although the companies selected may not have all these attributes: (1) free cash flows and intelligent investment of excess cash; (2) earnings that are growing and are reasonably predictable; and (3) high level of manager ownership. Once Harris Associates identifies a stock that it believes is selling at a significant discount to Harris Associates' estimate of intrinsic value and that the issuer has one or more of the additional qualities mentioned above, Harris Associates generally will consider buying that security for the Fund. Harris Associates usually sells a security when the price approaches its estimated value or the issuer's fundamentals change. Harris Associates monitors each stock holdings and reduces its price targets as warranted to reflect changes in the issuer's fundamentals. The Fund's portfolio typically holds 30 to 60 stocks. (Prospectus at 12) |
| Performance (year ended 12.31.2015) | Class I: -3.97%, Class 3: -4.39% | gross -6.04%; net: -6.77% | -4.41% |
| Performance (year ended 3/31/2016) | Class I: -8.09%, Class 3: -8.34% | Quarter: 0.36% gross; 0.17% net Year: -3.97% gross, -4.09% net | -4.92% |
| Number of Positions (12.31.2015) | 55 | no data | 53 |
| Number of Positions (3/31/2016) | 51 | 39 | 50 |
| Turnover (year ended 3/31/2015) | 22% | no data | 22% (annual for YE 2015, Prospectus at 12) |
| Turnover (6 months ended 3/31/2016) | 14% | 17.01% | |
| Top 10 Holdings (12.31.2015) | Bank of America Corp 3.5%<br>General Electric Co. 2.8<br>Citigroup, Inc. 2.7<br>American International Group, Inc. 2.7<br>JPMorgan Chase & Co. 2.6<br>MasterCard, Inc., Class A 2.5<br>Visa, Inc., Class A 2.4<br>Intel Corp. 2.3<br>Alphabet Inc., Class C 2.3<br>Microsoft Corp. 2.2 | Wells Fargo 3.7%<br>Microsoft 3.2%<br>American Intl Group 3.1%<br>General Motors 3.0%<br>JPMorgan Chase 3.0%<br>Goldman Sachs 2.9%<br>BlackRock 2.7%<br>Intel 2.7%<br>Citibank 2.7%<br>Caterpillar 2.6% | |
| Top 10 Holdings (3/31/2016) | General Electric Co. 3.0<br>Bank of America Corp 2.9<br>Citigroup, Inc. 2.8<br>MasterCard, Inc., Class A 2.6<br>Alphabet Inc., Class C 2.5<br>Apache Corp. 2.5<br>American International Group, Inc. 2.5<br>Visa, Inc., Class A 2.5<br>JPMorgan Chase & Co. 2.41<br>Intel Corp. 2.4 | Wells Fargo 3.9%<br>Microsoft 3.66%<br>Caterpillar 3.49%<br>American Intl Group 3.18%<br>Avon 3.14%<br>Goldman Sachs 3.10%<br>BlackRock 4.04%<br>JPMorgan Chase 3.84% | Alphabet 3.60%<br>Bank of America 3.13%<br>General Electric 3.12%<br>Citigroup 2.92%<br>Mastercard 2.83%<br>JPMorgan Chase 2.82%<br>Apache 2.66%<br>American Intl Group 2.58%<br>Whirlpool 2.50%<br>Visa 2.50% |
| Sector Allocations (12.31.2015) | Financials 30.5<br>Information Technology 25.0<br>Industrials 10.9<br>Consumer Discretionary 9.8<br>Energy 7.0<br>Consumer Staples 5.8<br>Health Care 5.1<br>Materials 2.7<br>Short-Term Investments and Other 3.0 | no data | |
| Sector Allocations (3/31/2016) | Financials 29.7<br>Information Technology 27.0<br>Industrials 11.0<br>Consumer Discretionary 10.0<br>Energy 6.1<br>Health Care 5.9<br>Consumer Staples 4.0<br>Materials 3.0<br>Short-Term Investments and Other 3.0 | Consumer Discretionary 30.0%<br>Consumer Staples 0.0%<br>Energy 2.1%<br>Financials 30.0%<br>Health Care 3.5%<br>Industrials 10.4%<br>Information Technology 10.0%<br>Materials 5.3%<br>Telecommunications Services 0.0%<br>Utilities 0.0%<br>Real Estate 0.0%<br>% Total 93.3% | Financials 30.70%<br>Information Technology 27.65%<br>Industrials 11.15%<br>Consumer Discretionary 11.04%<br>Energy 6.43%<br>Health Care 3.79%<br>Consumer Staples 4.77%<br>Materials 1.68% |

Exhibit A1

The Oakmark Fund, the Corresponding Harris U.S. Equity Strategy, and Similar/Identical Subadvised Funds

| Subadvised Funds | | |
|---|---|---|
| **Natixis Funds Trust I** | **Natixis International Funds (Lux) I** | NSAM Canada Investment Corp. |
| **Natixis U.S. Equity Opportunities Fund** | **Harris Associates U.S. Equity Fund** | **Oakmark Natixis Funds** |
| $277 million allocated to Harris (specifically ~50% of total) | $347,801,612 | $15,829,000 |
| NGAM Advisors, L.P. (0.90% advisory fee) | NGAM S.A. | NGAM Canada LP (management fees of 1%-2% on different share classes) |
| Harris (50% allocation) AND 3 other subadvisers (remaining 50%) | Harris | Harris |
| William C Nygren Kevin Grant M. Colin Hudson Michael Mangan | Robert M. Levy M. Colin Hudson Anthony Coniaris Robert Bierig | William Nygren Kevin Grant Michael Mangan |
| 0.92% (SAI at 53) | not publicly disclosed with any specificity agreements between NGAM and Investment Managers are available for review at Custodian Brown Brothers Harriman (Luxembourg) S.C.A.'s Luxembourg offices | not publicly disclosed subadvisory agreements between NGAM Canada LP and Harris can be inspected at NGAM's registered offices in Toronto, Canada |
| **Advisers** NGAM Advisors, L.P. ("NGAM Advisors") serve as the adviser to each of the Funds. NGAM Advisors oversees, evaluates, and monitors the subadvisory services provided to each Fund. It also provides general business management and administration to each Fund. NGAM Advisors does not determine what investments will be purchased or sold by the Funds. The advisers and subadvisers listed below make the investment decisions for their respective Funds. (Prospectus at 52) | **Management Company** The Umbrella Fund has appointed NGAM S.A. (the "Management Company") as its management company and has delegated to the Management Company all powers conferred upon it as management company in respect of its responsibilities to affiliated and non-affiliated parties, however, the Management Company oversees and retains full responsibility for the activities delegated to service providers. **Investment Managers** The Management Company has appointed an Investment Manager for each Fund, as indicated in each Fund's description under "Characteristics" "Investment Manager of the Fund". (Prospectus at 146) | **Manager** The Manager is responsible for the day-to-day business and operations of the Natixis Funds, including selecting the portfolio manager and sub-advisors, providing administration services and marketing and sales support. The Manager hires third parties to perform certain services for it and the Funds. **Sub-Advisor** As sub-advisor ... Harris gives advice and makes recommendations to the portfolio manager. Given that the Oakmark Natixis Registered Fund and the Oakmark International Natixis Registered Fund invest substantially all of their respective assets in the underlying Natixis Tax Managed Funds, their returns will be determined by the performance of the Natixis Tax Managed Funds in which all the active management is conducted. (Simplified Prospectus, at 11) |
| **Subadvisers** Each Subadviser has full investment discretion and makes all determinations with respect to the investment of the assets of a Fund or a segment of the Fund, subject to the general supervision of the Fund's adviser and the Board of Trustees. (Prospectus at 52) | not publicly disclosed with any specificity agreements between NGAM and Investment Managers are available for review at Custodian Brown Brothers Harriman (Luxembourg) S.C.A.'s Luxembourg offices | **Sub-Advisor** As sub-advisor ... Harris gives advice and makes recommendations to the portfolio manager. Given that the Oakmark Natixis Registered Fund and the Oakmark International Natixis Registered Fund invest substantially all of their respective assets in the underlying Natixis Tax Managed Funds, their returns will be determined by the performance of the Natixis Tax Managed Funds in which all the active management is conducted. (Simplified Prospectus, at 11) |
| The Fund seeks long-term capital appreciation. (Prospectus at 50) | Long-term growth of capital (Prospectus, at 26) | The Funds seek long-term capital appreciation primarily through investment in a diversified portfolio of common stocks of U.S. companies. (Simplified Prospectus, at 10, Factsheet) |
| **Principal Investment Strategies** The Fund's approach to equity investing combines the styles of two subadvisers in selecting securities for each of the Fund's segments. The segments and their subadvisers are listed below: • Harris Associates - Large Cap Value segment – Under normal circumstances, the Large Cap Value segment of the Fund managed by Harris Associates L.P. ("Harris Associates") will invest primarily in the common stocks of larger-capitalization companies that Harris Associates believes are trading at a substantial discount to the company's "true business value." By "true business value," Harris Associates means the estimate of the price a knowledgeable buyer would pay to acquire the entire business. Harris Associates believes an investment can provide significantly above their true business value presents the best opportunity to achieve the Fund's investment objectives. Harris Associates usually sells a security when the price approaches its estimated worth and reinvests such holding and ignores its price targets as warranted to reflect changes in the issuer's fundamentals ... (Prospectus at 21-22) | **Principal Investment Strategy** The Fund invests primarily in larger U.S. companies. The Fund invests at least two-thirds of its total assets in equity securities of larger U.S. companies, defined for this Fund as companies having a market value of more than $10 billion and domiciled or which exercise the preponderant part of their economic activities in the U.S. The Fund may invest up to one-third of its total assets in other securities than those described above including non-U.S. companies or companies with smaller market capitalization. The Fund may invest up to 10% of its net assets in undertakings for collective investment. (Prospectus, at 26) | The Fund generally invests in the securities of larger capitalization companies. The Fund uses a value investment philosophy in selecting equity securities. This investment philosophy is based on the belief that, over time, a company's stock price converges with the Sub-Advisor's estimate of the intrinsic value of that business (the "true business value"). The Sub-Advisor seeks to invest in securities priced significantly below what the Sub-Advisor believes is the true business value, with the expectation that the price of the security will appreciate ... (Simplified Prospectus, at 10, Factsheet) |
| 5.80% (but not applicable, as combined result of two subadvisers) | -8.17% (AR at 13) | n/a - Fund began 9/17/2015 |
| 2.55% (but not applicable, as combined result of two subadvisers) | -5.92% (yearly 0.40% quarter) (Portfolio Commentary) | n/a - Fund began 9/17/2015 |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | 36 (AR at 37-78) | 52 |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | 38 (Portfolio Commentary) | 53 |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | NO DATA | n/a - Fund began 9/17/2015 |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | NO DATA | n/a - Fund began 9/17/2015 |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | Wells Fargo 5.12% Microsoft 4.00% American Int'l Group 4.07% General Motors 4.06% JPMorgan Chase 4.03% Goldman Sachs 4.02% Macdonald 3.62% Omnicom 3.03% Intel 3.00% Caterpillar 3.01% | Bank of America 3.1% Alphabet 3.2% General Electric 2.8% Citigroup 2.7% American Int'l Group 2.6% JPMorgan Chase 2.6% Mastercard 2.5% Visa 2.4% Intel 2.3% Monsanto 2.2% |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | Alphabet 4.6% Wells Fargo 4.6% Bank of America 4.2% General Motors 4.1% Caterpillar 4.1% American Int'l Group 4.0% Aon 4.0% Goldman Sachs 3.8% Blackrock 3.7% JPMorgan Chase 3.5% | General Electric 3.0% Bank of America 3.0% Mastercard 2.9% Citigroup 2.9% Apache 2.5% Visa 2.5% Whirlpool 2.4% JPMorgan Chase 2.3% Union Pacific 2.3% Cash 3.9% |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | | Financials 30% Information Technology 24.9% Industrials 10.7% Consumer Discretionary 9.6% Cash 8.1% Energy 3.0% Consumer Staples 3.6% Health Care 3.0% Materials 3.9% |
| n/a (multiple subadvisers makes impossible to particularize Harris's particular contributions) | Financials 30% Technology 15% Industrials 20% Consumer Staples 9% Telecom 0% Utilities 0% | Financials 28.9% Information Technology 20.3% Industrials 13.0% Consumer Discretionary 10.7% Energy 6.2% Cash 3.9% Health Care 3.0% Consumer Staples 3.0% Materials 3.0% |

# EXHIBIT A-2

Exhibit A2

The Oakmark Select Fund, the Corresponding Harris Concentrated Value Strategy, and Similar/Identical Subadvised Funds

| | Oakmark Fund | Harris Strategy | | |
|---|---|---|---|---|
| Investment Company | Harris Associates Investment Trust | 37 client accounts | Nuntin International Funds (Lux) 1 | Musshireeard Select Funds |
| Fund | Oakmark Select Fund | Concentrated Value | Harris Associates Concentrated U.S. Equity Fund | Musshireeard Select Focused Value Fund |
| Size (12/31/2015) | $5,829,356,000 | | | $11,??,787,852 |
| Size (3/31/2016) | $5,323,666,000 | $3,996,111,900 | | $811,038,629 |
| Adviser | Harris Associates | Harris | NGAM S.A. | NML Investment Advisers / management its 0.49% on her $1 billion, 0.4% on ALM $1 billion |
| Subadviser | n/a | n/a | Harris | Harris |
| Portfolio Managers | William C. Nygren / Anthony P. Coniaris / Win Murray | Robert M. Levy | Robert M. Levy / M. Colm Hudson / Anthony Coniaris / Robert Bierig | Robert M. Levy / M. Colm Hudson / Anthony Coniaris / Robert Bierig |
| Subadvisory Fee | n/a | n/a | not publicly disclosed with any specificity; agreements between NGAM and Investment Managers are available for review at Custodian Brown Brothers Hartman (Luxembourg) S.C.A.'s Luxembourg offices | subadvisory rate NOT disclosed by virtue of exemption, but other disclosures reveal operative subadvisory fee is 0.20% (Prospectus at 14) |
| Advisory Services | | | Management Company — The Umbrella Fund has appointed NGAM S.A. (the "Management Company") as its management company and has delegated to the Management Company all powers related to the investment management, administration and distribution of the Umbrella Fund. The Management Company may delegate some of its responsibilities to affiliated and non-affiliated parties; however, the Management Company retains and remains full responsibility for the activities delegated to service providers. Investment Manager — The Management Company has appointed an Investment Manager for each Fund, as indicated in each Fund's description under "Characteristics" "Investment Manager of the Fund". (Prospectus at 146) | Investment Advice: NML Investment Advisers, LLC ("NML Advisers") [] is the Funds' investment adviser and is responsible for providing all necessary investment management and administrative services. In 2013, each Fund paid Mass Mutual or NML Advisers, as applicable, an investment management fee based on a percentage of each Fund's average daily net assets... Each Fund also pays NML Advisers an administrative and shareholder services fee to compensate it for providing general administrative services to the Funds and for providing or causing to be provided ongoing shareholder servicing... Subadvisers and Portfolio Managers: NML Advisers contracts with the following subadvisers to help manage the Funds. Subject to the oversight of the Trustees, NML Advisers has the ultimate responsibility to oversee the subadvisers and recommend their hiring, termination, and replacement. The responsibilities include, but is not limited to, analysis and review of subadviser performance, as well as assistance in the identification and vetting of new or replacement subadvisers. NML Advisers monitors responsibility the a number of other important obligations, including, among other things, board reporting, assistance in the annual advisory contract renewal process, and, in general, the performance of all obligations not delegated to a subadviser. NML Advisers also provides advice and recommendations to the Trustees, and performs such review and oversight functions as the Trustees may reasonably request as to th |
| Subadvisory Services | | n/a | not publicly disclosed with any specificity; agreements between NGAM and Investment Managers are available for review at Custodian Brown Brothers Hartman (Luxembourg) S.C.A.'s Luxembourg offices | 2. Duties of the Subadviser. (a) The Subadviser shall, subject to the direction and control of the Trust's Board of Trustees and MassMutual, (i) provide a continuing investment program for the Portfolio and determine what securities and other investments shall be purchased or sold by the Portfolio, (ii) arrange, subject to the provisions of Section 5 hereof, for the purchase and sale of securities and other investments for the Portfolio, and (iii) provide reports on the foregoing to the Board of Trustees of the Trust at each Board meeting. (b) The Subadviser shall provide to MassMutual such reports for the Portfolio, on a monthly, quarterly or annual basis, as MassMutual or the Board of Trustees of the Trust shall reasonably request or is required by applicable law or regulation, including, but not limited to compliance reports and those reports listed in Appendix A. –(Subadvisory Contract at Clause 2 and Appendix A) |
| Investment Objective | long-term capital appreciation | | The investment objective of Harris Associates Concentrated U.S. Equity Fund is long-term growth of capital (Prospectus at 19) | INVESTMENT OBJECTIVE: The Fund seeks growth of capital over the long term. (Prospectus, at 43) |
| Principal Investment Strategies | The Funds invests primarily in common stocks of U.S. companies. The Fund is non-diversified, which means that it may invest a greater portion of its assets in a limited number of issuers than a diversified fund. The Fund could own as few as twelve securities, but generally will have approximately twenty securities in its portfolio and as a result, a higher percentage of the Fund's total assets may also be invested in a particular sector of the economy or industry. The Fund generally invests in the securities of large- and mid-capitalization companies. The Fund uses a value investment philosophy in selecting equity securities. This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below their respective intrinsic value presents the best opportunity to achieve the Fund's investment objective. The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values... In assessing such companies, the Adviser looks for... (continues) | Concentrated portfolio is held approximately 20 securities with a market cap focus of $1 billion and above, and typically have a 25% investment in any one sector. Our Concentrated Value portfolios are composed of securities that we believe trade at a significant and material discount to our estimate of intrinsic value. These portfolios either grow with time, and have reproducible oriented management process and stable... We use a disciplined, research-oriented, bottom-up process of securities selection. | Principal Investment Strategy: The Fund invests primarily in a limited number of U.S. companies. The Fund invests at least two-thirds of its total assets in equity securities U.S. companies, defined as having their registered office or principal operations in the U.S. The Fund may invest up to one-third of its total assets in other securities that those described above including non-U.S. companies. The Fund may invest up to 60% of its net assets in undertakings for collective investment. The Fund's equity securities may include common stocks, preferred stocks and equity-related instruments. The Fund may invest on an available basis in equity-linked notes (i.e. debt instrument having a fixed payout based on the return of the underlying equity) and convertible bonds whose value is derived from the value of common stocks, preferred stocks, and related instruments, equity-linked notes or other equity-related securities. The Fund may further invest in depository receipts (depositary receipts negotiable stocks or other instruments representing stocks that can be traded on a public exchange)... (continues) | Principal Investment Strategies: The Fund invests primarily in equity securities of U.S. companies (the Fund's subadviser, Harris Associates L.P. ("Harris"), believes at undervalued). Equity securities may include common stocks, preferred stocks, securities convertible into common stocks, warrants, and... The Fund invests most of its assets in equity securities of U.S. companies, but may invest in companies domiciled outside the U.S. The Fund typically will hold a non-diversified portfolio, selects... The subadviser seeks to invest in a limited number of companies, which generally holds 20 securities in its portfolio when fully invested... The Fund uses a value investment philosophy... (continues) |
| Performance (year ended 12/31/2015) | Class I -3.98% Class I -3.94% | gross -1.73% net -8.67% | -12.77% (AR at 11) | -9.53% |
| Performance (year ended 3/31/2016) | Class I -8.04% Class I -8.34% | Quarter -0.35% gross, -0.80% net Year -7.38% gross, -8.03% net | -10.7% (AR at 11) | Quarter -0.32% Year -7.82% |
| Number of Positions (12/31/2015) | 19 | 20 | 20 (AR at 11) | |
| Number of Positions (3/31/2016) | 19 | 19 | | 19 |
| Turnover (year ended 9/30/2015) | 20% | no data | | 39% |
| Turnover (6 months ended 3/31/2016) | 9% | M 12% | | |
| Top 10 Holdings (12/31/2015) | Alphabet Inc., Class C 8.0 / General Electric Co 7.1 / American International Group, Inc. 6.2 / Bank of America Corp. 6.1 / TE Connectivity, Ltd. 6.0 / JPMorgan Chase & Co. 5.9 / Citigroup, Inc. 5.8 / CBRE Group, Inc. Class A 5.3 / MasterCard, Inc., Class A 5.1 / FNF Group 4.7 | Wells Fargo 6.2% / American Intl Group - 7.7% / Microsoft 7.2% / General Motors 6.8% / JPMorgan Chase 5.9% / Apple 6.8% / Citigroup 5.8% / Blackrock 5.8% / Applied Materials 5.6% / Cummins 5.3% / Intel 5.0% | Wells Fargo 7.57% / American Intl Group - 7.2% / General Motors 7.08% / JPMorgan Chase 7.00% / Apple 7.00% / Citibank 7.20% / Microsoft 6.87% / Blackrock 6.00% / Intel 5.90% / Caterpillar 5.76% | |
| Top 10 Holdings (3/31/2016) | General Electric Co 9.5 / Alphabet Inc., Class C 8.0 / TE Connectivity, Ltd. 6.0 / American International Group, Inc. 6.1 / JPMorgan Chase & Co. 5.6 / CBRE Group, Inc. Class A 5.3 / Bank of America Corp. 5.1 / Citigroup, Inc. 5.2 / FNF Group 4.8 | Wells Fargo 7.25% / Microsoft 6.93% / Cummins 6.49% / American Intl Group 6.2% / Applied Materials 5.9% / General Motors 6.30% / JPMorgan Chase 6.08% / Caterpillar 5.80% / Blackrock 5.70% / Aon 5.5% | (AS OF APRIL 30, 2016) Wells Fargo 7.87% / American Intl Group 8.03% / JPMorgan Chase 8.00% / General Motors 6.11% / Cummins 6.77% / Caterpillar 5.88% / Goldman Sachs 4.86% / Tiffany 4.80% / Blackrock 3.79% / Tribune Media 3.77% | Wells Fargo 7.1% / American Intl Group 7.1% / General Motors 7.0% / Microsoft 6.9% / Cummins 6.3% / JPMorgan Chase 5.7% / Applied Materials 5.4% / Caterpillar 5.2% / Blackrock 5.1% / Tiffany Media 4.7% |
| Sector Allocations (12/31/2015) | Financials 38.3 / Information Technology 17.0 / Consumer Discretionary 9.2 / Industrials 7.9 / Energy 6.4 / Materials 5.4 / Utilities 3.2 / Short-Term Investments and Other 3.9 | no data | | |
| Sector Allocations (3/31/2016) | Equity Investments: Financials 36.2 / Information Technology 28.8 / Industrials 8.3 / Consumer Discretionary 9.5 / Energy 5.3 / Industrials 5.3 / Materials 3.3 / Total Equity Investments 95.3 / Preferred Stock 0.1 / Fixed Income Investments: Convertible Bonds 2.9 / Corporate Bonds 1.6 / Total Fixed Income Investments 4.5 / Short-Term Investments and Other 2.8 | Consumer Discretionary 21.3% / Consumer Staples 0.0% / Energy 2.9% / Financials 37.4% / Health Care 3.2% / Industrials 11.6% / Information Technology 17.0% / Materials 0.0% / Telecommunication Services 0.0% / Utilities 0.2% / Real Estate 0.0% / % Total 99.2% | (AS OF APRIL 30, 2016) Financial Services 35.88% / Consumer Cyclical 19.85% / Technology 17.0% / Industrials 12.33% / Basic Materials 3.77% / Healthcare 3.37% / Communication Services 4.77% / Real Estate 0.00% | Financials 40.7% / Consumer Discretionary 24.0% / Information Technology 17.3% / Industrials 12.1% / Healthcare 5.0% / Energy 2.9% / Consumer Staples 0 / Materials 0 / Telecom Services 0 / Utilities 0 |

Exhibit A2

The Oakmark Select Fund, the Corresponding Harris Concentrated Value Strategy, and Similar/Identical Subadvised Funds

| MML Series Investment Fund | Litman Gregory Funds Trust |
|---|---|
| **MML Focused Equity Fund** | **Litman Gregory Masters Equity Fund** |
| $154,199,588 | |
| | Total Fund is $313.3 million, of which: 17% is allocated to Nygren, 17% is allocated to McLargan, and remainder allocated to other subadvisers |
| MML Investment Advisers, LLC (advisory fee rate: .5 % on first $200 million, .045% on AUM > $200 million) | Litman Gregory Fund Advisors, LLC (advisory fee rate: 1.10% on first $750 million, 1.00% thereafter) |
| Harris | Harris and 6 other subadvisers |
| Robert M. Levy M. Colm Hudson Andrew Cormie Robert Bierig | William C. Nygren (17% of fund) Clyde S. McGregor (17% of fund) |
| subadvisory rate NOT disclosed by virtue of exemption; separate subadvisers fee equate to 0.40% + (SAI at B-67) | 0.65% on first $50 million + 0.60% on next $100 million 0.55% on AUM > $150 million |
| **Investment Adviser** MML Advisers, a wholly owned subsidiary of MassMutual, serves as investment adviser to each Fund pursuant to Investment Management Agreement with MML Trust on behalf of the Funds (each, an "Advisory Agreement"). Under each Advisory Agreement, MML Advisers is obligated to provide for the management of each Fund's portfolio of securities, subject to the policies established by the Trustees of MML Trust and in accordance with each Fund's investment objective, policies, and restrictions as set forth herein and in the Prospectus, and has the right to select subadvisers to the Funds pursuant to an investment subadvisory agreement (the "Subadvisory Agreement"). (SAI at B-39) | The Funds are managed by Litman Gregory Fund Advisors, LLC ("Litman Gregory"). Litman Gregory has overall responsibility for each under management, recommends the selection of managers as subadvisers of the Funds, recommends the allocation ... of the Funds, and monitors the ... subadviser's ... the Board of Trustees (the "Board") of the Litman Gregory Funds Trust (the "Trust") evaluates the performance of the managers, monitors changes ...of the managers' organizations that may impair their abilities to deliver superior future performance, determines when to rebalance the managers' assets and the amount of cash equivalents of each Fund that may be held in ... |
| MML Advisers contracts with the following subadvisers to help manage the Funds. Subject to the oversight of the Trustees, MML Advisers has the ultimate responsibility to oversee the subadvisers and recommend their hiring, termination, and replacement. This responsibility includes, but is not limited to, analysis and review of subadviser performance, as well as assistance in the identification and vetting of new or replacement subadvisers. In addition, MML Advisers maintains responsibility for a number of other important obligations, including, among other things, loss reporting, assistance in the annual advisory contract renewal process, and, in general, the performance of all obligations not delegated to a subadviser. MML Advisers also provides advice and recommendations to the Trustees, and performs such review and oversight functions as the Trustees may reasonably request, as to the continuing appropriateness of the investment objective, strategies, and policies of each Fund, valuations of portfolio securities, and other matters relating generally to the investment program of each Fund. | ... in addition to such of the managers' sub-portfolios, coordinates with the managers with respect to diversification and tax issues and oversees the operational aspects of the Funds. Litman Gregory is responsible for hiring and replacing subadvisers. (Prospectus, at 25) |
| MML Advisers has also entered into a Subadvisory Agreement with Harris pursuant to which Harris serves as MML Focused Equity's and MML International Equity's subadviser, providing day-to-day management of each Fund's investments. (SAI at B-43) | the Equity Fund, a strategy is to engage a number of proven managers as subadvisers (each, a "manager" or "sub-adviser") with each manager investing in the securities of companies that it believes have strong appreciation potential. Under normal conditions, each sub-adviser manages a portion of the Equity Fund's assets by independently managing a portfolio typically composed of at least 5, but not more than 15, stocks. (Prospectus at 2) |
| **INVESTMENT OBJECTIVE** The Fund seeks growth of capital over the long-term. (Prospectus, at 13) | The Litman Gregory Masters Equity Fund seeks long-term growth of capital (Prospectus at 2) |
| **Principal Investment Strategies** The Fund invests primarily in equity securities of U.S. companies that the Fund's subadviser, Harris Associates L.P. ("Harris") believes are undervalued. Under normal circumstances, the Fund invests at least 80% of its net assets (plus the amount of any borrowings for investment purposes) in equity securities of issuers in the U.S. The Fund typically invests most of its assets in equity securities of U.S. companies, but may invest in foreign companies and American Depositary Receipts ("ADRs"), including emerging market securities. The Fund generally will not invest more than 25% of its total assets in foreign securities, and will not invest more than 5% of its total assets in emerging market securities. The Fund is non-diversified, which means that it may hold larger positions in a smaller number of stocks than a diversified fund. In selecting equity investments for the Fund, Harris uses a value investment philosophy. This investment philosophy is based upon the belief that, over time, a company's stock price converges with Harris' estimate of its ... intrinsic or true business value. Harris makes an estimate of the price a knowledgeable buyer would pay to acquire the entire business. Harris usually sells a stock when the price approaches its estimated worth. The stocks that Harris sees specific "buy" and "sell" targets for each stock it holds by the Fund. Harris also monitors each holding and adjusts those price targets as warranted to reflect changes in a company's fundamentals. (Prospectus at 13) | **Principal Strategies** Litman Gregory Fund Advisors, LLC, the adviser to the Equity Fund, believes that it is possible to identify investment managers who, over a market cycle, will deliver superior returns relative to their peers. Litman Gregory also believes it can identify skilled stock pickers who, within their more diversified portfolios, have higher confidence in the return potential of some stocks than others. Litman Gregory believes a portfolio composed only of those managers' "highest confidence" stocks should outperform their more diversified portfolios over a market cycle. Based on these beliefs, the Equity Fund's strategy is to engage a number of proven managers as sub-advisers (each, a "manager" or "sub-adviser") with each manager investing in the securities of companies that it believes have strong appreciation potential. Under normal conditions, each sub-adviser manages a portion of the Equity Fund's assets by independently managing a portfolio typically composed of at least 5, but not more than 15, stocks. (Prospectus at 2) |
| | Portfolio Manager: Clyde S. McGregor, CFA, Harris Associates L.P. Target Asset Allocation: 17% Market Capitalization of Companies in Portfolio: Medium and large Stock Picking Style: Value |
| | Portfolio Manager: William C. Nygren, CFA, Harris Associates L.P. Target Asset Allocation: 17% Market Capitalization of Companies in Portfolio: Medium/Large and large |
| ~0.93% | ~1.87% n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| 18 | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| 52% (Prospectus at 13) | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| Wells Fargo 7.1% American Int'l Group 7.9% General Motors 7.9% Wells Fargo 7.1% Microsoft 6.9% JPMorgan Chase 6.6% Aon 5.9% Cummins 5.6% Blackrock 4.9% CBRE Group 4.8% | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| Financials 40% Technology 16.9% Consumer Cyclical 13.7% Industrials 9.3% Communications 6.9% Energy 6.3% Real Estate 8.0% | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |
| | n/a (multiple subadvisers make it impossible to identify Harris particular contributions) |

# EXHIBIT A-3

Exhibit A3

**The Oakmark Equity and Income Fund, the Corresponding Harris Balanced Strategy, and Similar/Identical Subadvised Funds**

| | Oakmark Fund | Harris Strategy |
|---|---|---|
| Investment Company | Harris Associates Investment Trust | 33 client accounts |
| Fund | Oakmark Equity & Income Fund | Balanced |
| Size (12/31/2015) | $17,636,074,000 | |
| Size (3/31/2016) | $17,007,350,000 | $866,459,000 |
| Adviser | Harris Associates | Harris |
| Subadviser | n/a | n/a |
| Portfolio Managers | Clyde S. McGregor<br>Colin Hudson<br>Matthew Logan<br>Edward J Wojciechowski | Clyde S. McGregor;<br>Michael J Mangan;<br>Jay R. Bormeister,<br>Andrew M. Gloch;<br>Diane L. Mustain;<br>Thomas W. Delaney |
| Subadvisory Fee | n/a | n/a |
| Advisory Services | | |
| Subadvisory Services | n/a | n/a |
| Investment Objective | income and preservation and growth of capital. | |
| Principal Investment Strategies | The Fund invests primarily in a diversified portfolio of U.S. equity and debt securities (although the Fund may invest up to 35% of its total assets in equity and debt securities of non-U.S. issuers). The Fund is intended to present a balanced investment program between growth and income by investing approximately 40-75% of its total assets in common stock, including securities convertible into common stock, and up to 60% of its total assets in debt securities issued by U.S. or non-U.S. governments and corporate entities rated at the time of purchase within the two highest grades assigned by Moody's Investors Service, Inc. or by Standard & Poor's Corporation Ratings Group, a division of The McGraw-Hill Companies. The Fund may invest up to 20% of its total assets in unrated or below investment grade rated debt securities, sometimes called junk bonds. The Fund may invest in the securities of large-, mid-, and small-capitalization companies. The Fund uses a value investment philosophy in selecting equity securities. This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below what we believe is their true business value presents the best opportunity to achieve the Fund's investment objective. The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, the Adviser looks for the following characteristics, although the companies selected may not have all of these attributes: (1) free cash flows and intelligent investment of excess cash; (2) earnings that are growing and are reasonably predictable; and (3) high level of company management ownership. In making its equity investment decisions, the Adviser uses a 'bottom-up' approach focused on individual companies, rather than focusing on specific economic factors or specific industries. To facilitate its | Balanced portfolio typically hold 20 equity securities with market cap focus above $1 billion at time of initial purchase, and fixed-income securities of high quality and short to intermediate duration.<br><br>Balanced portfolios are a combination of equity and fixed-income securities intended to work together to optimize return and risk.<br><br>Equity securities held in the Balanced strategy fit the value-focused criteria established for all equity products at Harris Associates: companies that we believe are trading at a significant discount to our estimate of intrinsic value. With intrinsic values that grow with time and with proven, shareholder-oriented management teams.<br><br>The fixed-income component strives to minimize risk and generate income by investing primarily in high-quality instruments with short to intermediate duration. |
| Performance (year ended 12/31/2015) | Class 1: -4.60%; Class 2: -4.90% | gross -3.08%<br>net -3.80% |
| Performance (year ended 3/31/2016) | Class 1: -4.73%; Class 2: -5.04% | Quarter: 0.21% gross; 0.02% net<br>Year -3.20% gross; -3.93% net |
| Number of Positions (12/31/2015) | 49 | 27 equity |
| Number of Positions (3/31/2016) | 46 | 32 equity |
| Turnover (year ended 9/30/2015) | 25% | no data |
| Turnover (6 months ended 3/31/2016) | 12% | 31.22% |
| Top 10 Holdings (12/31/2015) | General Motors Co. 4.2<br>Bank of America Corp. 4.1<br>Oracle Corp. 3.7<br>Nestle ADR 3.4<br>TE Connectivity, Ltd. 2.8<br>CVS Health Corp. 2.8<br>Foot Locker, Inc. 2.4<br>Dover Corp. 2.2<br>MasterCard, Inc., Class A 2.0<br>TD Ameritrade Holding Corp. 1.9 | JPMorgan Chase 6.3%<br>Wells Fargo 5.5%<br>General Electric 5.2%<br>Alphabet Cl A 5.2%<br>Visa Cl A 5.2%<br>Intel 5.0%<br>Aflac 4.9%<br>American Intl Group 4.9%<br>TE Connectivity 4.7%<br>Oracle 4.3% |
| Top 10 Holdings (3/31/2016) | General Motors Co. 4.3<br>Oracle Corp. 4.1<br>Bank of America Corp. 3.8<br>Nestle ADR 3.3<br>CVS Health Corp. 3.0<br>TE Connectivity, Ltd. 2.8<br>Foot Locker, Inc. 2.4<br>Dover Corp. 2.4<br>Philip Morris International, Inc. 2.1<br>MasterCard, Inc., Class A 2.1 | JPMorgan Chase 3.64%<br>American Intl Group 3.55%<br>Caterpillar 3.22%<br>Wells Fargo 3.21%<br>Visa Cl A 3.19%<br>Aflac 3.06%<br>General Electric 3.01%<br>Oracle 2.98%<br>General Motors 2.97%<br>Intel 2.91% |
| Sector Allocations (12/31/2015) | **Equity Investments**<br>Financials 16.3<br>Consumer Discretionary 10.8<br>Industrials 10.3<br>Consumer Staples 9.5<br>Information Technology 9.1<br>Energy 2.7<br>Health Care 2.2<br>Materials 0.4<br>Total Equity Investments 61.3<br>**Fixed Income Investments**<br>Corporate Bonds 9.2<br>Government and Agency Securities 8.9<br>Asset Backed Securities 0.1<br>Total Fixed Income Investments 18.2<br>Short-Term Investments and Other 20.5 | no data |
| Sector Allocations (3/31/2016) | **Equity Investments**<br>Financials 18.3<br>Consumer Discretionary 11.2<br>Consumer Staples 10.0<br>Industrials 10.0<br>Information Technology 8.9<br>Energy 2.2<br>Health Care 1.9<br>Materials 0.9<br>Total Equity Investments 63.4<br>**Fixed Income Investments**<br>Corporate Bonds 11.0<br>Government and Agency Securities 9.1<br>Asset Backed Securities 0.1<br>Total Fixed Income Investments 20.2<br>Short-Term Investments and Other 16.4 | **Equity Sector:**<br>Consumer Discretionary 8.6%<br>Consumer Staples 2.7%<br>Energy 3.0%<br>Financials 20.2%<br>Health Care 1.4%<br>Industrials 9.2%<br>Information Technology 17.5%<br>Materials 0.7%<br>Telecommunication Services 0.0%<br>Utilities 1.8%<br>Real Estate 0.0%<br>% Total 65.1%<br><br>**Fixed Income Sector**<br>Consumer Discretionary 0.9%<br>Consumer Staples 0.1%<br>Energy 0.9%<br>Financials 2.5%<br>Health Care 0.8%<br>Industrials 0.2%<br>U.S. Government & Agencies 16.2%<br>Municipal 2.6%<br>% Total 24.3% |

# EXHIBIT A-4

Exhibit A4

The Oakmark International Fund, the Corresponding Harris International Strategy, and Similar/Identical Subadvised Funds

| | Oakmark Fund | Harris Strategy | | | Subadvised Funds |
|---|---|---|---|---|---|
| Investment Company | Harris Associates Investment Trust | 16 clients | Met Investors Series Trust | MML Series Investment Fund | NOAM Canada Investment Corp. |
| Fund | Oakmark International Fund | International | Harris Oakmark International Portfolio | MML International Equity Fund | Oakmark International Nortis Funds |
| Size (12/31/2015) | $26,139,957,000 | | $2,099,366,340 | $165,906,128 | $20,236,000 |
| Size (3/31/2016) | $26,223,345,000 | $37,524,665,000 | | | |
| Adviser | Harris Associates | Harris | MetLife Advisers, LLC (advisory fee rates – 40% first $100 million, 40% on next $400 million, 0.75% on ACM >$1 billion) | MML Investment Advisers (advisory fee rates – 0.85% on first $250 million, 0.75% on ACM > $250 million) | NOAM Canada L.P. |
| Subadviser | -- | -- | Harris | Harris | Harris |
| Portfolio Managers | David G. Herro; Robert A. Taylor | David Herro; Robert Taylor | David Herro; Robert Taylor | David Herro; Robert Taylor | David Herro; Robert Taylor |
| Subadvisory Fee | -- | -- | | operates on a rate scale 0.50% (5:1 at 8:45) | not publicly disclosed (advisory agreement between NOAM Canada LP and Harris can be inspected at NOAM's registered offices in Toronto, Canada) |
| Advisory Services | | | | | |
| Subadvisory Services | | | | | |
| Investment Objective | Long-term capital appreciation | | Long-term capital appreciation (Prospectus at 5) | The Fund seeks long-term capital growth. (Prospectus at 58) | Long-term capital appreciation |
| Principal Investment Strategies | | | | | |
| Performance (year ended 12/31/2015) | Class I -3.83%; Class II -4.17% | p/w -3.11% net -3.74% | -4.32% | Class II -4.77%; Class I -0.10% | not filed (began only in September 2015) |
| Performance (year ended 3/31/2016) | Class I -12.57% Class II -12.84% | Quarter -2.69% gross -2.84% net Year -11.59% gross -12.22% net | | | not filed (began only in September 2015) |
| Number of Positions (12/31/2015) | 56 | 60 | 60 | 59 | |
| Number of Positions (3/31/2016) | 57 | 57 | | | 59 |
| Turnover (year ended 9/30/2015) | 48% | no data | 48% | 48% calendar year | |
| Turnover (6 months ended 3/31/2016) | 27% (6 month) | 33.59% | | | |
| Top 10 Holdings (12/31/2015) | | | | | |
| Top 10 Holdings (3/31/2016) | | | | | |
| Sector Allocations (12/31/2015) | | no date | | | |
| Sector Allocations (3/31/2016) | | | | | |

Exhibit A4

**The Oakmark International Fund, the Corresponding Harris International Strategy, and Similar/Identical Subadvised Funds**

| Investment Company | Natixis Funds Trust I | Schwab Capital Trust |
|---|---|---|
| Fund | Natixis Oakmark International Fund | Laudus International MarketMasters Fund |
| Size (12/31/2015) | $2,084,764,508 | ~$352.7 million (Net-to-allocation of 23.85% of Fund total net assets of $1,549 billion as of October 31, 2015) |
| Size (3/31/2016) | | |
| Adviser | NGAM Advisors, L.P. (advisory fee rate - 0.80% on all assets) (AR at 83) | Charles Schwab Investment Management, Inc. (advisory fee 0.25% on first $500 million, 0.275% on next $500 million, 0.25% on assets exceeding $1 billion) |
| Subadviser | Harris | Harris (and 4 other subadvisers) |
| Portfolio Managers | David Herro Robert Taylor | David Herro Robert Taylor |
| Subadvisory Fee | 0.60% on all AUM (AR at 84) | 0.60% on the first $175 million 0.57% on the next $125 million 0.55% on amounts over $250 million |
| Advisory Services | Advisory NGAM Advisors, L.P. ("NGAM Advisors") serves as the adviser to each of the Funds. NGAM Advisors oversees, evaluates, and monitors the subadvisory services provided to each Fund ... It also provides general business management and administration to each Fund ... NGAM Advisors does not determine what investments will be purchased or sold by the Funds. The advisers and subadvisers listed below make the investment decisions for their respective Funds. (Prospectus, at 52) | The Funds' investment adviser, Charles Schwab Investment Management, Inc. ("CSIM"), acts to "manage" management" for the Funds. In this role, "CSIM, subject to approval by the funds' Board of Trustees, hires subadvisers (investment managers or sub-advisers) to manage the portfolios for the funds' assets (CAI at 11) ... Charles Schwab Investment Management, Inc. (CSIM) allocates portions of the fund's assets to several investment managers, who then manage their respective portions under the general supervision of CSIM... Each investment manager uses its own investment selection process and has discretion to select portfolio securities for the allocation of the fund's assets. At the same time, each investment manager invests within a specific market capitalization range and investment style under the general supervision of CSIM ... By assigning more specific parameters to each investment manager, CSIM attempts to capitalize on the strengths of each investment manager and to combine their investment activities in a complementary fashion. (Prospectus, at 9) |
| Subadvisory Services | Subadviser Each Subadviser has full investment discretion and makes all determinations with respect to the investment of the assets of a Fund or a segment of the Fund, subject to the general supervision of the Fund's adviser and the Board of Trustees ... Harris Associates ... serves as subadviser to the Natixis Oakmark Fund, Natixis Oakmark International Fund and a segment of the Natixis U.S. Equity Opportunities Fund. (Prospectus, at 53) | Charles Schwab Investment Management, Inc. (CSIM) allocates portions of the fund's assets to several investment managers, who then manage their respective portions under the general supervision of CSIM ... Each investment manager uses its own investment selection process and has discretion to select portfolio securities for the allocation of the fund's assets. (Prospectus, at 9) ... The following table identifies the fund's investment managers as of December 31, 2015, their areas of focus, and approximate asset allocation. Investment Manager: Harris Associates L.P. Investment Style: International large-cap value Approximate allocation of net assets: 23.85%. (Prospectus at 11) |
| Investment Objective | The Fund seeks long-term capital appreciation. (Prospectus at 14) | The fund seeks long-term capital appreciation. (Prospectus at 5) |
| Principal Investment Strategies | Principal Investment Strategies The Fund invests primarily in a diversified portfolio of common stocks of non-U.S. companies. The Fund may invest in non-U.S. markets throughout the world, including emerging markets. Ordinarily, the Fund will invest in the securities of at least five countries outside the U.S. There are no geographic limits on the Fund's non-U.S. investments ... Although the Fund invests primarily in common stocks of non-U.S. companies it may also invest in the securities of U.S. companies. The Fund may invest in the securities of large-, mid- and large-capitalization companies. The Fund's subadviser, Harris Associates L.P. / Harris Associates uses a value investment philosophy in selecting equity securities, such as common stocks, preferred stocks, warrants, and securities convertible into common stocks and preferred stocks. This investment philosophy is based upon the belief that, over time, a company's stock price converges with Harris Associates' estimate of its intrinsic or true business value. By 'true business value,' Harris Associates means its estimate of the price a knowledgeable buyer would pay to acquire the entire business. Harris Associates believes that investing in securities priced significantly below their true business value presents the best opportunity to achieve the Fund's investment objective ... Harris Associates uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, Harris Associates looks for the following characteristics, although not all of the companies selected will have these attributes (1) free cash flows and intelligent investment of excess cash; (2) ... | To pursue its goal, the fund normally invests a substantial amount of its assets in equity securities of companies outside the United States. The fund expects to invest in companies across all market capitalization ranges. Charles Schwab Investment Management, Inc. (CSIM) allocates portions of the fund's assets to several investment managers, who then manage their respective portions under the general supervision of CSIM ... Each investment manager uses its own selection process and has discretion to select portfolio securities for the allocation of the fund's assets. At the same time, each investment manager invests within a specific market capitalization range and investment style under the general supervision of CSIM ... By assigning more specific parameters to each investment manager, CSIM attempts to capitalize on the strengths of each investment manager and to combine their investment activities in a complementary fashion. (Prospectus, at 5-6) ... The following table identifies the fund's investment managers as of December 31, 2015, their areas of focus, and approximate asset allocation. Investment Manager: Harris Associates L.P. Investment Style: International large-cap value Approximate allocation of net assets: 23.85%. (Prospectus at 11) |
| Performance (year ended 12/31/2015) | -3.39% | 1.61% use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Performance (year ended 3/31/2016) | -3.11% | use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Number of Positions (12/31/2015) | 60 | use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Number of Positions (3/31/2016) | 57 | 1,181 use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Turnover (year ended 9/30/2015) | 51% | 72% use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Turnover (3 months ended 3/31/2016) | | |
| Top 10 Holdings (12/31/2015) | | use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Top 10 Holdings (3/31/2016) | Allianz SE 4.7% Credit Suisse 4.2% BNP Paribas 3.9% Nomura Holdings Inc 3.4% Daiwa Securities Group 3.4% Diageo 3.3% Richemont 3.2% Lloyds Banking Group 3.1% CNH Industrial 3.0% Intesa Sanpaolo 2.9% Schlumberger 2.9% | use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Sector Allocations (12/31/2015) | | use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |
| Sector Allocations (3/31/2016) | Financials 30.8% Consumer Discretionary 27.1% Industrials 20.1% Materials 9.9% Information Technology 7.4% Consumer Staples 3.1% | use (multiple subadvisers makes impossible to particularize Harris's particular contribution) |

# EXHIBIT A-5

**Exhibit A5**

**The Oakmark International Small Cap Fund, the Corresponding Harris International Small Cap Strategy, and Similar/Identical Subadvised Funds**

| | Oakmark Fund | Harris Strategy |
|---|---|---|
| Investment Company | Harris Associates Investment Trust | 8 clients |
| Fund | Oakmark International Small Cap Fund | Int'l Small Cap |
| Size (12/31/2015) | $2,767,877,000 | |
| Size (3/31/2016) | $2,583,565,000 | $3,680,560,000 |
| Adviser | Harris Associates | Harris |
| Subadviser | n/a | n/a |
| Portfolio Managers | David Herro<br>Michael Manelli | David G. Herro<br>Michael L. Manelli |
| Subadvisory Fee | n/a | n/a |
| Advisory Services | | |
| Subadvisory Services | n/a | n/a |
| Investment Objective | long-term capital appreciation | |
| Principal Investment Strategies | The Fund invests primarily in a diversified portfolio of common stocks of non-U.S. companies. Under normal market conditions, the Fund invests at least 80% of its net assets (plus any borrowings for investment purposes) in the stocks of "small" cap companies." A small cap company is one whose market capitalization is no greater than the largest market capitalization of any company included in the S&P EPAC (Europe Pacific Asia Composite) Small Cap Index ($12.8 billion as of December 31, 2015). The Fund may invest in non-U.S. markets throughout the world, including emerging markets. Ordinarily, the Fund will invest in the securities of at least five countries outside the U.S. There are no geographic limits on the Fund's non-U.S. investments. The Fund uses a value investment philosophy in selecting equity securities. This investment philosophy is based upon the belief that, over time, a company's stock price converges with our estimate of its intrinsic or true business value. By "true business value," we mean our estimate of the price a knowledgeable buyer would pay to acquire the entire business. We believe that investing in securities priced significantly below what we believe is their true business value presents the best opportunity to achieve the Fund's investment objective. The Fund's investment adviser, Harris Associates L.P. (the "Adviser"), uses this value philosophy to identify companies that it believes have discounted stock prices compared to the companies' true business values. In assessing such companies, the Adviser looks for the following characteristics, although the companies selected may not have all of these attributes: (1) free cash flows and intelligent | International Small Cap portfolios generally hold 35 to 70 equity securities with a market cap focus under $5 billion, and typically have no more than 30% in any country, 25% in any industry and 7% maximum position size at the time of initial purchase.<br><br>International Small Cap Equity portfolios are composed of securities that we believe trade at a significant discount to our estimate of intrinsic value, have intrinsic values that grow with time and have shareholder-oriented management teams.<br><br>Our bottom-up portfolio construction leads to the selection of approximately 35 to 70 attractive small-cap companies from our approved list of international stocks. The market capitalization focus is less than $5 billion at the time of initial purchase. We do not strive for specific country, sector or industry exposure – these allocations instead are determined strictly through our stock selection process.<br><br>Foreign currency exposure may be hedged defensively in the International Small Cap Equity strategy for any currencies that we believe are significantly overvalued. Investment in emerging-market securities is permitted only in countries that meet our legal standards. |
| Performance (year ended 12/31/2015) | Class 1: 1.84%; Class 2: 1.84% | gross 1.96%<br>net 0.95% |
| Performance (year ended 3/31/2016) | Class 1: -8.79% Class 2: -8.91% | Quarter: -0.76% gross; -1.01% net<br>Year: -7.57% gross; -8.50% net |
| Number of Positions (12/31/2015) | 60 | 60 |
| Number of Positions (3/31/2016) | 60 | 60 |
| Turnover (year ended 9/30/2015) | 46% | no data |
| Turnover (6 months ended 3/31/2016) | 22% | 46.98% |
| Top 10 Holdings (12/31/2015) | Julius Baer Group, Ltd. 4.1<br>Incitec Pivot, Ltd. 4.0<br>Konecranes Oyj 3.0<br>Meko International Development, Ltd. 2.8<br>MTU Aero Engines AG 2.8<br>Sugi Holdings Co., Ltd. 2.7<br>Hirose Electric Co., Ltd. 2.7<br>EFG International AG 2.6<br>Metso OYJ 2.6<br>Bucher Industries AG 2.6 | Julius Baer Group 4.3%<br>Incitec Pivot 4.2%<br>Konecranes 3.2%<br>Meko International Development 3.0%<br>MTU Aero Engines 3.0%<br>Sugi Holdings 2.8%<br>Hirose Electric 2.8%<br>EFG International 2.8%<br>Metso 2.7%<br>Bucher Industries 2.7% |
| Top 10 Holdings (3/31/2016) | Julius Baer Group, Ltd. 4.0<br>BNK Financial Group, Inc. 3.7<br>Incitec Pivot, Ltd. 3.7<br>Konecranes Plc 3.1<br>Atea ASA 2.9<br>Meko International Development, Ltd. 2.8<br>MTU Aero Engines AG 2.7<br>Panalpina Welttransport Holding AG 2.6<br>Countrywide PLC 2.5<br>Metso OYJ 2.4 | Julius Baer Group 4.14%<br>BNK Financial Group 3.86%<br>Incitec Pivot 3.80%<br>Konecranes 3.24%<br>Atea 2.97%<br>Meko International Development 2.94%<br>MTU Aero Engines 2.80%<br>Panalpina Welttransport 2.68%<br>Countrywide 2.58%<br>Metso 2.52% |
| Sector Allocations (12/31/2015) | Industrials 43.4<br>Financials 18.0<br>Information Technology 10.6<br>Consumer Discretionary 7.8<br>Materials 6.8<br>Consumer Staples 4.9<br>Health Care 3.6<br>Energy 0.5<br>Short-Term Investments and Other 4.4 | no data |
| Sector Allocations (3/31/2016) | Industrials 43.5<br>Financials 22.2<br>Information Technology 8.5<br>Consumer Discretionary 8.3<br>Materials 6.9<br>Health Care 4.4<br>Consumer Staples 2.5<br>Short-Term Investments and Other 3.7 | Consumer Discretionary 8.3%<br>Consumer Staples 2.5%<br>Energy 0.0%<br>Financials 22.2%<br>Health Care 4.4%<br>Industrials 43.5%<br>Information Technology 8.5%<br>Materials 6.9%<br>Telecommunication Services 0.0%<br>Utilities 0.0%<br>Real Estate 0.0% |

# EXHIBIT A-6

Exhibit A6

The Oakmark Global Fund, the Corresponding Harris Global All Cap Strategy, and Similar/Identical Subadvised Funds

| | Oakmark Fund | Harris Strategy | Subadvised Funds | | |
|---|---|---|---|---|---|
| Investment Company | Harris Associates Investment Trust | 11 client accounts | Natixis International Funds (Lux) I | JNL Series Trust | Russell Investment Co. |
| Fund | **Oakmark Global Fund** | **Global All Cap** | **Harris Associates Global Equity Fund** | **JNL/Harris Oakmark Global Equity Fund** | **Russell Global Equity Fund (10% allocation to Harris)** |
| Size (12/31/2015) | $3,054,844,000 | | $1,406,977,884 | $91,143,000 | ~$300 million (Harris 10% allocation) |
| Size (3/31/2016) | $2,643,047,000 | $6,561,342,000 | | | ~$440 million (Harris 10% allocation) |
| Adviser | Harris Associates | Harris | NGAM S.A. | Jackson National Asset Management advisory fees – 0.85% for first $1 billion, 0.80% for AUM > $1 billion | Russell Investment Management LLC (0.95% advisory fee) |
| Subadviser | -- | | Harris | Harris | Harris (18% of portfolio) AND 5 other subadvisers |
| Portfolio Managers | Clyde S. McGregor Robert A. Taylor | Clyde S. McGregor Robert Taylor | Clyde McGregor Robert Taylor | David Herro Robert Levy Michael Manelli | David Herro Robert Levy |
| Subadvisory Fee | -- | -- | not publicly disclosed with any specificity (agreements between NGAM and Investment Managers are available for review at Custodial Brown Brothers Harriman (Luxembourg) S.C.A.'s Luxembourg offices) | 0.80% for first $100 million 0.50% for AUM > $100 million | not multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Advisory Services | -- | | Management Company: The [ ... illegible ... ] Fund has appointed NGAM S.A. (the "Management Company") as its management company and has delegated to the Management Company all powers related to the investment management, administration, and distribution of the [ ... ] Funds. The Management Company may delegate some of its responsibilities to affiliated and non-affiliated parties; however, the Management Company oversees and retains full responsibility for the activities delegated to service providers.  Investment Manager: The Management Company has appointed an Investment Manager for each Fund, as indicated in each Fund's description under "Characteristics"/"Investment Managers of the Fund". (Prospectus at 144) | [ ... extensive illegible fine print describing advisory services ... ] | RIMCo provides or oversees the provision of all investment advisory and portfolio management services for the Fund, including developing the investment program for the Fund and managing the Fund's overall management philosophy, engaging Money Managers to manage each Fund's investments, [ ... illegible ... ] (Prospectus at 169) |
| Subadvisory Services | -- | -- | not publicly disclosed with any specificity (agreements between NGAM and Investment Managers are available for review at Custodial Brown Brothers Harriman (Luxembourg) S.C.A.'s Luxembourg offices) | [ ... extensive illegible fine print ... ] | [ ... extensive illegible fine print ... ] |
| Investment Objective | long-term capital appreciation | | The investment objective of Harris Associates Global Equity Fund is long term growth of capital. (Prospectus at 23) | The investment objective of the Fund is to seek capital appreciation. | long-term capital growth (Prospectus at 168) |
| Principal Investment Strategies | [ ... extensive illegible ... ] | [ ... extensive illegible ... ] | **Principal Investment Strategy**  The Fund invests primarily in equity securities of companies around the world. [ ... illegible ... ] (Prospectus at 23) | [ ... extensive illegible ... ] | [ ... extensive illegible ... ] |
| Performance (year ended 12/31/2015) | Class I: +3.79%; Class II: +3.79% | grew +5.70% net: +5.04% | -5.47% (AR at 12) | n/a should began April 27, 2015 May-Dec 2015 performance: ar 11.4% | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Performance (year ended 3/31/2016) | Class I: +13.17% Class II: +13.99% | Quarter: -0.87% gross; -7.00% net Year: -12.21% gross; -15.02% net | | | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Number of Positions (12/31/2015) | 39 | | 34 (AR at 12) | 37 | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Number of Positions (3/31/2016) | 37 | 37 | | | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Turnover (year ended 12/31/2015) | 34% | no data | | 23% for Nov-December 2015 | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Turnover (6 months ended 3/31/2016) | 15% | 33.10% | | | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Top 10 Holdings (12/31/2015) | [ ... list illegible ... ] | [ ... list illegible ... ] | [ ... list illegible ... ] | [ ... list illegible ... ] | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Top 10 Holdings (3/31/2016) | [ ... list illegible ... ] | [ ... list illegible ... ] | [ ... list illegible ... ] | [ ... list illegible ... ] | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Sector Allocations (12/31/2015) | [ ... list illegible ... ] | [ ... list illegible ... ] | [ ... list illegible ... ] | [ ... list illegible ... ] | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |
| Sector Allocations (3/31/2016) | [ ... list illegible ... ] | [ ... list illegible ... ] | (AS OF 3/31/2016) [ ... list illegible ... ] | [ ... list illegible ... ] | n/a multiple managers doesn't allow for particular attribution to Harris only - specifically |

# EXHIBIT A-7

Exhibit A7

The Oakmark Global Select Fund, the Corresponding Harris Global Concentrated Strategy, and Similar/Identical Subadvised Funds

| | Oakmark Fund | Harris Strategy | Subadvised Funds | | |
|---|---|---|---|---|---|
| Investment Company | Harris Associates Investment Trust | | NGAM Investment Funds UK ICVC | Litman Gregory Funds Trust | Advisors Inner Circle Fund |
| Fund | Oakmark Global Select Fund | Global Concentrated | Harris Associates Global Concentrated Equity Fund | Litman Gregory Masters International Fund (30% allocated to Harris; remainder to other subadvisers) | Cornerstone Advisors Global Public Equity Fund |
| Size (12/31/2015) | $2,298,262,000 | | | ~$318 million (25% allocation of $1.26 billion total portfolio) | allocation to Harris undisclosed; total Fund net assets of approximately $853 million as of October 31, 2015 |
| Size (3/31/2016) | $2,625,529,000 | $373,901,000 | | ~$223 million (29% allocation of $1.12 billion total portfolio) | allocation to Harris undisclosed; total Fund net assets of approximately $814 million as of April 30, 2016 |
| Adviser | Harris Associates | Harris | NGAM S.A. (1.2% management fee) | Litman Gregory Fund Advisors LLC (advisory fee rate: 1.09%) | Cornerstone Advisors Inc. (advisory fee rate: 0.68% + equals 0.10% fee to Cornerstone plus all further fees to subadvisers, paid directly by Fund) |
| Subadviser | n/a | n/a | Harris | Harris (Herro) | Harris (and one dozen further subadvisers) |
| Portfolio Managers | William C Nygren David G Herro | Robert M. Levy David G. Herro Michael L. Manelli | David Herro Robert Levy Rob Taylor Michael Manelli Anthony Coniaris M. Colin Hudson Robert Bierig | David Herro | David Herro William Nygren |
| Subadvisory Fee | n/a | n/a | not disclosed | no disclosed, but average subadvisory fee to all subadvisers = 0.17% | 1.09% on first $50 million, 0.90% on assets over $50 million |
| Advisory Services | | | The ACD (a NGAM S.A.) ... | Litman Gregory Fund Advisors, LLC ... | The Adviser serves as the overall investment adviser to the Fund. The Adviser ... |
| Subadvisory Services | n/a | n/a | The ACD has appointed the Investment Managers ... | the International Fund's strategy is to engage a number of proven managers in subadvisory roles ... | in accordance with the terms of separate investment sub-advisory agreements ... |
| Investment Objective | long-term capital appreciation | | Investment objective: The investment objective of Harris Associates Global Concentrated Equity Fund (the "Fund") is to achieve long-term growth of capital. (AR at 23) | Investment objective: The Litman Gregory Masters International Fund (the "International Fund") seeks long-term growth of capital. (Prospectus at 1) | The Cornerstone Advisors Global Public Equity Fund seeks capital appreciation. (Prospectus at 1) |
| Principal Investment Strategies | ...stocks of U.S. and non-U.S. companies. The Fund invests in the securities of companies located in at least three countries. The Fund is non-diversified, which means that it may invest a greater portion of its assets in a more limited number of issuers than a diversified fund... | approximately 20 securities with a market cap focus of $5 billion and above, and typically have no more than 30% in any industry (except U.S.), 50% in any industry and 15% maximum position size at the time of initial purchase. Global Concentrated portfolios are composed of equity securities that we believe trade at a significant discount to our estimate of intrinsic value, have superior values and have business-enhancing management teams. Our bottom-up portfolio construction leads to the selection of approximately 15-25 stocks in aggregate with a market cap focus of $5 billion and above. ... | Principal Investment Strategy: In order to meet its objective, the Fund will invest at least 80% of its assets in shares of companies around the world spread on Equities Markets, including emerging markets. The Fund may invest in companies with a market capitalisation greater than $2 billion at the time of initial purchase. The Fund may invest up to 20% of its assets in cash, cash equivalents or other types of securities other than those described above (and number of markets around the world, including emerging markets... | Highly skilled international equity managers with varying styles: Some exposure to emerging markets and small companies, although it is expected that exposure to developed markets will be significantly greater. Although each manager runs a concentrated portfolio of no fewer than 8 or more than 15 of their highest-conviction ideas, the Fund as a whole is diversified by industry, country, and number of stocks. ... HARRIS ASSOCIATES – DAVID HERRO: Dedicated value manager invests in companies of all sizes, making selections based on the size of the company's discount compared to its true business value. Herro has been with the Fund since inception in 1997 and also manages the Oakmark International and Oakmark Global Select Funds. Allocation: 25% ... | The Fund seeks to achieve its investment objective by allocating its assets among one or more investment strategies (directly through the use of one or more sub-advisers – to invest its assets in global, publicly traded equity securities as part of one of the following primary investment strategies: (i) Structured Global Strategy; (ii) Global Opportunistic Strategy; and (iii) Style Specialist Strategy. The Structured Global Strategy is based on the Adviser's quantitative investment process designed to efficiently capture the long-term returns of global equity markets — developed and emerging. The Global Opportunistic Strategy, which may use "value" and "growth" styles of investing, seeks to be opportunistic in pursuing companies that meet its investment criteria regardless of a company's location or style... |
| Performance (year ended 12/31/2015) | Class I: 1.85% | growth -7.71% (net -8.45%) | -8.17% (AR at 23) | 5.69% n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | -6.97% n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Performance (year ended 3/31/2016) | Class I: -1.36% | Quarter: -3.17% gross; -3.86% net Year: -12.11% gross; -12.19% net | | -14.2% n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Number of Positions (12/31/2015) | 20 | 18 | 21 | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Number of Positions (3/31/2016) | 20 | 18 | | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Turnover (year ended 9/30/2015) | 46% | no data | | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Turnover (x months ended 3/31/2016) | 7% | 11.55% | | 52% n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | 17% n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Top 10 Holdings (12/31/2015) | Alphabet Inc. / Class C 7.1% General Electric Co. 6.1% Daimler AG 5.6% American International Group, Inc. 5.3% JPMorgan Chase & Co. 5.1% Credit Suisse Group 5.1% Bank of America Corp. 5.1% Kering SA 4.9% LafargeHolcim, Ltd 4.9% MasterCard, Inc./ Class A 4.7% | Credit Suisse Group 8.9% American Intl Group 6.1% CNH Industrial 6.0% Toyota Motor 6.0% Daimler AG 5.9% Caterpillar 5.7% Wells Fargo 5.3% JPMorgan Chase 5.3% Daiwa Securities Group 5.0% Samsung 4.9% | American Intl Group 7.7% Credit Suisse 6.1% Daimler 6.1% General Motors 5.9% Toyota Motor 5.8% Allianz 5.5% Glencore 5.3% Caterpillar 5.2% CNH Industrial 5.0% Kering 4.8% | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Top 10 Holdings (3/31/2016) | Alphabet Inc. / Class C 8.0% General Electric Co. 6.7% LafargeHolcim, Ltd 5.3% Daimler AG 5.2% Samsung Electronics Co., Ltd. 5.2% American International Group, Inc. 5.1% Credit Suisse Group 5.1% JPMorgan Chase & Co. 4.9% MasterCard, Inc./ Class A 4.9% Apache Corp. 4.7% | General Motors 8.1% Caterpillar 8.0% CNH Industrial 6.7% Glencore 7.0% Daimler 5.9% American Intl Group 7.6% Credit Suisse Group 5.7% Toyota Motor 5.5% Wells Fargo 5.2% | (as of April 30, 2016) Glencore 7.3% American Intl Group 6.2% CNH Industrial 6.1% Credit Suisse 5.9% Caterpillar 5.9% Toyota Motor 5.7% General Motors 5.4% Daiwa Securities 5.3% LafargeHolcim 4.9% Allianz 4.6% | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Sector Allocations (12/31/2015) | Information Technology 23.1 Financials 21.1 Consumer Discretionary 18.6 Industrials 12.8 Consumer Staples 7.5 Materials 4.9 Energy 4.1 Short-Term Investments and Other 6.1 | no data | | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |
| Sector Allocations (3/31/2016) | Information Technology 27.6 Financials 21.0 Consumer Discretionary 14.6 Industrials 13.8 Consumer Staples 9.3 Materials 6.5 Energy 5.3 Short Term Investments and Other 3.3 | Consumer Discretionary 27.0% Consumer Staples 5.0% Energy 0.9% Financials 31.2% Health Care 0.9% Industrials 19.3% Information Technology 7.1% Materials 7.4% Telecommunication Services 0.0% Utilities 0.0% Real Estate 0.0% Short Term Investments 0.0% % Total 96.9% | | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) | n/a (multiple subadvisers make impossible to particularize Harris's particular contributions) |

# EXHIBIT B

**Exhibit B**

**Other Services Provided by Harris as Subadviser to the Subadvised Funds, as Set Forth in Operative Subadvisory Contracts**

| Subadvised Fund | Domicile / Subadvisory Contract Publicly Available | Portfolio Selection Services | Reporting | Administrative, Compliance, Books & Records |
|---|---|---|---|---|
| Natixis Oakmark Fund | U.S. Yes<br><br>October 29, 2002 Sub-Advisory Agreement with NGAM Advisors, as amended February 28, 2014 | WHEREAS, the Manager and the Trustees of the Trust desire to retain the Sub-Adviser to render portfolio management services in the manner and on the terms set forth in this Agreement. *** 1. SUB-ADVISORY SERVICES. a. The Sub-Adviser shall, subject to the supervision of the Manager and of any administrator appointed by the Manager (the "Administrator"), manage the investment and reinvestment of the assets of the Series . . . in conformity with (1) the investment objective, policies and restrictions of the Series set forth in the Trust's prospectus and statement of additional information relating to the Series . . . the Sub-Adviser is authorized, in its discretion and without prior consultation with the Manager, to buy, sell, lend and otherwise trade in any stocks, bonds and other securities and investment instruments on behalf of the Series, without regard to the length of time the securities have been held and the resulting rate of portfolio turnover or any tax considerations; and the majority or the whole of the Series may be invested in such proportions of stocks, bonds, other securities or investment instruments, or cash, as the Sub-Adviser shall determine | SUB-ADVISORY SERVICES. b. The Sub-Adviser shall furnish the Manager and the Administrator quarterly and annual reports concerning portfolio transactions and performance of the Series in such form as may be mutually agreed upon, and agrees to review the Series and discuss the management of it . . . The Sub-Adviser shall also provide the Manager with such other information and reports as may reasonably be requested by the Manager from time to time, including without limitation all material requested by or required to be delivered to the Trustees of the Trust | SUB-ADVISORY SERVICES. b. . . . The Sub-Adviser shall permit all books and records with respect to the Series to be inspected and audited by the Manager and the Administrator at all reasonable times during normal business hours, upon reasonable notice. |
| Natixis U.S. Equity Opportunities Fund | U.S. Yes<br><br>October 30, 2002 Sub-Advisory Agreement with NGAM Advisors, as amended February 28, 2014 | WHEREAS, the Manager and the trustees of the Trust desire to retain the Sub-Adviser to render portfolio management services in the manner and on the terms set forth in this Agreement. *** 1. SUB-ADVISORY SERVICES. a. The Sub-Adviser shall, subject to the supervision of the Manager and of any administrator appointed by the Manager (the "Administrator"), manage the investment and reinvestment of such portion of the assets of the Series as the Manager may from time to time allocated to the Sub-Adviser for management (each portion, the "Segment") . . . in conformity with (1) the investment objective, policies and restrictions of the Series set forth in the Trust's prospectus and statement of additional information relating to the Series . . . the Sub-Adviser is authorized, in its discretion and without prior consultation with the Manager, to buy, sell, lend and otherwise trade in any stocks, bonds and other securities and investment instruments on behalf of the Series, without regard to the length of time the securities have been held and the resulting rate of portfolio turnover or any tax considerations; and the majority or the whole of the Segment may be invested in such proportions of stocks, bonds, other securities or investment instruments, or cash, as the Sub-Adviser shall determine | SUB-ADVISORY SERVICES. b. The Sub-Adviser shall furnish the Manager and the Administrator quarterly and annual reports concerning portfolio transactions and performance of the Segment in such form as may be mutually agreed upon, and agrees to review the Segment and discuss the management of it . . . The Sub-Adviser shall also provide the Manager with such other information and reports as may reasonably be requested by the Manager from time to time, including without limitation all material requested by or required to be delivered to the Trustees of the Trust. | SUB-ADVISORY SERVICES. b. . . . The Sub-Adviser shall permit all books and records with respect to the Segment to be inspected and audited by the Manager and the Administrator at all reasonable times during normal business hours, upon reasonable notice. |
| Harris Associates U.S. Equity Fund | Europe No | | | |
| Oakmark Natixis Funds | Canada No | | | |
| Harris Associates Concentrated U.S. Equity Fund | Europe No | | | |

**Exhibit B**

**Other Services Provided by Harris as Subadviser to the Subadvised Funds, as Set Forth in Operative Subadvisory Contracts**

| Subadvised Fund | Domicile / Subadvisory Contract Publicly Available | Portfolio Selection Services | Reporting | Administrative, Compliance, Books & Records |
|---|---|---|---|---|
| **MassMutual Select Focused Value Fund** | U.S.<br>Yes<br><br>December 6, 2011 Sub-Advisory Agreement with Massachusetts Mutual Life Insurance Company | 2. Duties of the Subadviser<br>(a) The Subadviser shall, subject to the direction and control of the Trust's Board of Trustees and MassMutual, (x) provide a continuing investment program for the Portfolio and determine what securities or other investments shall be purchased or sold by the Portfolio; (xi) arrange, subject to the provisions of Section 5 hereof, for the purchase and sale of securities and other investments for the Portfolio; and (iii) provide reports on the foregoing to the Board of Trustees of the Trust at each Board meeting | 2. Duties of the Subadviser.<br>(a) . . . (iii) provide reports on the foregoing to the Board of Trustees of the Trust at each Board meeting.<br>(b) The Subadviser shall provide to MassMutual such reports for the Portfolio, on a monthly, quarterly or annual basis, as MassMutual or the Board of Trustees of the Trust shall reasonably request or as required by applicable law or regulation, including, but not limited to, compliance reports and those reports listed in Appendix A.<br>(c) On each business day the Subadviser shall provide to the Fund's custodian information relating to all transactions concerning the Portfolio's assets and shall provide to the Fund's custodian, administrator and/or sub-administrator any such additional information as reasonably requested.<br>(g) As MassMutual or the Board of Trustees of the Trust may request from time to time, the Subadviser shall timely provide to MassMutual (i) information and commentary for the Fund's annual and semi-annual reports, in a format approved by MassMutual, and shall (A) certify that such information and commentary discuss the factors that materially affected the performance of the Portfolio, including the relevant market conditions and the investment techniques and strategies used, and do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the information and commentary not misleading and (B) provide additional certifications related to the Subadviser's management of the Portfolio in order to support the Fund's filings on Form N-CSR and Form N-Q; and the Fund's Principal Executive Officer's and Principal Financial Officer's certifications under Rule 30a-2 under the Act . . . . | 2. Duties of the Subadviser. . .<br>(d) The Subadviser (i) shall maintain such books and records as are required under the Act or other applicable law, based on the services provided by the Subadviser pursuant to this Subadvisory Agreement and as are necessary for MassMutual or the Trust to meet its record keeping obligations generally set forth under Section 31 of the Act and rules thereunder, and (ii) shall meet with any persons at the request of MassMutual or the Board of Trustees of the Trust for the purpose of reviewing the Subadviser's performance under this Subadvisory Agreement at reasonable times and upon reasonable advance written notice.<br>***<br>(g) . . . (ii) a quarterly certification, as well as any requested sub-certifications, with respect to compliance matters related to the Subadviser and the Subadviser's management of the Portfolio, in formats reasonably requested by MassMutual, as they may be amended from time to time; and (iii) an annual certification from the Subadviser's Chief Compliance Officer, appointed under Rule 206(4)-7 under the Advisers Act, with respect to the design and operation of the Subadviser's compliance program, in a format reasonably requested by MassMutual. |
| **MML Focused Equity Fund** | U.S.<br>Yes<br><br>December 6, 2011 Sub-Advisory Agreement with Massachusetts Mutual Life Insurance Company | | The Subadviser shall provide to MassMutual the following:<br>1. Quarterly Portfolio Data Sheets (due on the 10th business day after the end of every quarter)<br>The data sheets should include the following information:<br>a. Portfolio Characteristics for the Portfolio, standard and best fit market index.<br>b. Portfolio Sector Weights for the Portfolio, standard and best fit market index.<br>c. Top 10 Equity Holdings (% of equities) for the Portfolio.<br>d. Top 5 contributors and detractors by performance based on contribution to the Portfolio<br>e. Purchases (New) and Sales (Eliminated) during the quarter.<br>f. Performance of the Portfolio vs. standard and best fit market index and peer group<br>2. Portfolio Manager Commentary (due on the 10th business day after the end of every quarter). The commentary should include information on the following topics (there is no limit on the number of words used):<br>a. Qualitative assessment by manager: list three factors that were the major influences on performance – both positive and negative<br>b. Performance attribution:<br>- The industry weightings that had the largest contribution to performance during the most recent quarter.<br>- The industry weightings that had the largest detraction from performance during the most recent quarter.<br>- The five holdings that contributed the most to performance during the most recent quarter.<br>- The five holdings that detracted the most from performance during the most recent quarter.<br>c. The manager's market outlook.<br>d. How he/she has positioned the Portfolio for the near term.<br>3. Portfolio attribution analysis on the Portfolio: Performance attribution should demonstrate the impact of portfolio management decisions including Asset Allocation | |

**Exhibit B**

**Other Services Provided by Harris as Subadviser to the Subadvised Funds, as Set Forth in Operative Subadvisory Contracts**

| Subadvised Fund | Domicile / Subadvisory Contract Publicly Available | Portfolio Selection Services | Reporting | Administrative, Compliance, Books & Records |
|---|---|---|---|---|
| Litman Gregory Masters Equity Fund | U.S. Yes  October 1, 2008 Sub-Advisory agreement with Litman Gregory Fund Advisors, LLC | 2.   Duties of Sub-Advisor. (a)   General Duties. The Sub-Advisor shall act as one of several investment managers to the Fund and shall invest the Sub-Advisor's Allocated Portion of the assets of the Fund in accordance with the investment objectives, policies and restrictions of the Fund . . . . Without limiting the generality of the foregoing, the Sub-Advisor shall: (i) furnish the Fund with advice and recommendations with respect to the investment of the Sub-Advisor's Allocated Portion of the Fund's assets; (ii) effect the purchase and sale of portfolio securities for the Sub-Advisor's Allocated Portion; (iii) determine that portion of the Sub-Advisor's Allocated Portion that will remain uninvested, if any; (iv) manage and oversee the investments of the Sub-Advisor's Allocated Portion, subject to the ultimate supervision and direction of the Trust's Board of Trustees . . . | 2.   Duties of Sub-Advisor. (a) . . . the Sub-Advisor shall . . . (vii) furnish reports, statements and other data on securities, economic conditions and other matters related to the investment of the Fund assets which the Advisor, the Trustees, or the officers of the Trust may reasonably request; and (viii) render to the Trust's Board of Trustees such periodic and special reports with respect to its Sub-Advisor's Allocated Portion as the Board may reasonably request. | 2.   Duties of Sub-Advisor. (a) . . . the Sub-Advisor shall . . . (v) vote proxies, file required ownership reports, and take other actions with respect to the securities in the Sub-Advisor's Allocated Portion; (vi) maintain the books and records required to be maintained with respect to the securities in the Sub-Advisor's Allocated Portion . . . |
| MIST Harris Oakmark International Portfolio | U.S. Yes  January 1, 2003 "Advisory" agreement with Met Investors Advisory LLC, as amended December 1, 2005, January 1, 2009 and May 1, 2009 | 2. Obligations of and Services to be Provided by the Adviser. (a) The Adviser shall manage the investment and reinvestment of the portfolio assets of the Portfolio, all without prior consultation with the Manager, subject to and in accordance with the investment objective and policies of the Portfolio . . . .  In pursuance of the foregoing, the Adviser shall make all determinations with respect to the purchase and sale of portfolio securities and shall take such action necessary to implement the same. | 2. Obligations of and Services to be Provided by the Adviser. (a) . . . The Adviser shall render such reports to the Trust's Board of Trustees and the Manager as they may reasonably request concerning the investment activities of the Portfolio . . . | 2. Obligations of and Services to be Provided by the Adviser. c. In connection with the placement of orders for the execution of the portfolio transactions of the Portfolio, the Adviser shall create and maintain all necessary records pertaining to the purchase and sale of securities by the Adviser on behalf of the Portfolio in accordance with all applicable laws, rules and regulations, including but not limited to records required by Section 31(a) of the 1940 Act. All records shall be the property of the Trust and shall be available for inspection and use by the SEC, the Trust, the Manager or any person retained by the Trust at all reasonable times. Where applicable, such records shall be maintained by the Adviser for the periods and in the places required by Rule 31a-2 under the 1940 Act |
| MML International Equity Fund | U.S. Yes  December 31, 2013 Sub-Advisory agreement with Massachusetts Mutual Life Insurance Company | same as MassMutual Select Focused Value Fund and MML Focused Equity Fund, supra | same as MassMutual Select Focused Value Fund and MML Focused Equity Fund, supra | same as MassMutual Select Focused Value Fund and MML Focused Equity Fund, supra |
| Oakmark International Natixis Funds | Canada No | | | |
| Natixis Oakmark International Fund | U.S. Yes  December 13, 2010 Sub-Advisory Agreement with NGAM Advisors, as amended February 28, 2014 | 1. Sub-Advisory Services. a. The Sub-Adviser shall, subject to the supervision of the Manager and of any administrator appointed by the Manager (the "Administrator"), manage the investment and reinvestment of the assets of the Series . . . .  The Sub-Adviser shall manage the Series in conformith with (1) the investment objective, policies and restrictions of the Series set forth in the Trust's prospectus and statement of additional information relating to the Series . . .  Subject to the foregoing, the Sub-Adviser is authorized, in its discretion and without prior consultation with the Manager, to buy, sell, lend and otherwise trade in any stocks, bonds and other securities and investment instruments on behalf of the Series, without regard to the length of time the securities have been held and the resulting rate of portfolio turnover or any tax considerations; and the majority or the whole of the Series may be invested in such proportions of stocks, bonds, other securities or investment instruments, or cash, as the Sub-Adviser shall determine. | 1. Sub-Advisory Services. b. The Sub-Adviser shall furnish the Manager and the Administrator monthly, quarterly and annual reports concerning portfolio transactions and performance of the Series in such form as may be mutually agreed upon, and agrees to review the Series and discuss the management of it . . . The Sub-Adviser shall also provide the Manager with such other information and reports as may reasonably be requested by the Manager from time to time, including without limitation all material requested by or required to be delivered to the Trustees of the Trust. | 1. Sub-Advisory Services. b. . . . The Sub-Adviser shall permit all books and records with respect to the Series to be inspected and audited by the Manager and the Administrator at all reasonable times during normal business hours, upon reasonable notice . . . |

**Exhibit B**

**Other Services Provided by Harris as Subadviser to the Subadvised Funds, as Set Forth in Operative Subadvisory Contracts**

| Subadvised Fund | Domicile / Subadvisory Contract Publicly Available | Portfolio Selection Services | Reporting | Administrative, Compliance, Books & Records |
|---|---|---|---|---|
| Laudus International MarketMasters Fund | U.S. Yes January 1, 2002 Sub-Advisory Agreement, as amended March 26, 2003 and December 2, 2004 | 2. DUTIES OF SUB-ADVISER. (a) Sub-Adviser shall be responsible for managing the investment and reinvestment of the Managed Assets and determine in its discretion, the securities and other property to be purchased or sold and the portion of the Managed Assets to be retained in cash . . . | Sub-Adviser will provide Fund Parties with records concerning Sub-Adviser's activities that Fund Parties are required to maintain, and regular reports concerning Sub-Adviser's performance of the Services. 7. REPORTS: (a) Sub-Adviser will provide written quarterly reports to Fund Parties regarding the Managed Assets. CSIM will specify the information to be included in such quarterly reports. Sub-Adviser will make available to Fund Parties any economic, statistical and investment services that Sub-Adviser makes available to its other institutional clients. (b) Sub-Adviser will promptly communicate to Fund Parties any information relating to transactions in the Managed Assets as Fund Parties may reasonably request. *** (d) Sub-Adviser or CDC IXIS will make its officers and employees available to meet with Fund Parties at such times and places, as Fund Parties may reasonably request, including at quarterly and special meetings of the Trustees in San Francisco, California | 10. CERTAIN RECORDS. (a) Sub-Adviser will maintain all books and records with respect to transactions involving the Managed Assets required by subparagraphs (b)(5), (6), (7), (9), (10) and (11) and paragraph (f) of Rule 31a-1 under the 1940 Act. Sub-Adviser will provide to Fund Parties periodic and special reports, balance sheets, profitability analyses (only for the Managed Assets), financial information, and such other information with regard to Sub-Adviser's, as Fund Parties may reasonably request, including any information requested by Fund Parties to assist the Trustees in evaluating the terms of this Agreement and any renewal thereof under Section 15(c) of the 1940 Act. (b) Sub-Adviser will keep the books and records relating to the Managed Assets required to be maintained by Sub-Adviser under this Agreement and will timely furnish to Fund Parties all information relating to Sub-Adviser's Services under this Agreement needed by Fund Parties to keep the other books and records of the Company required by Rule 31a-1 under the 1940 Act. Sub-Adviser will also furnish to Fund Parties any other information relating to the Managed Assets that must be filed by Company with the SEC or sent to shareholders under the 1940 Act, and any exemptive or other relief granted by the SEC . . . In addition, Sub-Adviser will preserve for the periods prescribed by Rule 31a-2 under 1940 Act any such records as are required to be maintained by it pursuant to this Agreement . . . |
| Harris Associates Global Equity Fund | Europe No | | | |
| JNL/Harris Oakmark Global Equity Fund | U.S. Yes April 27, 2015 Sub-Advisory Agreement with Jackson National Asset Management, LLC | 2. SERVICES TO BE RENDERED BY THE SUB-ADVISER TO THE TRUST A. As investment sub-adviser to each Fund, the Sub-Adviser will coordinate and monitor the investment and reinvestment of the assets of each Fund and determine the composition of the assets of each Fund, subject always to the supervision and authority of the Adviser and the Board. B. As part of the services it will provide hereunder, the Sub-Adviser will: (i) obtain and evaluate such economic, statistical, financial, and other information affecting the individual companies or industries it believes is pertinent, the securities of which are included in each Fund or are under consideration for inclusion in each Fund; (ii) formulate and implement a continuous investment program and make investment decisions for all assets in each Fund; (iii) take whatever steps are necessary to implement the investment program for each Fund by placing all orders, on behalf of each Fund, for the purchase and sale of securities and other property and investments, including issuing directives to the administrator and the custodian of the Trust as necessary for the appropriate implementation of the investment program of each Fund; | 2. SERVICES TO BE RENDERED BY THE SUB-ADVISER TO THE TRUST *** (v) keep the Board and the Adviser informed in writing on an ongoing basis of all material facts concerning the investment and reinvestment of the assets in each Fund, the Sub-Adviser and its key investment personnel and operations; make regular and periodic special written reports of such additional information concerning the same as may reasonably be requested from time to time by the Adviser or the Board; and attend meetings with the Adviser and/or the Board, as reasonably requested, to discuss the foregoing; (vi) cooperate with the Trust's Chief Compliance Officer in executing his/her responsibilities to monitor service providers of each Fund pursuant to Rule 38a-1 under the Investment Company Act, including but not limited to providing compliance and reporting information as reasonably requested by the Adviser and the Board; F. Sub-Adviser and Adviser will each make its officers and employees available to the other from time to time at reasonable times to review investment policies of each Fund and to consult with each other regarding the investment affairs of each Fund. Sub-Adviser will report to the Board and to Adviser with respect to the implementation of such program as requested by the Board or the Adviser. | 2. SERVICES TO BE RENDERED BY THE SUB-ADVISER TO THE TRUST *** (vi) cooperate with the Trust's Chief Compliance Officer in executing his/her responsibilities to monitor service providers of each Fund pursuant to Rule 38a-1 under the Investment Company Act, including but not limited to providing compliance and reporting information as reasonably requested by the Adviser and the Board; J. The Sub-Adviser will maintain all accounts, books and records with respect to each Fund as are required of an investment sub-adviser of a registered investment company pursuant to the Investment Company Act, Advisers Act, and Commodity Exchange Act and the rules thereunder, will furnish the Adviser and the Board such periodic and special reports as they may reasonably request, and shall timely file with the SEC all forms pursuant to Section 13 of the Exchange Act, with respect to its duties as are set forth herein. K. The Sub-Adviser shall ensure that each Fund complies with the provisions of Section 851 and Section 817(h) of the Code and the regulations thereunder, including, but not limited to, Treas. Reg. Section 1.817-5 Sub-Adviser shall be responsible for the correction of any failure under the provisions cited above attributable to its action whether in good faith, negligent, or reckless disregard, including any penalties, taxes, and interest and for any other obligations to Contract owners and insurance company investors in such Fund L. The Sub-Adviser will, unless and until otherwise directed by the Adviser or the Board, vote proxies with respect to each Fund's securities and exercise rights in corporate actions or otherwise in accordance with the Sub-Adviser's proxy voting guidelines, as amended from time to time, which shall be provided to the Trust and the Adviser. M. The Sub-Adviser will provide to the Adviser (i) a completed monthly compliance checklist developed for each Fund by Adviser and Sub-Adviser, (ii) quarterly reports developed for each Fund by Adviser and Sub-Adviser, and (iii) other compliance and reporting information as reasonably requested by the Adviser or the . . . |
| Russell Global Equity Fund | U.S. No | subadvisory contracts not disclosed | subadvisory contracts not disclosed | subadvisory contracts not disclosed |
| Harris Associates Global Concentrated Equity Fund | Europe No | | | |

**Exhibit B**

**Other Services Provided by Harris as Subadviser to the Subadvised Funds, as Set Forth in Operative Subadvisory Contracts**

| Subadvised Fund | Domicile / Subadvisory Contract Publicly Available | Portfolio Selection Services | Reporting | Administrative, Compliance, Books & Records |
|---|---|---|---|---|
| **Litman Gregory Masters International Fund** | U.S. Yes<br><br>October 30, 2002 Sub-Advisory agreement with Litman Gregory Fund Advisors, LLC | 2. Duties of Sub-Adviser. (a) General Duties. Sub-Adviser shall act as one of several investment managers to the Fund and shall invest Sub-Adviser's Allocated Portion of the assets of the Fund in accordance with the investment objectives, policies and restrictions of the Fund as set forth in the Fund's and the Trust's governing documents . . . Without limiting the generality of the foregoing, Sub-Adviser shall: (i) furnish the Fund with advice and recommendations with respect to the investment of the Sub-Adviser's Allocated Portion of the Fund's assets, (ii) effect the purchase and sale of portfolio securities for Sub-Adviser's Allocated Portion, (iii) determine that portion of Manager's Allocated Portion that will remain uninvested, if any; (iv) manage and oversee the investments of the Sub-Adviser's Allocated Portion, subject to the ultimate supervision and direction of the Trust's Board of Trustees . . . | 2. Duties of Sub-Adviser. (a) . . . Sub-Adviser shall . . . (vii) furnish reports, statements and other data on securities, economic conditions and other matters related to the investment of the Fund's assets which the Adviser, the Trustees, or the officers of the Trust may reasonably request, and (viii) render to the Trust's Board of Trustees such periodic and special reports with respect to Sub-Adviser's Allocated Portion as the Board may reasonably request. | 2. Duties of Sub-Adviser. (a) . . . Sub-Adviser shall . . . (v) vote proxies, file required ownership reports, and take other actions with respect to the securities in Sub-Adviser's Allocated Portion; (vi) maintain the books and records required to be maintained with respect to the securities in Sub-Adviser's Allocated Portion. |
| **Cornerstone Advisors Global Public Equity Fund** | U.S. Yes<br><br>August 14, 2012 Sub-Advisory Agreement with Cornerstone Advisors Inc. | 1. THE SUB-ADVISER'S SERVICES. (a) DISCRETIONARY INVESTMENT MANAGEMENT SERVICES. The Sub-Adviser shall act as sub-investment adviser with respect to the Fund. In such capacity, the Sub-Adviser shall, subject to the supervision of the Adviser and the Board, regularly provide the Fund with investment research, advice and supervision and shall furnish continuously an investment program for such Fund assets as may be allocated by the Adviser to the Sub-Adviser, consistent with the investment objectives and policies of the Fund. The Sub-Adviser shall determine from time to time, what investments shall be purchased for the Fund and what such securities shall be held or sold by the Fund . . . | 3. INFORMATION AND REPORTING. The Sub-Adviser shall provide the Adviser, the Trust, and their respective officers with such periodic reports concerning the obligations the Sub-Adviser has assumed under this Agreement as the Adviser and the Trust may from time to time reasonably request. (a) BOARD AND FILINGS INFORMATION. The Sub-Adviser will also provide the Adviser and Trust with any information reasonably requested regarding its management of the Fund required for any meeting of the Board, or for any shareholder report, Form N-CSR, Form N-Q, Form N-PX, Form N-SAR, amended registration statement, proxy statement, or prospectus supplement to be filed by the Trust with the Commission. The Sub-Adviser will make its officers and employees available to meet with the Board from time to time on due notice to review its investment management services to the Fund in light of current and prospective economic and market conditions and shall furnish to the Board such information as may reasonably be necessary in order for the Board to evaluate this Agreement or any proposed amendments thereto. (b) TRANSACTION INFORMATION. The Sub-Adviser shall furnish to the Adviser and the Trust such information concerning portfolio transactions as may be necessary to enable the Adviser, Trust or their designated agents to perform such compliance testing on the Fund and the Sub-Adviser's services as the Adviser and the Trust may, in their sole discretion, determine to be appropriate . . . | (a) COMPLIANCE. The Sub-Adviser agrees to comply with the requirements of the 1940 Act, the Investment Advisers Act of 1940, as amended (the "Advisers Act"), the 1933 Act, the Securities Exchange Act of 1934, as amended (the "1934 Act"), the Commodity Exchange Act and the respective rules and regulations thereunder, as applicable, as well as with all other applicable federal and state laws, rules, regulations and case law that relate to the services and relationships described hereunder and to the conduct of its business as a registered investment adviser. The Sub-Adviser also agrees to comply with the objectives, policies and restrictions set forth in the Registration Statement . . . (c) RECORDKEEPING . . . The Sub-Adviser shall maintain separate books and detailed records of all matters pertaining to the Fund's assets advised by the Sub-Adviser required by Rule 31a-1 under the 1940 Act (other than those records being maintained by the Adviser, or any administrator custodian or transfer agent appointed by the Fund) relating to its responsibilities provided hereunder with respect to the Fund, and shall preserve such records for the periods and in a manner prescribed therefore by Rule 31a-2 under the 1940 Act (the "Fund Books and Records"). |

# EXHIBIT C-1

**Exhibit C1**
**Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | AAM/BAHL & GAYNOR INC GR-A | United States | Value Large Cap | Large-cap | Value | AFNAX | Advisors Asset Management Inc | 259.3 | 0.65 |
| 2 | AB CORE OPPORTUNITIES-A | United States | Value Large Cap | Large-cap | Value | ADGAX | AllianceBernstein LP | 171.8 | 0.55 |
| 3 | AB VALUE FUND-B | United States | Value Large Cap | Large-cap | Value | ABVBX | AllianceBernstein LP | 376.2 | 0.55 |
| 4 | ALLIANZGI NFJ DVD VAL-INST | United States | Value Large Cap | Large-cap | Value | NFJEX | Allianz Global Investors Fund Management LLC | 5,497.3 | 0.7 |
| 5 | ALLIANZGI NFJ L/C VAL-A | United States | Value Large Cap | Large-cap | Value | PNBAX | Allianz Global Investors Fund Management LLC | 517.0 | 0.85 |
| 6 | ALPS/WMC RESEARCH VALUE-A | United States | Value Large Cap | Large-cap | Value | AMWYX | ALPS Advisors Inc | 90.9 | 0.95 |
| 7 | AMER CENT CAPITAL VALUE-INV | United States | Value Large Cap | Large-cap | Value | ACTIX | American Century Investment Management Inc | 143.2 | 1.1 |
| 8 | AMER CENT LARGE CO VALUE-IV | United States | Value Large Cap | Large-cap | Value | ALVIX | American Century Investment Management Inc | 896.8 | 0.84 |
| 9 | AMER CENT NT LARGE COMP V-IS | United States | Value Large Cap | Large-cap | Value | ACLLX | American Century Investment Management Inc | 1,675.9 | 0.64 |
| 10 | AMERICAN BEACON BR L/C VA-A | United States | Value Large Cap | Large-cap | Value | BWLAX | American Beacon Advisors Inc | 2,907.2 | 0.37 |
| 11 | AMERICAN BEACON L/C VALU-IS | United States | Value Large Cap | Large-cap | Value | AADEX | American Beacon Advisors Inc | 8,953.8 | 0.23 |
| 12 | AMERICAN WASH MUT INV-A | United States | Value Large Cap | Large-cap | Value | AWSHX | Capital Research & Management Co | 77,961.6 | 0.24 |
| 13 | AQR L/C MULTI-STYLE FUND-L | United States | Value Large Cap | Large-cap | Value | QCELX | AQR Capital Management LLC | 1,359.7 | 0.3 |
| 14 | ARIEL FOCUS FUND | United States | Value Large Cap | Large-cap | Value | ARFFX | Ariel Investments LLC | 45.2 | 0.65 |
| 15 | ASTON/CORNERSTONE L/C VAL | United States | Value Large Cap | Large-cap | Value | RVALX | Aston Asset Management LLC | 78.5 | 0.7 |
| 16 | ASTON/HERNDON L/C VALUE-N | United States | Value Large Cap | Large-cap | Value | AALIX | Aston Asset Management LLC | 86.3 | 0.7 |
| 17 | BEARLYBULLISH FUND-INVESTOR | United States | Value Large Cap | Large-cap | Value | BRBLX | Alpha + Capital Management | 27.0 | 1 |
| 18 | BECKER VALUE EQUITY FD-RET | United States | Value Large Cap | Large-cap | Value | BVEFX | Becker Capital Management Inc | 350.7 | 0.55 |
| 19 | BERWYN CORNERSTONE FUND | United States | Value Large Cap | Large-cap | Value | BERCX | Chartwell Investment Partners LLC | 17.6 | 0.85 |
| 20 | BISHOP STREET DVD VALUE-I | United States | Value Large Cap | Large-cap | Value | BSLIX | Bishop Street Capital Management Corp | 45.2 | 0.74 |
| 21 | BLACKROCK BASIC VAL FD INC-I | United States | Value Large Cap | Large-cap | Value | MABAX | BlackRock Advisors LLC | 3,688.6 | 0.41 |
| 22 | BLACKROCK EQUITY DIVIDEND-I | United States | Value Large Cap | Large-cap | Value | MADVX | BlackRock Advisors LLC | 21,313.3 | 0.54 |
| 23 | BLACKROCK LARGE CAP VALUE-B | United States | Value Large Cap | Large-cap | Value | MBLVX | BlackRock Advisors LLC | 665.7 | 0.5 |
| 24 | BLACKROCK LRG CAP VALUE-INST | United States | Value Large Cap | Large-cap | Value | MKLVX | BlackRock Advisors LLC | 162.8 | 0.5 |
| 25 | BMO DIVIDEND INCOME-I | United States | Value Large Cap | Large-cap | Value | MDIVX | BMO Asset Management Corp | 115.6 | 0.5 |
| 26 | BMO LARGE CAP VALUE-Y | United States | Value Large Cap | Large-cap | Value | MREIX | BMO Asset Management Corp | 269.5 | 0.5 |
| 27 | BPV LARGE CAP VALUE-ADV | United States | Value Large Cap | Large-cap | Value | BPAAX | BPV Capital Management LLC | 76.7 | 0.65 |
| 28 | BRIDGE BUILDER L/C VALUE | United States | Value Large Cap | Large-cap | Value | BBVLX | Olive Street Investment Advisers LLC | 2,339.5 | 0.44 |
| 29 | BROWN ADV VALUE EQUITY FD-IN | United States | Value Large Cap | Large-cap | Value | BIAVX | Brown Advisory LLC | 55.5 | 0.6 |
| 30 | CALVERT GLOBAL EQUITY INC-A | United States | Value Large Cap | Large-cap | Value | CEIAX | Calvert Investment Management Inc | 39.0 | 0.55 |
| 31 | CALVERT GLOBAL VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | CLVAX | Calvert Investment Management Inc | 113.5 | 0.65 |
| 32 | CALVERT US L/C VAL RES INX-A | United States | Value Large Cap | Large-cap | Value | CFJAX | Calvert Investment Management Inc | 84.5 | 0.27 |
| 33 | CAMBIAR OPPORTUNITY FUND-INV | United States | Value Large Cap | Large-cap | Value | CAMOX | Cambiar Investors LLC | 569.8 | 0.75 |
| 34 | CATALYST INSIDER BUYING FD-A | United States | Value Large Cap | Large-cap | Value | INSAX | Catalyst Capital Advisors LLC | 150.8 | 1 |
| 35 | CATALYST/GROES GTH OF INC-A | United States | Value Large Cap | Large-cap | Value | CGGAX | Catalyst Capital Advisors LLC | 18.1 | 1 |
| 36 | CENTAUR TOTAL RETURN | United States | Value Large Cap | Large-cap | Value | TILDX | Centaur Capital Partners LP | 26.8 | 1.5 |
| 37 | CLEARBRIDGE ALL CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | SHFVX | Legg Mason Partners Fund Advisor LLC | 1,603.6 | 0.74 |
| 38 | CLEARBRIDGE LARGE CAP VAL-I | United States | Value Large Cap | Large-cap | Value | SAIFX | Legg Mason Partners Fund Advisor LLC | 1,491.5 | 0.49 |
| 39 | CLEARBRIDGE TACT DIV INC-C | United States | Value Large Cap | Large-cap | Value | SMDLX | Legg Mason Partners Fund Advisor LLC | 695.3 | 0.75 |
| 40 | CLEARBRIDGE VALUE TRUST-C | United States | Value Large Cap | Large-cap | Value | LMVTX | Clearbridge LLC | 2,285.7 | 0.68 |
| 41 | CLIPPER FUND | United States | Value Large Cap | Large-cap | Value | CFIMX | Davis Selected Advisers LP | 1,065.6 | 0.55 |
| 42 | COHEN & STEERS DIV VALUE-A | United States | Value Large Cap | Large-cap | Value | DVFAX | Cohen & Steers Capital Management Inc | 211.5 | 0.8 |
| 43 | COHO REL VALUE EQUITY-ADV | United States | Value Large Cap | Large-cap | Value | COHOX | Coho Partners Ltd | 313.1 | 0.75 |
| 44 | COLUMBIA DISIPLINED VALUE-A | United States | Value Large Cap | Large-cap | Value | RLCAX | Columbia Management Investment Advisers LLC | 902.2 | 0.73 |
| 45 | COLUMBIA GL EQUITY VALUE-B | United States | Value Large Cap | Large-cap | Value | INEGX | Columbia Management Investment Advisers LLC | 838.1 | 0.7 |
| 46 | COLUMBIA SELECT L/C VAL-A | United States | Value Large Cap | Large-cap | Value | SLVAX | Columbia Management Investment Advisers LLC | 758.3 | 0.74 |

**Exhibit C1**
**Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 47 | CORNERCAP LRG/MID-CAP VALUE | United States | Value Large Cap | Large-cap | Value | CMCRX | CornerCap Investment Counsel Inc | 14.6 | 0.9 |
| 48 | CRM LARGE CAP OPP-INST | United States | Value Large Cap | Large-cap | Value | CRIGX | Cramer Rosenthal McGlynn LLC | 72.1 | 0.75 |
| 49 | CROFT VALUE FUND | United States | Value Large Cap | Large-cap | Value | CLVFX | Croft-Leominster Inc | 59.1 | 0.94 |
| 50 | CULLEN ENHANCED EQUITY-C | United States | Value Large Cap | Large-cap | Value | ENHCX | Cullen Capital Management LLC | 5.2 | 1 |
| 51 | CULLEN HIGH DIVIDEND EQ-RET | United States | Value Large Cap | Large-cap | Value | CHDEX | Cullen Capital Management LLC | 1,872.3 | 1 |
| 52 | CUTLER EQUITY FUND | United States | Value Broad Market | Large-cap | Value | CALEX | Cutler Investment Counsel LLC | 126.7 | 0.75 |
| 53 | DAVIS NEW YORK VENTURE FD-A | United States | Value Large Cap | Large-cap | Value | NYVTX | Davis Selected Advisers LP | 12,224.3 | 0.51 |
| 54 | DEAN MID CAP VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | DALCX | Dean Investment Associates LLC | 17.3 | 0.59 |
| 55 | DELAWARE POOLED TR L/C VL EQ | United States | Value Large Cap | Large-cap | Value | DPDEX | Delaware Management Co | 218.1 | 0.55 |
| 56 | DELAWARE VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | DDVAX | Delaware Management Co | 11,220.0 | 0.52 |
| 57 | DEUTSCHE CROCI EQ DIV-A | United States | Value Large Cap | Large-cap | Value | KDHAX | Deutsche Investment Management Americas Inc | 1,010.2 | 0.72 |
| 58 | DEUTSCHE CROCI US FUND-A | United States | Value Large Cap | Large-cap | Value | DCUAX | Deutsche Investment Management Americas Inc | 6.2 | 0.65 |
| 59 | DEUTSCHE LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | KDCAX | Deutsche Investment Management Americas Inc | 967.6 | 0.42 |
| 60 | DFA US L/C VALUE PORTFOLIO | United States | Value Large Cap | Large-cap | Value | DFLVX | Dimensional Fund Advisors LP | 16,196.0 | 0.35 |
| 61 | DFA US LARGE CAP VALUE-III | United States | Value Large Cap | Large-cap | Value | DFUVX | Dimensional Fund Advisors LP | 2,909.2 | 0.21 |
| 62 | DFA US LRG CAP VALUE PORT II | United States | Value Large Cap | Large-cap | Value | DFCVX | Dimensional Fund Advisors LP | 148.8 | 0.21 |
| 63 | DIAMOND HILL LARGE CAP FD-A | United States | Value Large Cap | Large-cap | Value | DHLAX | Diamond Hill Capital Management Inc/USA | 3,656.3 | 0.5 |
| 64 | DOUBLELINE SH ENH CAPE-I | United States | Value Large Cap | Large-cap | Value | DSEEX | Doubleline Capital LP | 939.6 | 0.45 |
| 65 | DREYFUS CORE EQTY-A | United States | Value Large Cap | Large-cap | Value | DLTSX | Dreyfus Corp/The | 217.3 | 1.1 |
| 66 | DUNHAM LARGE CAP VALUE-C | United States | Value Large Cap | Large-cap | Value | DCLVX | Dunham & Associates Investment Counsel Inc | 54.8 | 0.95 |
| 67 | EAGLE GROWTH & INCOME FD-A | United States | Value Large Cap | Large-cap | Value | HRCVX | Eagle Asset Management Inc | 546.2 | 0.46 |
| 68 | EATON VANCE FOC VALUE OPP-A | United States | Value Large Cap | Large-cap | Value | EAFVX | Eaton Vance Management | 64.8 | 0.75 |
| 69 | EATON VANCE LARGE-CAP VAL-A | United States | Value Large Cap | Large-cap | Value | EHSTX | Boston Management & Research | 3,047.9 | 0.625 |
| 70 | EDGAR LOMAX VALUE FUND | United States | Value Large Cap | Large-cap | Value | LOMAX | Edgar Lomax Co/The | 69.6 | 0.8 |
| 71 | EIC VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | EICVX | Lateef Investment Management LP | 319.5 | 0.75 |
| 72 | FBP EQUITY & DIVIDEND PLUS | United States | Value Large Cap | Large-cap | Value | FBPEX | Davenport & Co LLC | 24.3 | 0.7 |
| 73 | FEDERATED CLOVER VALUE-A | United States | Value Large Cap | Large-cap | Value | VFCAX | Federated Global Investment Management Corp/USA | 688.9 | 0.75 |
| 74 | FEDERATED EQUITY INCOME-A | United States | Value Large Cap | Large-cap | Value | LEIFX | Federated Equity Management Co of Pennsylvania | 1,187.0 | 0.6 |
| 75 | FEDERATED MDT STOCK TRUST-SS | United States | Value Large Cap | Large-cap | Value | FSTKX | Federated MDTA LLC | 550.2 | 0.75 |
| 76 | FEDERATED STRAT VAL DVD-A | United States | Value Large Cap | Large-cap | Value | SVAAX | Federated Equity Management Co of Pennsylvania | 12,682.8 | 0.75 |
| 77 | FIDELITY ADV EQUITY INCOME | United States | Value Large Cap | Large-cap | Value | FLMLX | Fidelity Service Co Inc | 1,659.9 | 0.2 |
| 78 | FIDELITY ADV EQUITY INCOME-T | United States | Value Large Cap | Large-cap | Value | FEIRX | Fidelity Management & Research Co | 2,075.6 | 0.45 |
| 79 | FIDELITY ADV STK SEL LC VA-A | United States | Value Large Cap | Large-cap | Value | FLUAX | Fidelity Service Co Inc | 761.2 | 0.3 |
| 80 | FIDELITY ADV VALUE LEADER-A | United States | Value Large Cap | Large-cap | Value | FVLAX | Fidelity Management & Research Co | 33.3 | 0.6 |
| 81 | FIDELITY BLUE CHIP VALUE | United States | Value Large Cap | Large-cap | Value | FBCVX | Fidelity Management & Research Co | 512.6 | 0.54 |
| 82 | FIDELITY EQUITY DVD INCOME | United States | Value Large Cap | Large-cap | Value | FEQTX | Fidelity Management & Research Co | 5,109.0 | 0.45 |
| 83 | FIDELITY EQUITY-INCOME FD | United States | Value Large Cap | Large-cap | Value | FEQIX | Fidelity Service Co Inc | 7,833.1 | 0.2 |
| 84 | FIDELITY LARGE CAP VALUE ENH | United States | Value Large Cap | Large-cap | Value | FLVEX | FMR Co Inc | 1,785.3 | 0.3 |
| 85 | FIDELITY SER 1000 VAL IDX | United States | Value Large Cap | Large-cap | Value | FIOOX | Fidelity Management & Research Co | 1,759.8 | 0.05 |
| 86 | FIDELITY SER EQUITY INCOME | United States | Value Large Cap | Large-cap | Value | FNKLX | Fidelity Service Co Inc | 11,816.8 | 0.2 |
| 87 | FIDELITY STK SEL L/C VALUE | United States | Value Large Cap | Large-cap | Value | FSLVX | Fidelity Service Co Inc | 761.2 | 0.3 |
| 88 | FIDELITY VALUE DISCOVERY FND | United States | Value Large Cap | Large-cap | Value | FVDFX | Fidelity Management & Research Co | 1,861.1 | 0.61 |
| 89 | FMI LARGE CAP FUND | United States | Value Large Cap | Large-cap | Value | FMIHX | Fiduciary Management Inc | 7,510.9 | 0.75 |
| 90 | FORESTER VALUE FUND | United States | Value Large Cap | Large-cap | Value | FVALX | Forester Capital Management Ltd | 100.3 | 0.89 |
| 91 | FRANKLIN LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | FLVAX | Franklin Advisory Services LLC | 170.9 | 0.75 |
| 92 | FRANKLIN MUTUAL BEACON FD-Z | United States | Value Large Cap | Large-cap | Value | BEGRX | Franklin Mutual Advisers LLC | 3,738.3 | 0.675 |

**Exhibit C1**
**Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 93 | GABELLI DIVIDEND GROWTH-A | United States | Value Large Cap | Large-cap | Value | GBCAX | Gabelli Funds LLC | 26.6 | 1 |
| 94 | GE INST US LG CP CORE EQY-IN | United States | Value Large Cap | Large-cap | Value | GEIVX | GE Asset Management Inc | 57.2 | 0.43 |
| 95 | GLENMEDE LARGE CAP VALUE PTF | United States | Value Large Cap | Large-cap | Value | GTMEX | Glenmede Investment Management LP | 71.7 | 0.55 |
| 96 | GOLDMAN SACHS GROWT & INC-A | United States | Value Large Cap | Large-cap | Value | GSGRX | Goldman Sachs Asset Management LP | 412.5 | 0.7 |
| 97 | GOLDMAN SACHS L/C VALUE FD-I | United States | Value Large Cap | Large-cap | Value | GSLIX | Goldman Sachs Asset Management LP | 1,278.0 | 0.73 |
| 98 | GOLDMAN SACHS US EQ DIV/PR-A | United States | Value Large Cap | Large-cap | Value | GSPAX | Goldman Sachs Asset Management LP | 1,801.7 | 0.72 |
| 99 | GOODHAVEN FUND | United States | Value Large Cap | Large-cap | Value | GOODX | GoodHaven Capital Management LLC | 255.9 | 0.9 |
| 100 | GREAT LAKES L/C VALUE-INS | United States | Value Large Cap | Large-cap | Value | GLLIX | Great Lakes Advisors LLC | 47.9 | 0.6 |
| 101 | GREAT-WEST PUTNAM EQ INC-INI | United States | Value Large Cap | Large-cap | Value | MXQIX | Great-West Capital Management LLC | 546.6 | 0.75 |
| 102 | GREEN OWL INTRINSIC VALUE | United States | Value Large Cap | Large-cap | Value | GOWLX | Kovitz Investment Group Partners LLC | 57.2 | 1 |
| 103 | GS-LG CAP VALUE INSIGHTS-I | United States | Value Large Cap | Large-cap | Value | GCVIX | Goldman Sachs Asset Management LP | 370.3 | 0.6 |
| 104 | GUGGENHEIM L/C VALUE-A | United States | Value Large Cap | Large-cap | Value | SECIX | Guggenheim Partners Investment Management LLC | 57.0 | 0.65 |
| 105 | GUIDEMARK L/C VALUE | United States | Value Large Cap | Large-cap | Value | GMLVX | AssetMark Inc | 116.0 | 0.59 |
| 106 | GUIDESTONE VALUE EQTY-GS4 | United States | Value Large Cap | Large-cap | Value | GVEZX | GuideStone Capital Management LLC | 1,234.8 | 0.33 |
| 107 | HANCOCK HORIZON VALUE-INST | United States | Value Large Cap | Large-cap | Value | HHGTX | Horizon Advisers | 152.2 | 0.8 |
| 108 | HARBOR LARGE CAP VALUE-INST | United States | Value Large Cap | Large-cap | Value | HAVLX | Harbor Capital Advisors Inc | 291.9 | 0.6 |
| 109 | HARTFORD DIVIDEND AND GRTH-A | United States | Value Large Cap | Large-cap | Value | IHGIX | Hartford Funds Management Co LLC | 7,692.4 | 0.61 |
| 110 | HARTFORD DVD & GROWTH HLS-IA | United States | Value Large Cap | Large-cap | Value | HIADX | Hartford Funds Management Co LLC | 3,307.4 | 0.65 |
| 111 | HARTFORD VALUE HLS FD-IA | United States | Value Large Cap | Large-cap | Value | HIAVX | Hartford Funds Management Co LLC | 523.2 | 0.74 |
| 112 | HCM DIVIDEND SECTOR PLUS-A | United States | Value Large Cap | Large-cap | Value | HCMNX | Howard Capital Management Inc/DE | 66.4 | 1.25 |
| 113 | HENNESSY CORNERST VALUE | United States | Value Large Cap | Large-cap | Value | HFCVX | Hennessy Advisors Inc | 125.9 | 0.74 |
| 114 | HENNESSY LARGE VALUE-INST | United States | Value Large Cap | Large-cap | Value | HLVIX | Hennessy Advisors Inc | 132.1 | 0.85 |
| 115 | HENNESSY TOTAL RETURN FUND | United States | Value Large Cap | Large-cap | Value | HDOGX | Hennessy Advisors Inc | 73.1 | 0.6 |
| 116 | HIMCO VIT AMER BLUE CHIP-IB | United States | Value Large Cap | Large-cap | Value | HVICX | Hartford Funds Management Co LLC | 38.3 | 0.75 |
| 117 | HOMESTEAD VALUE FUND | United States | Value Large Cap | Large-cap | Value | HOVLX | RE Advisers Corp | 900.5 | 0.47 |
| 118 | HOTCHKIS & WILEY DIV VALUE-A | United States | Value Large Cap | Large-cap | Value | HWCAX | Hotchkis and Wiley Capital Management LLC | 428.1 | 0.75 |
| 119 | HOTCHKIS & WILEY L/C VALUE-I | United States | Value Large Cap | Large-cap | Value | HWLIX | Hotchkis and Wiley Capital Management LLC | 495.6 | 0.75 |
| 120 | HUBER CAP DIV L/C VAL-INST | United States | Value Large Cap | Large-cap | Value | HUDEX | Huber Capital Management LLC | 6.6 | 0.75 |
| 121 | HUBER CAPITAL EQUITY INC-IV | United States | Value Large Cap | Large-cap | Value | HULIX | Huber Capital Management LLC | 92.7 | 0.99 |
| 122 | INVESCO DIVERSIFIED DVD-A | United States | Value Large Cap | Large-cap | Value | LCEAX | Invesco Advisers Inc | 15,000.8 | 0.41 |
| 123 | INVESCO DIVIDEND INCOME-INV | United States | Value Large Cap | Large-cap | Value | FSTUX | Invesco Advisers Inc | 1,475.5 | 0.71 |
| 124 | IVY DIVIDEND OPP FUND-A | United States | Value Large Cap | Large-cap | Value | IVDAX | Ivy Investment Management Co | 345.6 | 0.7 |
| 125 | IVY VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | IYVAX | Ivy Investment Management Co | 263.3 | 0.7 |
| 126 | JOHN HANCOCK III-DISCPLN V-A | United States | Value Large Cap | Large-cap | Value | JVLAX | John Hancock Advisers LLC | 13,321.0 | 0.66 |
| 127 | JOHN HANCOCK L/C EQUITY-A | United States | Value Large Cap | Large-cap | Value | TAGRX | John Hancock Advisers LLC | 3,753.8 | 0.62 |
| 128 | JOHN HANCOCK LRG CAP VAL-A | United States | Value Large Cap | Large-cap | Value | JFVAX | John Hancock Advisers LLC | 1,209.3 | 0.62 |
| 129 | JOHN HANCOCK VALUE EQTY-A | United States | Value Large Cap | Large-cap | Value | JVEAX | John Hancock Advisers LLC | 1.1 | 0.8 |
| 130 | JPMORGAN EQUITY INCOME-SEL | United States | Value Large Cap | Large-cap | Value | HLIEX | JP Morgan Investment Management Inc | 11,508.4 | 0.4 |
| 131 | JPMORGAN INTREPID VALUE-SEL | United States | Value Large Cap | Large-cap | Value | JPIVX | JP Morgan Investment Management Inc | 1,716.5 | 0.4 |
| 132 | JPMORGAN LARGE CAP VALUE-SEL | United States | Value Large Cap | Large-cap | Value | HLQVX | JP Morgan Investment Management Inc | 729.9 | 0.4 |
| 133 | KNIGHTS OF COLUM L/C VAL-INS | United States | Value Large Cap | Large-cap | Value | KCVIX | Knights of Columbus Asset Advisors LLC | 24.1 | 0.6 |
| 134 | LEGG MASON BW DIV L/C VAL-A | United States | Value Large Cap | Large-cap | Value | LBWAX | Legg Mason Partners Fund Advisor LLC | 872.3 | 0.751 |
| 135 | LM BW DYNAM LRG CAP VAL-A | United States | Value Large Cap | Large-cap | Value | LMBJX | Legg Mason Partners Fund Advisor LLC | 27.8 | 0.55 |
| 136 | LOOMIS SAYLES VALUE FUND-Y | United States | Value Large Cap | Large-cap | Value | LSGIX | Loomis Sayles & Co LP | 1,454.9 | 0.5 |
| 137 | LORD ABBETT AFFILIATED-A | United States | Value Large Cap | Large-cap | Value | LAFFX | Lord Abbett & Co LLC | 6,137.4 | 0.31 |
| 138 | LORD ABBETT CAL L/C VAL-A | United States | Value Large Cap | Large-cap | Value | LCAAX | Lord Abbett Distributor LLC | 420.9 | 0.6 |

**Exhibit C1**
**Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 139 | LORD ABBETT FUNDMTL EQ-A | United States | Value Large Cap | Large-cap | Value | LDFVX | Lord Abbett & Co LLC | 3,041.1 | 0.75 |
| 140 | LSV CONSERVATIVE VALUE EQ | United States | Value Large Cap | Large-cap | Value | LSVVX | LSV Asset Management | 93.2 | 0.38 |
| 141 | LSV VALUE EQUITY FUND | United States | Value Large Cap | Large-cap | Value | LSVEX | LSV Asset Management | 1,663.3 | 0.55 |
| 142 | LWAS/DFA US HIGH BOOK TO MKT | United States | Value Large Cap | Large-cap | Value | DFBMX | Dimensional Fund Advisors LP | 54.5 | 0.21 |
| 143 | LYRICAL US VALUE EQUITY-INST | United States | Value Large Cap | Large-cap | Value | LYRIX | Lyrical Asset Management LP | 993.3 | 1.25 |
| 144 | M LARGE CAP VALUE FUND | United States | Value Large Cap | Large-cap | Value | MBOVX | M Financial Investment Advisers Inc | 88.0 | 0.45 |
| 145 | MADISON DVD INC FUND | United States | Value Large Cap | Large-cap | Value | BHBFX | Madison Asset Management LLC | 89.0 | 0.75 |
| 146 | MADISON LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | MGWAX | Madison Asset Management LLC | 114.7 | 0.55 |
| 147 | MASSMUTUAL PR VALUE FUND-AD | United States | Value Large Cap | Large-cap | Value | DLBVX | MML Investment Advisers LLC | 62.1 | 0.5 |
| 148 | MASSMUTUAL PREM DISC VALUE-A | United States | Value Large Cap | Large-cap | Value | MEPAX | MML Investment Advisers LLC | 308.1 | 0.45 |
| 149 | MASSMUTUAL SEL DIVER VAL-A | United States | Value Large Cap | Large-cap | Value | MDDAX | MML Investment Advisers LLC | 346.1 | 0.5 |
| 150 | MASSMUTUAL SEL FUNDA VAL-R5 | United States | Value Large Cap | Large-cap | Value | MVUSX | MML Investment Advisers LLC | 1,256.4 | 0.6 |
| 151 | MASSMUTUAL SELECT L/C VAL-R5 | United States | Value Large Cap | Large-cap | Value | MLVSX | MML Investment Advisers LLC | 212.8 | 0.6 |
| 152 | MATRIX ADVISORS VALUE FUND | United States | Value Large Cap | Large-cap | Value | MAVFX | Matrix Asset Advisors Inc | 55.9 | 0.75 |
| 153 | MERITAGE VALUE EQUITY-INST | United States | Value Large Cap | Large-cap | Value | MVEBX | Meritage Portfolio Management Inc | 14.0 | 0.75 |
| 154 | MFS INSTL LARGE CAP VALUE | United States | Value Large Cap | Large-cap | Value | MIVLX | Massachusetts Financial Services Co | 55.4 | 0.55 |
| 155 | MFS VALUE FUND-B | United States | Value Large Cap | Large-cap | Value | MFEBX | Massachusetts Financial Services Co | 36,730.3 | 0.52 |
| 156 | MUNDOVAL FUND | United States | Value Large Cap | Large-cap | Value | MUNDX | Mundoval Capital Management Inc | 18.6 | 1.5 |
| 157 | NATIONW ZIEGLR EQ INC-A | United States | Value Large Cap | Large-cap | Value | NWGYX | Nationwide Fund Advisors | 724.3 | 0.51 |
| 158 | NATIXIS OAKMARK FUND-A | United States | Value Large Cap | Large-cap | Value | NEFOX | NGAM Advisors LP | 233.9 | 0.7 |
| 159 | NEIMAN LARGE CAP VALUE | United States | Value Large Cap | Large-cap | Value | NEIMX | Neiman Funds Management LLC | 28.0 | 1 |
| 160 | NEUBERGER BER MU/C OPP-A | United States | Value Large Cap | Large-cap | Value | NMUAX | Neuberger Berman Management LLC | 1,943.3 | 0.77 |
| 161 | NEUBERGER BERM DVD GROW-A | United States | Value Large Cap | Large-cap | Value | NDGAX | Neuberger Berman Investment Advisers LLC | 18.3 | 0.76 |
| 162 | NEUBERGER BERMAN GUARDIAN-IV | United States | Value Large Cap | Large-cap | Value | NGUAX | Neuberger Berman Management LLC | 1,120.6 | 0.75 |
| 163 | NEUBERGER BERMAN L/C VAL-INV | United States | Value Large Cap | Large-cap | Value | NPRTX | Neuberger Berman Management LLC | 1,270.4 | 0.75 |
| 164 | NEUBERGER BERMAN VALUE FD-IN | United States | Value Large Cap | Large-cap | Value | NLRLX | Neuberger Berman Management LLC | 12.6 | 0.7 |
| 165 | NORTHERN LARGE CAP VALU FUND | United States | Value Large Cap | Large-cap | Value | NOLVX | Northern Trust Investments Inc | 88.6 | 0.83 |
| 166 | NORTHPOINTE LRG CAP VAL-INST | United States | Value Large Cap | Large-cap | Value | NPILX | NorthPointe Capital LLC | 23.6 | 0.5 |
| 167 | NUVEEN LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | NNGAX | Nuveen Fund Advisors LLC | 376.0 | 0.7 |
| 168 | NUVEEN NWQ LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | NQCAX | Nuveen Fund Advisors LLC | 116.9 | 0.7 |
| 169 | OAKMARK FUND-I | United States | Value Large Cap | Large-cap | Value | OAKMX | Harris Associates LP | 15,408.5 | 0.72 |
| 170 | OPPENHEIMER EQUITY INCOME-A | United States | Value Large Cap | Large-cap | Value | OAEIX | OFI Global Asset Management Inc | 4,489.6 | 0.53 |
| 171 | OPPENHEIMER RISING DIV-A | United States | Value Large Cap | Large-cap | Value | OARDX | OFI Global Asset Management Inc | 4,719.7 | 0.58 |
| 172 | OPPENHEIMER VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | CGRWX | OFI Global Asset Management Inc | 1,961.1 | 0.47 |
| 173 | OPTIMUM LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | OALVX | Delaware Management Co | 1,382.9 | 0.7 |
| 174 | O'SHAUGHNESSY ENH DIV-I | United States | Value Large Cap | Large-cap | Value | OFDIX | O'Shaughnessy Asset Management LLC | 20.3 | 0.65 |
| 175 | PACE LARGE CO VALUE EQ INV-P | United States | Value Large Cap | Large-cap | Value | PCLVX | UBS Asset Management Americas Inc | 1,294.7 | 0.64 |
| 176 | PACIFIC ADVISORS L/C VAL-A | United States | Value Large Cap | Large-cap | Value | PAGTX | Pacific Global Investment Management Co | 7.6 | 0.75 |
| 177 | PACIFIC FNDS LRG CAP VAL-A | United States | Value Large Cap | Large-cap | Value | PFAAX | Pacific Life Fund Advisors LLC | 4.0 | 0.65 |
| 178 | PARAMETRIC DIV INCOME-INS | United States | Value Large Cap | Large-cap | Value | EIPDX | Eaton Vance Management | 4.7 | 0.55 |
| 179 | PAYDEN EQUITY INCOME FUND | United States | Value Large Cap | Large-cap | Value | PYVLX | Payden & Rygel | 700.0 | 0.5 |
| 180 | PAYSON TOTAL RETURN FUND | United States | Value Large Cap | Large-cap | Value | PBFDX | HM Payson & Co | 74.4 | 0.6 |
| 181 | PERKINS L/C VALUE-A | United States | Value Large Cap | Large-cap | Value | JAPAX | Janus Capital Management LLC | 160.0 | 0.51 |
| 182 | PIONEER CORE EQUITY FD-A | United States | Value Large Cap | Large-cap | Value | PIOTX | Pioneer Investment Management Inc | 1,435.8 | 0.5 |
| 183 | PIONEER DISCIPLINED VALUE-A | United States | Value Large Cap | Large-cap | Value | CVFCX | Pioneer Investment Management Inc | 581.5 | 0.65 |
| 184 | PNC LARGE CAP VALUE FUND | United States | Value Large Cap | Large-cap | Value | PLIVX | PNC Capital Advisors LLC | 113.5 | 0.75 |

**Exhibit C1**
**Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 185 | POPLAR FOREST PARTNERS-A | United States | Value Large Cap | Large-cap | Value | PFPFX | Poplar Forest Capital LLC | 553.7 | 0.89 |
| 186 | POWER DIVIDEND INDEX-A | United States | Value Large Cap | Large-cap | Value | PWDAX | WE Donoghue & Co Inc | 420.2 | 1 |
| 187 | PRAXIS VALUE INDEX FD-A | United States | Value Large Cap | Large-cap | Value | MVIAX | Everence Capital Management Inc | 139.0 | 0.3 |
| 188 | PRINCIPAL EQUITY INC-I | United States | Value Large Cap | Large-cap | Value | PEIIX | Principal Management Corp | 5,352.7 | 0.51 |
| 189 | PRINCIPAL INV L/C VALUE-INST | United States | Value Large Cap | Large-cap | Value | PVLIX | Principal Management Corp | 2,249.5 | 0.41 |
| 190 | PRINCIPAL L/C VALUE III-R-IN | United States | Value Large Cap | Large-cap | Value | PLVIX | Principal Management Corp | 1,740.8 | 0.77 |
| 191 | PROFUNDS LARGE CAP VALUE-S | United States | Value Large Cap | Large-cap | Value | LVPSX | ProFund Advisors LLC | 11.8 | 0.75 |
| 192 | PRUDENTIAL JENNISON VALUE-A | United States | Value Large Cap | Large-cap | Value | PBEAX | Prudential Investments LLC | 507.6 | 0.6 |
| 193 | PRUDENTIAL QMA STRAT VAL-A | United States | Value Large Cap | Large-cap | Value | SUVAX | Prudential Investments LLC | 343.6 | 0.8 |
| 194 | PUTNAM EQUITY INCOME FUND-A | United States | Value Large Cap | Large-cap | Value | PEYAX | Putnam Investment Management LLC | 6,060.1 | 0.47 |
| 195 | PUTNAM FD FOR GRWTH & INC-A | United States | Value Large Cap | Large-cap | Value | PGRWX | Putnam Investment Management LLC | 4,727.5 | 0.47 |
| 196 | QS S&P 500 INDEX FUND - A | United States | Value Large Cap | Large-cap | Value | SBSPX | Legg Mason Partners Fund Advisor LLC | 235.0 | 0.25 |
| 197 | RATIONAL DVD CAPTURE F-INV A | United States | Value Large Cap | Large-cap | Value | HDCAX | Rational Advisors Inc | 90.6 | 0.75 |
| 198 | RIDGEWORTH L/C VAL EQTY-A | United States | Value Large Cap | Large-cap | Value | SVIIX | RidgeWorth Capital Management LLC | 2,110.6 | 0.65 |
| 199 | RIVERPARK FOCUSED VALUE-INST | United States | Value Large Cap | Large-cap | Value | RFVIX | RiverPark Advisors LLC | 42.2 | 0.65 |
| 200 | RNC GENTER DIVIDEND INCOME | United States | Value Large Cap | Large-cap | Value | GDIIX | RNC Genter Capital Management LLC | 13.8 | 0.9 |
| 201 | ROYCE SPEC EQ MULTI-CAP-SERV | United States | Value Large Cap | Large-cap | Value | RSEMX | Royce & Associates LLC | 243.2 | 0.85 |
| 202 | RX DYANMIC STOCK FUND-I | United States | Value Large Cap | Large-cap | Value | FMGRX | RiskX Investments LLC | 13.7 | 1.16 |
| 203 | RYDEX SERIES INV S&P 500-INV | United States | Value Large Cap | Large-cap | Value | RYURX | Security Investors LLC | 185.0 | 0.9 |
| 204 | SA US VALUE FUND | United States | Value Large Cap | Large-cap | Value | SABTX | LWI Financial Inc | 516.5 | 0.55 |
| 205 | SARATOGA LARGE CAP VALUE-I | United States | Value Large Cap | Large-cap | Value | SLCVX | CLS Investments LLC | 20.8 | 0.65 |
| 206 | SCHWAB DIVIDEND EQUITY-SEL | United States | Value Large Cap | Large-cap | Value | SWDSX | Charles Schwab Investment Management Inc | 1,681.7 | 0.62 |
| 207 | SEI LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | TRMVX | SEI Investments Management Corp | 1,299.7 | 0.35 |
| 208 | SELECTED AMERICAN SHARES-S | United States | Value Large Cap | Large-cap | Value | SLASX | Davis Selected Advisers LP | 2,721.8 | 0.55 |
| 209 | SENTINEL VP COMMON STOCK | United States | Value Large Cap | Large-cap | Value | VSVPCSV | Sentinel Asset Management Inc/VT | 153.9 | 0.5 |
| 210 | SIMS TOTAL RETURN FUND INC | United States | Value Large Cap | Large-cap | Value | SIMFX | Arnold Investment Counsel Inc | 9.4 | 0.74 |
| 211 | SMEAD VALUE FUND-INV | United States | Value Large Cap | Large-cap | Value | SMVLX | Smead Capital Management Inc | 922.4 | 0.75 |
| 212 | SNOW CAPITAL INDEX PLUS-A | United States | Value Large Cap | Large-cap | Value | SPLAX | Snow Capital Management LP | 0.3 | 0.5 |
| 213 | SOUND SHORE FUND INC-INV | United States | Value Large Cap | Large-cap | Value | SSHFX | Sound Shore Management Inc | 1,870.1 | 0.75 |
| 214 | SPIRIT OF AMERICA L/C VAL | United States | Value Large Cap | Large-cap | Value | SOAVX | Spirit of America Management Corp | 71.3 | 0.97 |
| 215 | STERLING CAP BEH LG CP VAL-I | United States | Value Large Cap | Large-cap | Value | BBISX | Sterling Capital Management LLC | 273.3 | 0.7 |
| 216 | STOCK DIVIDEND FUND INC | United States | Value Large Cap | Large-cap | Value | SDIVX | Adams Asset Advisors LLC | 31.9 | 0.85 |
| 217 | STRATEGIC ADVISERS VALUE FD | United States | Value Large Cap | Large-cap | Value | FVSAX | Aristotle Capital Management LLC | 11,021.4 | 0.43 |
| 218 | STRATEGIC ADVISERS VALUE MM | United States | Value Large Cap | Large-cap | Value | FKMOX | Strategic Advisers Inc | 15.5 | 0.52 |
| 219 | SUNAMERICA FOC DVD STRATG-A | United States | Value Large Cap | Large-cap | Value | FDSAX | SunAmerica Asset Management LLC | 10,970.4 | 0.45 |
| 220 | T ROWE PRICE INST L/C VALUE | United States | Value Large Cap | Large-cap | Value | TILCX | T Rowe Price Associates Inc | 2,655.0 | 0.55 |
| 221 | T ROWE PRICE VALUE FUND | United States | Value Large Cap | Large-cap | Value | TRVLX | T Rowe Price Associates Inc | 22,287.3 | 0.35 |
| 222 | TA PARTNERS LARGE CORE-INV | United States | Value Large Cap | Large-cap | Value | DVGIX | Transamerica Asset Management Inc | 89.7 | 0.6 |
| 223 | TA PARTNERS LARGE VALUE-INV | United States | Value Large Cap | Large-cap | Value | DVEIX | Transamerica Asset Management Inc | 321.5 | 0.45 |
| 224 | TCW CONCENTRATED VALUE FUND | United States | Value Large Cap | Large-cap | Value | TGFVX | TCW Investment Management Co/USA | 10.6 | 0.65 |
| 225 | TCW RELATIVE VALUE L/C-N | United States | Value Large Cap | Large-cap | Value | TGDVX | TCW Investment Management Co/USA | 617.1 | 0.75 |
| 226 | THE PROFIT FUND | United States | Value Large Cap | Large-cap | Value | PVALX | Profit Investment Management LLC | 15.8 | 0.75 |
| 227 | THE TORRAY FUND | United States | Value Large Cap | Large-cap | Value | TORYX | Torray LLC | 399.7 | 1 |
| 228 | THORNBURG VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | TVAFX | Thornburg Investment Management Inc | 903.2 | 0.85 |
| 229 | THRIVENT LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | AAUTX | Thrivent Asset Management LLC | 786.6 | 0.45 |
| 230 | TIAA CREF EN L/C VAL IND-INS | United States | Value Large Cap | Large-cap | Value | TEVIX | Teachers Advisors Inc | 1,981.3 | 0.33 |

**Exhibit C1**
**Advisory Fees Paid by U.S. Large-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 231 | TIAA-CREF L/C VAL INDX-INST | United States | Value Large Cap | Large-cap | Value | TILVX | Teachers Advisors Inc | 4,024.6 | 0.04 |
| 232 | TIAA-CREF LARGE CAP VAL-INST | United States | Value Large Cap | Large-cap | Value | TRLIX | Teachers Advisors Inc | 5,648.2 | 0.4 |
| 233 | TIAA-CREF LIFE LRG CAP VAL | United States | Value Large Cap | Large-cap | Value | TLLVX | Teachers Advisors Inc | 65.8 | 0.24 |
| 234 | TIMOTHY PL LRG/MID CAP VAL-A | United States | Value Large Cap | Large-cap | Value | TLVAX | Timothy Partners Ltd | 173.3 | 0.85 |
| 235 | TOUCHSTONE VALUE-A | United States | Value Large Cap | Large-cap | Value | TVLAX | Touchstone Advisors Inc | 349.6 | 0.65 |
| 236 | TRANSAMERICA DIVID FOCUS-A | United States | Value Large Cap | Large-cap | Value | TDFAX | Transamerica Asset Management Inc | 1,461.1 | 0.67 |
| 237 | TRANSAMERICA LARG CAP VAL-A | United States | Value Large Cap | Large-cap | Value | TWQAX | Transamerica Asset Management Inc | 1,933.2 | 0.65 |
| 238 | TRANSPARENT VAL ALL VI-I | United States | Value Large Cap | Large-cap | Value | TVPLX | Guggenheim Partners Investment Management LLC | 7.5 | 0.95 |
| 239 | TRANSPARENT VALUE DVD-A | United States | Value Large Cap | Large-cap | Value | TVEAX | Guggenheim Partners Investment Management LLC | 20.1 | 0.95 |
| 240 | TRANSPARENT VALUE L/C VAL-A | United States | Value Large Cap | Large-cap | Value | TVVAX | Guggenheim Partners Investment Management LLC | 3.0 | 0.95 |
| 241 | TS&W EQUITY PORTFOLIO-INSTL | United States | Value Large Cap | Large-cap | Value | TSWEX | Thompson Siegel & Walmsley LLC | 42.7 | 0.75 |
| 242 | UBS US LARGE CAP EQUITY-P | United States | Value Large Cap | Large-cap | Value | BPEQX | UBS Asset Management Americas Inc | 28.1 | 0.7 |
| 243 | UNION ST PARTNERS VALUE-A | United States | Value Large Cap | Large-cap | Value | USPVX | McGinn Investment Management Inc | 20.8 | 1 |
| 244 | USAA VALUE FUND | United States | Value Large Cap | Large-cap | Value | UVALX | USAA Asset Management Co | 797.1 | 0.75 |
| 245 | VANGUARD EQUITY INCOME-INV | United States | Value Large Cap | Large-cap | Value | VEIPX | Wellington Management Group LLP | 20,761.5 | 0.24 |
| 246 | VANGUARD HI DVD YLD INDX-INV | United States | Value Large Cap | Large-cap | Value | VHDYX | Vanguard Group Inc/The | 4,947.1 | 0.14 |
| 247 | VANGUARD MEGA CAP VALUE-INST | United States | Value Large Cap | Large-cap | Value | VMVLX | Vanguard Group Inc/The | 223.8 | 0.05 |
| 248 | VANGUARD RUSSELL 1000 VA-INS | United States | Value Large Cap | Large-cap | Value | VRVIX | Vanguard Group Inc/The | 1,360.2 | 0.06 |
| 249 | VANGUARD S&P 500 VAL IDX-INS | United States | Value Large Cap | Large-cap | Value | VSPVX | Vanguard Group Inc/The | 9.5 | 0.06 |
| 250 | VANGUARD U.S. VALUE FUND | United States | Value Large Cap | Large-cap | Value | VUVLX | Vanguard Group Inc/The | 1,344.0 | 0.24 |
| 251 | VANGUARD VALUE INDEX-INV | United States | Value Large Cap | Large-cap | Value | VIVAX | Vanguard Group Inc/The | 19,922.2 | 0.19 |
| 252 | VANGUARD WINDSOR II-INV | United States | Value Large Cap | Large-cap | Value | VWNFX | Barrow Hanley Mewhinney & Strauss LLC | 45,413.0 | 0.32 |
| 253 | VANGUARD WINDSOR-INV | United States | Value Large Cap | Large-cap | Value | VWNDX | Pzena Investment Management LLC | 16,727.5 | 0.37 |
| 254 | VANTAGEPOINT EQUITY INC-INV | United States | Value Large Cap | Large-cap | Value | VPEIX | Vantagepoint Investment Advisers LLC | 1,866.6 | 0.4 |
| 255 | VIRTUS QUALITY L/C VAL-A | United States | Value Large Cap | Large-cap | Value | PPTAX | Virtus Investment Advisers Inc | 63.7 | 0.75 |
| 256 | VOYA LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | IEDAX | Voya Investments LLC | 930.8 | 0.75 |
| 257 | VULCAN VALUE PARTNERS FUND | United States | Value Large Cap | Large-cap | Value | VVPLX | Vulcan Value Partners LLC | 1,490.1 | 1 |
| 258 | WADDELL & REED ADV DVD-A | United States | Value Large Cap | Large-cap | Value | WDVAX | Waddell & Reed Investment Management Co | 535.3 | 0.7 |
| 259 | WADDELL&REED ADV VALUE-A | United States | Value Large Cap | Large-cap | Value | WVAAX | Waddell & Reed Investment Management Co | 729.8 | 0.7 |
| 260 | WASATCH-LARGE CAP VALUE FUND | United States | Value Large Cap | Large-cap | Value | FMIEX | Wasatch Advisors Inc | 209.7 | 0.9 |
| 261 | WEITZ VALUE FUND-INV | United States | Value Large Cap | Large-cap | Value | WVALX | Weitz Investment Management Inc | 925.3 | 0.89 |
| 262 | WESTWOOD LARGECAP VALUE-INST | United States | Value Large Cap | Large-cap | Value | WHGLX | CBRE Clarion Securities LLC | 183.0 | 0.7 |
| 263 | WF C&B LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | CBEAX | Wells Fargo Funds Management LLC | 249.4 | 0.7 |
| 264 | WF INTRINSIC VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | EIVAX | Wells Fargo Funds Management LLC | 1,032.8 | 0.68 |
| 265 | WF LARGE COMPANY VALUE-A | United States | Value Large Cap | Large-cap | Value | WLCAX | Wells Fargo Funds Management LLC | 251.8 | 0.7 |
| 266 | WILLIAM BLAIR L/C VALUE-I | United States | Value Large Cap | Large-cap | Value | BLVIX | William Blair Investment Management LLC | 2.8 | 0.7 |
| 267 | WILSHIRE MUTUAL L/C VAL-INV | United States | Value Large Cap | Large-cap | Value | DTLVX | Wilshire Associates Inc | 194.8 | 0.75 |

# EXHIBIT C-2

**Exhibit C2**
**Advisory Fees Paid by Large U.S. Large-Cap Value Mutual Funds**
**(only funds with net assets > $1 billion; listed in descending order of fees)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 1 | CULLEN HIGH DIVIDEND EQ-RET | United States | Value Large Cap | Large-cap | Value | CHDEX | Cullen Capital Management LLC | 1,872.3 | 1 |
| 2 | VULCAN VALUE PARTNERS FUND | United States | Value Large Cap | Large-cap | Value | VVPLX | Vulcan Value Partners LLC | 1,490.1 | 1 |
| 3 | NEUBERGER BER MU/C OPP-A | United States | Value Large Cap | Large-cap | Value | NMUAX | Neuberger Berman Management LLC | 1,943.3 | 0.77 |
| 4 | PRINCIPAL L/C VALUE III-R-IN | United States | Value Large Cap | Large-cap | Value | PLVIX | Principal Management Corp | 1,740.8 | 0.77 |
| 5 | FEDERATED STRAT VAL DVD-A | United States | Value Large Cap | Large-cap | Value | SVAAX | Federated Equity Management Co of Pennsylvania | 12,682.8 | 0.75 |
| 6 | FMI LARGE CAP FUND | United States | Value Large Cap | Large-cap | Value | FMIHX | Fiduciary Management Inc | 7,510.9 | 0.75 |
| 7 | LORD ABBETT FUNDMTL EQ-A | United States | Value Large Cap | Large-cap | Value | LDFVX | Lord Abbett & Co LLC | 3,041.1 | 0.75 |
| 8 | SOUND SHORE FUND INC-INV | United States | Value Large Cap | Large-cap | Value | SSHFX | Sound Shore Management Inc | 1,870.1 | 0.75 |
| 9 | NEUBERGER BERMAN L/C VAL-INV | United States | Value Large Cap | Large-cap | Value | NPRTX | Neuberger Berman Management LLC | 1,270.4 | 0.75 |
| 10 | NEUBERGER BERMAN GUARDIAN-IV | United States | Value Large Cap | Large-cap | Value | NGUAX | Neuberger Berman Management LLC | 1,120.6 | 0.75 |
| 11 | CLEARBRIDGE ALL CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | SHFVX | Legg Mason Partners Fund Advisor LLC | 1,603.6 | 0.74 |
| 12 | GOLDMAN SACHS L/C VALUE FD-I | United States | Value Large Cap | Large-cap | Value | GSLIX | Goldman Sachs Asset Management LP | 1,278.0 | 0.73 |
| 13 | OAKMARK FUND-I | United States | Value Large Cap | Large-cap | Value | OAKMX | Harris Associates LP | 15,408.5 | 0.72 |
| 14 | GOLDMAN SACHS US EQ DIV/PR-A | United States | Value Large Cap | Large-cap | Value | GSPAX | Goldman Sachs Asset Management LP | 1,801.7 | 0.72 |
| 15 | DEUTSCHE CROCI EQ DIV-A | United States | Value Large Cap | Large-cap | Value | KDHAX | Deutsche Investment Management Americas Inc | 1,010.2 | 0.72 |
| 16 | INVESCO DIVIDEND INCOME-INV | United States | Value Large Cap | Large-cap | Value | FSTUX | Invesco Advisers Inc | 1,475.5 | 0.71 |
| 17 | ALLIANZGI NFJ DVD VAL-INST | United States | Value Large Cap | Large-cap | Value | NFJEX | Allianz Global Investors Fund Management LLC | 5,497.3 | 0.7 |
| 18 | OPTIMUM LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | OALVX | Delaware Management Co | 1,382.9 | 0.7 |
| 19 | CLEARBRIDGE VALUE TRUST-C | United States | Value Large Cap | Large-cap | Value | LMVTX | Clearbridge LLC | 2,285.7 | 0.68 |
| 20 | WF INTRINSIC VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | EIVAX | Wells Fargo Funds Management LLC | 1,032.8 | 0.68 |
| 21 | FRANKLIN MUTUAL BEACON FD-Z | United States | Value Large Cap | Large-cap | Value | BEGRX | Franklin Mutual Advisers LLC | 3,738.3 | 0.675 |
| 22 | TRANSAMERICA DIVID FOCUS-A | United States | Value Large Cap | Large-cap | Value | TDFAX | Transamerica Asset Management Inc | 1,461.1 | 0.67 |
| 23 | JOHN HANCOCK III-DISCPLN V-A | United States | Value Large Cap | Large-cap | Value | JVLAX | John Hancock Advisers LLC | 13,321.0 | 0.66 |
| 24 | HARTFORD DVD & GROWTH HLS-IA | United States | Value Large Cap | Large-cap | Value | HIADX | Hartford Funds Management Co LLC | 3,307.4 | 0.65 |
| 25 | RIDGEWORTH L/C VAL EQTY-A | United States | Value Large Cap | Large-cap | Value | SVIIX | RidgeWorth Capital Management LLC | 2,110.6 | 0.65 |
| 26 | TRANSAMERICA LARG CAP VAL-A | United States | Value Large Cap | Large-cap | Value | TWQAX | Transamerica Asset Management Inc | 1,933.2 | 0.65 |
| 27 | AMER CENT NT LARGE COMP V-IS | United States | Value Large Cap | Large-cap | Value | ACLIX | American Century Investment Management Inc | 1,675.9 | 0.64 |
| 28 | PACE LARGE CO VALUE EQ INV-P | United States | Value Large Cap | Large-cap | Value | PCLVX | UBS Asset Management Americas Inc | 1,294.7 | 0.64 |
| 29 | EATON VANCE LARGE-CAP VAL-A | United States | Value Large Cap | Large-cap | Value | EHSTX | Boston Management & Research | 3,047.9 | 0.625 |
| 30 | JOHN HANCOCK L/C EQUITY-A | United States | Value Large Cap | Large-cap | Value | TAGRX | John Hancock Advisers LLC | 3,753.8 | 0.62 |
| 31 | SCHWAB DIVIDEND EQUITY-SEL | United States | Value Large Cap | Large-cap | Value | SWDSX | Charles Schwab Investment Management Inc | 1,681.7 | 0.62 |
| 32 | JOHN HANCOCK LRG CAP VAL-A | United States | Value Large Cap | Large-cap | Value | JFVAX | John Hancock Advisers LLC | 1,209.3 | 0.62 |
| 33 | HARTFORD DIVIDEND AND GRTH-A | United States | Value Large Cap | Large-cap | Value | IHGIX | Hartford Funds Management Co LLC | 7,692.4 | 0.61 |
| 34 | FIDELITY VALUE DISCOVERY FND | United States | Value Large Cap | Large-cap | Value | FVDFX | Fidelity Management & Research Co | 1,861.1 | 0.61 |
| 35 | MASSMUTUAL SEL FUNDA VAL-RS | United States | Value Large Cap | Large-cap | Value | MVUSX | MML Investment Advisers LLC | 1,256.4 | 0.6 |
| 36 | FEDERATED EQUITY INCOME-A | United States | Value Large Cap | Large-cap | Value | LEIFX | Federated Equity Management Co of Pennsylvania | 1,187.0 | 0.6 |
| 37 | OPPENHEIMER RISING DIV-A | United States | Value Large Cap | Large-cap | Value | OARDX | OFI Global Asset Management Inc | 4,719.7 | 0.58 |
| 38 | SELECTED AMERICAN SHARES-S | United States | Value Large Cap | Large-cap | Value | SLASX | Davis Selected Advisers LP | 2,721.8 | 0.55 |
| 39 | T ROWE PRICE INST L/C VALUE | United States | Value Large Cap | Large-cap | Value | TILCX | T Rowe Price Associates Inc | 2,655.0 | 0.55 |
| 40 | LSV VALUE EQUITY FUND | United States | Value Large Cap | Large-cap | Value | LSVEX | LSV Asset Management | 1,663.3 | 0.55 |
| 41 | CLIPPER FUND | United States | Value Large Cap | Large-cap | Value | CFIMX | Davis Selected Advisers LP | 1,065.6 | 0.55 |
| 42 | BLACKROCK EQUITY DIVIDEND-I | United States | Value Large Cap | Large-cap | Value | MADVX | BlackRock Advisors LLC | 21,313.3 | 0.54 |
| 43 | OPPENHEIMER EQUITY INCOME-A | United States | Value Large Cap | Large-cap | Value | OAEIX | OFI Global Asset Management Inc | 4,489.6 | 0.53 |
| 44 | MFS VALUE FUND-B | United States | Value Large Cap | Large-cap | Value | MFEBX | Massachusetts Financial Services Co | 36,730.3 | 0.52 |
| 45 | DELAWARE VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | DDVAX | Delaware Management Co | 11,220.0 | 0.52 |

**Exhibit C2**
**Advisory Fees Paid by Large U.S. Large-Cap Value Mutual Funds**
**(only funds with net assets > $1 billion; listed in descending order of fees)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee (%) |
|---|---|---|---|---|---|---|---|---|---|
| 46 | DAVIS NEW YORK VENTURE FD-A | United States | Value Large Cap | Large-cap | Value | NYVTX | Davis Selected Advisers LP | 12,224.3 | 0.51 |
| 47 | PRINCIPAL EQUITY INC-I | United States | Value Large Cap | Large-cap | Value | PEIIX | Principal Management Corp | 5,352.7 | 0.51 |
| 48 | DIAMOND HILL LARGE CAP FD-A | United States | Value Large Cap | Large-cap | Value | DHLAX | Diamond Hill Capital Management Inc/USA | 3,656.3 | 0.5 |
| 49 | LOOMIS SAYLES VALUE FUND-Y | United States | Value Large Cap | Large-cap | Value | LSGIX | Loomis Sayles & Co LP | 1,454.9 | 0.5 |
| 50 | PIONEER CORE EQUITY FD-A | United States | Value Large Cap | Large-cap | Value | PIOTX | Pioneer Investment Management Inc | 1,435.8 | 0.5 |
| 51 | CLEARBRIDGE LARGE CAP VAL-I | United States | Value Large Cap | Large-cap | Value | SAIFX | Legg Mason Partners Fund Advisor LLC | 1,491.5 | 0.49 |
| 52 | PUTNAM EQUITY INCOME FUND-A | United States | Value Large Cap | Large-cap | Value | PEYAX | Putnam Investment Management LLC | 6,060.1 | 0.47 |
| 53 | PUTNAM FD FOR GRWTH & INC-A | United States | Value Large Cap | Large-cap | Value | PGRWX | Putnam Investment Management LLC | 4,727.5 | 0.47 |
| 54 | OPPENHEIMER VALUE FUND-A | United States | Value Large Cap | Large-cap | Value | CGRWX | OFI Global Asset Management Inc | 1,961.1 | 0.47 |
| 55 | SUNAMERICA FOC DVD STRATG-A | United States | Value Large Cap | Large-cap | Value | FDSAX | SunAmerica Asset Management LLC | 10,970.4 | 0.45 |
| 56 | FIDELITY EQUITY DVD INCOME | United States | Value Large Cap | Large-cap | Value | FEQTX | Fidelity Management & Research Co | 5,109.0 | 0.45 |
| 57 | FIDELITY ADV EQUITY INCOME-T | United States | Value Large Cap | Large-cap | Value | FEIQX | Fidelity Management & Research Co | 2,075.6 | 0.45 |
| 58 | BRIDGE BUILDER L/C VALUE | United States | Value Large Cap | Large-cap | Value | BBVLX | Olive Street Investment Advisers LLC | 2,339.5 | 0.44 |
| 59 | STRATEGIC ADVISERS VALUE FD | United States | Value Large Cap | Large-cap | Value | FVSAX | Aristotle Capital Management LLC | 11,021.4 | 0.43 |
| 60 | INVESCO DIVERSIFIED DVD-A | United States | Value Large Cap | Large-cap | Value | LCEAX | Invesco Advisers Inc | 15,000.8 | 0.41 |
| 61 | BLACKROCK BASIC VAL FD-INC-I | United States | Value Large Cap | Large-cap | Value | MABAX | BlackRock Advisors LLC | 3,688.6 | 0.41 |
| 62 | PRINCIPAL INV L/C VALUE-INST | United States | Value Large Cap | Large-cap | Value | PVLIX | Principal Management Corp | 2,249.5 | 0.41 |
| 63 | JPMORGAN EQUITY INCOME-SEL | United States | Value Large Cap | Large-cap | Value | HLIEX | JP Morgan Investment Management Inc | 11,508.4 | 0.4 |
| 64 | TIAA-CREF LARGE CAP VAL-INST | United States | Value Large Cap | Large-cap | Value | TRLIX | Teachers Advisors Inc | 5,648.2 | 0.4 |
| 65 | VANTAGEPOINT EQUITY INC-INV | United States | Value Large Cap | Large-cap | Value | VPEIX | Vantagepoint Investment Advisers LLC | 1,866.6 | 0.4 |
| 66 | JPMORGAN INTREPID VALUE-SEL | United States | Value Large Cap | Large-cap | Value | JPIVX | JP Morgan Investment Management Inc | 1,716.5 | 0.4 |
| 67 | VANGUARD WINDSOR-INV | United States | Value Large Cap | Large-cap | Value | VWNDX | Pzena Investment Management LLC | 16,727.5 | 0.37 |
| 68 | AMERICAN BEACON BR L/C VA-A | United States | Value Large Cap | Large-cap | Value | BWLAX | American Beacon Advisors Inc | 2,907.2 | 0.37 |
| 69 | T ROWE PRICE VALUE FUND | United States | Value Large Cap | Large-cap | Value | TRVLX | T Rowe Price Associates Inc | 22,287.3 | 0.35 |
| 70 | DFA US L/C VALUE PORTFOLIO | United States | Value Large Cap | Large-cap | Value | DFLVX | Dimensional Fund Advisors LP | 16,196.0 | 0.35 |
| 71 | SEI LARGE CAP VALUE-A | United States | Value Large Cap | Large-cap | Value | TRMVX | SEI Investments Management Corp | 1,299.7 | 0.35 |
| 72 | TIAA CREF EN L/C VAL IND-INS | United States | Value Large Cap | Large-cap | Value | TEVIX | Teachers Advisors Inc | 1,981.3 | 0.33 |
| 73 | GUIDESTONE VALUE EQTY-GS4 | United States | Value Large Cap | Large-cap | Value | GVEZX | GuideStone Capital Management LLC | 1,234.8 | 0.33 |
| 74 | VANGUARD WINDSOR II-INV | United States | Value Large Cap | Large-cap | Value | VWNFX | Barrow Hanley Mewhinney & Strauss LLC | 45,413.0 | 0.32 |
| 75 | LORD ABBETT AFFILIATED-A | United States | Value Large Cap | Large-cap | Value | LAFFX | Lord Abbett & Co LLC | 6,137.4 | 0.31 |
| 76 | FIDELITY LARGE CAP VALUE ENH | United States | Value Large Cap | Large-cap | Value | FLVEX | FMR Co Inc | 1,785.3 | 0.3 |
| 77 | AQR L/C MULTI-STYLE FUND-L | United States | Value Large Cap | Large-cap | Value | QCELX | AQR Capital Management LLC | 1,359.7 | 0.3 |
| 78 | AMERICAN WASH MUT INV-A | United States | Value Large Cap | Large-cap | Value | AWSHX | Capital Research & Management Co | 77,961.6 | 0.24 |
| 79 | VANGUARD EQUITY INCOME-INV | United States | Value Large Cap | Large-cap | Value | VEIPX | Wellington Management Group LLP | 20,761.5 | 0.24 |
| 80 | VANGUARD U.S. VALUE FUND | United States | Value Large Cap | Large-cap | Value | VUVLX | Vanguard Group Inc/The | 1,344.0 | 0.24 |
| 81 | AMERICAN BEACON L/C VALU-IS | United States | Value Large Cap | Large-cap | Value | AADEX | American Beacon Advisors Inc | 8,953.8 | 0.23 |
| 82 | DFA US LARGE CAP VALUE-III | United States | Value Large Cap | Large-cap | Value | DFUVX | Dimensional Fund Advisors LP | 2,909.2 | 0.21 |
| 83 | FIDELITY SER EQUITY INCOME | United States | Value Large Cap | Large-cap | Value | FNKLX | Fidelity Service Co Inc | 11,816.8 | 0.2 |
| 84 | FIDELITY EQUITY-INCOME FD | United States | Value Large Cap | Large-cap | Value | FEQIX | Fidelity Service Co Inc | 7,833.1 | 0.2 |
| 85 | FIDELITY ADV EQUITY INCOME | United States | Value Large Cap | Large-cap | Value | FLMIX | Fidelity Service Co Inc | 1,659.9 | 0.2 |
| 86 | VANGUARD VALUE INDEX-INV | United States | Value Large Cap | Large-cap | Value | VIVAX | Vanguard Group Inc/The | 19,922.2 | 0.19 |
| 87 | VANGUARD HI DVD YLD INDX-INV | United States | Value Large Cap | Large-cap | Value | VHDYX | Vanguard Group Inc/The | 4,947.1 | 0.14 |
| 88 | VANGUARD RUSSELL 1000 VA-INS | United States | Value Large Cap | Large-cap | Value | VRVIX | Vanguard Group Inc/The | 1,360.2 | 0.06 |
| 89 | FIDELITY SER 1000 VAL IDX | United States | Value Large Cap | Large-cap | Value | FIOOX | Fidelity Management & Research Co | 1,759.8 | 0.05 |
| 90 | TIAA-CREF L/C VAL INDX-INST | United States | Value Large Cap | Large-cap | Value | TILVX | Teachers Advisors Inc | 4,024.6 | 0.04 |

# EXHIBIT D-1

**Exhibit D1**
**Advisory Fees Paid by Moderate Allocation Mutual Funds**
**(alphabetically, by fund name)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ million) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|
| 1 | 1789 GROWTH & INCOME FUND-A | United States | Moderate Allocation | Moderate Allocation | PSEAX | Pinnacle Capital Management LLC | 10.6 | 0.75 |
| 2 | AB BALANCED WEALTH STRAT-A | United States | Moderate Allocation | Moderate Allocation | ABWAX | AllianceBernstein LP | 1,045.3 | 0.55 |
| 3 | AC ALTERNATIVES INCOME-A | United States | Moderate Allocation | Moderate Allocation | ALNAX | American Century Investment Management Inc | 50.2 | 2 |
| 4 | AB TAX-MGD BAL WLTH STRAT-B | United States | Moderate Allocation | Moderate Allocation | AGIBX | AllianceBernstein LP | 142.6 | 0.55 |
| 5 | ADVANCE CAPITAL I BALANCED-A | United States | Moderate Allocation | Moderate Allocation | ADBAX | Advance Capital Management Inc | 89.7 | 0.7 |
| 6 | ALGER GROWTH & INCOME FUND-A | United States | Moderate Allocation | Moderate Allocation | ALBAX | Fred Alger Management Inc | 97.6 | 0.59 |
| 7 | AMER CENT BALANCED FUND-INV | United States | Moderate Allocation | Moderate Allocation | TWBIX | American Century Investment Management Inc | 780.4 | 0.9 |
| 8 | AMER CENT STRAT ALLO MOD-INV | United States | Moderate Allocation | Moderate Allocation | TWSMX | American Century Investment Management Inc | 1,495.3 | 1.06 |
| 9 | AMERICAN BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | ABALX | Capital Research & Management Co | 86,689.4 | 0.23 |
| 10 | AMERICAN BEACON BALANCED-IS | United States | Moderate Allocation | Moderate Allocation | AADBX | American Beacon Advisors Inc | 622.3 | 0.21 |
| 11 | AMERICAN CAP INCM BUILDER-A | United States | Moderate Allocation | Moderate Allocation | CAIBX | Capital Research & Management Co | 96,323.2 | 0.232 |
| 12 | AMG CHP BALANCED-I | United States | Moderate Allocation | Moderate Allocation | MBEYX | AMG Funds LLC | 171.0 | 0.7 |
| 13 | ARCHER BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | ARCHX | Archer Investment Corp/USA | 26.8 | 0.75 |
| 14 | ASTON MONTAG & CALDWL BLNC-N | United States | Moderate Allocation | Moderate Allocation | MOBAX | Aston Asset Management LLC | 42.0 | 0.75 |
| 15 | BLACKROCK BALANCED CAPITAL-I | United States | Moderate Allocation | Moderate Allocation | MACPX | BlackRock Advisors LLC | 938.2 | 0.5 |
| 16 | BLACKROCK MULTI-ASSET INC-I | United States | Moderate Allocation | Moderate Allocation | BIICX | BlackRock Advisors LLC | 12,156.3 | 0.52 |
| 17 | BOSTON TRUST ASSET MGMT FD | United States | Moderate Allocation | Moderate Allocation | BTBFX | Boston Trust Investment Management Inc | 351.1 | 0.75 |
| 18 | BRIDGES INVESTMENT FUND | United States | Moderate Allocation | Moderate Allocation | BRGIX | Bridges Investment Management Inc | 112.3 | 0.5 |
| 19 | BRUCE FUND INC | United States | Moderate Allocation | Moderate Allocation | BRUFX | Bruce & Co | 544.7 | 0.54 |
| 20 | BUFFALO FLEXIBLE INCOME FUND | United States | Moderate Allocation | Moderate Allocation | BUFBX | Kornitzer Capital Management Inc | 905.0 | 1 |
| 21 | CALAMOS GROWTH & INCOME-C | United States | Moderate Allocation | Moderate Allocation | CVTCX | Calamos Advisors LLC | 2,294.7 | 1 |
| 22 | CALVERT BALANCED PORTFOLIO-A | United States | Moderate Allocation | Moderate Allocation | CSIFX | Calvert Investment Management Inc | 647.3 | 0.52 |
| 23 | CAVANAL HILL BALANCED FD-IV | United States | Moderate Allocation | Moderate Allocation | APBAX | Cavanal Hill Investment Management Inc | 60.6 | 0.74 |
| 24 | CG CORE BALANCED FUND-INS | United States | Moderate Allocation | Moderate Allocation | CGBNX | Wall Street Management Corp | 2.9 | 0.75 |
| 25 | CGM MUTUAL FUND | United States | Moderate Allocation | Moderate Allocation | LOMMX | Capital Growth Management LP | 370.3 | 0.9 |
| 26 | COLUMBIA BALANCED FUND-Z | United States | Moderate Allocation | Moderate Allocation | CBALX | Columbia Management Investment Advisers LLC | 4,375.8 | 0.57 |
| 27 | CORNERCAP BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | CBLFX | CornerCap Investment Counsel Inc | 25.3 | 0.9 |
| 28 | DAVENPORT BALANCED INCOME | United States | Moderate Allocation | Moderate Allocation | DBALX | Davenport & Co LLC | 15.0 | 0.75 |
| 29 | DAVIS APP & INCOME FUND-A | United States | Moderate Allocation | Moderate Allocation | RPFCX | Davis Selected Advisers LP | 280.5 | 0.55 |
| 30 | DEUTSCHE GLB INCM BUILDER-A | United States | Moderate Allocation | Moderate Allocation | KTRAX | Deutsche Investment Management Americas Inc | 810.1 | 0.37 |
| 31 | DODGE & COX BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | DODBX | Dodge & Cox | 13,274.7 | 0.5 |
| 32 | DREYFUS BALANCED OPPORTUN-A | United States | Moderate Allocation | Moderate Allocation | DBOAX | Bank of New York Mellon Corp/The | 258.8 | 0.8 |
| 33 | EATON VANCE BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | EVIFX | Boston Management & Research | 561.0 | 0.04 |
| 34 | ESG MANAGERS BALANCED PRTF-A | United States | Moderate Allocation | Moderate Allocation | PMPAX | Pax World Management LLC | 29.2 | 0.48 |
| 35 | FEDERATED MDT BALANCED-INS | United States | Moderate Allocation | Moderate Allocation | QJBGX | Federated MDTA LLC | 136.0 | 0.75 |
| 36 | FIDELITY ADV ASSET MGR 50%-A | United States | Moderate Allocation | Moderate Allocation | FFAMX | Fidelity Management & Research Co | 7,319.6 | 0.5 |
| 37 | FIDELITY ADV ASSET MGR 60%-A | United States | Moderate Allocation | Moderate Allocation | FSAAX | Fidelity Management & Research Co | 1,408.6 | 0.55 |
| 38 | FIDELITY ASSET MANAGER 50% | United States | Moderate Allocation | Moderate Allocation | FASMX | Fidelity Management & Research Co | 7,319.6 | 0.5 |
| 39 | FIDELITY ASSET MANAGER 60% | United States | Moderate Allocation | Moderate Allocation | FSANX | Fidelity Management & Research Co | 1,408.6 | 0.55 |
| 40 | FIDELITY BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | FBALX | Fidelity Management & Research Co | 26,271.3 | 0.15 |
| 41 | FIDELITY PURITAN FUND | United States | Moderate Allocation | Moderate Allocation | FPURX | Fidelity Management & Research Co | 24,172.0 | 0.15 |
| 42 | FRANKLIN BALANCED-A | United States | Moderate Allocation | Moderate Allocation | FBLAX | Franklin Advisers Inc | 2,983.1 | 0.64 |
| 43 | FROST MODERATE ALLOCATION-IN | United States | Moderate Allocation | Moderate Allocation | FIBTX | Frost Investment Advisors LLC | 22.7 | 0.15 |

**Exhibit D1**
**Advisory Fees Paid by Moderate Allocation Mutual Funds**
**(alphabetically, by fund name)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|
| 44 | GEORGE PUTNAM BALANCED-A | United States | Moderate Allocation | Moderate Allocation | PGEOX | Putnam Investment Management LLC | 1,198.0 | 0.52 |
| 45 | GOLDMAN SACHS BALANCED ST-A | United States | Moderate Allocation | Moderate Allocation | GIPAX | Goldman Sachs Asset Management LP | 443.2 | 0.15 |
| 46 | GOLDMAN SACHS INC BUILD-A | United States | Moderate Allocation | Moderate Allocation | GSBFX | Goldman Sachs Asset Management LP | 2,066.3 | 0.62 |
| 47 | GREAT-WEST SECFOUND BLNCD-G | United States | Moderate Allocation | Moderate Allocation | MXSBX | Great-West Capital Management LLC | 267.0 | 0.1 |
| 48 | GREEN CENTURY BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | GCBLX | Green Century Capital Management Inc | 173.8 | 0.65 |
| 49 | HARTFORD BALANCED HLS FD-IA | United States | Moderate Allocation | Moderate Allocation | HADAX | Hartford Funds Management Co LLC | 2,436.3 | 0.68 |
| 50 | HENNESSY BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | HBFBX | Hennessy Advisors Inc | 16.2 | 0.6 |
| 51 | HOLLAND BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | HOLBX | Holland & Co LLC | 31.7 | 0.75 |
| 52 | INCOME FUND OF AMERICA-A | United States | Moderate Allocation | Moderate Allocation | AMECX | Capital Research & Management Co | 94,382.8 | 0.22 |
| 53 | INVESCO EQUITY AND INCOME-A | United States | Moderate Allocation | Moderate Allocation | ACEIX | Invesco Advisers Inc | 12,966.3 | 0.35 |
| 54 | IVY BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | IBNAX | Ivy Investment Management Co | 2,600.0 | 0.67 |
| 55 | IVY INTERNATIONAL GL IN/AL-A | International | Moderate Allocation | Moderate Allocation | IVBAX | Ivy Investment Management Co | 741.7 | 0.7 |
| 56 | JAMES BAL GOLDEN RAINBOW-RET | United States | Moderate Allocation | Moderate Allocation | GLRBX | James Investment Research Inc | 4,466.0 | 0.64 |
| 57 | JANUS BALANCED FND-S | United States | Moderate Allocation | Moderate Allocation | JABRX | Janus Capital Management LLC | 12,865.5 | 0.55 |
| 58 | JANUS GLOBAL ALLOC-MOD-T | United States | Moderate Allocation | Moderate Allocation | JSPMX | Janus Capital Management LLC | 267.0 | 0.05 |
| 59 | JHVIT JOHN HAN TR-LIFE BALAN | United States | Moderate Allocation | Moderate Allocation | JELBX | John Hancock Investment Management Services LLC | 3,822.5 | 0.04 |
| 60 | JHVIT JOHN HAN TR-LIFE MOD | United States | Moderate Allocation | Moderate Allocation | JELMX | John Hancock Investment Management Services LLC | 1,683.2 | 0.04 |
| 61 | JOHN HANCOCK BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | SVBAX | John Hancock Advisers LLC | 1,546.5 | 0.6 |
| 62 | JOHN HANCOCK II-LIFE BAL-1 | United States | Moderate Allocation | Moderate Allocation | JILBX | John Hancock Advisers LLC | 13,000.6 | 0.04 |
| 63 | JOHN HANCOCK II-LIFE MOD-1 | United States | Moderate Allocation | Moderate Allocation | JILMX | John Hancock Advisers LLC | 4,075.1 | 0.04 |
| 64 | JPMORGAN DIVERSIFIED-INST | United States | Moderate Allocation | Moderate Allocation | JPDVX | JP Morgan Investment Management Inc | 1,369.7 | 0.55 |
| 65 | JPMORGAN INVEST BALANCE-SEL | United States | Moderate Allocation | Moderate Allocation | OIBFX | JPMorgan Asset Management Holdings Inc | 5,369.3 | 0.05 |
| 66 | JPMORGAN SMRTRET BL INC-R5 | United States | Moderate Allocation | Moderate Allocation | JIBBX | JP Morgan Investment Management Inc | 52.9 | 0.3 |
| 67 | LK BALANCED-INS | United States | Moderate Allocation | Moderate Allocation | LKBLX | Lawson Kroeker Investment Management Inc/NE | 25.0 | 0.75 |
| 68 | LKCM BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | LKBAX | Luther King Capital Management Corp | 41.4 | 0.65 |
| 69 | MAINSTAY BALANCED FUND-I | United States | Moderate Allocation | Moderate Allocation | MBAIX | New York Life Investment Management LLC | 778.8 | 0.7 |
| 70 | MAIRS AND POWER BALANCED FD | United States | Moderate Allocation | Moderate Allocation | MAPOX | Mairs & Power Inc | 672.6 | 0.6 |
| 71 | MANNING & NAPIER INC-PB MO | United States | Moderate Allocation | Moderate Allocation | EXBAX | Manning & Napier Advisors LLC | 1,381.3 | 0.75 |
| 72 | MASSMUTUAL PR BALANCED FD-R5 | United States | Moderate Allocation | Moderate Allocation | MBLDX | MML Investment Advisers LLC | 113.4 | 0.48 |
| 73 | MFS TOTAL RETURN FUND-A | United States | Moderate Allocation | Moderate Allocation | MSFRX | Massachusetts Financial Services Co | 7,426.0 | 0.35 |
| 74 | MSIF GLOBAL STRATEGIST-A | United States | Moderate Allocation | Moderate Allocation | MBAAX | Morgan Stanley Investment Management Inc | 369.4 | 0.45 |
| 75 | NUVEEN REAL ASSET INCOME-A | United States | Moderate Allocation | Moderate Allocation | NRIAX | Nuveen Fund Advisors LLC | 857.5 | 0.6 |
| 76 | OAKMARK EQUITY & INCOME-I | United States | Moderate Allocation | Moderate Allocation | OAKBX | Harris Associates LP | 17,102.3 | 0.66 |
| 77 | PACIFIC ADVISORS BALANCED-A | United States | Moderate Allocation | Moderate Allocation | PAABX | Pacific Global Investment Management Co | 6.6 | 0.75 |
| 78 | PACIFIC FIN FAITH & VAL-INV | United States | Moderate Allocation | Moderate Allocation | FVMLX | Pacific Financial Group Inc | 9.4 | 1 |
| 79 | PIONEER CLASSIC BALANCED-A | United States | Moderate Allocation | Moderate Allocation | AOBLX | Pioneer Investment Management Inc | 285.0 | 0.65 |
| 80 | PLUMB BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | PLBBX | Wisconsin Capital Management LLC | 31.8 | 0.65 |
| 81 | PNC BALANCED ALLOCATION FD-I | United States | Moderate Allocation | Moderate Allocation | PBLIX | PNC Capital Advisors LLC | 59.2 | 0.75 |
| 82 | PRUDENTIAL BALANCED FUND-Z | United States | Moderate Allocation | Moderate Allocation | PABFX | Prudential Investments LLC | 433.6 | 0.65 |
| 83 | PRUDENTIAL MODERATE ALLOC-B | United States | Moderate Allocation | Moderate Allocation | JDMBX | Prudential Investments LLC | 164.2 | 0.2 |
| 84 | PUTNAM DYN ASST ALLOC BAL-C | United States | Moderate Allocation | Moderate Allocation | AABCX | Putnam Investment Management LLC | 2,020.9 | 0.68 |
| 85 | QCI BALANCED-INS | United States | Moderate Allocation | Moderate Allocation | QCIBX | QCI Asset Management Inc | 51.4 | 0.75 |
| 86 | RIVERFRONT GLOBAL ALLOC-A | United States | Moderate Allocation | Moderate Allocation | RMGAX | ALPS Advisors Inc | 41.1 | 0.85 |

**Exhibit D1**
**Advisory Fees Paid by Moderate Allocation Mutual Funds**
**(alphabetically, by fund name)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ million) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|
| 87 | RIVERFRONT MOD GTH&INC-A | United States | Moderate Allocation | Moderate Allocation | RMIAX | ALPS Advisors Inc | 141.9 | 0.85 |
| 88 | SATURNA SEXTANT CORE FUND | United States | Moderate Allocation | Moderate Allocation | SCORX | Saturna Capital Corp | 8.5 | 0.39 |
| 89 | SCHARF BALANCED OPP-INV | United States | Moderate Allocation | Moderate Allocation | LOGOX | Scharf Investments LLC | 55.4 | 0.99 |
| 90 | SEI VP MODERATE STRATEGY | United States | Moderate Allocation | Moderate Allocation | SVPMX | SEI Investments Management Corp | 13.0 | 0.1 |
| 91 | STATE FARM BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | STFBX | State Farm Investment Management Corp | 1,671.1 | 0.11 |
| 92 | T ROWE PRICE BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | RPBAX | T Rowe Price Associates Inc | 3,724.1 | 0.15 |
| 93 | T ROWE PRICE PERS STRAT BAL | United States | Moderate Allocation | Moderate Allocation | TRPBX | T Rowe Price Associates Inc | 1,901.8 | 0.54 |
| 94 | TA PARTNERS BALANCED-INV | United States | Moderate Allocation | Moderate Allocation | DVIBX | Transamerica Asset Management Inc | 90.1 | 0.45 |
| 95 | TETON WESTWD BALANC FUND-AAA | United States | Moderate Allocation | Moderate Allocation | WEBAX | Teton Advisors Inc | 69.5 | 0.75 |
| 96 | THRIVENT BALANCE INCOME PL-A | United States | Moderate Allocation | Moderate Allocation | AABFX | Thrivent Asset Management LLC | 276.8 | 0.55 |
| 97 | TRANSAMERICA ALL MODER PT-A | United States | Moderate Allocation | Moderate Allocation | IMOAX | Transamerica Asset Management Inc | 2,005.0 | 0.12 |
| 98 | TRANSAMERICA MM BALANCED-A | United States | Moderate Allocation | Moderate Allocation | IBALX | Transamerica Asset Management Inc | 621.7 | 0.68 |
| 99 | TRIBUTARY BALANCED FUND-INST | United States | Moderate Allocation | Moderate Allocation | FOBAX | Tributary Capital Management LLC | 106.0 | 0.75 |
| 100 | USAA CORNERSTONE MODER AGGR | United States | Moderate Allocation | Moderate Allocation | USCRX | USAA Asset Management Co | 2,176.1 | 0.7 |
| 101 | USAA CORNERSTONE MODERATE | United States | Moderate Allocation | Moderate Allocation | USBSX | USAA Asset Management Co | 1,012.5 | 0.67 |
| 102 | USAA FLEXIBLE INCOME-SHS | United States | Moderate Allocation | Moderate Allocation | USFIX | USAA Asset Management Co | 62.1 | 0.5 |
| 103 | USAA GROWTH AND TAX STRATEGY | United States | Moderate Allocation | Moderate Allocation | USBLX | USAA Asset Management Co | 299.4 | 0.49 |
| 104 | VALUE LINE INCOME & GR-INV | United States | Moderate Allocation | Moderate Allocation | VALIX | EULAV Asset Management | 320.7 | 0.7 |
| 105 | VANGUARD BALANCED INDEX-INV | United States | Moderate Allocation | Moderate Allocation | VBINX | Vanguard Group Inc/The | 25,786.9 | 0.2 |
| 106 | VANGUARD WELLINGTON-INV | United States | Moderate Allocation | Moderate Allocation | VWELX | Wellington Management Group LLP | 83,829.5 | 0.25 |
| 107 | VICTORY BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | SBALX | Victory Capital Management Inc | 12.5 | 0.1 |
| 108 | VILLERE BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | VILLX | St Denis J Villere & Co LLC | 434.1 | 0.75 |
| 109 | VIRTUS TACTICAL ALLOC-A | United States | Moderate Allocation | Moderate Allocation | NAINX | Virtus Investment Advisers Inc | 152.5 | 0.7 |
| 110 | VOYA GLOBAL PERSPECTIVES-A | United States | Moderate Allocation | Moderate Allocation | IAPVX | Voya Investments LLC | 37.3 | 0.2 |
| 111 | WBI TACTICAL BA FUND-NO LOAD | United States | Moderate Allocation | Moderate Allocation | WBADX | WBI Investments Inc | 43.1 | 0.85 |
| 112 | WEITZ BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | WBALX | Weitz Investment Management Inc | 111.5 | 0.8 |
| 113 | WESMARK BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | WMBLX | WesBanco Bank Inc | 100.0 | 0.75 |
| 114 | WF GROWTH BALANCED-ADM | United States | Moderate Allocation | Moderate Allocation | NVGBX | Wells Fargo Funds Management LLC | 250.3 | 0.3 |
| 115 | WF INDX ASST ALLOC-A | United States | Moderate Allocation | Moderate Allocation | SFAAX | Wells Fargo Funds Management LLC | 1,002.4 | 0.63 |
| 116 | WF MODERATE BALANCE-ADM | United States | Moderate Allocation | Moderate Allocation | NVMBX | Wells Fargo Funds Management LLC | 192.5 | 0.3 |
| 117 | WF WEALTHBUILDER GROW BAL-A | United States | Moderate Allocation | Moderate Allocation | WBGBX | Wells Fargo Funds Management LLC | 955.3 | 0.25 |

# EXHIBIT D-2

**Exhibit D2**
**Advisory Fees Paid by Large Moderate Allocation Mutual Funds**
**(only funds with net assets > $1 billion; listed in descending order of fees)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ million) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|
| 1 | AMER CENT STRAT ALLO MOD-INV | United States | Moderate Allocation | Moderate Allocation | TWSMX | American Century Investment Management Inc | 1,495.3 | 1.06 |
| 2 | CALAMOS GROWTH & INCOME-C | United States | Moderate Allocation | Moderate Allocation | CVTCX | Calamos Advisors LLC | 2,294.7 | 1 |
| 3 | MANNING & NAPIER INC-PB MO | United States | Moderate Allocation | Moderate Allocation | EXBAX | Manning & Napier Advisors LLC | 1,381.3 | 0.75 |
| 4 | USAA CORNERSTONE MODER AGGR | United States | Moderate Allocation | Moderate Allocation | USCRX | USAA Asset Management Co | 2,176.1 | 0.7 |
| 5 | HARTFORD BALANCED HLS FD-IA | United States | Moderate Allocation | Moderate Allocation | HADAX | Hartford Funds Management Co LLC | 2,436.3 | 0.68 |
| 6 | PUTNAM DYN ASST ALLOC BAL-C | United States | Moderate Allocation | Moderate Allocation | AABCX | Putnam Investment Management LLC | 2,020.9 | 0.68 |
| 7 | IVY BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | IBNAX | Ivy Investment Management Co | 2,600.0 | 0.67 |
| 8 | USAA CORNERSTONE MODERATE | United States | Moderate Allocation | Moderate Allocation | USBSX | USAA Asset Management Co | 1,012.5 | 0.67 |
| 9 | OAKMARK EQUITY & INCOME-I | United States | Moderate Allocation | Moderate Allocation | OAKBX | Harris Associates LP | 17,102.3 | 0.66 |
| 10 | JAMES BAL GOLDEN RAINBOW-RET | United States | Moderate Allocation | Moderate Allocation | GLRBX | James Investment Research Inc | 4,466.0 | 0.64 |
| 11 | FRANKLIN BALANCED-A | United States | Moderate Allocation | Moderate Allocation | FBLAX | Franklin Advisers Inc | 2,983.1 | 0.64 |
| 12 | WF INDX ASST ALLOC-A | United States | Moderate Allocation | Moderate Allocation | SFAAX | Wells Fargo Funds Management LLC | 1,002.4 | 0.63 |
| 13 | GOLDMAN SACHS INC BUILD-A | United States | Moderate Allocation | Moderate Allocation | GSBFX | Goldman Sachs Asset Management LP | 2,066.3 | 0.62 |
| 14 | JOHN HANCOCK BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | SVBAX | John Hancock Advisers LLC | 1,546.5 | 0.6 |
| 15 | COLUMBIA BALANCED FUND-Z | United States | Moderate Allocation | Moderate Allocation | CBALX | Columbia Management Investment Advisers LLC | 4,375.8 | 0.57 |
| 16 | JANUS BALANCED FND-S | United States | Moderate Allocation | Moderate Allocation | JABRX | Janus Capital Management LLC | 12,865.5 | 0.55 |
| 17 | FIDELITY ADV ASSET MGR 60%-A | United States | Moderate Allocation | Moderate Allocation | FSAAX | Fidelity Management & Research Co | 1,408.6 | 0.55 |
| 18 | FIDELITY ASSET MANAGER 60% | United States | Moderate Allocation | Moderate Allocation | FSANX | Fidelity Management & Research Co | 1,408.6 | 0.55 |
| 19 | JPMORGAN DIVERSIFIED-INST | United States | Moderate Allocation | Moderate Allocation | JPDVX | JP Morgan Investment Management Inc | 1,369.7 | 0.55 |
| 20 | AB BALANCED WEALTH STRAT-A | United States | Moderate Allocation | Moderate Allocation | ABWAX | AllianceBernstein LP | 1,045.3 | 0.55 |
| 21 | T ROWE PRICE PERS STRAT BAL | United States | Moderate Allocation | Moderate Allocation | TRPBX | T Rowe Price Associates Inc | 1,901.8 | 0.54 |
| 22 | BLACKROCK MULTI-ASSET INC-I | United States | Moderate Allocation | Moderate Allocation | BIICX | BlackRock Advisors LLC | 12,156.3 | 0.52 |
| 23 | GEORGE PUTNAM BALANCED-A | United States | Moderate Allocation | Moderate Allocation | PGEOX | Putnam Investment Management LLC | 1,198.0 | 0.52 |
| 24 | DODGE & COX BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | DODBX | Dodge & Cox | 13,274.7 | 0.5 |
| 25 | FIDELITY ADV ASSET MGR 50%-A | United States | Moderate Allocation | Moderate Allocation | FFAMX | Fidelity Management & Research Co | 7,319.6 | 0.5 |
| 26 | FIDELITY ASSET MANAGER 50% | United States | Moderate Allocation | Moderate Allocation | FASMX | Fidelity Management & Research Co | 7,319.6 | 0.5 |
| 27 | INVESCO EQUITY AND INCOME-A | United States | Moderate Allocation | Moderate Allocation | ACEIX | Invesco Advisers Inc | 12,966.3 | 0.35 |
| 28 | MFS TOTAL RETURN FUND-A | United States | Moderate Allocation | Moderate Allocation | MSFRX | Massachusetts Financial Services Co | 7,426.0 | 0.35 |
| 29 | VANGUARD WELLINGTON-INV | United States | Moderate Allocation | Moderate Allocation | VWELX | Wellington Management Group LLP | 83,829.5 | 0.25 |
| 30 | AMERICAN BALANCED FUND-A | United States | Moderate Allocation | Moderate Allocation | ABALX | Capital Research & Management Co | 86,689.4 | 0.23 |
| 31 | AMERICAN CAP INCM BUILDER-A | United States | Moderate Allocation | Moderate Allocation | CAIBX | Capital Research & Management Co | 94,323.2 | 0.232 |
| 32 | INCOME FUND OF AMERICA-A | United States | Moderate Allocation | Moderate Allocation | AMECX | Capital Research & Management Co | 94,382.8 | 0.22 |
| 33 | VANGUARD BALANCED INDEX-INV | United States | Moderate Allocation | Moderate Allocation | VBINX | Vanguard Group Inc/The | 25,786.9 | 0.2 |
| 34 | FIDELITY BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | FBALX | Fidelity Management & Research Co | 26,271.3 | 0.15 |
| 35 | FIDELITY PURITAN FUND | United States | Moderate Allocation | Moderate Allocation | FPURX | Fidelity Management & Research Co | 24,172.0 | 0.15 |
| 36 | T ROWE PRICE BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | RPBAX | T Rowe Price Associates Inc | 3,724.1 | 0.15 |
| 37 | TRANSAMERICA AL MODER PT-A | United States | Moderate Allocation | Moderate Allocation | IMOAX | Transamerica Asset Management Inc | 2,005.0 | 0.12 |
| 38 | STATE FARM BALANCED FUND | United States | Moderate Allocation | Moderate Allocation | STFBX | State Farm Investment Management Corp | 1,671.1 | 0.11 |
| 39 | JPMORGAN INVEST BALANCE-SEL | United States | Moderate Allocation | Moderate Allocation | OIBFX | JPMorgan Asset Management Holdings Inc | 5,369.3 | 0.05 |
| 40 | JOHN HANCOCK II-LIFE BAL-1 | United States | Moderate Allocation | Moderate Allocation | JILBX | John Hancock Advisers LLC | 13,000.6 | 0.04 |
| 41 | JOHN HANCOCK II-LIFE MOD-1 | United States | Moderate Allocation | Moderate Allocation | JILMX | John Hancock Advisers LLC | 4,075.1 | 0.04 |
| 42 | JHVIT JOHN HAN TR-LIFE BALAN | United States | Moderate Allocation | Moderate Allocation | JELBX | John Hancock Investment Management Services LLC | 3,822.5 | 0.04 |
| 43 | JHVIT JOHN HAN TR-LIFE MOD | United States | Moderate Allocation | Moderate Allocation | JELMX | John Hancock Investment Management Services LLC | 1,683.2 | 0.04 |

# EXHIBIT E-1

**Exhibit E1**
**Advisory Fees Paid by International All-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|---|
| 1 | AB INTERNATIONAL VALUE-A | International | Foreign Value | N.A. | Value | ABIAX | AllianceBernstein LP | 296.4 | 0.75 |
| 2 | ADVISORY-INTL ALL CAP VAL | International | Foreign Value | Broad Market | Value | ADVEX | Advisory Research Inc | 0.4 | 0.8 |
| 3 | AMER CENT INTERNATIONAL V-C | International | Foreign Value | N.A. | Value | ACCOX | American Century Investment Management Inc | 72.4 | 1.3 |
| 4 | AMER CENT NT INTL VALUE-IS | International | Foreign Value | N.A. | Value | ANTYX | American Century Investment Management Inc | 811.7 | 1.1 |
| 5 | ARISTOTLE INTL EQTY-INST | International | Foreign Value | Broad Market | Value | ARSFX | Aristotle Capital Management LLC | 15.0 | 0.8 |
| 6 | ARTISAN INTL VALUE FUND-INV | International | Foreign Value | Broad Market | Value | ARTKX | Artisan Partners LP | 11,064.1 | 0.93 |
| 7 | BNY MELLON INTERNATIONAL-M | International | Foreign Value | Broad Market | Value | MPITX | BNY Mellon Fund Advisers | 1,089.3 | 0.85 |
| 8 | BOSTON COMMON INTERNATIONAL | International | Foreign Value | N.A. | Value | BCAIX | Boston Common Asset Management LLC | 191.4 | 0.9 |
| 9 | BRANDES INSTL INTL EQUITY FD | International | Foreign Value | Broad Market | Value | BIIEX | Brandes Investment Partners LP | 631.6 | 0.8 |
| 10 | BROWN CAP MGMT INTL EQ-INV | International | Foreign Value | Broad Market | Value | BCIIX | Brown Capital Management LLC | 34.5 | 0.9 |
| 11 | CAUSEWAY INTERNATL VAL-INST | International | Foreign Value | N.A. | Value | CIVIX | Causeway Capital Management LLC | 5,538.3 | 0.8 |
| 12 | COLUMBIA INTL VALUE FUND-A | International | Foreign Value | Broad Market | Value | NIVLX | Columbia Management Investment Advisers LLC | 176.9 | 0.79 |
| 13 | CRM INTERNATIONAL OPP-INSTIT | International | Foreign Value | N.A. | Value | CRIIX | Cramer Rosenthal McGlynn LLC | 13.0 | 0.9 |
| 14 | DAVIS INTERNATIONAL FUND-A | International | Foreign Value | N.A. | Value | DILAX | Davis Selected Advisers LP | 95.5 | 0.55 |
| 15 | DELAWARE INTL VAL EQTY FD-A | International | Foreign Value | Broad Market | Value | DEGIX | Delaware Management Co | 246.9 | 0.85 |
| 16 | EUROPAC INTERNATIONAL VAL-A | International | Foreign Value | Broad Market | Value | EPIVX | Euro Pacific Asset Management LLC | 53.5 | 1.08 |
| 17 | EUROPAC INTL DIVIDEND INC-A | International | Foreign Value | N.A. | Value | EPDPX | Euro Pacific Asset Management LLC | 55.7 | 0.85 |
| 18 | FEDERATED INTL STRAT VAL-A | International | Foreign Value | Broad Market | Value | IVFAX | Federated Global Investment Management Corp/L | 758.3 | 0.75 |
| 19 | FIDELITY AD INTL VALUE FD-A | International | Foreign Value | N.A. | Value | FIVMX | Fidelity Management & Research Co | 327.3 | 0.7 |
| 20 | FIRST EAGLE OVERSEAS-A | International | Foreign Value | N.A. | Value | SGOVX | First Eagle Investment Management LLC | 14,020.9 | 0.75 |
| 21 | FPA INTERNATIONAL VALUE FUND | International | Foreign Value | N.A. | Value | FPIVX | First Pacific Advisors LLC | 488.7 | 0 |
| 22 | GMO FOREIGN FUND-III | International | Foreign Value | Broad Market | Value | GMOFX | Grantham Mayo Van Otterloo & Co LLC | 168.1 | 0.6 |
| 23 | GMO INTERNATIONAL EQUITY-III | International | Foreign Value | Broad Market | Value | GMOIX | Grantham Mayo Van Otterloo & Co LLC | 8,493.1 | 0.5 |
| 24 | HARTFORD INTL VALUE FUND-A | International | Foreign Value | N.A. | Value | HILAX | Hartford Funds Management Co LLC | 1,245.7 | 0.85 |
| 25 | ICON INTERNATIONAL EQUITY-S | International | Foreign Value | N.A. | Value | ICNEX | ICON Advisers Inc | 68.6 | 1 |
| 26 | J HANCOCK DISC VAL INTL-A | International | Foreign Value | Broad Market | Value | JDIBX | John Hancock Advisers LLC | 287.5 | 0.9 |
| 27 | JOHN HANC III-INT VAL EQ-I | International | Foreign Value | Broad Market | Value | JIEEX | John Hancock Advisers LLC | 510.2 | 0.88 |
| 28 | JOHN HANCOCK II-INTL VAL-1 | International | Foreign Value | N.A. | Value | JIVIX | John Hancock Advisers LLC | 1,558.0 | 0.8 |
| 29 | JPMORGAN INTL EQTY INC-A | International | Foreign Value | Broad Market | Value | JEIAX | JP Morgan Investment Management Inc | 117.4 | 0.7 |
| 30 | LAZARD INTER STRAT EQ-INST | International | Foreign Value | N.A. | Value | LISIX | Lazard Asset Management LLC/USA | 7,678.5 | 0.75 |
| 31 | LONGLEAF PARTNERS INTL FND | International | Foreign Value | N.A. | Value | LLINX | Southeastern Asset Management Inc | 995.6 | 1.07 |
| 32 | LORD ABBETT INTL DIVD INC-A | International | Foreign Value | Broad Market | Value | LIDAX | Lord Abbett & Co LLC | 1,568.8 | 0.7 |
| 33 | LWAS/DFA INTL HI BOOK TO MKT | International | Foreign Value | Broad Market | Value | DFHBX | Dimensional Fund Advisors LP | 51.9 | 0.41 |
| 34 | MADISON INTL STOCK FUND-A | International | Foreign Value | N.A. | Value | MINAX | Madison Asset Management LLC | 38.5 | 1.05 |
| 35 | MAINSTAY ICAP INTERNATION-A | International | Foreign Value | N.A. | Value | ICEVX | New York Life Investment Management LLC | 1,638.9 | 0.8 |
| 36 | MAINSTAY INTERNATIONAL EQ-B | International | Foreign Value | N.A. | Value | MINEX | New York Life Investment Management LLC | 317.1 | 0.89 |
| 37 | MASSMUTUAL SEL DIV INTERN-A | International | Foreign Value | N.A. | Value | MMZAX | MML Investment Advisers LLC | 73.8 | 0.8 |
| 38 | MCKEE INTL EQUITY PORT-INS | International | Foreign Value | N.A. | Value | MKIEX | CS McKee LP | 166.6 | 0.7 |
| 39 | MFS INTL VALUE-A | International | Foreign Value | N.A. | Value | MGIAX | Massachusetts Financial Services Co | 25,587.8 | 0.71 |
| 40 | MFS VIT II-MFS INTL VALUE | International | Foreign Value | N.A. | Value | MFSINVA | Massachusetts Financial Services Co | N.A. | 0.9 |
| 41 | MOTLEY FOOL EPIC VOYAGE | International | Foreign Value | N.A. | Value | TMFEX | Motley Fool Asset Management LLC | 30.4 | 0.85 |
| 42 | MSIF-INTERNATIONAL EQUITY-I | International | Foreign Value | N.A. | Value | MSIQX | Morgan Stanley Investment Management Inc | 4,255.4 | 0.8 |
| 43 | MSIF-INTERNATIONAL OPPORT-I | International | Foreign Value | N.A. | Value | MIOIX | Morgan Stanley Investment Management Inc | 71.3 | 0.8 |
| 44 | NATIONW BAILRD INT EQ-A | International | Foreign Value | Broad Market | Value | NWHIX | Nationwide Fund Advisors | 353.6 | 0.75 |
| 45 | NATIXIS OAKMARK INTERNATIO-A | International | Foreign Value | N.A. | Value | NOIAX | NGAM Advisors LP | 969.5 | 0.85 |
| 46 | NUVEEN SB INTL DIVD GROW-A | International | Foreign Value | Broad Market | Value | NUIAX | Nuveen Fund Advisors LLC | 3.6 | 0.81 |
| 47 | NUVEEN TRADEWINDS INT VAL-I | International | Foreign Value | Broad Market | Value | NGRRX | Nuveen Fund Advisors LLC | 237.5 | 0.84 |
| 48 | OAKMARK INTERNATIONAL-I | International | Foreign Value | Broad Market | Value | OAKIX | Harris Associates LP | 25,226.0 | 0.83 |

**Exhibit E1**
**Advisory Fees Paid by International All-Cap Value Mutual Funds (all funds, alphabetically)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|---|
| 49 | OPPENHEIMER INTL VALUE FD-B | International | Foreign Value | N.A. | Value | QIVBX | OFI Global Asset Management Inc | 932.5 | 0.8 |
| 50 | OPTIMUM INTERNATIONAL FUND-A | International | Foreign Value | Broad Market | Value | OAIEX | Delaware Management Co | 578.0 | 0.77 |
| 51 | PEAR TREE POL-FOREIGN VAL-OR | International | Foreign Value | Broad Market | Value | QFVOX | Pear Tree Advisors Inc | 1,646.0 | 1 |
| 52 | PERKINS INTL VALUE-A | International | Foreign Value | N.A. | Value | JIFAX | Janus Capital Management LLC | 11.5 | 0.8 |
| 53 | PIMCO INTL DVD FND-A | International | Foreign Value | Broad Market | Value | PVIAX | Pacific Investment Management Co LLC | 6.0 | 1.09 |
| 54 | PIONEER INTERNATIONAL EQ-A | International | Foreign Value | N.A. | Value | PIIFX | Pioneer Investments Management Inc | 158.7 | 0.85 |
| 55 | PRINCIPAL OVERSEAS FUNDS | International | Foreign Value | N.A. | Value | PINZX | Principal Management Corp | 2,899.6 | 1.06 |
| 56 | RBB FREE MARKET INTL EQUITY | International | Foreign Value | N.A. | Value | FMNEX | Matson Money Inc | 1,550.3 | 0.5 |
| 57 | SALIENT INTERNAT DVD SIG-IV | International | Foreign Value | N.A. | Value | FFINX | Forward Management LLC | 174.2 | 0.25 |
| 58 | SARATOGA INTERNATIONAL EQ-I | International | Foreign Value | N.A. | Value | SIEPX | CLS Investments LLC | 5.8 | 0.75 |
| 59 | SCHRODER INTL MLT CAP VA-INV | International | Foreign Value | Broad Market | Value | SIDNX | Schroder Investment Management North America | 259.6 | 0.65 |
| 60 | TEMPLETON FOREIGN FUND-A | International | Foreign Value | N.A. | Value | TEMFX | Templeton Global Advisors Ltd | 6,533.9 | 0.69 |
| 61 | TEMPLETON INST FOREIGN EQT-P | International | Foreign Value | N.A. | Value | TFEQX | Templeton Asset Management Ltd | 4,985.7 | 0.75 |
| 62 | THIRD AVENUE INTL VALUE-INST | International | Foreign Value | Broad Market | Value | TAVIX | Third Avenue Management LLC | 132.7 | 1.25 |
| 63 | TOCQUEVILLE INTL VALUE FUND | International | Foreign Value | N.A. | Value | TIVFX | Tocqueville Asset Management LP | 434.9 | 1 |
| 64 | VANGUARD INTERNATIONAL VALUE | International | Foreign Value | Broad Market | Value | VTRIX | Vanguard Group Inc/The | 7,822.6 | 0.42 |
| 65 | VANGUARD INTL DVD AP IDX-ADV | International | Foreign Value | N.A. | Value | VIAAX | Vanguard Group Inc/The | 16.8 | 0.21 |
| 66 | VANGUARD INTL HI DVD YLD-ADV | International | Foreign Value | N.A. | Value | VIHAX | Vanguard Group Inc/The | 13.0 | 0.2 |
| 67 | WORLD EX US VALUE PORT | International | Foreign Value | N.A. | Value | DFWVX | Dimensional Fund Advisors LP | 178.4 | 0.47 |

# EXHIBIT E-2

**Exhibit E2**
**Advisory Fees Paid by Large International All-Cap Value Mutual Funds**
**(only funds with net assets > $1 billion; listed in descending order of fees)**

| | Fund Name | Fund Geographical Focus | Fund Objective | Fund Market Cap Focus | Fund Strategy | Ticker | Investment Advisors | Fund Assets ($ millions) | Fund Mgr Stated Fee |
|---|---|---|---|---|---|---|---|---|---|
| 1 | PRINCIPAL OVERSEAS FUNDS | International | Foreign Value | N.A. | Value | PINZX | Principal Management Corp | 2,899.6 | 1.06 |
| 2 | PEAR TREE POL-FOREIGN VAL-OR | International | Foreign Value | Broad Market | Value | QFVOX | Pear Tree Advisors Inc | 1,646.0 | 1 |
| 3 | ARTISAN INTL VALUE FUND-INV | International | Foreign Value | Broad Market | Value | ARTKX | Artisan Partners LP | 11,064.1 | 0.93 |
| 4 | HARTFORD INTL VALUE FUND-A | International | Foreign Value | N.A. | Value | HILAX | Hartford Funds Management Co LLC | 1,245.7 | 0.85 |
| 5 | BNY MELLON INTERNATIONAL-M | International | Foreign Value | Broad Market | Value | MPITX | BNY Mellon Fund Advisers | 1,089.3 | 0.85 |
| 6 | OAKMARK INTERNATL-I | International | Foreign Value | Broad Market | Value | OAKIX | Harris Associates LP | 25,226.0 | 0.83 |
| 7 | CAUSEWAY INTERNATL VAL-INST | International | Foreign Value | N.A. | Value | CIVIX | Causeway Capital Management LLC | 5,538.3 | 0.8 |
| 8 | MSIF-INTERNATIONAL EQUITY-I | International | Foreign Value | N.A. | Value | MSIQX | Morgan Stanley Investment Management Inc | 4,255.4 | 0.8 |
| 9 | MAINSTAY ICAP INTERNATION-A | International | Foreign Value | N.A. | Value | ICEVX | New York Life Investment Management LLC | 1,638.9 | 0.8 |
| 10 | JOHN HANCOCK II-INTL VAL-1 | International | Foreign Value | N.A. | Value | JIVIX | John Hancock Advisers LLC | 1,558.0 | 0.8 |
| 11 | FIRST EAGLE OVERSEAS-A | International | Foreign Value | N.A. | Value | SGOVX | First Eagle Investment Management LLC | 14,020.9 | 0.75 |
| 12 | LAZARD INTER STRAT EQ-INST | International | Foreign Value | N.A. | Value | LISIX | Lazard Asset Management LLC/USA | 7,678.5 | 0.75 |
| 13 | TEMPLETON INST FOREIGN EQT-P | International | Foreign Value | N.A. | Value | TFEQX | Templeton Asset Management Ltd | 4,985.7 | 0.75 |
| 14 | MFS INTL VALUE-A | International | Foreign Value | N.A. | Value | MGIAX | Massachusetts Financial Services Co | 25,587.8 | 0.71 |
| 15 | LORD ABBETT INTL DVD INC-A | International | Foreign Value | Broad Market | Value | LIDAX | Lord Abbett & Co LLC | 1,568.8 | 0.7 |
| 16 | TEMPLETON FOREIGN FUND-A | International | Foreign Value | N.A. | Value | TEMFX | Templeton Global Advisors Ltd | 6,533.9 | 0.69 |
| 17 | GMO INTERNATIONAL EQUITY-III | International | Foreign Value | Broad Market | Value | GMOIX | Grantham Mayo Van Otterloo & Co LLC | 8,493.1 | 0.5 |
| 18 | RBB FREE MARKET INTL EQUITY | International | Foreign Value | N.A. | Value | FMNEX | Matson Money Inc | 1,550.3 | 0.5 |
| 19 | VANGUARD INTERNATIONAL VALUE | International | Foreign Value | Broad Market | Value | VTRIX | Vanguard Group Inc/The | 7,822.6 | 0.42 |

Page 1 of 1

# EXHIBIT F-1

**Exhibit F1**
**Oakmark Fund - Historical Data Relevant to Analysis of Economies of Scale**

| Date | Fund Net Assets ($ 000s) | Paid in Capital ($ 000s) | Unrealized / Undistributed Income, Gains and Losses ($ 000s) | Share of Fund Assets Consisting of Appreciation | Shares Outstanding (000s) | Advisory Fees ($ 000s) | Advisory Fee Blended Rate (per Prospectus) | Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules) | Advisory Fee Rate Schedule | Portfolio Turnover | Number of Equity Holdings | Portfolio Managers | Performance (Class 1, Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Growth 2001 to 2015 | 435.16% | 328.85% | n/a | average 19.08% | 181.18% | 403.21% | -25.00% | -6.99% | n/a | n/a Average 28% | n/a (-3.4%) Average 54.8 | | n/a Average 9.38% |
| 2015 | 16,639,388 | 13,275,685 | 3,363,703 | 20.22% | Class 1: 269,919 Class 2: 3,209 | 129,133 | 0.72% | 0.74% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.625% on the next $2.5 billion; and 0.620% over $12.5 billion | 33% | 57 | Nygren; Grant | -4.87% |
| 2014 | 16,660,099 | 11,200,543 | 5,459,556 | 32.77% | Class 1: 240,877 Class 2: 2,503 | 100,973 | 0.75% | 0.74% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.625% on the next $2.5 billion; and 0.620% over $12.5 billion | 25% | 58 | Nygren; Grant | 20.01% |
| 2013 | 10,502,825 | 6,712,629 | 3,790,196 | 36.09% | Class 1: 174,280 Class 2: 1,574 | 70,263 | 0.81% | 0.74% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.625% over $10 billion | 19% | 53 | Nygren; Grant | 26.75% |
| 2012 | 6,774,801 | 4,741,405 | 2,033,396 | 30.01% | Class 1: 137,601 Class 2: 719 | 49,713 | 0.87% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; 0.65% over $10 billion | 27% | 55 | Nygren; Grant | 30.43% |
| 2011 | 4,537,223 | 3,896,069 | 641,155 | 14.13% | Class 1: 119,170 Class 2: 653 | 37,842 | 0.92% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; 0.65% over $10 billion | 18% | 56 | Nygren; Grant | -0.67% |
| 2010 | 3,428,344 | 2,575,400 | 852,944 | 24.88% | Class 1: 89,139 Class 2: 235 | 31,573 | 0.94% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; 0.65% over $10 billion | 24% | 56 | Nygren; Grant | 11.74% |
| 2009 | 3,152,383 | 2,642,189 | 510,194 | 16.18% | Class 1: 90,992 Class 2: 236 | 25,877 | 0.99% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; 0.65% over $10 billion | 62% | 53 | Nygren; Grant | 3.38% |
| 2008 | 3,632,498 | 2,930,321 | 692,177 | 19.11% | Class 1: 102,736 Class 2: 354 | 41,395 | 0.93% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; 0.65% over $10 billion | 32% | 49 | Nygren; Grant | -18.14% |
| 2007 | 5,685,992 | 3,564,474 | 2,121,518 | 37.31% | Class 1: 119,638 Class 2: 618 | 51,887 | 0.87% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; 0.65% over $10 billion | 32% | 54 | Nygren; Grant | 11.51% |

Page 1 of 2

**Exhibit F1**
**Oakmark Fund - Historical Data Relevant to Analysis of Economies of Scale**

| Date | Fund Net Assets ($ 000s) | Paid in Capital ($ 000s) | Unrealized / Undistributed Income, Gains and Losses ($ 000s) | Share of Fund Assets Consisting of Appreciation | Shares Outstanding (000s) | Advisory Fees ($ 000s) | Advisory Fee Blended Rate (per Prospectus) | Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules) | Advisory Fee Rate Schedule | Portfolio Turnover | Number of Equity Holdings | Portfolio Managers | Performance (Class I, Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2006 | 5,523,659 | 3,736,773 | 1,786,886 | 32.35% | Class 1: 122,891 Class 2: 845 | 50,810 | 0.89% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; and 0.65% over $10 billion | 9% | 52 | Nygren; Grant | 10.46% |
| 2005 | 6,384,079 | 5,108,750 | 1,275,329 | 19.98% | Class 1: 155,579 Class 2: 1,078 | 59,185 | 0.86% | 0.76% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% on the next $2.5 billion; 0.70% on the next $2.5 billion; and 0.65% over $10 billion | 16% | 53 | Nygren; Grant | 5.79% |
| 2004 | 6,525,895 | 5,604,817 | 921,078 | 14.11% | Class 1: 167,357 Class 2: 1,349 | 50,652 | 0.87% | 0.80% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% over $5 billion | 19% | 56 | Nygren; Grant | 14.73% |
| 2003 | 4,790,515 | 4,577,793 | 212,722 | 4.44% | Class 1: 140,880 Class 2: 627 | 37,074 | 0.91% | 0.80% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% over $5 billion | 21% | 56 | Nygren; Grant | 20.99% |
| 2002 | 3,308,681 | 3,831,067 | -522,386 | -15.79% | Class 1: 117,549 Class 2: 276 | 34,849 | 0.93% | 0.80% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% over $5 billion | 44% | 55 | Nygren; Grant | -11.77% |
| 2001 | 3,109,329 | 3,095,659 | 13,570 | 0.44% | Class 1: 97,133 Class 2: 3 | 25,662 | 0.96% | 0.80% | 1.00% up to $2 billion; 0.90% on the next $1 billion; 0.80% on the next $2 billion; 0.75% over $5 billion | 57% | 59 | Nygren; Grant | 20.42% |

# EXHIBIT F-2

**Exhibit F2**
**Oakmark Equity and Income Fund - Historical Data Relevant to Analysis of Economies of Scale**

| Date | Fund Net Assets ($ 000s) | Paid in Capital ($ 000s) | Unrealized / Undistributed Income, Gains and Losses ($ 000s) | Share of Fund Assets Consisting of Appreciation | Shares Outstanding (000s) | Advisory Fees ($ 000s) | Advisory Fee Blended Rate (per Prospectus) | Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules) | Advisory Fee Rate Schedule | Portfolio Turnover | Number of Equity Holdings | Portfolio Managers | Performance (Class I, Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Growth 2001 to 2015 | 2817.48% | 2140.55% | n/a | average 15.71% | 1598.45% | 8397.99% | -12.00% | -9.21% | 92.21% | n/a Average 64% | n/a (27.0%) Average 45.9 | | n/a Average 9.27% |
| 2015 | 18,186,260 | 13,771,509 | 4,414,751 | 24.28% | Class 1: 576,493 Class 2: 30,277 | 135,788 | 0.66% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 25% | 47 | McGregor; Hudson; Logan (resigned May 2016); Wojciechowski | -2.53% |
| 2014 | 20,549,911 | 13,781,149 | 6,768,762 | 32.94% | Class 1: 576,366 Class 2: 34,640 | 135,014 | 0.66% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 18% | 47 | McGregor; Hudson; Logan; Wojciechowski | 10.39% |
| 2013 | 19,433,937 | 12,883,006 | 6,550,931 | 33.71% | Class 1: 551,172 Class 2: 36,902 | 126,059 | 0.66% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 25% | 49 | McGregor; Hudson; Logan; Wojciechowski | 17.63% |
| 2012 | 19,176,927 | 15,008,292 | 4,168,635 | 21.74% | Class 1: 614,882 Class 2: 44,571 | 127,495 | 0.67% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 29% | 52 | McGregor | 17.19% |
| 2011 | 17,653,225 | 15,888,006 | 1,765,219 | 10.00% | Class 1: 614,618 Class 2: 47,636 | 130,775 | 0.67% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 47% | 54 | McGregor | -0.77% |
| 2010 | 18,263,871 | 16,231,244 | 2,032,626 | 11.13% | Class 1: 652,905 Class 2: 49,133 | 117,037 | 0.67% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 91% | 49 | McGregor; Studzinski | 6.52% |

**Exhibit F2**
**Oakmark Equity and Income Fund - Historical Data Relevant to Analysis of Economies of Scale**

| Date | Fund Net Assets ($ 000s) | Paid in Capital ($ 000s) | Unrealized / Undistributed Income, Gains and Losses ($ 000s) | Share of Fund Assets Consisting of Appreciation | Shares Outstanding (000s) | Advisory Fees ($ 000s) | Advisory Fee Blended Rate (per Prospectus) | Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules) | Advisory Fee Rate Schedule | Portfolio Turnover | Number of Equity Holdings | Portfolio Managers | Performance (Class 1, Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2009 | 15,528,819 | 14,302,777 | 1,226,041 | 7.90% | Class 1: 583,331 Class 2: 45,196 | 91,562 | 0.70% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; 0.585% on the next $5 billion; 0.5775% on the next $7 billion; and 0.5725% over $28 billion | 78% | 47 | McGregor; Studzinski | 1.02% |
| 2008 | 14,273,014 | 12,652,392 | 1,620,622 | 11.35% | Class 1: 518,629 Class 2: 35,749 | 98,087 | 0.69% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.65% on the next $2.5 billion; 0.60% on the next $3.5 billion; and 0.585% over $16 billion | 65% | 38 | McGregor; Studzinski | -3.85% |
| 2007 | 13,404,672 | 10,003,021 | 3,401,651 | 25.38% | Class 1: 435,622 Class 2: 32,113 | 86,512 | 0.70% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; and 0.60% over $12.5 billion | 67% | 40 | McGregor; Studzinski | 15.77% |
| 2006 | 11,132,617 | 8,766,146 | 2,366,471 | 21.26% | Class 1: 393,158 Class 2: 27,256 | 73,932 | 0.71% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; and 0.60% over $12.5 billion | 81% | 41 | McGregor; Studzinski | 6.51% |
| 2005 | 9,805,220 | 7,870,952 | 1,934,268 | 19.73% | Class 1: 362,971 Class 2: 23,013 | 63,670 | 0.72% | 0.68% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; 0.65% on the next $2.5 billion; and 0.60% over $12.5 billion | 112% | 50 | McGregor; Studzinski | 13.65% |
| 2004 | 8,056,558 | 6,987,289 | 1,069,269 | 13.27% | Class 1: 327,695 Class 2: 20,787 | 46,998 | 0.72% | 0.69% | 0.75% up to $5 billion; 0.70% on the next $2.5 billion; 0.675% on the next $2.5 billion; and 0.65% over $10 billion | 72% | 54 | McGregor; Studzinski | 14.64% |
| 2003 | 4,384,649 | 4,019,127 | 365,522 | 8.34% | Class 1: 203,829 Class 2: 12,186 | 23,469 | 0.73% | 0.75% | 0.75% | 48% | 37 | McGregor; Studzinski | 19.75% |
| 2002 | 2,360,587 | 2,521,771 | -161,184 | -6.83% | Class 1: 190,508 Class 2: 6,924 | 12,100 | 0.71% | 0.75% | 0.75% | 73% | 46 | McGregor; Studzinski | -0.47% |
| 2001 | 623,356 | 614,649 | 8,707 | 1.40% | Class 1: 35,536 Class 2: 189 | 1,592 | 0.75% | 0.75% | 0.75% | 124% | 37 | McGregor; Studzinski | 14.40% |

# EXHIBIT F-3

**Exhibit F3**
**Oakmark International Fund - Historical Data Relevant to Analysis of Economies of Scale**

| Date | Fund Net Assets ($ 000s) | Paid in Capital ($ 000s) | Unrealized / Undistributed Income, Gains and Losses ($ 000s) | Share of Fund Assets Consisting of Appreciation | Shares Outstanding (000s) | Advisory Fees ($ 000s) | Advisory Fee Blended Rate (per Prospectus) | Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules) | Advisory Fee Rate Schedule | Portfolio Turnover | Number of Equity Holdings | Portfolio Managers | Performance (Class I, Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Growth 2001 to 2015 | 3475% | 2986% | n/a | average 4.7% | 1996.48% | 2849% | -17.82% | -3.80% | n/a | n/a Average 39% | n/a Average 55.3 | n/a | n/a Average 9.3% |
| 2015 | $26,474,252 | $28,019,805 | -$1,545,553 | -5.84% | Class 1: 1,224,341 Class 2: 26,124 | $243,867 | 0.83% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; 0.80% on the next $6.5 billion; 0.795% on the next $7 billion; 0.790% on the next $5 billion; and 0.785% over $18 billion. | 48% | 60 | Herro Taylor | -8.98% |
| 2014 | $30,298,516 | $27,114,799 | $3,183,717 | 10.51% | Class 1: 1,190,093 Class 2: 21,496 | $245,916 | 0.82% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; 0.80% on the next $6.5 billion; and 0.795% over $16 billion. | 39% | 60 | Herro Taylor | -0.64% |
| 2013 | $24,272,832 | $19,819,353 | $4,453,479 | 18.35% | Class 1: 922,633 Class 2: 14,894 | $122,041 | 0.81% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; and 0.80% over $14.5 billion. | 37% | 58 | Herro Taylor | 40.79% |
| 2012 | $9,234,940 | $9,356,788 | -$121,848 | -1.32% | Class 1: 478,700 Class 2: 12,900 | $71,165 | 0.88% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; and 0.80% over $14.5 billion. | 38% | 53 | Herro Taylor | 17.40% |
| 2011 | $7,124,754 | $8,451,200 | -$1,326,446 | -18.62% | Class 1: 429,002 Class 2: 12,607 | $68,064 | 0.90% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; and 0.80% over $14.5 billion. | 45% | 52 | Herro Taylor | -10.54% |
| 2010 | $5,853,411 | $5,707,404 | $146,007 | 2.49% | Class 1: 313,956 Class 2: 8,000 | $43,917 | 0.91% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; and 0.805% on the next $5.5 billion; and 0.80% over $16.5 billion. | 51% | 55 | Herro Taylor | 17.67% |
| 2009 | $4,153,275 | $4,912,067 | -$758,842 | -18.27% | Class 1: 248,993 Class 2: 6,584 | $29,265 | 0.98% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; 0.805% on the next $5.5 billion; and 0.80% over $16.5 billion. | 53% | 57 | Herro Taylor | 17.71% |
| 2008 | $3,884,458 | $4,696,991 | -$812,533 | -20.92% | Class 1: 238,911 Class 2: 8,415 | $60,881 | 0.94% | 0.83% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; and 0.805% over $14.5 billion. | 41% | 45 | Herro | -28.59% |
| 2007 | $9,033,477 | $6,234,604 | $2,798,873 | 30.98% | Class 1: 317,678 Class 2: 22,295 | $78,628 | 0.88% | 0.84% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; 0.815% on the next $3.5 billion; and 0.805% over $11 billion. | 50% | 52 | Herro | 14.53% |
| 2006 | $7,696,541 | $4,876,783 | $2,819,758 | 36.64% | Class 1: 268,357 Class 2: 18,644 | $61,243 | 0.90% | 0.84% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; and 0.815% over $7.5 billion. | 37% | 60 | Herro | 22.14% |

**Exhibit F3**
**Oakmark International Fund – Historical Data Relevant to Analysis of Economies of Scale**

| Date | Fund Net Assets ($ 000s) | Paid in Capital ($ 000s) | Unrealized / Undistributed Income, Gains and Losses ($ 000s) | Share of Fund Assets Consisting of Appreciation | Shares Outstanding (000s) | Advisory Fees ($ 000s) | Advisory Fee Blended Rate (per Prospectus) | Advisory Fee Blended Rate (6/30/2016 AUM @ historical rate schedules) | Advisory Fee Rate Schedule | Portfolio Turnover | Number of Equity Holdings | Portfolio Managers | Performance (Class 1, Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005 | $5,990,250 | $4,092,102 | $1,898,148 | 31.69% | Class 1: 239,303 Class 2: 15,535 | $47,254 | 0.91% | 0.84% | 1.00% up to $2 billion; 0.95% on the next $1 billion; 0.85% on the next $2 billion; 0.825% on the next $2.5 billion; and 0.815% over $7.5 billion | 34% | 65 | Herro Welsh | 25.85% |
| 2004 | $4,296,110 | $3,484,490 | $811,620 | 18.89% | Class 1: 212,697 Class 2: 13,746 | $36,338 | 0.94% | 0.87% | 1.00% up to $2 billion; 0.95% on the next $1 billion; and 0.85% over $3 billion | 21% | 58 | Herro Welsh | 21.92% |
| 2003 | $2,799,845 | $2,640,298 | $159,547 | 5.70% | Class 1: 170,774 Class 2: 7,908 | $19,015 | 0.96% | 0.87% | 1.00% up to $2 billion; 0.95% on the next $1 billion; and 0.85% over $3 billion | 34% | 49 | Herro Welsh | 29.97% |
| 2002 | $1,442,264 | $1,393,787 | $48,477 | 3.36% | Class 1: 114,538 Class 2: 3,995 | $12,049 | 0.97% | 0.87% | 1.00% up to $2 billion; 0.95% on the next $1 billion; and 0.85% over $3 billion | 24% | 54 | Herro Welsh | -1.53% |
| 2001 | $740,477 | $907,829 | -$167,352 | -22.60% | Class 1: 59,013 Class 2: 156 | $8,270 | 1.01% | 0.87% | 1.00% up to $2 billion; 0.95% on the next $1 billion; and 0.85% over $3 billion | 58% | 52 | Herro Welsh | -13.10% |