**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| SELWYN KARP and ETHAN TREISTMAN,<br><br>               Plaintiffs,<br><br>     v.<br><br>HARRIS ASSOCIATES L.P.,<br><br>               Defendant. | **1:16-cv-08216**<br><br>**Judge Thomas M. Durkin**<br><br><br>**ORAL ARGUMENT REQUESTED** |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

---

John D. Donovan, Jr. (admitted *pro hac vice*)
Robert A. Skinner (admitted *pro hac vice*)
Amy D. Roy (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone:  (617) 951-7000
Facsimile:   (617) 951-0394
john.donovan@ropesgray.com
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

Nicholas M. Berg
191 North Wacker Drive
32nd Floor
Chicago, IL 60606
Telephone:  (312) 845-1200
Facsimile:   (312) 845-5500
Nicholas.Berg@ropesgray.com

*Attorneys for Defendant Harris Associates L.P.*

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ................................................................... 1

**BACKGROUND** .................................................................................... 4

    A.    Mutual Funds and the Investment Company Act of 1940 .................................... 4

    B.    Harris and the Oakmark Funds ........................................................... 5

    C.    Subadvised Funds and Separate Accounts ............................................... 8

    D.    Annual Approval of the IAAs by the Statutorily Independent Board of Trustees .................................................................................... 11

**ARGUMENT** ........................................................................................ 12

I.    THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE FEES UNDER SECTION 36(B) OF THE ICA ...................................... 12

    A.    The Legal Standard for Pleading a Section 36(b) Claim Is Stringent ................. 12

    B.    Plaintiffs' Naked Allegations that Harris Provides Substantially the Same Services to Subadvised Funds as It Does to the Funds Lend No Support to the Claim that Harris's Fees Are Beyond Arm's-Length Bargaining .................. 15

    C.    Comparison of the Fees Charged and Services Provided to the Oakmark Funds and Harris's Separate Account Clients Is Likewise Inapt ...................... 24

    D.    Comparisons of the Funds' Fees to Fees Paid by Other Mutual Funds Do Not Suggest the Funds' Fees Are Beyond the Arm's-Length Range ................. 26

    E.    Plaintiffs' Recitation of Other *Gartenberg* Factors Provides No Basis for a Conclusion that the Funds' Fees Are Outside the Arm's-Length Range ............ 30

II.    SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM ....................... 37

**CONCLUSION** ..................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*188 LLC v. Trinity Indus., Inc.,*
  300 F.3d 730 (7th Cir. 2002) ..................................................................5

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)..........................................................................12

*Amron v. Morgan Stanley Inv. Advisors Inc.,*
  464 F.3d 338 (2d. Cir. 2006)........................................................ *passim*

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007).........................................................................12

*Bissessur v. Indiana Univ. Bd. of Trs.,*
  581 F.3d 599 (7th Cir. 2009) .......................................................12, 13

*Brooks v. Ross,*
  578 F.3d 574 (7th Cir. 2009) ............................................................13

*Burks v. Lasker,*
  441 U.S. 471 (1979)...........................................................................4

*Davis v. Bailey,*
  No. 05-civ-0042, 2005 WL 3527286 (D. Colo. Dec. 22, 2005) ...........37

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.,*
  694 F.2d 923, 929 (2d. Cir. 1982).................................................13, 33

*Hoffman v. UBS-AG,*
  591 F. Supp. 2d 522 (S.D.N.Y. 2008)..............................................35

*Ingehutt v. State Farm Inv. Mgmt Corp.,*
  No. 1:15-cv-01303 (C.D. Ill. June 22, 2016) ..............................14, 22

*In re Am. Mut. Funds Fee Litig.,*
  No. 04-5593, 2009 WL 5215755 (C.D. Cal. Dec. 28, 2009).................33

*In re Franklin Mut. Funds Fee Litig.,*
  478 F. Supp. 2d 677, 687 (D.N.J. 2007) ......................................27, 31

*Jones v. Harris Assocs. L.P.,*
  611 Fed. App'x 359 (7th Cir. 2015) ........................................ *passim*

*Jones v. Harris Assocs. L.P.,*
  559 U.S. 335 (2010)................................................................ *passim*

*Jones v. Harris Assocs. L.P.,*
   No. 04 Civ. 8305, 2007 WL 627640 (N.D. Ill. Feb. 27, 2007) ....................................... *passim*

*Kalish v. Franklin Advisers, Inc.,*
   742 F. Supp. 1222 (S.D.N.Y. 1990) ............................................................................34

*Krantz v. Prudential Invs. Fund Mgmt. LLC,*
   305 F.3d 140 (3d Cir. 2002) .........................................................................................35

*Krinsk v. Fund Asset Mgmt., Inc.,*
   875 F.2d 404 (2d Cir. 1989) ....................................................................................5, 37

*Krinsk v. Fund Asset Mgmt., Inc.,*
   715 F. Supp. 472 (S.D.N.Y. 1988) ...............................................................................37

*Migdal v. Rowe Price-Fleming Int'l, Inc.,*
   248 F.3d 321 (4th Cir. 2001) ................................................................................ *passim*

*Pugh v. Tribune Co.,*
   521 F.3d 686 (7th Cir. 2008) ..........................................................................................6

*Sivolella v. AXA Equitable Life Ins. Co.,*
   No. 11-CV 4194, 2016 WL 4487857 (D.N.J. Aug. 25, 2016) ...................................22, 23, 33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
   551 U.S. 308 (2007) ................................................................................................5, 20

*Turner v. Davis Selected Advisers, LP,*
   626 F. App'x 713 (9th Cir. 2015) ......................................................................... *passim*

*Turner v. Davis Selected Advisers, LP,*
   No. 08-cv-00421, 2011 WL 13070408 (D. Ariz. June 1, 2011) ............................... *passim*

STATUTES

15 U.S.C. § 80a-10(a) .....................................................................................................4

15 U.S.C. § 80a-10(b) .....................................................................................................4

15 U.S.C. § 80a-15(a) .....................................................................................................4

15 U.S.C. § 80a-15(b) .....................................................................................................4

15 U.S.C. § 80a-15(c) .....................................................................................................4

15 U.S.C. § 80a-35(b) .....................................................................................................5

15 U.S.C. § 80a-46(b)(1) ...............................................................................................37

## PRELIMINARY STATEMENT

The plaintiffs – shareholders in the Oakmark Fund, the Oakmark Equity and Income Fund, and the Oakmark International Fund (the "Oakmark Funds") – claim that these mutual funds' investment adviser, Harris Associates L.P. ("Harris"), charged "excessive" fees in violation of Section 36(b) of the Investment Company Act of 1940 (the "ICA").

Ironically, this action replicates a prior lawsuit against Harris under Section 36(b) on behalf of two of the same mutual funds. In *Jones v. Harris Associates L.P.*, shareholder plaintiffs also claimed that investment advisory fees Harris charged three mutual funds were "excessive." No. 04 Civ. 8305, 2007 WL 627640, at *3 (N.D. Ill. Feb. 27, 2007). The plaintiffs' theory in that case mirrored the Complaint's thesis here: they compared the fees Harris charged the mutual funds to what it charged certain "subadvised" mutual funds, as well as to the fees paid by separate accounts like pension funds and other institutional investors, and labeled the difference proof of excess. *Id.* at *8. But the plaintiffs' claim in the first case got them nowhere. Judge Kocoras granted summary judgment to Harris because the proffered comparisons were inapt; the same services were not provided to the different clients. *Id.* The Seventh Circuit ultimately agreed.[1] Even more ironically, the fees that the plaintiffs challenge in this case are even *lower* than the fees at issue in the first suit. This duplicate case is therefore a dead end.

More importantly, the Complaint here does not heed the precepts taught by the prior action. For after summary judgment, the first case ultimately went to the United States Supreme Court, which announced the standard that now applies for Section 36(b) liability, and articulated just what a plaintiff needs to allege and prove to sustain a claim. According to the unanimous Court, "[t]o face liability under § 36(b), an investment adviser must charge a fee that is so

---

[1]     *See Jones v. Harris Assocs. L.P.*, 611 F. App'x 359 (7th Cir. 2015) (on remand from Supreme Court).

disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (emphasis added). Moreover, a plaintiff cannot establish that fees are beyond the bargaining range simply by comparing fees an adviser charges to different clients. "[T]here may be significant differences between the services provided by an investment adviser to a mutual fund and those it provides to a pension fund" or other account, so a foundation for comparability must be laid, and courts must "be wary of inapt comparisons." *Id.* at 349–50. "[I]f the services rendered are sufficiently different that a comparison is not probative, then courts *must* reject such a comparison." *Id.* (emphasis added). Finally, even where a comparison is appropriate and a foundation for the contrast has been laid, that will not suffice to justify a trial. A plaintiff must first establish that fees are beyond the arm's-length bargaining range. Courts may then "assess any disparity in fees in light of the different markets for advisory services." *Id.* at 350 n.8. But "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services *in addition to other evidence that the fee is outside the arm's-length range* will trial be appropriate." *Id.* (emphasis added).

On remand from the Supreme Court, the Seventh Circuit amplified these instructions and further described the contours of a viable claim. The court confirmed that the job of the court is "to identify the outer bounds of arm's length bargaining and not engage in rate regulation." *Jones*, 611 F. App'x at 360. The "bargaining range" for these purposes is informed by fees "produced by bargaining at other mutual-fund complexes." *Id.* at 361. While fees charged to non-mutual fund clients like subadvised funds or separate accounts might be relevant, the requirement of a factual foundation for comparability is exacting: a plaintiff must show the investment adviser provided those clients "with the same sort of services that it provided to the

. . . [mutual] funds, or that it incurred the same costs when serving different types of clients." *Id*.

The plaintiffs' complaint here does not begin to advance the essential elements of a claim that the Supreme Court and the Seventh Circuit insisted upon. The pleading does not attempt to establish a factual foundation for comparability between types of clients beyond its own say-so. It does not describe congruent services in any detail. And it ignores costs altogether. *Ipse dixit* is both the source and the conclusion of the plaintiffs' comparability contention.

Worse, the plaintiffs' comparison of mutual fund fees to fees charged to other clients – whether subadvised funds, separate accounts or other mutual funds – is grounded in manipulation, which strips away its plausibility. The plaintiffs compare the Oakmark Funds' fees for *all* the services Harris provides, to the fees Harris charges subadvised funds for a *subset* of those services. That ignores the Securities and Exchange Commission's ("SEC") mandated disclosure that gives investors the ability to "comparison shop" between funds on an apples-to-apples basis. But that disclosure reveals the Oakmark Funds' aggregate fees to be at or *below* both the mean and median of equivalent fees the subadvised funds pay their managers. Similarly, the plaintiffs compare the Oakmark Funds' advisory fees to a self-selected group of ostensibly "similar" funds sponsored by competitors, but they again blind themselves to the SEC mandated disclosure of these funds' overall expenses. That disclosure also shows the Oakmark Funds' total fees to be consistent with mean and medians among the peer group. Whether competitor fund managers allocate differently between fee components in calculating total expenses is irrelevant. The point is that in the end, investors who buy those competing funds pay *more* than Oakmark Funds' investors.

The plaintiffs' naked allegations and manufactured fee comparisons therefore do not

plausibly establish the "bargaining range" sufficient to support a claim that the challenged fees are beyond the "outer bounds" of that range. As set forth below, the Complaint should be dismissed.

## BACKGROUND

### A.     Mutual Funds and the Investment Company Act of 1940

A mutual fund is an investment vehicle made up of a pool of assets, consisting primarily of a portfolio of securities, that belongs to the individual investors who own shares in the fund. *Jones*, 559 U.S. at 338. Under industry practice, the management and operations of a mutual fund are externalized and contractually delegated to a fund's investment adviser and other vendors. The ICA directly acknowledges that externalization, and enshrines the legal separation of a mutual fund and its adviser as the hallmark of the ICA's principal purpose, establishing the independent trustees as the "cornerstone" of the Act's control of conflicts of interest. *See Burks v. Lasker*, 441 U.S. 471, 482–85 (1979); *see also* 15 U.S.C. §§ 80a-10(a)-(b), 80a-15(a)-(c).

The ICA therefore delegates to trustees unaffiliated with the adviser (the "independent trustees") the primary responsibility to protect the fund and its shareholders from any conflicts of interest with the fund's adviser and the adviser's affiliates. A majority of independent trustees must approve the advisory and other service agreements annually, including the compensation received by the adviser for the services it provides to the fund. 15 U.S.C. § 80a-15(c); *accord Jones*, 559 U.S. at 340. To fulfill that obligation, under Section 15(c) of the ICA, the trustees must "request and evaluate" all information from the adviser reasonably necessary to evaluate the terms of the advisory contract with the funds. 15 U.S.C. § 80a-15(c).

The ICA's reliance on independent trustees to police conflicts of interest between a fund and its adviser also lies at the heart of Section 36(b), which provides that an investment adviser owes a "fiduciary duty with respect to [its] receipt of compensation" from a mutual fund. *Id.*

-4-

§ 80a-35(b). To state a cognizable claim for a breach of this duty, a shareholder plaintiff must show that the fee charged is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added). In making that inquiry, the statute obliges a court to consider the role of the independent trustees in negotiating that fee: "[A]pproval by the board of directors of such investment company of such compensation or payments . . . *shall* be given such consideration by the court as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a-35(b)(2) (emphasis added). The statute does not oblige the directors to negotiate the "'best deal' possible." *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 409 (2d Cir. 1989). And it does not authorize the Court to sit as a "super-trustee" charged with "setting" a fee, or to second-guess informed board decisions. *See Jones*, 559 U.S. at 352. Instead, it requires a plaintiff to plausibly allege and ultimately prove that the result of the independent trustees' deliberation *could not* have derived from an arm's-length negotiation.

### B.      Harris and the Oakmark Funds

Each of the Oakmark Funds is a series of the Harris Associates Investment Trust (the "Trust"), a Massachusetts business trust that is an open-end investment management company registered under the ICA. (Compl. ¶ 38; Ex. 1, Oakmark Funds Statement of Additional Information (Jan. 28, 2015) at 2 ("2015 SAI")).[2] Harris serves as investment adviser to the

---

[2]      All exhibits to the Roy Declaration are cited hereinafter as "Ex. __." As discussed in the Request for Judicial Notice in Support of Defendant's Motion to Dismiss Plaintiffs' Complaint, filed concurrently herewith (the "Request for Judicial Notice"), the Complaint directly references nearly all public disclosures filed by the Funds and the plaintiff-identified "comparator funds" with respect to which Harris seeks judicial notice. Having relied expressly on public filings, the plaintiffs have no basis to suggest that those same documents should be ignored for purposes of this Motion. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (holding that the district court may consider "documents incorporated into the complaint by reference" when ruling on a motion to dismiss); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (courts should consider documents referenced in the complaint "to prevent parties from surviving a motion to dismiss by artful pleading or by failing to attach relevant documents"). The Court may also take judicial notice of documents in the public record, such as

Funds pursuant to an Investment Advisory Agreement ("IAA") between Harris and each of the Funds. (Compl. ¶ 71; Ex. 1, 2015 SAI at 16). As required by the ICA, each advisory agreement is reviewed and approved annually by the Funds' Board of Trustees ("Board"). (Compl. ¶¶ 193, 282; Ex. 2, Harris Associates Investment Trust, Semi-Annual Report (Mar. 31, 2015) at 72 ("2015 SAR")).

Harris provides the Oakmark Funds with a full suite of investment advisory and management services, including: (1) furnishing a continuing investment program; (2) making and executing investment decisions; (3) managing risks that arise from the Funds' investments and operations; (4) developing and maintaining a comprehensive compliance program; (5) maintaining the Funds' portfolio holdings disclosures and procedures; (6) selecting brokers and dealers for the Funds' portfolio transactions; (7) providing the Funds with office space, equipment, and personnel; (8) preparing and distributing of the Funds' prospectuses, profiles, and reports to prospective investors; (9) regularly reporting to the Board; (10) performing a host of administrative services; (11) overseeing third-party service providers; and (12) managing the Funds' business affairs. (Compl. ¶¶ 84, 86, 127; Ex. 1, 2015 SAI at 16, 24, 34; Ex. 2, 2015 SAR at 72–73; Ex. 3, Oakmark Funds Prospectus (Jan. 28, 2015) at 2, 14, 36 ("2015 Prospectus")).

The extent of Harris's administrative and compliance-related services as adviser to the Funds is illustrated in the Funds' publicly-filed agreements with the essential third-party service providers to the Funds such as the custodian, administrator, and transfer agent. As those agreements reflect, in its role as adviser, Harris actively oversees the third-party providers, compiles materials needed for their activities, and reserves the right of final approval over all relevant actions. Specifically, Harris retains the following critical and distinct responsibilities,

---

required disclosures on file with the SEC, without converting a motion to dismiss into a motion for summary judgment. *See Pugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008).

among others:

1. Continuous monitoring of portfolio activity and Fund operations in conjunction with the ICA, Prospectus, Statement of Additional Information, and any other applicable laws and regulations;

2. Monitoring testing results and approving resolution of compliance issues;

3. Continuous monitoring of portfolio activity in conjunction with IRS requirements;

4. Review of quarterly asset diversification test results and taking necessary action;

5. Review of quarterly qualifying income test results and taking necessary action;

6. Review and approval of tax positions to be taken in tax treatment of particular issues;

7. Review and approval of asset level projections;

8. Review and approval of the fund's annual expense budget;

9. Providing information as necessary for the review of the fund's net expense ratios and vendors;

10. Review of expense analysis and approval of budget revision;

11. Review and approval of invoices and allocations of payment of fund expenses;

12. Review and approval of dividend calculation methodologies for each share class;

13. Review and approval of dividend rate per share and aggregate amounts;

14. Obtaining Board approval for dividend decisions, when required;

15. Review and approval of the filing of SEC Form 24f-2;

16. Review of monthly and quarterly financial information reports for presentation to Fund Management, the Board, and shareholders;

17. Providing financial statements and other information required for the annual and semi-annual audits of the Funds and assisting in managing the audit cycle;

18. Preparing a management letter and coordinating production of Management Discussion and Analysis related to the annual and semi-annual audits;

19. Providing response for SEC Form N-SAR and reviewing and authorizing its filing;

20. Providing transaction information for the preparation of income tax provisions;

21. Identifying Passive Foreign Investment Companies for the preparation of income tax provisions and the calculation of excise tax distributions;

22. Review and approval of all income tax accounting positions;

23. Providing transaction information for the calculation of excise tax distributions;

24. Review and approval of all income and distribution calculations, including projected income and dividend shares;

25. Review and approval of all information provided for Form 1099;

26. Review and approval of all information provided for the preparation of all year-end tax-related disclosures; and

27. Monitoring the issuance of shares recorded by the transfer agent in light of laws relating to the issuance of such shares.

(Ex. 4, Administration Agreement (Apr. 1, 2002) at App. B; Ex. 5, Custodian Agreement (Apr. 1, 2002) at App. B; Ex. 6, Transfer Agency and Service Agreement (Oct. 1, 2005) ¶ 1.1(k)).

In addition to these described services that Harris provides, it also bears a variety of enterprise risks as adviser and sponsor of the Funds. These include both investment risk (*i.e.*, risk that the Funds will not succeed) and compliance and regulatory risk (*i.e.*, risk that the Funds will not comply with applicable federal and state laws, resulting in enforcement actions, litigation, potential penalties, and other potential harms imposed upon Harris). Harris also undertakes significant business risk (*i.e.*, risk that sales of the Funds or shareholder redemptions will make the Funds uneconomic to offer).

For all its services and the risks it bears as the Funds' sponsor, Harris receives a fee from each of the Funds, calculated as a percentage of that Fund's net assets at the end of the preceding month. (Compl. ¶ 91). The fee structure for each of the Funds features "breakpoints" – that is, marginal percentage fee declines as the net assets of the Fund increase. (*Id.* ¶ 92, Tbl. 2).

C.     **Subadvised Funds and Separate Accounts**

*Subadvised Funds.*     As alleged in the Complaint, Harris also provides subadvisory services to seven U.S.-registered mutual funds,[3] sponsored by other primary advisers, that pursue

---

[3]     The seven U.S.-registered funds are: the Natixis Oakmark Fund, the Natixis U.S. Equities and Opportunities Fund, the Litman Gregory Masters Equity Fund, the MIST Harris Oakmark International Portfolio, the MML International Equity Fund, the Natixis Oakmark International Fund, and the Laudus International MarketMasters Fund.

similar investment strategies as the Oakmark Funds, as well as three foreign-domiciled funds[4] with similar investment strategies (together with the U.S.-registered funds, the "Subadvised Funds"). (*See* Compl. ¶148, Tbl. 6).[5] To the Subadvised Funds, Harris provides a strictly defined set of services – fundamentally a sub-set of the full range of services it provides to its proprietary Oakmark Funds. (*Id.* ¶ 63, Ex. B; *see, e.g.*, Ex. 7, Harris Associates L.P. Form ADV Part 2A (Mar. 21, 2016) at 4 ("2016 Form ADV Part 2A")). Harris's services to the Subadvised Funds are limited to conducting portfolio research and securities selection, trade execution, and narrow investment-related reporting and compliance assistance that is strictly related to the core portfolio management function. (*See* Compl. Ex. B).

Each of the Subadvised Funds is sponsored by its own investment adviser that, in exchange for a management fee, provides a host of management services that Harris does not provide as a subadviser, supervises the subadviser's performance, and bears the business, legal, and regulatory risks in connection with the sponsorship of that fund. (*See, e.g.*, Ex. 8, MML Series Investment Fund Prospectus (February 27, 2015) at 87 ("MML Fund Prospectus"); *see also* Compl. Ex. B at 3). For example, as the primary adviser to the Natixis Oakmark Fund, NGAM Advisors, L.P. provides the balance of the services that the fund requires, including administrative services, such as the provision of personnel, office space, facilities, and equipment; investment advisory services, such as obtaining and evaluating economic, statistical, and financial information in order to manage the fund's assets in line with its investment

---

[4]   The three foreign-based funds are: the Harris Associates U.S. Equity Fund, the Oakmark Natixis Funds, and the Oakmark International Natixis Fund. Known as "UCITS" (or "Undertakings for the Collective Investment in Transferable Securities"), these investment products are not subject to the ICA's requirements or SEC regulation. They are offered primarily to European investors and are organized under an entirely separate European Union regulatory regime.

[5]   The Complaint compares ten additional funds subadvised by Harris that pursue strategies similar to funds within the Trust *other than* the Oakmark Funds. (*See* Compl. ¶148, Tbl. 6). Because the plaintiffs do not allege that they hold shares in those other funds, the comparisons are entirely inapposite.

objectives and policies; arrangement for the distribution of the fund's shares; allocation of the fund's brokerage; development of compliance policies; and monitoring and oversight of the fund's subadvisers. (Ex. 9, Natixis Funds Prospectus (May 1, 2015) at 61 ("Natixis Funds Prospectus"); Ex. 10, Natixis Funds Statement of Additional Information (May 1, 2015) at 86–87 ("Natixis Funds SAI"); Ex. 11, Natixis Funds Semi-Annual Report (June 30, 2016) at 10–11; *see also* Compl. Ex. A (listing similar types of services performed by primary advisers of the remaining Subadvised Funds)).

*Separate Accounts*. Harris also provides investment advisory services to institutional and private clients, such as wealthy individuals, government retirement plans, corporate pension and profit sharing plans, trusts, charitable organizations, and other types of entities, on a separate account basis. (*See* Compl. ¶ 61; Ex. 7, 2016 Form ADV Part 2A at 4–6, 8–9). The nature of services that Harris provides to separate accounts varies depending on the client type. Separate account clients may receive from Harris discretionary investment services, which "include a variety of investment strategies from which clients may select." (Ex. 7, 2016 Form ADV Part 2A at 4). Institutional and certain private clients may also select to receive non-discretionary services, in which the client retains "ultimate decision making and discretionary responsibility for the determination of when securities will be purchased and sold." *Id*. at 5. Separate accounts require large minimum account sizes, ranging from $3 million for private clients and $5 million to $100 million for institutional accounts. *Id.* at 7. As the Oakmark Funds' Board recognized, Harris undertakes a greater level of responsibility and a broader scope of investment services for the Funds than it does for the separate accounts. (Ex. 2, 2015 SAR at 72–73). It thus faces more extensive regulatory risks and obligations associated with its management of the Funds. *Id.* In exchange for the provision of investment services to separate account clients, Harris receives

lower fees from those clients compared to the Funds.  *Id.*; Ex. 7, 2016 Form ADV Part 2A at 6–7.

### D. Annual Approval of the IAAs by the Statutorily Independent Board of Trustees

As required by SEC rules, the Funds' public disclosures detail the annual approval process and the Board's thorough review and analysis throughout each year of the Funds' service agreements, including the IAAs.  (*See* Ex. 2, 2015 SAR at 72–73).  The Board is composed of nine trustees, eight of whom (or 89%) are disinterested as defined by the ICA, exceeding the statutory requirement that 40% of trustees be disinterested.  (Compl. ¶ 290; *see* Ex. 1, 2015 SAI at 22–23).  Throughout the approval process, the independent trustees are advised by their experienced, independent legal counsel.  (Ex. 2, 2015 SAR at 72).

In connection with the approval process, and as required by Section 15(c) of the ICA, Harris provides written materials to assist the Board with its consideration of continuing the respective service agreements, including a report prepared by an independent consulting firm, Broadridge Financial Solutions, Inc. ("Broadridge").  (*See* Compl. ¶ 297; Ex. 12, Harris Associates Investment Trust, Semi-Annual Report (Mar. 31, 2016) at 73–74 ("2016 SAR")).  This report provides information comparing the performance and expenses of the Funds to those of competitor funds with similar investment objectives.  (Ex. 12, 2016 SAR at 73–74).  Additional information provided to the Board by Harris includes materials addressing the so-called "*Gartenberg* factors," including information relating to economies of scale, comparisons to the fees and performance of similar funds, and profitability.  (*See* Compl. ¶ 297; Ex. 12, 2016 SAR at 73–74).  The independent trustees, in accordance with their duties under Section 15(c), also send requests to Harris through their independent legal counsel for further information relevant to contract renewal.  (Ex. 12, 2016 SAR at 73).  The Board then meets with senior

Harris representatives to discuss Harris's personnel, operations, and financial condition as they relate to the Funds. (*Id.*). At a meeting on October 21, 2015, the Board completed this review and determined that "the continuation of the [IAA] for each fund was in the best interest of the Fund and its shareholders . . . ." (Compl. ¶ 297; Ex. 12, 2016 SAR at 73). The IAAs were approved for a one-year period ending October 31, 2016, which covers most of the relevant time period for this action. (Ex. 12, 2016 SAR at 73).

**ARGUMENT**

**I.    THE COMPLAINT FAILS TO STATE A PLAUSIBLE CLAIM FOR EXCESSIVE FEES UNDER SECTION 36(B) OF THE ICA**

**A.    The Legal Standard for Pleading a Section 36(b) Claim Is Stringent**

The standard established by the Supreme Court to show a breach of Section 36(b) is exacting:  a plaintiff must demonstrate that the challenged fee is "so disproportionately large that it bears no reasonable relationship to the services rendered and *could not have been* the product of arm's length bargaining." *Jones*, 559 U.S. at 346 (emphasis added). When applying this standard on remand to affirm dismissal on summary judgment of the plaintiffs' claims against Harris in the *Jones* litigation, the Seventh Circuit further explained, "[T]he Supreme Court's approach does not allow a court to assess the fairness or reasonableness of advisers' fees; *the goal is to identify the outer bounds* of arm's length bargaining and not engage in rate regulation." *Jones*, 611 F. App'x at 360 (emphasis added). The "bargaining range" for these purposes is informed by fees "produced by bargaining at other mutual-fund complexes." *Id.* at 361.

Accordingly, to sustain a cognizable claim, the plaintiffs must plead factual allegations that satisfy the rigorous *Jones* standard and are "plausible on [their] face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[I]t is not enough to give a threadbare recitation of the elements of a claim without factual support."

-12-

*Bissessur v. Indiana Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). Rather, to survive a motion to dismiss, a complaint "must state sufficient facts to raise a plaintiff's right to relief above the speculative level." *Id*. at 602; *see also Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009) ("[I]n considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements."). In the context of a Section 36(b) claim, that means the allegations of fact must support a *plausible* claim that the fees are "so disproportionately large" relative to the services provided that they are *beyond* the range of what *could* have been bargained at arm's-length. It follows that to say what lies *beyond* the "bargaining range," a pleading needs to *identify* the limits of the negotiating spectrum. A complaint that fails to define the bargaining range cannot plausibly place a fee beyond it.

In assessing whether the beyond-arm's-length standard is met, "all relevant circumstances [are to] be taken into account." *Jones*, 559 U.S. at 347 (citing *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923, 929 (2d Cir. 1982)). These circumstances may include economies of scale achieved by the adviser and other factors set forth by the Second Circuit in *Gartenberg* and cited favorably in *Jones*:

> (1) the nature and quality of the services provided to the fund and shareholders; (2) the profitability of the fund to the adviser; (3) any "fall-out financial benefits," those collateral benefits that accrue to the adviser because of its relationship with the mutual fund; (4) comparative fee structure (meaning a comparison of the fees with those paid by similar funds); and (5) the independence, expertise, care, and conscientiousness of the board in evaluating adviser compensation.

*Id.* at 344 n.5 (quoting *Gartenberg*, 694 F.2d at 929–32). Importantly, the "*Gartenberg* factors" are not themselves the standard of liability or the elements for establishing a Section 36(b) claim. Rather, the "factors" provide a rubric for analyzing whether the beyond-arm's-length standard is

-13-

met under *Jones*. Accordingly, it is not sufficient simply to assert rote allegations about any one "factor," or even all of them. Rather, the specifics about any "factor" must be tied to the challenged fee so that those details permit the inference that the fee is "so disproportionately large" it "could not have been" negotiated at arm's length. *See Migdal v. Rowe Price-Fleming Int'l, Inc.*, 248 F.3d 321, 327 (4th Cir. 2001) (affirming dismissal of Section 36(b) claim because plaintiffs "failed to allege any facts pertinent to th[e] relationship between fees and services").

The recent decision of the Ninth Circuit in *Turner v. Davis Selected Advisers, LP*, illustrates the point. *See* 626 F. App'x 713 (9th Cir. 2015). *Turner* was the first appellate court decision applying *Jones* at the motion to dismiss stage, and affirmed the dismissal of the plaintiff's complaint. The *Turner* court made clear that when applying *Jones* and the pleading standard under Rule 12(b)(6), a plaintiff cannot cobble together conclusory allegations of "excessiveness" and survive a dismissal motion. Of particular importance, the Ninth Circuit held that a valid claim could not be supported by (i) "inapt comparisons" to other funds' fees that did not lay a factual foundation for comparability; or by (ii) "conclusory statement[s]" about the defendant's costs unadorned with supporting factual allegations. *Id*. at 717. *Turner* makes clear that unparticularized allegations that attest to "excessiveness" in the eyes of a mutual fund shareholder are not sufficient to state a claim under the *Jones* liability standard. Rather, a plaintiff must specifically allege *why* a challenged fee *could not* have been bargained for at arm's length.

The Central District of Illinois recently heeded these precepts, dismissing a Section 36(b) claim where the plaintiff did not sufficiently allege that the adviser's charges on top of what it paid subadvisers exceeded the fair bargaining range. *Ingenhutt v. State Farm Inv. Mgmt. Corp.*, No. 1:15-cv-01303, slip op. at 7–8 (C.D. Ill. June 22, 2016) (copy attached hereto as Ex. 13).

-14-

**B.** **Plaintiffs' Naked Allegations that Harris Provides Substantially the Same Services to Subadvised Funds as It Does to the Funds Lend No Support to the Claim that Harris's Fees Are Beyond Arm's-Length Bargaining**

Despite the Seventh Circuit's directive that a Section 36(b) claim requires a court to "identify the outer bounds of arm's length bargaining," *Jones*, 611 F. App'x at 360, the Complaint alleges no facts from which to discern the arm's-length bargaining range for the Funds' advisory fees. Indeed, the plaintiffs offer the same types of comparisons rejected in *Jones*. One such comparison is based on the unsupported premise that the *advisory services* Harris provides to the Oakmark Funds are the same as the *subadvisory* services it provides to the Subadvised Funds.

That premise is flatly contradicted by the public record upon which the plaintiffs rely, and was rejected by Judge Kocoras in *Jones* because Harris's subadvisory services are "in all events . . . more limited than those provided to the Funds." *Jones*, 2007 WL 627640, at *1. The Supreme Court agreed. Under the Court's directive, any comparison requires a foundation upon which to build a legitimate contrast. *See Jones*, 559 U.S. at 349. The Supreme Court cautioned courts to "be wary of inapt comparisons," especially when "there may be significant differences between the services" rendered to the different types of clients. *Id.* at 350. "If the services rendered are sufficiently different that a comparison is not probative, then courts *must* reject such a comparison." *Id.* (emphasis added).

On remand from the Supreme Court, the Seventh Circuit rejected the very same argument the plaintiffs advance here that comparison to the fees Harris charged to other clients – including other mutual funds that Harris subadvised – was appropriate. In that case there was no evidence that Harris provided those clients "with the same sort of services that it provided to the Oakmark funds, or that it incurred the same costs when serving different types of clients." *Jones*, 611 F. App'x at 361. And here the plaintiffs offer no evidence either. They rely only on their own say-

-15-

so that services were similar. That failure to point to specifics means there is nothing to "justify a further inquiry" into the proffered comparison. *Id.*

Disregarding *Jones*, the Complaint proposes the same inapt comparison of Harris's *advisory* fees to the *subadvisory* fees it is paid by the Subadvised Funds for a narrower set of services. The plaintiffs simply ignore the apples-to-apples comparisons illustrated by the Subadvised Funds' respective SEC-mandated "fee tables" – *i.e.*, how the total *advisory* fee paid by the Funds stacks up against the total *advisory* fee paid by the Subadvised Funds (for the services of both the adviser and subadviser) *or* how the Funds' total operating expenses compare to the total operating expenses of the Subadvised Funds. These comparisons demonstrate that the Funds' fees are at or *below* the mean and median of the Subadvised Funds' equivalent fees.

SEC regulations require mutual fund fees to be disclosed in a way that permits "comparison shopping" by investors. Funds are legally obliged to file with the SEC and mail to shareholders an annual "fee table" that discloses "Management Fees," "Distribution Fees," "Other Expenses," and "Total Annual Fund Operating Expenses." Item 3, SEC Form N1-A, 17 C.F.R. § 239.15A. A comparison of the mandatory fee tables in the prospectuses of the Funds and the U.S.-registered Subadvised Funds reveals an inarguable fact ignored by the plaintiffs: the Funds' fees are comfortably *within* the bargaining range of the plaintiff-identified comparable funds.[6]

---

[6]     Compl. ¶ 168, Tbl. 7; Ex. 3, 2015 Prospectus at 1, 13, 35; Ex. 1, 2015 SAI at 16; Ex. 9, Natixis Funds Prospectus at 17, 21, 25; Ex. 10, Natixis Funds SAI at 12; Ex. 14, Litman Gregory Trust Funds Prospectus (Apr. 30, 2015) at 2, 27; Ex. 15, MET Investors Series Trust Prospectus (May 1, 2015) at 3 ("MIST Fund Prospectus"); Ex. 8, MML Fund Prospectus at 37; Ex. 16, Laudus MarketMasters Funds Prospectus (February 21, 2015) at 5. Not included in this table are the three foreign-domiciled UCITS also alleged by the plaintiffs to be comparable to the Oakmark Funds – the Harris Associates U.S. Equity Fund, Oakmark Natixis Fund, and Oakmark International Natixis Fund. These investment products are not registered as investment companies under the ICA, are offered primarily to European investors, are not subject to the extensive SEC regulatory regime that applies to U.S.-based mutual funds, and are not required to publish comparable prospectuses setting forth the fee disclosures in the table.

| 1. Oakmark Fund's Management Fee | 2. Subadvised Fund's Management Fee | 3. Subadvised Fund's Subadvisory Fee to Harris | 4. Subadvised Fund's Total Operating Expenses | 5. Oakmark Fund's Total Operating Expenses |
|---|---|---|---|---|
| **Oakmark Fund**<br><br>1.00% from $0 - $2 bil<br>0.90% from $2 bil - $3 bil<br>0.80% from $3 bil - $5 bil<br>0.75% from $5 bil - $7.5 bil<br>0.675% from $7.5 bil - $10 bil<br>0.625% from $10 bil - $12.5 bil<br>0.62% over $12.5 bil<br><br>(0.75% "Blended" Fee) | **Natixis Oakmark Fund**<br><br>0.70% from $0 - $200 mil<br>0.65% from $200 mil - $500 mil<br>0.60% over $500 mil<br><br>(0.69% "Blended" Fee) | 0.52% from $0 - $200 mil<br>0.50% over $200 mil | 1.22% | **Oakmark Fund**<br><br>0.87% |
| | **Natixis U.S. Equity Opportunities Fund**<br><br>0.80% | 0.52% | 1.31% | |
| **Oakmark Equity & Income Fund**<br><br>0.75% from $0 - $5 bil<br>0.70% from $5 bil - $7.5 bil<br>0.675% from $7.5 bil - $10 bil<br>0.65% from $10 bil - $12.5 bil<br>0.60% from $12.5 bil - $16 bil<br>0.585% from $16 bil - $21 bil<br>0.5775% from $21 bil - $28 bil<br>0.5725% over $28 bil<br><br>(0.66% "Blended" Fee) | **Litman Gregory Masters Equity Fund**<br><br>1.10% from $0 - $750 mil<br>1.00% over $750 mil<br><br>(1.00% "Blended" Fee) | 0.65% from $0 - $50 mil<br>0.60% from $50 mil - $150 mil<br>0.55% over $150 mil | 1.42% | **Oakmark Equity & Income Fund**<br><br>0.74% |
| **Oakmark International Fund**<br><br>1.00% from $0 - $2 bil<br>0.95% from $2 bil - $3 bil<br>0.85% from $3 bil - $5 bil<br>0.825% from $5 bil - $7.5 bil<br>0.815% from $7.5 bil - $11 bil<br>0.805% from $11 bil - $16.5 bil<br>0.80 from $16.5 bil - $23 bil<br>0.795% from $23 bil - 30 bil<br>0.79% from $30 bil - $35 bil<br>0.785% over $35 bil<br><br>(0.82% "Blended" Fee) | **MIST Harris Oakmark International Portfolio**<br><br>0.85% from $0 - $100 mil<br>0.80% from $100 mil - $1 bil<br>0.725% over $1 bil<br><br>(0.75% "Blended" Fee) | 0.65% from $0 - $50 mil<br>0.60% from $50 mil - $100 mil<br>0.50% from $100 mil - $1 bil<br>0.45% over $1 bil | 0.81% | **Oakmark International Fund**<br><br>0.95% |
| | **MML International Equity Fund**<br><br>0.85% | 0.50% | 1.00% | |
| | **Natixis Oakmark International Fund**<br><br>0.85% | 0.60% | 1.30% | |
| | **Laudus International MarketMasters Fund**<br><br>1.26% | 0.60 % from $0 - $125 mil<br>0.575% from $125 mil - $250 mil<br>0.55% over $250 mil | 1.40% | |

Significantly, the plaintiffs compare the Oakmark Funds' *advisory* fees (Column 1) to the Subadvised Funds' *subadvisory* fees (Column 3), instead of comparing the Funds' *advisory* fees (Column 1) to the Subadvised Funds' *advisory* fees (Column 2). [7] The Complaint thus

---

[7]     The "blended" fees listed in Columns 1 and 2 reflect the "management fees" as reported in the prospectus fee tables of the Oakmark Funds and the Subadvised Funds, minus any applicable fee waivers reflected in the fee tables. (*See supra* n.6). The subadvisory fees that Harris receives (blended or with breakpoints) are not reported in the SEC disclosure. (*See id.*). Accordingly, the fees listed in Column 3 are taken from the Complaint. (*See* Compl. ¶ 168, Tbl. 7).

juxtaposes a *portion* of the management fee paid by the Subadvised Funds with the *entire* management fee paid by the Funds. Not only is that misleading, but it is the very type of "inapt" comparison the Supreme Court warned cannot sustain a Section 36(b) claim. *See Jones*, 559 U.S. at 350. The reason for the plaintiffs' deceptive tactic is clear – as the chart shows, each of the three Oakmark Funds pays advisory fees that are at or *below* the mean and median of those paid by the respective Subadvised Funds that the plaintiffs proffer as comparators.

Likewise, the Complaint altogether ignores the comparison of total operating expenses paid by the Funds and the Subadvised Funds (Columns 4 and 5), which the SEC views as investors' chief method of comparing fund costs. *See* SEC, *Invest Wisely: An Introduction to Mutual Funds*, Investor Publications (July 2, 2008) (informing investors that "[l]ooking at the expense ratio can help you make comparisons among funds").[8] The total operating expenses metric not only shows the bottom-line cost of investing in mutual funds, but it accounts for differences in how expenses are allocated between the management fee and other expenses and thus tells a more complete story for comparison purposes. *See id.* (noting that "administrative fees payable to the investment adviser" may be included in the "Management Fee" or the "Other Expenses" category). The comparison reveals that the Funds' shareholders pay *less* in total operating expenses than the shareholders of the Subadvised Funds in all but one instance.[9] In other words, if the plaintiffs had invested in the Subadvised Funds instead of the Oakmark

---

[8]     Available at http://www.sec.gov/investor/pubs/inwsmf.htm (last visited Oct. 24, 2016).

[9]     Although the MIST Harris Oakmark International Portfolio has slightly lower total operating expenses than the Oakmark International Fund, this Subadvised Fund is not available to the investing public at large but is rather a variable insurance product reserved for separate account clients of MetLife Insurance Company, who pay additional fees to the sponsoring entity. (*See* Ex. 15, MIST Fund Prospectus at 3 (noting that the total operating expenses "do not reflect the fees, expenses or withdrawal charges imposed by your variable life insurance policy or variable annuity contract")).

Funds, they would have paid *more* in annual fees in almost every instance.[10]

The prospectuses for the Subadvised Funds also illustrate that the funds each have different sponsors, are each a part of a different, branded business proposition, and represent fundamentally different investment products that the sponsoring entities have built to appeal to different types of investors.[11]  Simply put, the public record overwhelmingly demonstrates that the plaintiffs' contentions are false and simplistic, and thus that their comparison is inapt.

By the same token, the public record refutes the plaintiffs' allegations that the services performed by Harris for the advisory and subadvisory fees are "*largely identical*."  Compl. ¶ 142. Harris's role as the Funds' adviser involves management services extending well beyond pure portfolio services that it provides to the Subadvised Funds.  The Complaint concedes that Harris is responsible for "continuing investment supervision of the Funds"; "overall management of the Funds' business affairs"; "administrative services"; "compliance-related services"; regulatory filings; reporting to the Funds' Board; and "oversight" of third-party service providers.  (*Id.* ¶¶ 84, 86, 127).  And the public filings reveal that Harris also provides office space, equipment, and personnel to the Funds, and assumes the expenses of printing and distributing the Funds'

---

[10] Further, unlike the Oakmark Funds, which are "no load" funds that charge no up-front fees from investors, three Subadvised Funds (the Natixis Oakmark Fund, the Natixis U.S. Equity and Opportunities Fund, and the Natixis Oakmark International Fund) are "load" funds that impose a sales charge of 5.75% paid directly from a shareholder's investment.  (Ex. 9, Natixis Funds Prospectus at 17, 21, 25).

[11] For example, like the MIST Harris Oakmark International Portfolio, shares of the MML International Equity Fund are only sold in connection with variable annuity contracts and variable life insurance policies offered by the MassMutual Life Insurance Company.  (Ex. 8, MML Fund Prospectus at 95).  MassMutual has separately branded its variable annuity products, distributes them through completely different channels than Harris employs for its retail mutual funds, accounts for returns and otherwise services shareholders/policyholders separately, provides a different set of reports and communications to shareholders/policyholders, independently complies with regulatory requirements as a mutual fund sponsor as well as an insurance company, and otherwise has committed its capital to build a completely different business than Harris operates.  (*See id.*).  Similarly, the Natixis U.S. Equity Opportunities Fund, the Laudus International MarketMasters Fund, and the Litman Gregory Masters Equity Fund are multi-manager funds that attract investors who seek different investment styles for a mix of multiple subadvisers.  (*See, e.g.*, Ex. 9, Natixis Funds Prospectus at 26).

prospectuses, profiles, and reports to prospective investors. (Ex. 1, 2015 SAI at 16).

Contrary to the allegation that Harris's administrative and compliance-related services are "nowhere specified" and "nowhere distinguished" from the services provided by the Funds' custodian, administrator, and transfer agent, (Compl. ¶ 87), the very agreements with those providers expressly delineate the nature of Harris's services and oversight role.[12] The publicly-filed agreements detail a long list of distinct and critical management services that Harris provides to the Funds in its interaction with these three service providers alone, including monitoring and approving resolution of compliance issues; approving tax positions; validating dividend calculation methodologies; authorizing financial information reports to the Board and shareholders; approving financial statements; coordinating review of and approving annual and semi-annual audits; reviewing and authorizing the filing of SEC Form N-SAR; and monitoring the issuance of shares recorded by the transfer agent, among other services. *See supra* at 7–8. Thus, contrary to the plaintiffs' bald assertions, the responsibilities retained by Harris in connection with the administrative, compliance, regulatory, and reporting services are extensive and amount to far more than "maintaining certain books and records." (Compl. ¶ 123).

The plaintiffs offer nothing but conclusory allegations that the wide-ranging services provided to the Funds are "substantially similar" or "equivalent" to services provided to the Subadvised Funds. (*Id.* ¶¶ 124, 129). As subadviser, Harris provides virtually none of the above services. Rather, Harris is responsible only for conducting portfolio research and securities selection, trade execution, and limited investment-related reporting and compliance assistance for the Subadvised Funds (for which primary advisers remain ultimately responsible). (*See id.* Ex. B). The Subadvised Funds' advisers provide the balance of the services that those funds

---

[12] The Complaint specifically names the relevant agreements. (Compl. ¶ 87). As such, they are incorporated into the Complaint by reference. *See Tellabs*, 551 U.S. at 322.

require, including portfolio monitoring, administrative services, compliance-related services, and oversight of the subadvisers and other third-party service providers.  (*See id.* Ex. A).  The distribution of responsibilities between adviser and subadviser can be summarized as follows:

| Oakmark Funds | Subadvised Funds | |
|---|---|---|
| **Primary Adviser (Harris)** | **Primary Adviser (MassMutual, MetLife, NGAM Advisors, etc.)** | **Subadviser (Harris)** |
| • SEC filings<br>• Shareholder communications<br>• Regulatory/legal compliance<br>• 15(c) process<br>• Third-party service provider oversight<br>• Fund officers & facilities<br>• Portfolio research & securities selection<br>• Portfolio trade execution | • SEC filings<br>• Shareholder communication<br>• Regulatory/legal compliance<br>• 15(c) process<br>• Third-party service provider oversight<br>• Fund officers & facilities | • Portfolio research & securities selection<br>• Portfolio  trade execution<br>• Assistance with compliance |

The public record delineating these services, considered along with the fee comparisons in the chart above, puts the lie to the plaintiffs' fundamental contention that the services Harris performs for the Funds and the Subadvised Funds are "*largely identical*."  (*Id.* ¶ 142).  The plaintiffs allege no facts concerning the underlying costs of Harris's non-portfolio services provided to the Funds or otherwise show that the Subadvised Funds receive the same array of services.  Their effort to equate the fraction of the services Harris provides to the Subadvised Funds with the full suite of services it provides to the Funds accordingly is not plausible, and as a result the comparison is not a sufficient basis for alleging a violation of Section 36(b).[13]  By omitting crucial information from the Complaint and providing instead a misleading illustration

---

[13]      Even if Harris provided the same set of services to the Funds and the Subadvised Funds, which it does not, this would not be enough to state a Section 36(b) claim.  The Supreme Court in *Jones* cautioned that Section 36(b) does not require "fee parity" among all clients and funds.  559 U.S. at 350.  Allegations of a lack of "fee parity" by themselves do not state a plausible claim that the Funds' advisory fees are "so disproportionately large" that they could not have been negotiated at arm's length.  *Id.* at 346.  Indeed, the Court instructed that a trial will be warranted "[o]nly where plaintiffs have shown a large disparity in fees that cannot be explained by the different services *in addition to other evidence that the fee is outside the arm's-length range*."  *Id.* at 350 n.8 (emphasis added).

of comparative fees, the plaintiffs allege nothing about the actual "bargaining range" for the challenged fees.

Recent decisions in two other Section 36(b) cases illustrate that the Complaint's flimsy allegations do not state a claim. In dismissing a claim that the mutual fund adviser charged excessive fees on top of what it paid the subadviser, the Central District of Illinois in *Ingenhutt* refused to credit conclusory allegations concerning comparability of fees paid by other mutual funds where "a review of the judicially noticed materials from the public record reveals that Plaintiffs have not presented a sufficient foundation to find that they are similar enough to be comparable" or made "any effort to compare the services being provided by [the adviser] to those being provided by the chosen comparators." *Ingenhutt*, slip op. at 7. Likewise, the court rejected the plaintiffs' say-so that the adviser's non-portfolio management services (similar to the services the plaintiffs here concede Harris performs for the Funds) were "on their face limited in scope and ministerial." *Id.* at 6. As a result, the court had little trouble concluding that the complaint failed to "demonstrate[] some connection between the services provided and fees charged that could establish fees charged beyond the outer bounds of arm's length bargaining that is plausible rather than merely possible." *Id.* at 8.

The district court's recent trial decision in *Sivolella v. AXA Equitable Life Insurance Co.*, No. 11-CV-4194, 2016 WL 4487857 (D.N.J. Aug. 25, 2016), further confirms that Harris's non-portfolio services provided exclusively to the Oakmark Funds are substantial and – together with the inherent risks that only an adviser bears – can easily justify the Funds' higher fees. *See id.* at *42–43. The *AXA* court rejected the plaintiffs' theory that the similar language of the advisory and subadvisory agreements proved that AXA delegated all its duties to the subadvisers. *Id.* at *34, *46–47. In analyzing which duties were retained by the adviser and which were delegated

-22-

to the subadvisers, the *AXA* court looked beyond the contractual language in the respective service agreements and considered "all duties, whether enumerated in a contract or undertaken in a manner to carry out the contractual duties." *Id.* at *34. The court recognized that "[i]t is not uncommon for sophisticated business entities to come to a more specific understanding of their relationship, and undertake tasks throughout the course of business that may not have been explicitly outlined in a fairly boilerplate agreement." *Id.* at *47. Among the management tasks that the court found AXA performed – and thus justified its portion of the fee – included selection, supervision and management of third party service providers; certain risk management functions; compliance and legal services; and extensive board governance services. *Id.* at *36–47. That *AXA* is a trial decision does not limit its application here as the plaintiffs in this case have already acknowledged that Harris performs these very services for the Oakmark Funds. (*See* Compl. ¶¶ 84, 86, 127). Importantly, the *AXA* court also acknowledged the critical reality that the adviser bears significant risks not borne by any subadviser, including reputational, operational, business, and litigation risks that "justify a portion of the [adviser's] fees charged to investors." 2016 WL 4487857, at *42–43.

In short, the Complaint's threadbare allegations that Harris provides "largely identical" services to the Subadvised Funds as it does to the Funds, and that Harris provides no real services to the Funds beyond portfolio management run headlong into the trio of *Jones* decisions rejecting this very comparison due to the "significant differences" in Harris's services as adviser versus subadviser. *See Jones*, 559 U.S. at 349–50; *Jones*, 611 F. App'x at 361; *Jones*, 2007 WL 627640, at *1. The plaintiffs' barren allegations are contradicted by the public record that establishes the extent of the service differentials in Harris's different roles and demonstrates that on an apt comparison of either total management fees or total operating expenses of the Funds

-23-

and the Subadvised Funds, the Funds' fees are well within the bargaining range.

### C. Comparison of the Fees Charged and Services Provided to the Oakmark Funds and Harris's Separate Account Clients Is Likewise Inapt

The plaintiffs' comparison of the Oakmark Funds' fees to fees paid by Harris's separate account clients not only lacks a factual bearing, but it was definitively rejected in *Jones*. The Supreme Court cautioned that courts "must reject" this very comparison where, as here, there are clear "significant differences" between the services that a mutual fund requires as opposed to private clients, "which are attributable to the greater frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund assets, the more burdensome regulatory and legal obligations, and higher marketing costs." *Jones*, 559 U.S. at 350. The Seventh Circuit on remand in *Jones* likewise discarded this comparison because there was absolutely no evidence that "Harris provided pension funds (and other non-public clients) with the same sort of services that it provided to the Oakmark funds, or that it incurred the same costs when serving different types of clients." *Jones*, 611 F. App'x at 361. Nothing in the Complaint suggests that Harris's services to the separate accounts have changed since they were examined in *Jones* and found to be sufficiently different to render the comparison inapt.

The plaintiffs offer no facts whatsoever about the services Harris actually provides to separate accounts. Tellingly, the exhibits upon which plaintiffs rely to set forth their faulty comparison all leave cells titled "Advisory Services" under the "Funds" and "Strategies" columns completely blank. (*See* Compl. Ex. A1–A7). Instead, the plaintiffs cling to the sole proposition that Harris's portfolio services to the Oakmark Funds are "substantially similar to – and often, exactly identical to" portfolio services provided to the separate accounts. (*Id.* ¶ 121). The Complaint's allegations, however, amount to nothing more than unsupported, conclusory assertions that Harris has "repackaged" for its separate account clients the principal investment

-24-

strategies it provides to the Funds (*id.* ¶ 106); that certain Funds and strategies "are fundamentally similar investment products in design and intent, and differ only in particularized execution" (*id.* ¶ 113); and that similarities between some of the Funds and strategies extend to the provision of "identical, investment positions, portfolios and products" (*id.* ¶¶ 114). That certain portfolio managers and performance figures are alleged to overlap between some of the Funds and separate accounts (*id.* ¶¶ 107–111, 118–120), says very little about the complete array of services Harris provides to different types of clients with different servicing needs.

It is no surprise that the plaintiffs do not offer a factual predicate of comparability, as the services provided to separate accounts and those furnished to the Funds are by their nature not readily analogous. First, the very type of services provided varies depending on the type of client. In addition to the service differentials that the Supreme Court highlighted in *Jones*, even portfolio securities selection and trading services vary among clients. Unlike mutual fund shareholders, separate account clients, for instance, may choose to "have the ultimate decision making and discretionary responsibility" for the determination of which securities are to be purchased and sold, and when. (Ex. 7, 2016 Form ADV Part 2A at 5). Second, minimum account size requirements are vastly higher for separate account clients. For example, U.S. Equity investment strategy private clients have a minimum account size of $3 million, and for institutional clients, the number rises to $10 million. (*Id.* at 7). By contrast, the minimum initial investment for the Funds' retail shares is $1,000. (Ex. 3, 2015 Prospectus at 6, 20, 40). Third, separate accounts are not subject to the same investment guidelines, services,[14] or regulatory protections (*e.g.*, daily net asset value pricing, daily liquidity, Board oversight) provided to

---

[14] For example, investors in Harris's separate accounts do not receive custodial services procured by Harris, and are therefore responsible for independently selecting and retaining a custodian, as well as reviewing quarterly account statements from the custodian. (Ex. 7, 2016 Form ADV Part 2A at 28). Similarly, separate account clients by definition do not require transfer agent services (which relate to purchase and sale of fund shares), thus obviating Harris's oversight of those services for these clients.

mutual fund investors as mandated under the ICA.  Finally, as the Board recognized, Harris undertakes a greater level of responsibility and a broader scope of investment services for the Funds than it does for its separate accounts, including more extensive regulatory, legal, and business risks.  (Ex. 2, 2015 SAR at 73).  That Harris receives a lower fee from separate account clients, therefore, says absolutely nothing about the bargaining range for the Funds' fees.

### D. Comparisons of the Funds' Fees to Fees Paid by Other Mutual Funds Do Not Suggest the Funds' Fees Are Beyond the Arm's-Length Range

The plaintiffs' characterization of the advisory fee rates paid by the Funds as "sharply higher" than fees paid to allegedly similar mutual funds (Compl. ¶ 173) also does not constitute a plausible allegation that the Funds' fees violate Section 36(b) under *Jones*.  Significantly, even taking as true the plaintiffs' assertions that their hand-selected set of comparator funds is representative of the range of arm's-length fees, the fact that the Oakmark Funds' advisory fees are somewhat above average within their supposed peer groups (as calculated by the plaintiffs), does not support a plausible claim that such fees "*could not* have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346 (emphasis added).  As the Seventh Circuit stated in affirming dismissal of the *Jones* plaintiffs' claims, "Harris's fee was comparable to that produced by bargaining at other mutual-fund complexes, *which tells us the bargaining range*."  *Jones*, 611 F. App'x at 361 (emphasis added).  Merely alleging that a given fee is above the median or mean for its peer group does not suggest the fee is beyond arm's-length.  If that were sufficient to state a plausible claim under Section 36(b), plaintiffs would have a free pass at the motion to dismiss stage against at least *half* of the funds in any peer group that necessarily have fees *above* the group's *average* or *median*.  Despite the plaintiffs' flippant characterization of Harris's fees as "outliers" (Compl. ¶ 173) – which implies falling outside the expected range, or being detached from the group – the judicially noticeable facts demonstrate clearly that the Funds' fees are

-26-

within the range of advisory fee rates paid by their other comparable funds as identified by the plaintiffs.

In making their peer group comparison, the plaintiffs would have the Court focus solely on advisory fees and ignore the Funds' expense ratios. The plaintiffs' carefully-crafted Exhibits C1–E2, comprising select information from Bloomberg Finance L.P.'s ("Bloomberg") vast industry database,[15] include a column listing each fund's advisory fee – but omit each fund's total expense ratio, which Bloomberg sets forth. The *reason* the SEC requires total expense ratios to be published, along with the fund's advisory fee (referred to as a "management fee" in the SEC form), is to enable investors to make apples-to-apples comparisons among funds and thereby "to increase investor awareness and understanding of the significance of the costs that they pay in connection with mutual fund investments."[16] The disclosure regulation recognizes that the components of the overall expense may differ among fund sponsors for multiple reasons, including business decisions about how to allocate between those components. *See* Mutual Fund Distribution Fees; Confirmations, S.E.C. Release No. 9128, 2010 WL 2860109, *41 (July 21, 2010) (noting in the context of distribution fees that mutual funds may allocate expenses for the same service to different expense categories and that "[d]ifferent approaches to the same fees do not affect the comparability of fund expense ratios, but will affect the subcategories of the fee

---

[15]     For example, a significant number of the funds with the lowest fees in the plaintiffs' charts are passively managed index funds. (*See* Compl. Exs. C1, C2). *Passively* managed index funds and *actively* managed funds like the Oakmark Funds, however, are not comparable. *See Turner*, 626 F. App'x at 716–17 (dismissing a comparison between an index fund and an actively managed fund because "allegations pertaining to a fund's performance must use mutual funds pursuing similar investment strategies as comparators"); *see also Amron v. Morgan Stanley Inv. Advisors Inc.,* 464 F.3d 338, 344 (2d Cir. 2006) (rejecting a claim that hinged on a comparison of an actively managed fund to an index fund); *In re Franklin Mut. Funds Fee Litig.*, 478 F. Supp. 2d 677, 687 (D.N.J. 2007) (dismissing Section 36(b) complaint because "the allegations pertaining to these Funds' resemblance to index funds does not address the actual services rendered to those Funds").

[16]     Shareholder Reports and Quarterly Portfolio Disclosure of Registered Management Investment Companies, 69 Fed. Reg. 11,244, 11,245 (Mar. 9, 2004).

table"). The SEC accordingly requires total expense disclosure so that investors can make a bottom-line choice between funds with full knowledge of the cost of investing in each. The plaintiffs' calculated decision to omit that critical data appears purposely designed to prevent the court from making precisely the kind of comparison the SEC requires be disclosed to investors.

Comparing the Oakmark Fund to 267 mutual funds categorized by Bloomberg as "U.S. equity large-cap value funds," the plaintiffs state that the Oakmark Fund's investment advisory fee is "above [] average." (Compl. ¶¶ 175, 176). But a review of the expense ratios of those funds tells a more complete and different story.[17] In fact, the average expense ratios of the funds in each of the Funds' purported peer groups, place the Funds' respective expense ratios all *well below the respective means and medians*.[18] (*See* Def.'s Ex. C1 (ranking the Oakmark Fund 83rd out of the 259 funds)). Even when compared to funds with greater than $1 billion in net assets[19] – the subset of mutual funds the plaintiffs have arbitrarily deemed to be a "more apt comparison" – the plaintiffs' comparisons fall short, as the Funds continue to rank below, or hover right at, both the mean and median of these purported comparators.[20] In light of the Bloomberg data

---

[17]    *See* Def.'s Ex. C1 (setting forth the expense ratios of 266 of the 267 mutual funds categorized by Bloomberg as "U.S. large-cap value funds").

[18]    For example, the average expense ratio of the Oakmark Fund's so-designated 266 peer funds is 1.00%, rendering the Oakmark Fund's expense ratio of 0.85% well below the mean and median. (*See* Def.'s Ex. C1 (ranking the Oakmark fund 84th out of the 266 funds)). Ranking 34th out of 117 moderate allocation funds, the Oakmark Equity and Income Fund's expense ratio is well below the median. (*See* Def.'s Ex. D1). Its expense ratio of 0.75% is also well below the average total expense ratio of 0.98% for the 117 funds. (*See id.*). Similarly, the Oakmark International Fund's expense ratio of 0.95% is well below the median, as it ranks 13th of 65 international equity all-cap value funds, and is also well below the mean of 1.22%. (*See* Def.'s Ex. E1).

[19]    In the Complaint's Exhibits C2, D2, and E2, the plaintiffs select a sub-set of comparators, alleged to be each of the Funds' "closest peers," on the sole basis that the funds' net asset size is more than $1 billion. (Compl. ¶¶ 177, 182, 187). The plaintiffs provide no factual basis for their conclusory and baseless allegation that "[s]uch large funds are more closely comparable because they . . . present economies of scale in provision of investment advisory services that often allow for reduced advisory fee rates." *Id.*

demonstrating the total expense ratios of the purported peer groups for the Oakmark Funds, the complete picture – illustrated by the chart below – demonstrates that the Funds' fees are competitive, not that their fees "stand as marked outliers at the extreme end of the entire fee range." (Compl. ¶¶ 179, 184, 189).

| | Oakmark Total Expense Ratio | All Funds | | Funds >$1 billion | |
|---|---|---|---|---|---|
| | | **Mean** | **Median** | **Mean** | **Median** |
| **Oakmark Fund** | 0.85% | 1.00% | 1.01% | 0.81% | 0.85% |
| **Oakmark Equity & Income Fund** | 0.75% | 0.98% | 0.97% | 0.75% | 0.75% |
| **Oakmark International Fund** | 0.95% | 1.22% | 1.19% | 1.00% | 1.01% |

The Fund's Board considered in detail these very comparisons of the Funds' advisory fees to industry peers as part of the 15(c) process. And as reflected in the Funds' public filings – in contrast to the Complaint – the Board's review did not stop with the advisory fees, but also included analysis of the Funds' *expense ratios* and those of "other mutual funds comparable in size, character and investment strategy." (*Id.* ¶¶ 194, 297 (*citing* 2016 SAR at 74)). That analysis involved the Board's consideration of a robust report by an independent industry analyst, Broadridge, comparing the performance and expenses of the Funds to those of competitor funds with similar investment objectives. (*See id.* ¶ 297). After considering the advisory fees *and* expense ratios of the Funds, the Board found that the Oakmark Fund's and the Oakmark Equity and Income Fund's advisory fee is "higher than the median of the Fund's Expense Group," but that "each Fund's total expense ratio, which reflects the total fees paid by

---

[20]    For example, the Oakmark International Fund's total expense ratio of 0.95% remains well below the 1.00% average of the peer funds with more than $1 billion in assets, and is still below the median, ranking 7th of 19 funds. (*See* Def.'s Ex. E2). And a far cry from "outliers," the Oakmark Fund's expense ratio of 0.85% hovers just over the peer group average of 0.81% with a median ranking of 45th of 89 funds, (*see* Def.'s Ex. C2), while the Oakmark Equity and Income Fund's expense ratio of 0.75% falls squarely at the 0.75% group average and median. (*See* Def.'s Ex. D2).

an investor, is lower than the median of each Fund's Expense Group," and that the Oakmark International Fund's "management fee and total expense ratio are lower than the respective medians of the Fund's Expense Group." (*Id.* ¶ 297 (*citing* 2016 SAR at 73–75)).

In any event, the Court need not determine which of these comparisons are the "right" ones for purposes of this motion. What is clear from the foregoing is that the plaintiffs' allegations comparing the Oakmark Funds' advisory fees to a hand-selected group of peer funds – even taken as true – does not establish a plausible claim that Harris's fees are beyond what could have been bargained at arm's length.

### E. Plaintiffs' Recitation of Other *Gartenberg* Factors Provides No Basis for a Conclusion that the Funds' Fees Are Outside the Arm's-Length Range

The plaintiffs import the other "*Gartenberg*" factors into the pleading by advancing conclusory allegations about the nature and quality of Harris's services, profitability, economies of scale, Board independence and conscientiousness, and fall-out benefits. Yet none of their allegations permits an inference that these factors affected the challenged fees at all, much less pushed the fees outside the range that could have been negotiated at arm's length. Accordingly, these allegations do not help the plaintiffs state a viable claim under Section 36(b).

#### 1. *Nature and Quality of Harris's Services*

The plaintiffs' allegations regarding the services Harris provides the Funds are negligible. They characterize the advisory services as "primarily" portfolio securities selection services, and "in comparatively *de minimis* part, [o]ther services," (Compl. ¶ 253), that are defined to consist only of "minor administrative- and compliance-related services" and "periodic reporting" to Fund shareholders and the Board "concerning the Funds' performance." (*Id.* ¶ 73). But that dramatically overgeneralized description of Harris's services flies in the face of the wide array of services set forth in the agreements and public filings referenced above. *See supra* 6–8. The

Semi-Annual Report, for example, details the Board's consideration of the significant complexity involved in managing the Oakmark Funds, (Ex. 12, 2016 SAR at 73–75); the array of investment instruments in which the Funds invest, (*id*. at 6–7, 15–20, 34–35); and the broad suite of services provided by Harris personnel, (*id*. at 73) (*e.g.*, time intensive in-house research, making and executing investment decisions, serving as the fund administrator, and managing a strong compliance program). Despite these public filings being readily available to the plaintiffs, the Complaint lacks allegations relating to the services detailed therein. *Cf. In re Franklin Mut. Funds Fee Litig*., 478 F. Supp. 2d at 687 (dismissing complaint that failed to "address the actual services rendered to [the] Funds").

The Complaint then alleges that Harris's portfolio securities selection services "do not rise to the high level of the advisory fees charged by Harris" and cites to a single piece of evidence: the Funds' short-term, relative underperformance. (Compl. ¶ 259). Not only do the plaintiffs disregard the extensive non-portfolio services Harris provides,[21] but they conveniently ignore the Funds' long-term, 10-year performance, in which each Fund significantly outperformed its stated benchmark. (*See id*. ¶ 261). Notably, the Complaint concedes, and public filings confirm, that the independent trustees were provided extensive information about the nature and quality of Harris's investment advisory services, including independent analyst Broadridge's report about the Funds' short-term and long-term performance as compared to their benchmarks and peers. (*Id*. ¶ 297; Ex. 12, 2016 SAR at 73–74). Given that the plaintiffs' "allegations of underperformance alone are insufficient to prove that an investment adviser's fees are excessive," *Migdal*, 248 F.3d at 327, and that the Board was armed with full information regarding the scope of Harris's services and the Funds' historical investment performance, the

---

[21]    The plaintiffs claim without support that the portfolio securities selection services "are the primary metric" of the quality of Harris's services. (Compl. ¶ 255).

Complaint fails to create a plausible basis from which to conclude that Harris's fees could not have resulted from arm's-length bargaining based on the nature of the services rendered.

### 2. *Profitability*

The plaintiffs allege that because the Funds are "large," have "high" fees, and a narrower "geographic focus" than funds with a "global" investment mandate, they *must* be more profitable to Harris than the other funds Harris advises. (Compl. ¶¶ 271–73). But that is circular. And in all events, it is well-established that such a bare-boned allegation about the size or growth of a fund is not enough to withstand a motion to dismiss. *See, e.g.*, *Amron*, 464 F.3d at 343 (dismissing a Section 36(b) claim and finding plaintiffs' assertions regarding the size of the investment advisory fees "irrelevant to a showing of profitability without some allegation of the corresponding costs incurred in operating the funds"); *Turner v. Davis Selected Advisers, LP*, No. 08-cv-00421-TUC-AWT, 2011 WL 13070408, at *8 (D. Ariz. June 1, 2011), *aff'd*, 626 F. App'x 713 (9th Cir. 2015) (finding the allegation that the fund was "large" insufficient to support an inference that the fund was "excessively profitable" to adviser). Here, the plaintiffs rely on nothing more than their own say-so that the Funds are less expensive to operate than others because Harris's management supposedly requires less research efforts and fewer investment advisory services. (Compl. ¶¶ 273b–273c). And even if the Funds are less expensive to operate, whether one fund is conceivably more profitable to the adviser than another says nothing about the profitability level tipping the Funds' fees into the range beyond what "could" be bargained for at arm's length. The plaintiffs simply have nothing to say about Harris's revenue or the costs incurred by Harris in providing the suite of services detailed above.

Otherwise the plaintiffs merely invoke profitability as a factor and fail to provide a factual link between the degree of profitability of Harris's services and the size of the challenged

fees. Courts have recognized that "Section 36(b) does not prohibit an investment adviser from making a profit, nor does it regulate the level of profit." *In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 WL 5215755, at *50 (C.D. Cal. Dec. 28, 2009) (citing S. Rep. No. 91-184, at 5 (1970), reprinted in 1970 U.S.C.C.A.N. 4897, 4902); *see also Gartenberg*, 694 F.2d at 928 (Senate Report indicated that "a 'cost-plus' type of [advisory] contract is not required"). Indeed, Harris bears risks as the Funds' sponsor, including entrepreneurial, operational, and litigation risks, that alone justify earning profits from the advisory fee. *See* Investment Company Act Amendments of 1967 Hearings, Hearings on H.R. 9510, H.R. 9511 Before the H. Comm. on Interstate and Foreign Commerce, 90th Cong., 1st Sess., 688 (1967) ("We are accepting the fact that [advisers] should have some entrepreneurial profit . . . . We recognize . . . that the creation and the building of a fund does involve certain risks, and that those who are successful are entitled to some reward" beyond "compensation for their services"); *AXA*, 2016 WL 4487857, at *42–43 (acknowledging that the adviser bears significant risks not borne by a subadviser, including reputational, operational, business, and litigation risks that "justify a portion of the [adviser's] fees charged to investors"). Devoid of factual allegations permitting any inference as to Harris's profitability due to its relationship with the Funds, the plaintiffs' invocation of profitability as a factor utterly fails.

### 3.   *Economies of Scale*

The Complaint's conclusory allegations about the Funds' growth in assets under management ("AUM") and presumed economies of scale similarly do not plausibly support an inference that the fees are outside the range of what could have been bargained at arm's length. *See Turner*, 626 F. App'x at 717. First, the plaintiffs plead no *facts* suggesting that economies of scale actually existed. They simply proclaim that "[t]he Funds' sharp growth generated economies of scale for Harris," and assert that Harris "retained for itself the lion's share" of these

presumed economies of scale. (Compl. ¶¶ 199, 200, 208). The plaintiffs fail to offer any factual support for these allegations, other than referencing the Funds' AUM growth statistics. (*See*, *e.g.*, *id.* ¶ 208a). But courts have rejected as "insufficient" plaintiffs' "[m]ere allegations that the fund was 'large' and that there were economies of scale to be realized." *Turner*, 2011 WL 13070408, at *9; *see Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1238 (S.D.N.Y 1990).

Second, the plaintiffs do not, and in fact cannot, allege that Harris failed to share any potential economies of scale with the Funds' shareholders. Indeed, they acknowledge that the Funds' management fee structure employs breakpoints specifically designed to share the benefits of economies of scale with shareholders. (*See* Compl. ¶ 226; *see also* Ex. 1, 2015 SAI at 16; Ex. 12, 2016 SAR at 73, 75). The plaintiffs even concede that breakpoints, like those approved by the Funds' Board, "allow investment advisors to comply with [the Congressional intent] that investment advisors 'reduce their effective charges as the fund grows in size.'" (Compl. ¶ 206 (citation omitted)). Notwithstanding the breakpoints negotiated by the Board with Harris – including the new breakpoints added since summary judgment was granted in Harris's favor in *Jones*[22] – the plaintiffs criticize the Funds' fee schedules for not having additional breakpoints at the plaintiffs' desired levels. (*Id.* ¶¶ 208, 226, 233, 234). But fatal to the Complaint is its failure to provide "any facts to show that these breakpoints are an inadequate means of giving the shareholders benefits of economies of scale." *Turner*, 2011 WL 13070408, at *9. Nor do the plaintiffs "make a substantive allegation regarding the actual transaction costs at issue and whether the costs per investor increased or decreased as the assets under management grew."

---

[22]     *Compare, e.g.*, Ex. 1, 2015 SAI at 16, *with* Ex. 17, Oakmark Funds Statement of Additional Information (Jan. 28, 2016) at 17 ("2016 SAI") (showing new breakpoints added to the Oakmark Fund's advisory fees of 0.62% on assets from $12.5 billion to $25 billion; 0.615% on assets from $25 billion to $35 billion; and 0.610% on assets over $35 billion); *see also* Ex. 2, 2015 SAR at 73 (noting that the Board negotiated new breakpoints to the Oakmark International Fund's advisory fees of 0.790% on assets from $30 billion to $35 billion and 0.785% for assets over $35 billion).

*See Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008). To the contrary, the public filings upon which the plaintiffs rely clearly establish that the Board negotiated, as recently as this year, additional breakpoints for the Oakmark International Fund and the Oakmark Fund in order to reduce Harris's fees "at levels that would come into effect as fund assets continue to grow." (Compl. ¶ 297; Ex. 12, 2016 SAR at 74). Because the Board expressly considered potential economies of scale in its IAA approval process and found "that the breakpoints in the fee schedule for each Fund allow shareholders to benefit from potential economies of scale that may be achieved by [Harris]," (Ex. 12, 2016 SAR at 75), deference to the independent trustees' judgment is warranted. *See Jones*, 559 U.S. at 351.

### 4. *Board Independence and Conscientiousness*

Case law and the public record compel rejection of the plaintiffs' circular allegations that the Board *must have* "lacked adequate conscientiousness" because the trustees approved "excessive" fees. (Compl. ¶¶ 285a, 299). First, this very Board's oversight and fee approval process was evaluated in *Jones* and found to be sufficient. *See Jones*, 2007 WL 627640, at *8. Second, a plaintiff's own classifications of excessiveness do not suffice to support a claim that a board rubberstamped investment management agreement and advisory fees. *See, e.g.*, *Krantz v. Prudential Invs. Fund Mgmt. LLC*, 305 F.3d 140, 143–44 (3d Cir. 2002) (collecting cases). A complaint must do more than allege bald "generalities" about "the frequency with which and amount of time the directors meet throughout the year," *Turner*, 2011 WL 13070408, at *10, the number of other professional responsibilities held by the trustees, *Amron*, 464 F.3d at 345, the compensation paid to the trustees, *id.*, and the materials prepared by the adviser in the 15(c) process, *Migdal*, 248 F.3d at 331. Accordingly, the plaintiffs' contentions that the Board's

-35-

Committee on Contracts[23] met four times during 2015, that the trustees received $200,000 in compensation, and that the information and analyses were prepared by Harris (Compl. ¶¶ 291, 292, 347), are wholly inadequate to form a plausible basis for concluding that Harris's fees could not have resulted from arm's-length bargaining.

The plaintiffs criticize the Semi-Annual Report's *description* and *substance* of the Board's approval process, (*id.* ¶ 312), and characterize the report's language as "self-serving misinformation," (*id.*); "hearsay"; "boilerplate"; and "indicative of a *deficient* fee approval fee procedure[.]" (*Id.* ¶ 299). But such factually unsubstantiated criticisms do nothing to undercut the public filing's weight in demonstrating the Board's thorough review and analysis of the Funds' IAAs. Not only did the Board consider all *Gartenberg* factors, the Funds' performance records, and comparisons of the Funds' performance and fees to those of peer funds provided by an independent data source, but it also negotiated new breakpoints in recent years during its annual 15(c) review. (*See supra* n.22). The Court should thus give deference to the independent trustees' judgment in approving the Funds' advisory fees. *See Jones*, 559 U.S. at 351.

### 5. *Fall-out Benefits*

The plaintiffs seek to allege that Harris receives "fall-out benefits," which are "collateral benefits that accrue to the adviser because of its relationship with the mutual fund." *Id.* at 344 n.5. They again rely on their own say-so that Harris incurs no investment advisory costs and merely copies advisory services developed and paid for by the Funds in managing subadvised funds and separate accounts. (*See* Compl. ¶¶ 277, 278, 279, 281, 334). The Complaint simply notes the existence of these relationships, yet makes no effort to quantify with facts the alleged

---

[23]     The Semi-Annual Report makes clear that the Committee on Contracts "is comprised entirely of trustees who are not 'interested persons' of the Funds as defined in the 1940 Act . . . and more than 75% of the Board is comprised of Independent Trustees." (Ex. 2, 2015 SAR at 72; *see also* Ex. 1, 2015 SAI at 26).

fall-out benefits accruing to Harris or their supposed effect on Harris's fees. Thus, the plaintiffs "necessarily fail[] to establish that such benefits, taken together with other surrounding circumstances, render the advisory fee so disproportionately large as to be beyond the range of what would have been negotiated at arm's-length." *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 495 (S.D.N.Y. 1988) (quotations omitted), *aff'd*, 875 F.2d 404 (2d Cir. 1989).

## II.    SECTION 47(B) PROVIDES NO SEPARATE BASIS FOR A CLAIM

The plaintiffs are not entitled to rescission under Section 47(b) because they failed to state a plausible claim under Section 36(b). Section 47(b) authorizes rescission of a contract made under the ICA only if the contract or performance of that contract involves "a violation of this subchapter." 15 U.S.C. § 80a-46(b)(1). The Complaint's failure to plead a violation of Section 36(b) necessarily dooms the rescission claim. Additionally, the plain language of Section 47(b) makes rescission available only to a "party" to that contract – in this case, Harris Associates Investment Trust and Harris. *See id.* The plaintiffs are not parties to the IAAs, so they lack standing to seek their rescission. *See Turner*, 2011 WL 13070408, at *11 (dismissing Section 47(b) claim because Section 36(b) plaintiff was not standing in the shoes of the fund and was not a party to the challenged advisory agreement); *see also Davis v. Bailey*, No. 05-cv-0042, 2005 WL 3527286, at *6 (D. Colo. Dec. 22, 2005) (rejecting rescission of advisory agreement because "[p]laintiffs were not parties" to it).

## CONCLUSION

For the foregoing reasons, the plaintiffs' Complaint should be dismissed.

Dated:  October 24, 2016        Respectfully Submitted,

/s/ Robert A. Skinner
ROPES & GRAY LLP

John D. Donovan, Jr. (admitted *pro hac vice*)
Robert A. Skinner (admitted *pro hac vice*)
Amy D. Roy (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone:  (617) 951-7000
Facsimile:   (617) 951-0394
john.donovan@ropesgray.com
robert.skinner@ropesgray.com
amy.roy@ropesgray.com

Nicholas M. Berg
191 North Wacker Drive
32nd Floor
Chicago, IL 60606
Telephone:  (312) 845-1200
Facsimile:   (312) 845-5500
Nicholas.Berg@ropesgray.com

*Attorneys for Defendant Harris Associates L.P.*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on the 24th day of October, 2016, true and correct copies of the foregoing were served on all counsel of record via CM/ECF notice of electronic filing.


Dated:  October 24, 2016                               /s/ Robert A. Skinner

Robert A. Skinner (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone:  (617) 951-7000
Facsimile:   (617) 951-0394
robert.skinner@ropesgray.com